# EXHIBIT A

Deposition of Nancy Ng

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE


- - - - - - - - - - - - - - - -     X

UNITED STATES,                      :

      Plaintiff,               :   Case No.

  v.                                :   12-0193

STERLING FOOTWEAR, INC., ALEX       :

NG, and NG BRANDING, LLC,           :

      Defendants.              :

- - - - - - - - - - - - - - - -     X

                      Long Beach, California

                      Monday, November 17, 2014




        Deposition of NANCY NG, a witness herein, called for examination by counsel for Plaintiff, pursuant to Notice, taken at One World Trade Center, Suite 1200, Long Beach, California, beginning at 9:32 a.m. and ending at 1:29 p.m., Monday, November 17, 2014, before Lisa Moskowitz, California CSR No. 10816, RPR.

Page 2

APPEARANCES:

On behalf of the Plaintiff:
MIKKI COTTET, ESQ.
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
National Courts Section
Washington, DC 20530
(202) 353-0897

On behalf of the Defendants:
THOMAS A. FASEL, ESQ.
FASEL LAW
610 Newport Center Drive, Suite 810
Newport Beach, California 92660
(949) 706-3188

On behalf of the Deponent:
JOHN D. EARLY, ESQ.
LAW OFFICES OF JOHN D. EARLY
15333 Culver Drive, Suite 340-141
Irvine, California 92604
(949) 551-2339

Page 3

INDEX

WITNESS

NANCY NG                                   PAGE
  BY MS. COTTET                              7

EXHIBITS

PLAINTIFF'S EXHIBIT NUMBER                 PAGE
1 -  Subpoena, dated 10/20/14               12
2 -  Copy of Driver's License              12
3 -  Copy of Business Cards                30
11 -  Email Chain, dated 7/20/09           57
12 -  Email Chain, dated 7/21/09           57
19 -  Email Chain, dated 11/30/09          69
20 -  Email Chain, dated 11/19/09          57
22 -  Resume                            18

Page 4

LONG BEACH, MONDAY, NOVEMBER 17, 2014
9:32 A.M.

P R O C E E D I N G S

MS. COTTET: I am Mikki Cottet, and I represent the United States in this action, United States vs. Sterling Footwear, Inc., NG Branding, LLC, and Alex Ryan Ng.

Did I pronounce that last name correctly Mr. Fasel?

MR. FASEL: Yes.

MS. COTTET: And this action is currently pending in the United States Court of International Trade.

Good morning, Ms Ng.

THE WITNESS: Good morning.

MS. COTTET: Did I pronounce your last name correctly?

THE WITNESS: That's correct.

MS. COTTET: Thank you. This is your deposition, and I am representing the United States here.

Do you have an attorney present?

THE WITNESS: Yes, I do.

Page 5

MR. EARLY: Mikki, do you want the court reporter to swear her in before you start questioning her?

MS. COTTET: Yes, please.

MR. EARLY: Okay.

MS. COTTET: Thank you.

whereupon,

NANCY NG,

was called as a witness by counsel for Plaintiff and having been duly sworn by the court reporter, was examined and testified as follows:

MS. COTTET: Thanks. I'm trying to account for the delay. But, Mr. Early, can you please identify yourself for the record?

MR. EARLY: My name is John Early, like early in the morning, representing the witness.

MS. COTTET: And, Mr. Fasel, can you identify yourself for the record as well, please?

MR. FASEL: My name is Thomas Fasel. I'm hearing representing the defendants.

MS. COTTET: And that is all three defendants?

MR. FASEL: Correct.

Alderson Reporting Company
1-800-FOR-DEPO

Page 6

MS. COTTET: Thank you, sir.

This deposition is being taken pursuant to the Federal Rules of Civil Procedure, and specifically pursuant to Federal Rules of Civil Procedure 32(d)(3)(A) and (B), meaning that all objections except for those as to form and foundation of questions are preserved until trial. Also, I am specifically requesting that Ms. Ng read and sign the transcript and return it to me.

Is that okay, Mr. Early?

MR. EARLY: Well, there's other parties to the case. I don't mind if you have a stipulation with the defense regarding the handling of the transcript. I'd just like to make sure everyone agrees to it. But that's fine. We'll comply with the Code and any stipulations you two agree to.

MS. COTTET: Very good. I wasn't just referring to the stipulation regarding form and foundation of questions. I was also referring to the reading and signing of the transcript.

Now, Mr. Fasel, do you also agree to those stipulations?

MR. FASEL: I agree.

MS. COTTET: Did I pronounce your name correctly?

Page 7

MR. FASEL: Yes.

MS. COTTET: Okay. Thank you.

EXAMINATION

BY MS. COTTET:

Q. Ms. Ng?

A. Yes.

Q. You are going to receive a copy of the transcript, and I am requesting that you read it and that you make any corrections to it that you see must be made; for instance, if you use a word during this deposition but the transcript provides another word, I would like for you to make corrections to the transcript, or typos and those types of things.

Do you understand?

A. Yes.

Q. Now, Ms. Ng, you are here because you have been identified by the defendants Sterling Footwear, Inc., NG Branding, LLC, and Mr. Alex Ryan Ng as being someone who may know about some of the facts involved in this case.

I want to know what you know; so I am going to ask you questions to which under oath you're going to give me full and complete answers.

Do you understand?

Page 8

A. Yes.

Q. Do you know what a deposition is?

A. Yes.

Q. Can you tell me what you understand it to be?

A. It's a question -- it's a question by the -- questioning by the lawyers --

Q. I'm sorry. Is Mr. Early speaking to you right now?

A. No.

Q. Okay. Please continue.

A. It's a questioning by the opposing lawyers where I'm under oath, and there's a court reporter present.

Q. Okay. So the bottom line is I'm going to ask you questions, and you're going to give me answers.

Do you understand?

A. Yes.

Q. Have you ever had your deposition taken before?

A. No.

Q. Have you ever testified at a trial or a hearing before?

A. No.

Page 9

Q. Now, our reporter gave us certain instructions up front to facilitate her taking this deposition. But I'd like to repeat some of them for you. Our reporter is taking down everything that is being said here today word for word. So you must speak loudly enough for her to hear you and to take down what you say, but also for me to hear you.

Do you understand?

A. Yes.

Q. Sometimes witnesses nod their heads or make hand gestures in response to a question. I can't tell you not to do those things. However, when you answer a question, in addition to doing those things, I request that you actually use words to respond to my questions.

Do you understand?

A. Yes.

Q. Sometimes I get excited and I presume that you might get excited as well during this process. Maybe not. But sometimes it's been my experience that where one or both the questioner and the deponent get excited, we talk over each other. So I'm going to ask you to allow me to finish -- to fully complete my answer before you respond.

Do you understand?

Alderson Reporting Company
1-800-FOR-DEPO

Page 10

A. Yes.

Q. And likewise, I will allow you to complete your answers before I ask another question. Okay?

A. Yes.

Q. If I ask a question and you do not understand my question, let me know, and I'll rephrase it. Okay?

A. Okay.

Q. If you need to take a break for whatever reason, even if that is to speak with your attorney, you may do so.

Do you understand?

A. Yes.

Q. The only caveat to that is if I ask you a question, you must answer my question before you take a break or before you speak with your attorney.

Do you understand?

A. Yes.

Q. Now, under the Federal Rules of Civil Procedure, I'm allowed seven hours to take your deposition. However, I estimate that this deposition will take, at the maximum, four hours. Are you taking any medication that would prevent you from sitting here for four to seven hours?

A. No.

Page 11

MR. EARLY: Mikki, this is John Early.

BY MS. COTTET:

Q. Are you taking any --

MR. EARLY: Mikki, I just wanted to -- you might be getting there. Nancy is actually pregnant. So I don't know if that's going to affect a need for breaks or not, but I just wanted to alert you to that.

MS. COTTET: Thank you very much for alerting me to that. I think that's covered by my prior statement that if she wants to take a break, just let me know, so long as the questions I've asked have been answered. She can take as many breaks as she'd like.

MR. EARLY: Okay.

THE WITNESS: Okay.

BY MS. COTTET:

Q. Okay? And you understand that, Ms. Ng; correct?

A. Yes.

Q. Thank you.

Are you taking any medication that would prevent you from understanding and answering my questions?

A. No.

Page 12

Q. Now, aside from being pregnant, are you under a doctor's care for any other medical conditions that would prevent you from sitting here for about four to seven hours?

A. No.

MS. COTTET: Meredith, can you please hand the witness, Ms. Ng, Exhibit Number 1.

(Exhibit Number 1 was marked for identification.)

BY MS. COTTET:

Q. Ms. Ng, I've had Exhibit Number 1 handed to you. Do you recognize this document?

A. Yes.

Q. Is this a copy of the subpoena that you were served with on October 31st, 2014, at about 7:00 in the morning?

A. Yes.

Q. Thank you.

Meredith, can you hand Ms. Ng a copy of Exhibit Number 2, please.

(Exhibit Number 2 was marked for identification.)

BY MS. COTTET:

Q. Ms. Ng, you've been handed Exhibit Number 2. Is this a copy of your driver's license?

Page 13

A. Yes.

Q. Is this the correct address on the -- is this a correct and current address for you on the driver's license?

A. Yes.

Q. Is that address 132 West Avenue 48, Los Angeles, California 90065?

A. It's 45 instead of 48.

Q. Thank you. Thank you.

Was everything else correct that I stated?

A. Yes.

Q. Ms. Ng, what did you do to prepare for your deposition today?

A. I spoke with my attorney.

Q. When you spoke with your attorney, did you speak to your attorney in person or by phone?

A. By phone.

Q. Was anybody else party to that telephone conversation?

A. No.

Q. Did you also speak with Mr. Fasel?

A. No.

Q. Did you meet with anyone else in connection with your deposition for today?

A. I spoke with Janet, which is the manager.

4 (Pages 10 to 13)

Page 14

Q. Do you know Janet's last name?
A. Huynh.
Q. Can you spell that for the reporter, please?
A. H-u-y-n-h.
Q. When did you speak with Janet Huynh?
A. Yesterday.
Q. Did you call her?
A. Yes.
Q. How long was your conversation?
A. About an hour.
Q. Tell me about the conversation.
A. I just wanted to talk to her about the deposition, whether she received one, and she just told me to tell the truth.
Q. Well, it took you about 15 seconds to tell me that, but your conversation with Ms. Huynh lasted for about an hour. So what was the first thing you said to her when you called her?
A. I asked her if she received the deposition.
Q. And her response to that was?
A. Yes.
Q. You mean the subpoena?
A. Yes. Sorry.
Q. Okay. Oh, no, that's okay. Sometimes these things happen; so it's totally okay. Don't worry

Page 15

about that.
So you asked her if she had received the subpoena, and her answer to that was yes; right?
A. Yes. Yes.
Q. And after you asked her that question, what did you say?
A. I told her that I wasn't sure what the issue was regarding, that I wasn't sure what this was -- what you were going to ask me. I told her that I haven't worked at Sterling for over four years; so I wasn't sure if I was relevant to this case.
Q. Is that all you said?
A. Yes.
Q. Now, what did she say?
A. She said just say what I remembered.
Q. Did you discuss with her what you did at Sterling when you were there?
A. Yes.
Q. When you were employed by Sterling?
A. Yes.
Q. Okay. Tell me about that part of the conversation with Ms. Huynh.
A. We -- before I left, there was some issues with, I believe, classification and duty, and I asked Ms. Huynh if this deposition was in relation to that.

Page 16

Q. What did she say in response?
A. She wasn't sure.
Q. Did you speak with Janet about Mr. Alex Ryan Ng --
A. No.
Q. -- during that conversation?
Did you speak to Mr. Ng about your deposition --
A. No.
Q. -- today?
Did you speak with anybody else who worked at Sterling Footwear, Inc., about your deposition?
A. No.
Q. Did you review any documents in preparation for your deposition today?
A. No.
Q. Now, I just want to go back to your conversation that you had yesterday with Ms. Huynh. You mentioned that during your conversation with her you said -- you asked whether or not this deposition had to do with issues with classification and duties.
What did you mean by that?
A. We had -- we had -- well, Sterling Footwear had received some notice of actions regarding increased duty.

Page 17

Q. I'm listening.
A. That's it.
Q. What did Sterling do with respect to those notices of action regarding increased duties?
A. That's something Alex -- I don't know if Alex resolved that with customs.
Q. But you were aware that notices of action regarding increased duties were sent to Sterling?
A. Yes.
Q. Correct?
A. Yes.
Q. And you were aware of that when you worked for Sterling?
A. Yes.
Q. And you were concerned yesterday when you spoke with Ms. Huynh that this deposition may have to do with those notices of actions regarding increased duties?
MR. EARLY: I object to the form of the question.
You can answer.
THE WITNESS: Yes.
BY MS. COTTET:
Q. You still have to answer, Ms. Ng.
So your answer was yes; correct?

5 (Pages 14 to 17)

Page 18

A. Yes.

Q. This is a good time for me to explain something. I am certain that Mr. Early has provided you with certain guidance as to what can take place at a deposition, but just in case, if I ask you a question, you have to answer my question. I hear objections when they take place. However, you still must answer the question unless you're directed not to, and that -- there are different procedures that Mr. Early and I will deal with regarding that type of situation.

So I don't want you to think I'm disrespecting Mr. Early or Mr. Fasel, should he decide to object. They make their record, and you still have to answer the question, and I'm not going to say anything about their objections during this deposition.

Do you understand?

A. Yes.

Q. Thank you.

Now, I want you to --

Meredith, can you hand Ms. Ng deposition Exhibit Number 22.

(Exhibit Number 22 was marked for identification.)

Page 19

BY MS. COTTET:

Q. So, Ms. Ng, do you recognize Exhibit 22?

A. Yes.

Q. And is this a copy of your résumé?

A. Correct.

Q. Is this a complete résumé?

A. Yes.

Q. So it includes all the jobs that you've had?

A. Yes.

Q. Do you have any other versions of your résumé?

A. No.

Q. So based on your résumé, it appears that you graduated from the University of California, Irvine, in 2004 with a bachelor of arts degree; is that correct?

A. Correct.

Q. What was your major at UC Irvine?

A. Asian literature.

Q. Did you have a minor there, a minor study of concentration?

A. No.

Q. Your first job after graduation was what? What did you do after graduating in 2004?

A. I graduated at the end of 2004. So I was

Page 20

unemployed for six months.

Q. Okay. So your first job was with Oceanland Service, Inc.?

A. Yes.

Q. Were you a customs broker there?

A. Yes.

Q. Do you have a customs broker license?

A. No.

Q. Did you work under a licensed customs broker?

A. Yes.

Q. Who was the licensed customs broker that you worked under at Oceanland Service, Inc.?

A. I don't remember.

Q. Was there more than one licensed customs broker there?

A. I believe so.

Q. Tell me about what you did at Oceanland Service, Inc.

A. It was customer service. I filed entries -- I filed customs entries. I notified the customers once their goods were released, and I dispatched the entries to the trucking companies for delivery.

Q. When you file customs entries, what does that process entail?

Page 21

A. There's a system that each company uses, and so you just enter -- you just enter the information into that system.

Q. Is that a computer system that you're talking about?

A. Yes.

Q. A database?

A. Yes.

Q. So on your résumé it says, "Prepare customs entries from A to Z." What does that mean?

A. So basically in the beginning, we would receive documents from the customers themselves to file the entries. What that includes is a commercial invoice, packing list, arrival notice, or bill of lading. And as soon as you receive that set of documents, we would get the ETA, the estimated arrival of the -- either the steamship or the airline, and we would file the entry according to the date.

Q. Now, when you -- so this is all stuff that you actually did when you worked at Oceanland Services, and when I say "stuff that you actually did," I mean receiving documents from the customer, the commercial invoice, the packing list, the bill of lading, the ETA, and then filing of the entry;

6 (Pages 18 to 21)

Page 22

correct?

A. Correct.

Q. Did you ever make classification decisions when you were at Oceanland Services, Inc.?

A. No.

Q. When you file an entry, the filing of the entry includes a tariff classification provision; correct?

A. Correct.

Q. How was that tariff classification determination made while you were at Oceanland Service, Inc.?

A. It was either provided by the customer themself or a supervisor.

Q. You mean one of your supervisors at Oceanland Service?

A. Correct.

Q. How did you learn to file entries for your job at Oceanland Service?

A. I was trained by an employee, by a co-worker.

Q. Was your co-worker a licensed customs broker?

A. No.

Q. How long were you at Oceanland Service,

Page 23

Inc., as an employee?

A. A little under two years.

Q. And during that -- during that almost two-year period of time, did you have the same position, the same title?

A. Yes.

Q. And you did the same kind of work from the time that you started until the time that you left --

A. Yes.

Q. -- Oceanland Service, Inc.?

While you were there, did you attend any seminars or conferences for customs brokers?

A. No.

Q. So your training solely consisted of being trained on the job by a co-worker?

A. Yes.

Q. Were you required to read any manuals, pamphlets, or books regarding the classification and entry of goods into the United States?

A. No.

Q. Did you do this to educate yourself on your own? And when I say "do this," I mean did you read any pamphlets, manuals, or booklets or any customs publications to educate yourself about classification and entry of goods into the United States?

Page 24

A. No.

Q. Can you tell me why you left Oceanland Service, Inc.?

A. I wanted a bigger growth in the company, and there was no growth. So I decided to apply for a new position elsewhere.

Q. And you got such a position with Expeditors International, Inc.?

A. Correct.

Q. So what was your position at Expeditors International, Inc.?

A. I was an import brokerage customer service rep.

Q. What does that mean?

A. Pretty much the same things that I did at Oceanland, filing entries for a customer, receiving documents, dispatching to truckers.

Q. So just out of curiosity, was this job paying you more than the other job?

A. Yes.

Q. Okay. So your duties and responsibilities with Expeditors were really the same as they had been with Oceanland Service; the only real difference was you got paid more money?

A. Yes.

Page 25

Q. Did you receive any additional training with respect to classification and entry of goods into the United States when you started with Expeditors International, Inc.?

A. No.

Q. Is it fair to say that the kind of work that you did with respect to classification and the entry of goods into the United States when you were at Expeditors International, Inc., was essentially the same kind of work you did when you were with Oceanland Service, Inc.?

A. Yes.

Q. Now, you were only with Expeditors International, Inc., for about a year-and-a-half from March, 2007, to December, 2008. Can you tell me why you left Expeditors International, Inc.?

A. There was a high turnover rate. There was a lot of people leaving with the economy not doing well. And on top of that, my commute to Expeditors was pretty intense at that time. During that year, 2008, my father passed away; so I just wanted to be closer to home.

Q. Where was your job with Expeditors? Where was that located?

A. By the airport. By LAX.

7 (Pages 22 to 25)

Page 26

Q. Now, on your résumé, under Expeditors International, Inc., the last bullet point refers to "obtained proper classification of customs duty," and in parentheses it says "HTS." HTS, what does that stand for?

A. Harmonized Tariff System.

Q. And when -- what do you mean on your résumé by "obtained proper classification of customs duty"?

A. Either we received the classification from the customers, or we had an internal compliance department that we worked with to ensure that the classification was correct.

Q. Now, the internal compliance department at Expeditors International, about how many people worked in that department?

A. I would say about three or four.

Q. Okay. And do you know what the people in the internal compliance department did to ensure the proper classification of goods that were being entered?

A. Not exactly.

Q. Now, did you ever at any time have to compare the customer's classification recommendation with that of the internal compliance department to make sure that the classification the customer

Page 27

recommended was correct?

A. Yes.

Q. Were there ever circumstances where the customer's classification was determined by the internal compliance department at Expeditors to be wrong?

A. Yes.

Q. What happened when there was a disagreement?

A. Usually we went with the customer's classification.

Q. So you would -- Expeditors International would go with the customer classification even if it disagreed with the customer's classification?

MR. EARLY: Objection. Mischaracterized her testimony.

You can answer.

MR. FASEL: Join in that objection.

MS. COTTET: Pardon me?

MR. EARLY: We had a joinder in the objection.

MS. COTTET: Okay. Thank you.

BY MS. COTTET:

Q. Please answer.

A. Well, we went with the customer's classification because we would tell them that they

Page 28

were liable for misclassifying, whereas Expeditors -- if we went with our internal classification, then the company would be liable.

Q. So in 2008 it appears you started working for Sterling Footwear, Inc.; is that correct?

A. Correct.

Q. Ms. Ng, I was thinking that we'd go for another about 13 to 15 minutes before taking a brief break, but I'll leave it to you if you want to take a break now for a few minutes, maybe ten minutes, we could do that too. It's your call.

MR. EARLY: Do you want to take a break? Are you okay?

THE WITNESS: I'm okay.

BY MS. COTTET:

Q. Okay. Cool. I just want to make sure. Please don't hesitate to let me know when you need a break.

A. Okay.

Q. How did you learn of a job opportunity at Sterling Footwear, Inc.?

A. I applied through an online posting.

Q. And do you recall what online site that was?

A. No.

Q. Do you recall what the posting -- the

Page 29

position posted was?

A. No.

Q. After you applied to the online posting, did you have an interview?

A. Yes.

Q. Who interviewed you?

A. Janet.

Q. And this is Janet Huynh, the woman you spoke with yesterday?

A. Correct.

Q. Okay. Did anyone else interview you for this position with Sterling Footwear, Inc.?

A. No.

Q. So how many interviews or how many times did you speak with Ms. Huynh about getting this job?

A. There were at least two in-person interviews.

Q. And where did these two in-person interviews take place?

A. In the office.

Q. And where was that office located?

A. Los Angeles, California.

Q. The interviews that you had with Ms. Huynh that took place in an office in California, was that the same office that you actually ultimately worked

8 (Pages 26 to 29)

Page 30

in for Sterling Footwear, Inc.?

A. Yes.

Q. What was the address of that location that you worked in for about four years?

MR. EARLY: I object. That misstates the testimony.

MR. FASEL: Join in that objection.

MS. COTTET: Oh, I apologize.

BY MS. COTTET:

Q. You haven't worked there for four years. So what was the address of the location where you worked at Sterling Footwear, Inc., from 2008 until the time you ceased to work for Sterling Footwear, Inc.?

A. I don't remember the address exactly.

MS. COTTET: Meredith, can you hand Ms. Ng a copy of -- or hand her Exhibit 3, please.

(Exhibit Number 3 was marked for identification.)

BY MS. COTTET:

Q. Now, Exhibit Number 3 is certainly somewhat blurry. Do you remember having business cards for Sterling Footwear, Inc.?

A. Yes.

Q. And did your business card provide that you were a logistics coordinator at Sterling Footwear,

Page 31

Inc.?

A. Correct.

Q. Was Sterling Footwear, Inc., located at 1501 South Alameda Street, Los Angeles, California?

A. That sounds about right.

Q. Was there a suite number associated with that address?

A. Yes.

Q. Was it B or C?

A. I believe it was B and C.

Q. Okay. Thank you.

MS. COTTET: I think this is a good time for a 10-minute break. And I do believe that we are on schedule to certainly not exceed a four-hour deposition.

(Recess taken from 10:24 a.m. to 10:41 a.m.)

MS. COTTET: All right. We're back on the record. Is everybody ready?

MR. EARLY: Yes.

THE WITNESS: Yes.

MR. FASEL: Yes.

MS. JOHNSON: Yes.

BY MS. COTTET:

Q. Ms. Ng, before we took our break, I was

Page 32

starting to ask you questions about Sterling Footwear, Inc. and your employment there, and I think we left off with you having been interviewed twice in person in the offices of Sterling Footwear, Inc., in Los Angeles.

I'd like to talk to you now more specifically about your employment at Sterling Footwear, Inc. According to your résumé, you started working there in December of 2008; correct?

A. Yes.

Q. Do you remember what day in December you started working there?

A. No.

Q. Okay. Was it early in December or later in December?

A. I don't remember.

Q. Okay. Now, on your résumé it states that you were production and logistics coordinator at Sterling Footwear, Inc.

Is it okay if I just refer to it as Sterling?

A. Yes.

Q. You understand what I'm talking about when I say that?

A. Yes.

Page 33

Q. Thank you.

So what does production and logistics coordinator mean?

A. In terms of production, I worked with the overseas manufacturing side to follow up on status of purchase orders and delivery, and that's where the logistics comes in. Logistics is the delivery and the clearance of goods and delivery to the customer.

Q. What type of business was Sterling Footwear, Inc.?

A. Wholesale.

Q. Wholesale of what?

A. Footwear -- wholesale of footwear.

Q. So Sterling had, according to Exhibit Number 3, which is your business card, as well as that of Janet Huynh's, they had a U.S. office, Ms. Ng?

MR. EARLY: Are you asking her to read from the business card? Because it's illegible. Or are you asking from her own knowledge?

MS. COTTET: Well, it's not illegible with respect to "U.S. office and International Branch."

BY MS. COTTET:

Q. But Ms. Ng, did Sterling Footwear, Inc., have both a U.S. office and an international branch?

9 (Pages 30 to 33)

Page 34

A. I'm not sure of the international branch because I was never -- I never traveled to the international office, but that's what I was told.

Q. Who told you that Sterling had an international branch?

A. Management.

Q. When you say management, who do you mean by management?

A. Janet and Alex.

Q. And that's Janet Huynh and Alex Ryan Ng --

A. Correct.

Q. -- that you're referring to?

A. Yes.

Q. Did you ever have any communications with the international branch by telephone or email?

A. Via email.

Q. Do you recall who you had communications with from the international branch by email?

A. There was various QCs. I don't remember their names.

Q. You said there were various CCs?

A. QCs, quality control.

Q. Okay. The international branch and the people that you communicated with from quality control, where were they located?

Page 35

A. Vietnam.

Q. Was Alex Ryan Ng one of the people that you communicated with via email from the international branch?

A. No.

Q. Okay. Now, what do you know of the quality control folks that worked at the international branch? I mean, what did they do?

A. They went to the factories and they inspected the shoes.

Q. So when you communicated with the quality control people whose names you don't remember -- and it's okay to not remember the names. I'm not pressing you on that. But when you communicated with them regarding quality control issues or matters, what types of matters did you communicate with them about?

A. Production issues, I guess delivery status, sample status.

Q. And these were all issues that fell under your duties and responsibilities as a production and logistics coordinator?

A. Correct.

Q. Now, when you say production issues, can you give me an example of what a production issue was?

Page 36

A. Basically -- basically, I would follow up with the -- a particular order, a particular PO number, to see if there was any issues meaning problem with the design of the shoe, with the color, with the fabric, or any other details of the shoe that they had problems sourcing.

Q. When you say PO number, what do you mean by that?

A. A purchase order number.

Q. Okay. And when you say sourcing, I understand what sourcing means, but I want to understand what you understand it to mean. So what do you mean by "sourcing"?

A. Sourcing meaning sourcing the materials, the materials necessary to make the shoe.

Q. So that means going out and finding materials that are necessary to make the shoes?

A. Correct.

Q. And my understanding of sourcing would be finding materials, comparing prices of materials, the quality of the materials, and then making a decision that these are the materials that we're going to use to satisfy certain purchase orders.

Is that your understanding as well?

A. Yes.

Page 37

Q. Now, you mentioned that as a part of your responsibilities you would deal with quality control regarding sample status. Can you explain to me what you meant by that?

A. I'm sorry?

Q. Sure. You didn't understand my question?

A. Yes.

Q. Earlier I asked you -- and this is a few questions ago -- I asked you what types of matters you dealt with quality control about, and you referred to production issues, delivery status, and sample status.

Do you recall --

A. Yes.

Q. -- telling me that a few minutes ago?

A. Yes.

Q. I saw you nod your head. Okay. Thank you.

So now I just want to know, we just talked about what you meant by production issues. So now I want to understand what you meant by sample status. So can you tell me what you meant by sample status?

A. Well, before production was approved, we would need a sample of perhaps one style of a shoe and to see if the -- to see -- basically to see how the quality of the shoe would come out.

10 (Pages 34 to 37)

Page 38

Q. So these samples would be sent to the United States, to the U.S. office, to be reviewed, inspected for -- to determine whether the sample actually meets the quality necessary to satisfy a purchase order? Is that what you're saying?

A. Correct.

Q. So would Sterling, while you were employed there, receive samples of each style of shoe that was being produced?

A. We received -- I wouldn't say we received every single style, but we would receive most of the styles.

Q. And these styles that you received samples of, you would actually be able to physically inspect whether or not they satisfied an order placed by a customer here in the United States?

A. Yes.

Q. Okay. So I'm going to stop right here for a second and just -- I want to know -- Sterling had manufacturers in Vietnam, is that correct, that it dealt with?

A. Correct.

Q. How many manufacturers did it have in Vietnam, of footwear?

A. I'm aware of three factories.

Page 39

Q. Are you aware of whether or not those three factories were dealing with Sterling or manufacturing footwear for Sterling prior to you working there?

A. I don't know.

Q. Okay. But so while you were working there, you were aware that Sterling worked with three factories?

A. Yes.

Q. And it's three factories in Vietnam, and that's what you're aware of --

A. Correct.

Q. -- correct?

Sterling didn't sell these shoes that it had manufactured by the three factories in Vietnam that you're aware of. It actually sold these shoes to retailers; correct?

A. Correct.

Q. Do you know who dealt with the factories in Vietnam for Sterling?

A. What do you mean by that question?

Q. Well, what I mean by that question is did you deal directly with the factories in Vietnam regarding purchase orders?

A. No.

Q. Do you know who actually did communicate

Page 40

with the factories in Vietnam?

A. Yes.

Q. For Sterling?

A. Yes.

Q. Who was that person?

A. Janet Huynh or Alex Ng.

Q. Now, with respect to the retailers that Sterling sold footwear to, do you know who those retailers were here in the United States?

A. Yes.

Q. And who were they?

A. We actually sold to a distributor named PSDI.

Q. Is that the only distributor you sold to?

A. Yes. That I'm aware of.

Q. Did -- was Ed Hardy shoes a part of that distributor?

A. Yes.

Q. So maybe I didn't say that correctly.

The distributor you sold to, you said it's called PSDI?

A. Correct.

Q. Okay. Do you know what PSDI stands for?

A. No, I don't remember.

Q. Now, some of the shoes that were

Page 41

manufactured and sold to the distributor were for Ed Hardy shoes; is that correct?

A. Correct.

Q. Do you know who else?

A. No.

Q. I'm sorry.

A. No.

Q. Do you know who at Sterling dealt with PSDI?

A. It was me, Janet, and Sonya.

Q. Do you remember Sonya's last name?

A. Wang, W-a-n-g.

Q. Thank you.

Now, when you dealt with PSDI, what exactly did you do with respect to PSDI?

A. We would receive the purchase orders from them and deal with the day-to-day customer service, update them on the status of the order, and notify them of when the order was ready to be delivered, when customs was cleared.

Q. Now, did PSDI request that certain styles be made --

A. Yes.

Q. -- in Vietnam?

They did?

A. Yes.

Alderson Reporting Company
1-800-FOR-DEPO

Page 42

Q. Can you tell me, just walk me through when a request for a certain style is made, what you, Janet, or Sonya or anyone else at Sterling Footwear would do to then communicate that to the factories in Vietnam and get the merchandise to be delivered and sold to PSDI. Can you walk me through that process?

A. Either it was via phone call or email because -- because the factories were in Vietnam, some of the things we couldn't -- some of the things Sonya and I couldn't address because we didn't speak the language; so Janet herself would talk to the factories regarding a particular issue.

Q. How many people worked at Sterling while you were there?

A. Between 10 to 15.

Q. Are you including in the 10 to 15 people Alex Ng?

A. Yes.

Q. So how was Sterling structured in terms of departments? Who did what? Who were supervisors? Who were employees?

A. That was managed by Janet.

Q. So do you recall what title Janet had at Sterling?

A. General manager.

Page 43

Q. Did Janet supervise everybody?

A. Yes.

Q. Were there any managers or supervisors who reported to Janet?

A. Yes.

Q. Who were they?

A. The designer, the sales -- the sales rep.

Q. So there were only two supervisors under Janet?

A. Yes.

Q. Alex Ng wasn't managed by Janet, was he?

A. No.

Q. What was Alex Ng's relationship to Sterling Footwear, Inc.?

A. He's the CEO.

Q. He's also the president; correct?

A. Correct.

Q. And the owner --

A. Yes.

Q. -- of Sterling Footwear, Inc.; correct?

A. Yes.

Q. Did -- while you were there, were there ever office meetings?

A. Yes.

Q. Were office meetings regular, meaning

Page 44

regularly held once a week, once every two weeks, or something like that?

A. No, I don't think so.

Q. How often were there -- were office meetings convened?

A. We would have production meetings for our department occasionally, but it was never formal. It was never a formal sit-down meeting. It was just kind of to discuss any issues or updates.

Q. Now, you just said that you would have production meetings for your department. What department did you work in?

A. Production.

Q. Now, was there a production supervisor?

A. That would be Janet.

Q. How many different departments were there at Sterling?

MR. FASEL: Object as asked and answered.

MR. EARLY: Join.

You can answer.

THE WITNESS: About five.

BY MS. COTTET:

Q. All right. So earlier I asked you who reported to Janet, and you told me the designer and the sales rep; correct?

Page 45

A. Correct.

Q. And those were actually supervisors in their own right, but under Janet; correct?

A. Yes.

Q. So a moment ago I asked you which department you worked for, and you said production. What are the other four departments?

A. Sales, accounting, design, production, and customer service. Yes.

Q. So you worked for production department. Is that the only department that you worked for?

A. Yes.

Q. Did different employees work for each of the different -- the five different departments that you've just identified?

MR. EARLY: Objection. Vague.

You can answer.

THE WITNESS: I'm not sure what you're asking.

BY MS. COTTET:

Q. What I'm asking is did other employees there work for more than one department?

A. Not that I'm aware of.

Q. Okay. So the people who worked for the design department solely worked for the design

Alderson Reporting Company
1-800-FOR-DEPO

Page 46

department. Is that fair to say?

A. Yes.

Q. The people who worked for the production department only worked in the production department. Is that fair to say?

A. Yes.

Q. The people who worked for accounting only worked for accounting. Is that fair to say?

A. Yes.

Q. The people who worked in sales, they only worked in sales and for no other department. Is that fair to say?

A. I believe sales and customer service were kind of hand in hand.

Q. And so is it fair to say that people who worked for sales or customer service could conceivably be doing work for sales or customer service?

A. Correct.

Q. Okay. What were your duties and responsibilities in the production department?

MR. EARLY: Objection. Asked and answered. Go ahead.

BY MS. COTTET:

Q. You can answer.

Page 47

A. Receiving the orders from the customer, sending the orders to overseas, following up with overseas in regards to status and delivery.

Q. Were you also responsible for making classification determination regarding goods that were entered by Sterling Footwear, Inc.?

A. No.

Q. Who was responsible for making classification decisions on entries made by Sterling Footwear, Inc.?

A. Management.

Q. And when you say management, who do you mean by management?

A. Janet or Alex.

Q. Was it a part of your duties and responsibilities to communicate with customs brokers on behalf of Sterling Footwear, Inc.?

A. Yes.

Q. This time you're communicating with them as a customer rather than as a broker -- a customs broker yourself; correct?

A. Correct.

Q. You didn't work in the accounting department at any time while you were at Sterling, did you?

A. No.

Page 48

Q. Did you have any involvement with accounting-type responsibilities, the payment of bills, receipt of a payment, et cetera?

MR. EARLY: Objection. Vague and overbroad. You can answer.

THE WITNESS: No.

BY MS. COTTET:

Q. Who handled receiving payment or making payments on behalf of Sterling Footwear, Inc.?

A. Ty Ngo.

Q. And Ty Ngo -- Ngo is spelled N-g-o?

A. Correct.

Q. Thank you.

And Ty is spelled how, ma'am?

A. T-y.

Q. Thank you.

Do you know, who wrote the check for the employees or for your payment, to pay you?

A. Ty.

Q. Do you know who wrote the check to make payments to U.S. Customs and Border Protection for entries that were made by Sterling?

A. Ty.

Q. Do you know what Ty's title was at Sterling?

A. No.

Page 49

Q. Was he management?

A. Yes.

Q. And when you say that he was management, what do you mean by that?

A. I believe he had access to -- he had access to sign off on the checks, on approving payment.

Q. Were you ever a part of management, Ms. Ng?

A. No.

Q. Were you ever a corporate officer for Sterling Footwear, Inc.?

A. No.

Q. Did you own a part of Sterling Footwear, Inc.?

A. No.

Q. While you were at Sterling, can you tell me what Mr. Ng's day-to-day involvement was with Sterling Footwear, Inc., and the management of that company?

MR. FASEL: I'll object as to vague and ambiguous.

MR. EARLY: Join and add compound. You can answer.

THE WITNESS: He was in and out of the office a lot. Whatever he did, whatever instructions he wanted us to know about, he would convey them to

13 (Pages 46 to 49)

Page 50

Janet and/or Ty.
BY MS. COTTET:
Q. Do you know whether he was made aware of the day-to-day business of Sterling Footwear, Inc.?
MR. EARLY: Objection. Vague and overbroad.
MR. FASEL: Join.
MR. EARLY: You can answer.
THE WITNESS: I'm not sure.
BY MS. COTTET:
Q. Did you ever communicate with Mr. Ng about any issues arising under your duties and responsibilities as an employee there?
A. Yes.
Q. What issues did you discuss with Mr. Ng about while you worked there?
A. Sometimes --
Q. And, I mean, specifically with respect to your duties and responsibilities.
A. Sometimes PSDI would call him directly and ask him -- ask him about the status of a particular shipment, and he would come to me and ask me what's going on, is it delivered, are there any issues.
Q. Did there come a time while -- well, there came a time while you were employed at Sterling Footwear, Inc., where you had communications with

Page 51

U.S. Customs and Border Protection regarding classification on numerous entries; right?
A. Correct.
Q. Do you recall attending a meeting on July 24, 2009, with import specialists from U.S. Customs and Border Patrol with Janet Huynh and Scott Kauffman?
A. I remember attending a meeting.
Q. With import specialists --
A. Yes.
Q. -- from --
A. Yes.
Q. -- customs, with Janet and with Scott Kauffman?
A. Correct.
Q. What do you remember about that meeting?
A. I remember customs --
Q. Let's start off with the -- I'm sorry. I'm sorry to interrupt you.
But how did it come about that you and Janet and Scott Kauffman met with import specialists from customs?
A. I don't remember the exact details.
Q. Okay. Well, let's talk about the meeting itself. What do you remember about the meeting?

Page 52

A. I remember customs telling us that there was some issues with classifications; they were misclassified. And then they gave us a list, a spreadsheet, of all the entries that they wanted us to go back and revise.
Q. And the import specialists with customs also during that meeting stated that additional duties were owed on those entries; correct?
A. Correct.
Q. Okay. After that meeting, what was done to correct the classification of the entries that customs gave a list of?
A. That was something that Janet and Alex went over.
Q. You weren't involved with the discussions that Janet and Alex had with respect to the meeting that you attended with Janet and Scott Kauffman?
A. No, no.
Q. And -- okay.
By the way, you and Mr. Ng have the same last name. You're not related, are you?
A. No.
Q. Are you aware of what Janet and Mr. Ng discussed with respect to the meeting that you and Janet and Scott Kauffman, Sterling's customs broker

Page 53

had with customs' national import specialist?
MR. FASEL: Object as asked and answered.
BY MS. COTTET:
Q. Or import specialists?
A. No.
Q. You can answer the question.
MR. EARLY: She did. She said no.
THE WITNESS: No.
BY MS. COTTET:
Q. Okay. How do you know that Janet and Alex went over the issues with the classifications or misclassifications of the listed entries that customs requested be revised?
MR. FASEL: Objection. Misstates testimony.
MR. EARLY: You can answer.
THE WITNESS: I followed up with her on -- I followed up with Janet to see what Alex wanted to do going forward, and the instructions were just continue doing what we were doing, that he'll take care of the entries.
BY MS. COTTET:
Q. I'm sorry. I misunderstood what you just said at the end.
A. Janet told me that Alex would take care of whatever -- of all the other entries that needed to

Page 54

be revised, that I would just continue doing what I was doing.

Q. Okay.

MS. COTTET: This is a very good time to take a 10-minute break. I probably only have about an hour-and-a-half more discussion that I'd like to have with you or continuation of this deposition, but a 10-minute break for now. Is that okay?

MR. EARLY: That's okay, Mikki. I just want to -- I'll talk to Nancy at the break. Just because of her condition, I want to make sure that if she needs something to eat, that we have time to take care of that.

MR. FASEL: Why don't we just roll it into a lunch now.

MS. COTTET: Okay.

MR. FASEL: If we're going to go another hour and a half.

MS. COTTET: Is this lunchtime for you guys?

MS. JOHNSON: It's 11:30 right now; so we can eat lunch.

MS. COTTET: Pardon me?

MS. JOHNSON: It's 11:30 right now. We can eat lunch if you want.

MS. COTTET: So here's what I wanted to

Page 55

offer. And this is solely up to Ms. Ng and you guys there. We can either take a 10-minute break now and press through for an hour-and-a-half and be done, or we can take a 45-minute break now and then continue. It's really up to you how you would like to do this.

MR. EARLY: Let's go off the record for a moment. We'll all stay here, but we're going to go off the record, if you agree.

MS. COTTET: Sure, sure.

(Lunch recess taken from 11:33 a.m. to 12:31 p.m.)

BY MS. COTTET:

Q. So we are back on the record after our lunch break.

Ms. Ng, before we took our lunch break, we were discussing what took place after you and Janet Huynh met with U.S. Customs and Border Protection on July 29, 2009.

Do you recall us discussing that meeting and what took place afterwards?

MR. EARLY: Well, just to be clear, Mikki, I think she didn't -- she didn't remember the date.

MS. COTTET: Okay. Thank you.

BY MS. COTTET:

Q. Do you recall us discussing your meeting,

Page 56

the meeting that you attended with Janet Huynh, Scott Kauffman, and import specialists from U.S. Customs and Border Protection?

A. Yes.

Q. Okay. And after that meeting, you testified that Janet Huynh spoke with Alex Ng about the meeting; correct?

A. Correct.

Q. You also testified that you followed up with Janet Huynh about that, about her meeting with Alex Ng, and she informed you that Mr. Ng would take care of the issues with customs but wanted you to continue doing what you were doing.

Do you recall testifying to that before the break?

A. Correct.

Q. What did you understand Janet Huynh to be telling you with respect to the "continue doing what you were doing" instruction?

A. Just continue doing my job as I was previously doing.

Q. So what had you previously been doing that Ms. Janet Huynh was instructing you to continue doing?

MR. FASEL: Objection. Asked and answered.

Page 57

BY Ng COTTET:

Q. Please answer.

A. To file the -- to clear customs with the same classification.

Q. So I just heard you say, "to clear customs with the same classification" numbers; is that correct?

A. Correct.

Q. Okay. So can you take a look at --

Meredith, can you hand Ms. Ng Exhibits 11, 12, and 20.

(Exhibit Numbers 11, 12, and 20 were marked for identification.)

BY MS. COTTET:

Q. Ms. Ng, we'll go through each one of these separately.

If you can just let me know when you've completed your review of these documents.

A. I'm ready.

Q. Okay. Very good.

Now, when you refer to clearing customs with the same classification number, is it fair to say that what you meant by that was that you gave the classification numbers to the customs brokers to provide on the entry papers that would be submitted

15 (Pages 54 to 57)

Page 58

to customs?

A. Correct.

Q. Because you didn't actually prepare entry papers of any kind, entry summaries, or submit any of those documents yourself to customs; right?

A. Correct.

Q. Okay. Now, in Exhibit 11 -- I'll just do them one at a time. I apologize but I don't want to confuse the record here. But in Exhibit 11, on the bottom of the first page and going over to the second page, you sent -- you sent an email on July 20, 2009, to Angela Kimbrough and Janet instructing, "Please see attached docs, please clear under 9902.22.51 and 6404.20.4090"; correct?

MR. EARLY: And this is John Early. Could you reread the very first part of that question? I may have misheard the date.

MS. COTTET: The date was Monday, July 20, 2009.

MR. EARLY: Okay. That's fine. I had heard a different date. So we're good.

MS. COTTET: That's all right. I might have said it differently. Thank you.

BY MS. COTTET:

Q. You sent that email; right?

Page 59

A. Yes.

Q. Okay. And just where it says, "Please clear under," those two sets of numbers provided on page 2 of Exhibit 11, those are tariff classification numbers, correct, under the Harmonized Tariff Schedules?

A. Correct.

Q. Okay. And Angela Kimbrough was an international logistics supervisor at A.N. Deringer, Inc.; correct?

A. Correct.

Q. Was Deringer one of the customs brokerage firms that was used by Sterling Footwear, Inc.?

A. Yes.

Q. Okay. Turning to Exhibit 12, on page 1 of Exhibit 12, you're, again, communicating with Angela Kimbrough and Janet.

By the way, was Janet, who is one of the recipients of this email, Janet Huynh?

A. I'm not sure.

Q. It's okay. But, again, in Exhibit Number 12, you again provided the HTS numbers to Angela Kimbrough for purposes of clearing Sterling Footwear's goods through customs; correct?

A. Correct.

Page 60

Q. Now, when you provided these HTS numbers, you were providing them for your customs broker to use them for entering the goods; correct?

A. Yes.

Q. Where did you get the specific numbers to use for entering Sterling Footwear, Inc.'s entries?

A. I'm not sure exactly what these HTS numbers are. I don't know what the duty rate is at this, but we did go over another method to lower the duty rate, which was to apply a textile to the bottom of the soles of the shoes. And I'm not sure if this is the classification that we used. This was discussed with customs as well.

Q. Okay. For right -- pardon me?

A. This process was discussed with customs as well.

Q. I understand.

And the process with customs didn't just involve Sterling Footwear, Inc.'s entries. It also involved NG Branding, LLC's entries; correct?

A. Correct.

Q. Okay. So is it possible that the textile and lowering of the duties could have applied to both companies that you just referred to?

MR. EARLY: I'm just going to object as

Page 61

calling for speculation.

But you can answer.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Or rather, I'll just rephrase the question, and thank you.

Did Sterling and NG Branding, LLC, try to lower their duties in the manner that you discussed a moment ago with respect to textiles and the bottoms?

A. Yes.

Q. Thank you.

Now, turning to Exhibit Number 20, I'm going to refer you three pages in to an email that you sent on July 14, 2009, to Yan of MGL (USA) Inc. Again, did you instruct Yan to clear entries under a specific tariff provision --

A. Yes.

Q. -- for Sterling Footwear, Inc.?

And I'm going to ask you to turn to the fifth page of this document, also an email from you to Yan, July 14, 2009, wherein you specify which HTS heading -- subheadings goods are to be entered under; is that correct?

A. Yes.

Q. Now -- and, again, the seventh page in, you

16 (Pages 58 to 61)

Page 62

sent an email to Alex Lin, L-i-n, again instructing under which HTS subheading entries were to be cleared under; is that correct?

A. Correct.

Q. And finally, on the next page -- actually, I shouldn't say finally, but on the next page, you again, in an email dated July 6, 2009, instructed Alex Lin on which subheadings under the HTS to clear entries under?

A. Yes.

Q. And then finally, I'm going to ask you to turn to the last page of Exhibit Number 20, and the date of an email that you sent to Alex Lin and yyu@mgllax.com. Again, you instructed Mr. Lin under which subheadings to enter Sterling Footwear, Inc.'s entries under; correct?

A. Yes.

Q. All right. Now, a moment ago I asked you where you -- how you came about the classification number. Maybe I didn't express or ask the question in the right way, but -- so I'm going to explain to you what I'm looking -- what I want to ask you and then try to muddle my way through with you.

Earlier you stated that you did not receive any training specifically on entering merchandise

Page 63

under the Harmonized Tariff Schedules of the United States. Am I correct?

A. Correct.

Q. Okay. Have you ever studied the Harmonized Tariff Schedule of the United States?

A. No.

Q. Have you seen the Harmonized Tariff Schedule of the United States?

A. Yes.

Q. Certainly portions of it regarding the classification of footwear?

A. Yes.

Q. Did you make a decision that Sterling Footwear, Inc., footwear should all be classified under subheading 6402.91.40 or any of its subheadings?

A. This was something that was discussed with Janet and Alex prior.

Q. So you discussed which subheadings Sterling Footwear, Inc.'s footwear should be entered under with Janet Huynh and Alex Ng?

A. Correct.

Q. Was that before there were issues regarding Sterling Footwear, Inc.'s entries with customs, or after?

Page 64

A. After.

Q. Now, you had been using -- before your meeting with customs, you had been using the same Harmonized Tariff Schedule subheading to enter Sterling Footwear, Inc.'s goods anyway; correct?

A. That was a classification that was provided before I even started working there.

Q. And that's where I -- that's what I was asking before. And the question I really was trying to get at was: Did you make the decision to use that classification subheading, or did it predate you coming there?

A. It was before my time. Before my employment.

Q. Okay. So you -- okay. And so you continued doing something that Sterling Footwear had been doing before you ever worked there?

A. Yes.

Q. And I'm speaking specifically with respect to instructing brokers and freight forwarders to use specific classification provisions for entering Sterling Footwear, Inc.'s footwear into the United States; correct?

A. Yes.

Q. Now, after your meeting with customs --

Page 65

after your meeting with customs, you were instructed to continue using the same tariff classification provisions; correct?

A. Yes.

Q. And that's what you meant by you were to continue doing what you were doing; correct?

A. Yes.

Q. Now, I'm just curious who instructed you to use that tariff classification the first time? Do you recall?

MR. FASEL: Objection. Objection. Vague and ambiguous as to "first time."

THE WITNESS: Which one? Which classification are you referring to?

BY MS. COTTET:

Q. Well, they all appear to be the same subheading; so I'm saying 9402.91.40, and that's at the eight-digit level. So it appears that you used or instructed your brokers and your freight forwarders to clear all of Sterling Footwear, Inc.'s entries under 6402.91.40.

MR. EARLY: Just to be clear --

MS. COTTET: 40 --

MR. EARLY: Do you want her to go through and look at that? She doesn't remember the numbers

Alderson Reporting Company
1-800-FOR-DEPO

Page 66

off the top of her head.

BY MS. COTTET:

Q. Oh, that's fine. Oh, please do to refresh your recollection. That's why I went through the email -- or the exhibits first. And you can identify each and every classification you instructed brokers and freight forwarders to use.

MR. EARLY: Based on these records. Okay.

MS. COTTET: Sure. Because it's my understanding that she has none of these records of her own.

BY MS. COTTET:

Q. Correct?

A. Correct.

MR. EARLY: Correct.

BY MS. COTTET:

Q. Okay.

MR. EARLY: Go ahead and read all the classification numbers that are in there that are in the documents. That's what she's asking. Just go through and read the numbers that are in the documents.

THE WITNESS: Which one do you want me to start with?

///

Page 67

BY MS. COTTET:

Q. 11.

A. 6404.20.4090.

Q. That's one. Let's look at 12.

A. 6402.91.4010, 6402.91.4050, 6402.91.4061. The others are the same.

Q. Pardon me?

A. The others are the same classification.

Q. Right. Exactly.

So it appears to me that the only difference in the classifications pertain to whether they were in styles ending in quote, unquote "W," styles ending in quote, unquote "M," and styles ending in quote, unquote "K." Is that fair to say?

A. Yes.

Q. Oh, and I'm sorry. There's one more. Samples as well, because in some instances you imported -- or entered -- had samples entered; correct?

A. Correct.

Q. The styles ending in quote, unquote "W," is that a reference to women's footwear?

A. Yes.

Q. And is it fair to say that the ones -- styles ending in quote, unquote "M" were for men's

Page 68

footwear?

A. Yes.

Q. And for the styles ending in quote, unquote "K," those were for children's footwear?

A. Correct.

Q. Okie-dokie.

These were style number -- classification numbers that were used prior to your meeting with customs, Janet Huynh, and Scott Kauffman; correct?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: No.

BY MS. COTTET:

Q. You didn't use these style numbers before that meeting?

A. I believe these were used after the meeting.

Q. Okay. Now, if you were instructed to continue doing what you were doing, is it fair to say that you were also using these style numbers before the meeting with customs?

A. I don't remember.

Q. Okay. Fair enough.

Now, are you aware that the brokerage -- customs brokerage firm that Scott Kauffman worked with, Seattle Logistics, Inc., ceased to do -- ceased to do entries for Sterling Footwear, Inc. --

Page 69

A. Yes.

Q. -- after that meeting that Scott Kauffman attended with you and Janet and the import specialists with customs?

A. Yes.

Q. So I'd like you to take a look at Exhibit Number 19, please.

MS. COTTET: Could you hand Ms. Ng Exhibit Number 19? I don't think you already have it.

MS. JOHNSON: No, not yet.

(Exhibit Number 19 was marked for identification.)

BY MS. COTTET:

Q. Are you ready? Oh, no, she's still reviewing. I'm sorry.

A. No, go ahead.

Q. No, I want you to review it before I start asking you any questions. When you're done, just let me know.

A. No, I'm ready.

Q. Okay. Did you receive an email from Scott Kauffman advising that Seattle Logistics, Inc., was returning the power of attorney to Sterling Footwear and would no longer act as the broker of record for Sterling Footwear?

Page 70

A. Yes.

Q. Do you know why Scott Kauffman and Seattle Logistics, Inc., decided to no longer act as a broker for Sterling Footwear, Inc.?

A. No.

Q. Did Scott Kauffman recommend an attorney to you?

A. I don't recall.

Q. Okay. But you are aware that Seattle Logistics, Inc., and Scott Kauffman terminated their business relationship as a broker for Sterling Footwear, Inc.; correct?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Yes.

MS. COTTET: I'm going to take a ten-minute break, but I think that after that, I'll only be going for a maximum of about 15 minutes. So we're almost done. I just want to look through my files quickly so that it doesn't take her time on the record, if you don't mind.

MR. EARLY: Okay.

MR. FASEL: Yes.

MS. COTTET: Thank you.

(Recess taken from 1:10 p.m. to 1:15 p.m.)

Page 71

MS. COTTET: I just wanted to go on the record and identify my agency counsel who has been assisting in connection with this deposition and has been present for the entirety of it but who I neglected to identify for the record.

So for the record, Meredith A. Johnson, an attorney with the Department of Homeland Security U.S. Customs and Border Protection is the Meredith that I've been referring to during the course of this deposition.

Now, I'm going to resume my questioning.

BY MS. COTTET:

Q. And, again, Ms. Ng, I don't have very many more questions for you, but I do want to wrap things up with a few questions. So are you ready?

A. Yes.

Q. Okay. Now, you did participate in another meeting with customs officials and Mr. Ng, Mr. Ng's attorney at the time, Elon Pollack, and Janet Huynh, didn't you?

THE REPORTER: Counsel, this is the reporter. You kind of broke up when you were identifying Mr. Ng's attorney.

MS. COTTET: Okay. I'm sorry. I didn't realized I broke up. So I'm just going to repeat the

Page 72

question.

THE REPORTER: Thank you.

BY MS. COTTET:

Q. You participated in another meeting with U.S. Customs and Border Protection officials, Mr. Ng, Mr. Ng's attorney, Elon Pollack, and Janet Huynh, didn't you?

A. Yes.

Q. And that meeting pertained to NG Branding, LLC's importations; correct?

A. Yes.

Q. Now, at some point, you stopped working for Sterling Footwear, correct, and started working for NG Branding, LLC --

A. Yes.

Q. -- right?

Were those essentially the same company doing the same kind of business?

MR. FASEL: Objection. Vague and ambiguous.

THE WITNESS: Yes.

BY MS. COTTET:

Q. So they were the same company under different names; correct?

MR. EARLY: Objection to the extent it calls for a legal conclusion.

Page 73

MR. FASEL: Objection. Also vague and ambiguous.

MR. EARLY: You can answer.

THE WITNESS: Correct.

BY MS. COTTET:

Q. Okay. So when you started working for NG Branding, LLC, can you explain to me how the transition was from Sterling Footwear, Inc., to NG Branding, LLC?

A. I don't remember much of a transition. We did come -- we did have new email addresses, but as far as the processes and everything and management and personnel, everybody was the same.

Q. So the location was the same as well?

A. Yes.

Q. And I mean, your offices were the same?

A. Correct.

Q. So did you have the same customers?

A. Yes.

Q. Did you have the same manufacturers in Vietnam, to your knowledge?

A. Yes.

Q. Do you know why the name of the company changed from Sterling Footwear, Inc., to NG Branding, LLC?

Page 74

A. No.

Q. When Sterling Footwear, Inc., became NG Branding, LLC, did you continue to use the same -- or continue to instruct brokers to use the same HTS classification provisions for styles ending in W, ending in M, and ending in K, that you had previously been instructed to use?

A. Yes.

Q. What happened with NG Branding, LLC, and your employment with that company?

A. Ultimately, I was laid off.

Q. Were you the only person laid off?

A. No.

Q. How many of the 15 employees at -- I take that back.

So you stated that it was all the same employees. Were there any additional employees who worked for NG Branding, LLC, that didn't work for Sterling Footwear, Inc.?

A. I believe there were.

Q. Approximately how many?

A. I don't know for sure.

Q. Did NG Branding, LLC, continue to enter footwear just like Sterling had?

A. Yes.

Page 75

Q. How many other employees of NG Branding, LLC, were laid off, to your knowledge, at about the same time that you were laid off?

A. About three.

Q. Were other employees laid off before you were laid off?

A. Yes.

Q. When you were laid off, about how many employees were left at NG Branding, LLC?

A. Before or after?

Q. After.

A. Probably about half.

Q. Do you know how long NG Branding, LLC, continued to do business after you were laid off?

A. No.

Q. When you say NG Branding, LLC, had the same management, are you including within that Janet Huynh and Alex Ng?

A. Yes.

Q. Did Alex Ng own NG Branding, LLC?

A. Yes.

Q. Are you aware of any other persons who owned any part of that company?

A. No, I'm not aware.

Q. Are you aware of there being any other

Page 76

owners of Sterling Footwear, Inc., other than Alex Ng?

A. Not that I'm aware of.

Q. To your knowledge, could Janet Huynh make decisions without Alex Ng?

MR. EARLY: Objection. Vague as to time, as to entity, and calls for speculation.

MR. FASEL: Join.

THE WITNESS: I'm not sure.

BY MS. COTTET:

Q. Okay. Who made decisions as to which brokers to use while you were at Sterling Footwear, Inc.?

A. Janet.

Q. Do you know how often Janet spoke with Alex Ng --

A. No.

Q. -- regarding business matters?

MS. COTTET: Thank you very, very much for your time, Ms. Ng.

This deposition is concluded.

MR. EARLY: Wait one --

MS. COTTET: I will have --

MR. EARLY: I'm sorry, Mikki. Just before we go off, Nancy would like to request her witness

Page 77

fees.

MS. COTTET: She didn't even have to request it. She'll get her witness fees as per the Rules.

MR. EARLY: Okay. I just wanted to make sure we got that. Okay.

MS. COTTET: And that will be the same for each of the other witnesses who are subpoenaed.

MR. EARLY: Okay. But she'll get her mileage? You'll calculate all that? Okay.

MS. JOHNSON: Mileage, parking.

MR. EARLY: Okay.

MS. JOHNSON: Just make sure you submit your receipt for parking.

MS. COTTET: I have to submit that separate after the deposition. I can't get it in advance of.

MR. EARLY: No, that's okay. The Rules require for me to ask for it at the deposition or else it's waived. So that's why I'm asking for it.

MS. COTTET: Cool. Thank you very much, and I expect to hear you ask if you're representing any other people.

MR. EARLY: Okay. As far as the transcript, do you guys -- are we just going to go with the times in the Federal Rules? Do you have any need for an expedited return?

Page 78

MS. COTTET: At this moment in time I do not require an expedited return.

MR. EARLY: Okay.

MS. COTTET: So I'm just -- they're pretty good with the turnaround time. I mean, you can request an expedited return if you want, but I'm not requesting that.

MR. EARLY: Even though my name is early, I think I'll pass on that.

MS. COTTET: All right. Very good.

So what I guess the deposition transcript will be sent to Ms. Ng for review, and I would like for her to read it and sign it and return it.

THE WITNESS: Okay.

MS. COTTET: Okay?

THE WITNESS: Okay.

MS. COTTET: Very good.

And, Mr. Early, you can forward to me the mileage and that sort of stuff.

MR. EARLY: Okay. Sounds good.

MS. COTTET: Very good. Thank you very much everybody. See you tomorrow.

MR. EARLY: Thank you. Bye.

(Whereupon at 1:29 p.m. the taking of the instant deposition ceased.)

Page 79

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____
Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of _____, 2014, and executed the above certificate in my presence.

_____
NOTARY PUBLIC IN AND FOR

_____
County Name

MY COMMISSION EXPIRES:

Page 80

DEPOSITION OFFICER'S CERTIFICATION

I, Lisa Moskowitz, a Certified Shorthand Reporter in the State of California, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me.

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed.

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney or of any of the parties, nor financially interested in the action.

I declared under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this date: November 23, 2014.

_____

LISA MOSKOWITZ, CA CSR No. 10816
Registered Professional Reporter

Alderson Reporting Company
1-800-FOR-DEPO

## A

**able** 38:14
**abovenamed** 79:14
**access** 49:5,5
**account** 5:14
**accounting** 45:8 46:7,8 47:23
**accountingtype** 48:2
**accurate** 79:5
**act** 69:24 70:3
**action** 4:7,13 17:4,7 80:16
**actions** 16:24 17:17
**add** 49:21
**addition** 9:13
**additional** 25:1 52:7 74:17
**additions** 79:6
**address** 13:2,3,6 30:3,11,14 31:7 42:10
**addresses** 73:11
**advance** 77:15
**advising** 69:22
**affect** 11:6
**agency** 71:2
**ago** 37:9,15 45:5 61:9 62:18
**agree** 6:16,21,23 55:8
**agrees** 6:15
**ahead** 46:23 66:18 69:16
**airline** 21:18
**airport** 25:25
**alameda** 31:4
**alert** 11:7
**alerting** 11:10
**alex** 1:7 4:9 7:19 16:3 17:5,6 34:9,10 35:2 40:6 42:17

43:11,13 47:14
52:13,16 53:10
53:17,24 56:6
56:10 62:1,8
62:13 63:18,21
75:18,20 76:1
76:5,15
**allow** 9:23 10:2
**allowed** 10:20
**ambiguous** 49:20 65:12 72:19 73:2
**angela** 58:12 59:8,16,23
**angeles** 13:7 29:22 31:4 32:5
**answer** 9:13,24 10:15 15:3 17:21,24,25 18:6,8,15 27:16,23 44:20 45:17 46:25 48:5 49:22 50:7 53:6,15 57:2 61:2 73:3
**answered** 11:13 44:18 46:22 53:2 56:25 68:10 70:13
**answering** 11:23
**answers** 7:24 8:17 10:3
**anybody** 13:18 16:11
**anyway** 64:5
**apologize** 30:8 58:8
**appear** 65:16
**appearances** 2:1
**appeared** 79:15
**appears** 19:13 28:4 65:18 67:10
**applied** 28:22

29:3 60:23
**apply** 24:5 60:10
**approved** 37:22
**approving** 49:6
**approximately** 74:21
**arising** 50:11
**arrival** 21:14,17
**arts** 19:15
**asian** 19:19
**aside** 12:1
**asked** 11:12 14:19 15:2,5 15:24 16:20 37:8,9 44:18 44:23 45:5 46:22 53:2 56:25 62:18 68:10 70:13
**asking** 33:18,20 45:19,21 64:9 66:20 69:18 77:18
**assisting** 71:3
**associated** 31:6
**attach** 79:7
**attached** 58:13
**attend** 23:11
**attended** 52:17 56:1 69:3
**attending** 51:4,8
**attorney** 4:24 10:10,16 13:14 13:15,16 69:23 70:6 71:7,19 71:23 72:6 80:15
**avenue** 13:6
**aware** 17:7,12 38:25 39:1,6 39:10,15 40:15 45:23 50:3 52:23 68:22 70:9 75:22,24 75:25 76:3

## B

**b** 3:8 6:5 31:9,10
**bachelor** 19:15
**back** 16:17 31:18 52:5 55:13 74:15
**based** 19:13 66:8
**basically** 21:11 36:1,1 37:24
**beach** 1:11,18 2:15 4:1
**beginning** 1:18 21:11
**behalf** 2:3,11,18 47:17 48:9
**believe** 15:24 20:17 31:10,13 46:13 49:5 68:15 74:20
**bigger** 24:4
**bill** 21:14,24
**bills** 48:3
**blurry** 30:21
**booklets** 23:23
**books** 23:18
**border** 48:21 51:1,6 55:17 56:3 71:8 72:5
**bottom** 8:15 58:10 60:10
**bottoms** 61:9
**branch** 33:22,25 34:1,5,15,18 34:23 35:4,8
**branding** 1:8 4:8 7:19 60:20 61:7 72:9,14 73:7,9,24 74:3 74:9,18,23 75:1,9,13,16 75:20
**break** 10:9,16 11:11 28:9,10 28:12,18 31:13

31:25 54:5,8
54:10 55:2,4
55:14,15 56:15
70:16
**breaks** 11:7,13
**brief** 28:8
**broke** 71:22,25
**broker** 20:5,7,10 20:12,16 22:23 47:20,21 52:25 60:2 69:24 70:3,11
**brokerage** 24:12 59:12 68:22,23
**brokers** 23:12 47:16 57:24 64:20 65:19 66:6 74:4 76:12
**bullet** 26:2
**business** 3:12 30:21,24 33:9 33:15,19 50:4 70:11 72:18 75:14 76:18
**bye** 78:23

## C

**c** 4:4 31:9,10
**ca** 80:23
**calculate** 77:9
**california** 1:11 1:18,20 2:15 2:22 13:7 19:14 29:22,24 31:4 80:4,18
**call** 14:7 28:11 42:7 50:19
**called** 1:16 5:10 14:18 40:21
**calling** 61:1
**calls** 72:24 76:7
**cant** 9:11 77:15
**card** 30:24 33:15,19

cards 3:12 30:21
care 12:2 53:20
    53:24 54:13
    56:11
case 1:5 6:12
    7:21 15:11
    18:5
caveat 10:14
ccs 34:21
ceased 30:13
    68:24,24 78:25
center 1:17 2:14
ceo 43:15
certain 9:1 18:3
    18:4 36:23
    41:20 42:2
certainly 30:20
    31:14 63:10
certificate 79:1
    79:16
certification
    80:1
certified 80:3
certify 79:3,13
    80:4,14
cetera 48:3
chain 3:13,14,15
    3:16
changed 73:24
check 48:17,20
checks 49:6
childrens 68:4
circumstances
    27:3
civil 6:3,4 10:19
classification
    15:24 16:21
    22:3,7,10
    23:18,24 25:2
    25:7 26:3,8,9
    26:12,19,23,25
    27:4,10,12,13
    27:25 28:2
    47:5,9 51:2
    52:11 57:4,6

57:22,24 59:4
60:12 62:19
63:11 64:6,11
64:21 65:2,9
65:14 66:6,19
67:8 68:7 74:5
classifications
    52:2 53:11
    67:11
classified 63:14
clear 55:21 57:3
    57:5 58:13
    59:2 61:15
    62:8 65:20,22
clearance 33:8
cleared 41:19
    62:2
clearing 57:21
    59:23
closer 25:22
code 6:16
color 36:4
com 62:14
come 37:25
    50:21,23 51:20
    73:11
comes 33:7
coming 64:12
commercial
    21:13,24
commission
    79:25
communicate
    35:16 39:25
    42:4 47:16
    50:10
communicated
    34:24 35:3,11
    35:14
communicating
    47:19 59:16
communicatio...
    34:14,17 50:25
commute 25:19
companies

20:23 60:24
company 21:1
    24:4 28:3
    49:18 72:17,22
    73:23 74:10
    75:23
compare 26:23
comparing
    36:20
complete 7:24
    9:24 10:2 19:6
completed 57:18
compliance
    26:10,13,18,24
    27:5
comply 6:15
compound
    49:21
computer 21:4
conceivably
    46:17
concentration
    19:21
concerned 17:15
concluded 76:21
conclusion
    72:25
condition 54:11
conditions 12:3
conferences
    23:12
confuse 58:9
connection
    13:23 71:3
consisted 23:14
continuation
    54:7
continue 8:11
    53:19 54:1
    55:4 56:12,18
    56:20,23 65:2
    65:6 68:17
    74:3,4,23
continued 64:15
    75:14

control 34:22,25
    35:7,12,15
    37:2,10
convened 44:5
conversation
    13:19 14:9,11
    14:16 15:22
    16:6,18,19
convey 49:25
cool 28:16 77:19
coordinator
    30:25 32:18
    33:3 35:22
copy 3:11,12 7:8
    12:14,19,25
    19:4 30:16
corporate 49:9
correct 4:20
    5:25 11:19
    13:2,3,10
    17:10,25 19:5
    19:16,17 22:1
    22:2,8,9,17
    24:9 26:12
    27:1 28:5,6
    29:10 31:2
    32:9 34:11
    35:23 36:18
    38:6,20,22
    39:11,12,16,17
    40:22 41:2,3
    43:16,17,20
    44:25 45:1,3
    46:19 47:21,22
    48:12 51:3,15
    52:8,9,11 56:7
    56:8,16 57:7,8
    58:2,6,14 59:5
    59:7,10,11,24
    59:25 60:3,20
    60:21 61:23
    62:3,4,16 63:2
    63:3,22 64:5
    64:23 65:3,6
    66:13,14,15

67:19,20 68:5
68:9 70:12
72:10,13,23
73:4,17 80:12
80:19
corrections 7:10
    7:13 79:6
correctly 4:10
    4:19 6:25
    40:19
cottet 2:4 3:4 4:6
    4:6,13,18,21
    5:4,6,14,19,23
    6:1,17,24 7:2,5
    11:2,9,17 12:6
    12:10,23 17:23
    19:1 27:18,21
    27:22 28:15
    30:8,9,15,19
    31:12,18,24
    33:21,23 44:22
    45:20 46:24
    48:7 50:2,9
    53:3,9,21 54:4
    54:16,19,22,25
    55:9,12,23,24
    57:1,14 58:18
    58:22,24 61:4
    65:15,23 66:2
    66:9,12,16
    67:1 68:12
    69:8,13 70:15
    70:23 71:1,12
    71:24 72:3,21
    73:5 76:10,19
    76:23 77:2,6
    77:14,19 78:1
    78:4,10,15,17
    78:21
couldnt 42:9,10
counsel 1:16
    5:10 71:2,21
county 79:23
course 71:9
court 1:1 4:14

5:1,11 8:13
**courts** 2:7
**covered** 11:10
**coworker** 22:21
22:22 23:15
**csr** 1:21 80:23
**culver** 2:21
**curiosity** 24:18
**curious** 65:8
**current** 13:3
**currently** 4:13
**customer** 20:20
21:23 22:13
24:12,16 26:25
27:12 33:8
38:16 41:16
45:9 46:13,16
46:17 47:1,20
**customers** 20:21
21:12 26:10,23
27:4,9,13,24
73:18
**customs** 17:6
20:5,7,9,12,15
20:21,24 21:9
22:22 23:12,23
26:3,8 41:19
47:16,20 48:21
51:1,6,13,17
51:22 52:1,6
52:12,25 53:1
53:12 55:17
56:2,12 57:3,5
57:21,24 58:1
58:5 59:12,24
60:2,13,15,18
63:24 64:3,25
65:1 68:9,19
68:23 69:4
71:8,18 72:5

— **D** —
**d** 2:19,20 3:1 4:4
6:5
**database** 21:7

**date** 21:19 55:22
58:17,18,21
62:13 80:20
**dated** 3:10,13,14
3:15,16 62:7
80:20
**day** 32:11 79:15
**daytoday** 41:16
49:16 50:4
**dc** 2:8
**deal** 18:10 37:2
39:22 41:16
**dealing** 39:2
**dealt** 37:10
38:21 39:18
41:8,13
**december** 25:15
32:9,11,14,15
**decide** 18:14
**decided** 24:5
70:3
**decision** 36:21
63:13 64:10
**decisions** 22:3
47:9 76:5,11
**declared** 80:17
**defendants** 1:9
2:11 5:22,24
7:18
**defense** 6:13
**degree** 19:15
**delay** 5:15
**delivered** 41:18
42:5 50:22
**delivery** 20:23
33:6,7,8 35:18
37:11 47:3
**department** 2:5
26:11,13,15,18
26:24 27:5
44:7,11,12
45:5,10,11,22
45:25 46:1,4,4
46:11,21 47:23
71:7

**departments**
42:20 44:16
45:7,14
**deponent** 2:18
9:22 79:1,11
**deposition** 1:15
4:22 6:2 7:12
8:2,20 9:3
10:21,21 13:13
13:24 14:13,19
15:25 16:8,12
16:15,20 17:16
18:5,17,22
31:15 54:7
71:3,10 76:21
77:15,17 78:11
78:25 80:1
**deringer** 59:9,12
**design** 36:4 45:8
45:25,25
**designer** 43:7
44:24
**details** 36:5
51:23
**determination**
22:11 47:5
**determine** 38:3
**determined** 27:4
**didnt** 37:6 39:13
40:19 42:10
47:23 55:22,22
58:3 60:18
62:20 68:13
71:20,24 72:7
74:18 77:2
**difference** 24:23
67:10
**different** 18:9
44:16 45:13,14
45:14 58:21
72:23
**differently**
58:23
**directed** 18:8
**directly** 39:22

50:19
**disagreed** 27:13
**disagreement**
27:8
**discuss** 15:16
44:9 50:14
**discussed** 52:24
60:12,15 61:8
63:17,19
**discussing** 55:16
55:19,25
**discussion** 54:6
**discussions**
52:15
**dispatched**
20:22
**dispatching**
24:17
**disrespecting**
18:13
**distributor**
40:12,14,17,20
41:1
**docs** 58:13
**doctors** 12:2
**document** 12:12
61:20
**documents**
16:14 21:12,16
21:23 24:17
57:18 58:5
66:20,22
**doesnt** 65:25
70:19
**doing** 9:13 25:18
46:17 53:19,19
54:1,2 56:13
56:13,18,19,20
56:21,22,24
64:16,16 65:6
65:6 68:17,17
72:18
**dont** 6:12 11:6
14:25 17:5
18:12 20:14

28:17 30:14
32:16 34:19
35:12 39:4
40:24 44:3
51:23 54:14
58:8 60:8
68:20 69:9
70:8,20 71:13
73:10 74:22
**drive** 2:14,21
**drivers** 3:11
12:25 13:4
**duly** 5:11
**duties** 16:21
17:4,8,18
24:21 35:21
46:20 47:15
50:11,18 52:7
60:23 61:8
**duty** 15:24
16:25 26:3,8
60:8,9

— **E** —
**e** 3:1,8 4:4,4
**earlier** 37:8
44:23 62:24
**early** 2:19,20 5:1
5:5,15,17,17
5:18 6:10,11
8:8 11:1,1,4,15
17:19 18:3,10
18:13 27:14,19
28:12 30:5
31:20 32:14
33:18 44:19
45:16 46:22
48:4 49:21
50:5,7 53:7,15
54:9 55:6,21
58:15,15,20
60:25 65:22,24
66:8,15,18
70:21 72:24
73:3 76:6,22

76:24 77:4,8
77:11,16,22
78:3,8,8,18,20
78:23
eat 54:12,21,24
economy 25:18
ed 40:16 41:1
educate 23:21
23:24
eightdigit 65:18
either 21:17
22:13 26:9
42:7 55:2
elon 71:19 72:6
email 3:13,14,15
3:16 34:15,16
34:18 35:3
42:7 58:11,25
59:19 61:13,20
62:1,7,13 66:5
69:21 73:11
employed 15:19
38:7 50:24
employee 22:20
23:1 50:12
80:15
employees 42:21
45:13,21 48:18
74:14,17,17
75:1,5,9
employment
32:2,7 64:14
74:10
ensure 26:11,18
entail 20:25
enter 21:2,2
62:15 64:4
74:23
entered 26:20
47:6 61:22
63:20 67:18,18
entering 60:3,6
62:25 64:21
entirety 71:4
entity 76:7

entries 20:20,21
20:23,24 21:10
21:13 22:18
24:16 47:9
48:22 51:2
52:4,8,11
53:12,20,25
60:6,19,20
61:15 62:2,9
62:16 63:24
65:21 68:25
entry 21:18,25
22:6,7 23:19
23:25 25:2,7
57:25 58:3,4
esq 2:4,12,19
essentially 25:9
72:17
estimate 10:21
estimated 21:16
et 48:3
eta 21:16,25
everybody 31:19
43:1 73:13
78:22
exact 51:23
exactly 26:21
30:14 41:13
60:7 67:9
examination
1:16 7:4 80:9
examined 5:12
79:3
example 35:25
exceed 31:14
excited 9:18,19
9:22
executed 79:16
exhibit 3:9 12:7
12:8,11,20,21
12:24 18:23,24
19:2 30:16,17
30:20 33:14
57:12 58:7,9
59:4,15,16,21

61:12 62:12
69:6,8,11
exhibits 57:10
66:5
expect 77:20
expedited 77:25
78:2,6
expeditors 24:7
24:10,22 25:3
25:9,13,16,19
25:23 26:1,14
27:5,11 28:1
experience 9:20
expires 79:25
explain 18:2
37:3 62:21
73:7
express 62:20
extent 72:24

_____
F
_____

fabric 36:5
facilitate 9:2
factories 35:9
38:25 39:2,7,9
39:14,18,22
40:1 42:4,8,12
facts 7:20
fair 25:6 46:1,5
46:8,12,15
57:22 67:14,24
68:17,21
far 73:12 77:22
fasel 2:12,13
4:11,12 5:19
5:21,21,25
6:21,23 7:1
13:21 18:13
27:17 30:7
31:22 44:18
49:19 50:6
53:2,14 54:14
54:17 56:25
65:11 68:10
70:13,22 72:19

73:1 76:8
father 25:21
federal 6:3,4
10:19 77:24
feel 79:6
fees 77:1,3
fell 35:20
fifth 61:20
file 20:24 21:13
21:18 22:6,18
57:3
filed 20:20,21
files 70:18
filing 21:25 22:6
24:16
finally 62:5,6,11
financially
80:16
finding 36:16,20
fine 6:15 58:20
66:3
finish 9:23
firm 68:23
firms 59:13
first 14:17 19:23
20:2 58:10,16
65:9,12 66:5
five 44:21 45:14
folks 35:7
follow 33:5 36:1
followed 53:16
53:17 56:9
following 47:2
follows 5:12
footwear 1:7 4:8
7:18 16:12,23
28:5,21 29:12
30:1,12,13,22
30:25 31:3
32:2,4,8,19
33:9,13,13,24
38:24 39:3
40:8 42:3
43:14,20 47:6
47:10,17 48:9

49:10,12,17
50:4,25 59:13
60:6,19 61:18
62:15 63:11,14
63:14,20,20,24
64:5,16,22,22
65:20 67:22
68:1,4,25
69:23,25 70:4
70:12 72:13
73:8,24 74:2
74:19,24 76:1
76:12
footwears 59:24
foregoing 79:4
80:5,12,19
form 6:6,18
17:19
formal 44:7,8
forth 80:6
forward 53:18
78:18
forwarders
64:20 65:20
66:7
foundation 6:6
6:19
four 10:22,24
12:4 15:10
26:16 30:4,10
45:7
fourhour 31:14
freight 64:20
65:19 66:7
front 9:2
full 7:24
fully 9:24
further 80:14

_____
G
_____

g 4:4
general 42:25
gestures 9:11
getting 11:5
29:15

**give** 7:24 8:16
  35:25
**given** 79:5
**go** 16:17 27:12
  28:7 46:23
  52:5 54:17
  55:6,7 57:15
  60:9 65:24
  66:18,20 69:16
  71:1 76:25
  77:23
**going** 7:8,22,23
  8:15,16 9:23
  11:6 15:9
  18:15 36:16,22
  38:18 50:22
  53:18 54:17
  55:7 58:10
  60:25 61:12,19
  62:11,21 70:15
  70:17 71:11,25
  77:23
**good** 4:16,17
  6:17 18:2
  31:12 54:4
  57:20 58:21
  78:5,10,17,20
  78:21
**goods** 20:22
  23:19,25 25:2
  25:8 26:19
  33:8 47:5
  59:24 60:3
  61:22 64:5
**graduated** 19:14
  19:25
**graduating**
  19:24
**graduation**
  19:23
**growth** 24:4,5
**guess** 35:18
  78:11
**guidance** 18:4
**guys** 54:19 55:1

77:23

———————
**H**
———————
**h** 3:8
**half** 54:18 75:12
**hand** 9:11 12:6
  12:19 18:22
  30:15,16 46:14
  46:14 57:10
  69:8
**handed** 12:11,24
**handled** 48:8
**handling** 6:13
**happen** 14:25
**happened** 27:8
  74:9
**hardy** 40:16
  41:2
**harmonized**
  26:6 59:5 63:1
  63:4,7 64:4
**havent** 15:10
  30:10
**head** 37:17 66:1
**heading** 61:22
**heads** 9:10
**hear** 9:6,7 18:6
  77:20
**heard** 57:5
  58:20
**hearing** 5:22
  8:24
**held** 44:1
**hell** 53:19
**heres** 54:25
**hes** 43:15,16
**hesitate** 28:17
**high** 25:17
**home** 25:22
**homeland** 71:7
**hour** 14:10,17
  54:18
**hourandahalf**
  54:6 55:3
**hours** 10:20,22

10:24 12:4
**hts** 26:4,4 59:22
  60:1,7 61:21
  62:2,8 74:4
**huynh** 14:2,4,5
  14:16 15:22,25
  16:18 17:16
  29:8,15,23
  34:10 40:6
  51:6 55:17
  56:1,6,10,17
  56:23 59:19
  63:21 68:9
  71:19 72:6
  75:17 76:4
**huynhs** 33:16

———————
**I**
———————
**id** 6:14 9:3 32:6
  54:6 69:6
**identification**
  12:9,22 18:25
  30:18 57:13
  69:12
**identified** 7:18
  45:15
**identify** 5:16,20
  66:5 71:2,5
**identifying**
  71:23
**ill** 10:6 28:9
  49:19 54:10
  58:7 61:5
  70:16 78:9
**illegible** 33:19
  33:21
**im** 5:14,21 8:8
  8:13,15 9:23
  10:20 17:1
  18:12,15 28:14
  32:23 34:1
  35:13 37:5
  38:18,25 40:15
  41:6 45:18,21
  45:23 50:8

51:18,18 53:22
  57:19 59:20
  60:7,11,25
  61:12,19 62:11
  62:21,22 64:19
  65:8,17 67:16
  69:15,20 70:15
  71:11,24,25
  75:24 76:3,9
  76:24 77:18
  78:4,6
**import** 24:12
  51:5,9,21 52:6
  53:1,4 56:2
  69:3
**importations**
  72:10
**imported** 67:18
**includes** 19:8
  21:13 22:7
**including** 42:16
  75:17
**increased** 16:25
  17:4,8,17
**individual** 79:13
  79:14
**information**
  21:2
**informed** 56:11
**inperson** 29:16
  29:18
**inspect** 38:14
**inspected** 35:10
  38:2
**instance** 7:11
**instances** 67:17
**instant** 78:25
**instruct** 61:15
  74:4
**instructed** 62:7
  62:14 65:1,8
  65:19 66:6
  68:16 74:7
**instructing**
  56:23 58:12

62:1 64:20
**instruction**
  56:19
**instructions** 9:2
  49:24 53:18
**intense** 25:20
**interested** 80:16
**internal** 26:10
  26:13,18,24
  27:5 28:2
**international**
  1:1 4:14 24:8
  24:11 25:4,9
  25:14,16 26:2
  26:14 27:11
  33:22,25 34:1
  34:3,5,15,18
  34:23 35:3,7
  59:9
**interrupt** 51:19
**interview** 29:4
  29:11
**interviewed**
  29:6 32:3
**interviews** 29:14
  29:17,18,23
**invoice** 21:14,24
**involve** 60:19
**involved** 7:20
  52:15 60:20
**involvement**
  48:1 49:16
**irvine** 2:22
  19:14,18
**issue** 15:7 35:25
  42:12
**issues** 15:23
  16:21 35:15,18
  35:20,24 36:3
  37:11,19 44:9
  50:11,14,22
  52:2 53:11
  56:12 63:23
**ive** 11:12 12:11
  71:9

**J**

**janet** 13:25 14:5 16:3 29:7,8 33:16 34:9,10 40:6 41:9 42:2 42:11,22,23 43:1,4,9,11 44:15,24 45:3 47:14 50:1 51:6,13,20 52:13,16,17,23 52:25 53:10,17 53:24 55:16 56:1,6,10,17 56:23 58:12 59:17,18,19 63:18,21 68:9 69:3 71:19 72:6 75:17 76:4,14,15
**janets** 14:1
**job** 19:23 20:2 22:19 23:15 24:18,19 25:23 28:20 29:15 56:20
**jobs** 19:8
**john** 2:19,20 5:17 11:1 58:15
**johnson** 31:23 54:20,23 69:10 71:6 77:10,12
**join** 27:17 30:7 44:19 49:21 50:6 76:8
**joinder** 27:19
**july** 51:5 55:18 58:11,18 61:14 61:21 62:7
**justice** 2:5

**K**

**k** 67:14 68:4 74:6

**kauffman** 51:7 51:14,21 52:17 52:25 56:2 68:9,23 69:2 69:22 70:2,6 70:10
**kimbrough** 58:12 59:8,17 59:23
**kind** 23:7 25:6 25:10 44:9 46:14 58:4 71:22 72:18
**know** 7:20,22,22 8:2 10:6 11:6 11:12 14:1 17:5 26:17 28:17 35:6 37:18 38:19 39:4,18,25 40:8,23 41:4,8 48:17,20,24 49:25 50:3 53:10 57:17 60:8 69:19 70:2 73:23 74:22 75:13 76:15
**knowledge** 33:20 73:21 75:2 76:4

**L**

**l** 2:6
**lading** 21:15,25
**laid** 74:11,12 75:2,3,5,6,8,14
**language** 42:11
**lasted** 14:16
**law** 2:13,20
**laws** 80:18
**lawyers** 8:7,12
**lax** 25:25
**learn** 22:18 28:20

**leave** 28:9
**leaving** 25:18
**left** 15:23 23:8 24:2 25:16 32:3 75:9
**legal** 72:25
**level** 65:18
**liable** 28:1,3
**license** 3:11 12:25 13:4 20:7
**licensed** 20:9,12 20:15 22:22
**likewise** 10:2
**lin** 62:1,1,8,13 62:14
**line** 8:15
**lisa** 1:20 80:3,23
**list** 21:14,24 52:3,12
**listed** 53:12
**listening** 17:1
**literature** 19:19
**little** 23:2
**llc** 1:8 4:8 7:19 61:7 72:14 73:7,9,25 74:3 74:9,18,23 75:2,9,13,16 75:20
**llcs** 60:20 72:10
**located** 25:24 29:21 31:3 34:25
**location** 30:3,11 73:14
**logistics** 30:25 32:18 33:2,7,7 35:22 59:9 68:24 69:22 70:3,10
**long** 1:11,18 4:1 11:12 14:9 22:25 75:13
**longer** 69:24

70:3
**look** 57:9 65:25 67:4 69:6 70:18
**looking** 62:22
**los** 13:6 29:22 31:4 32:5
**lot** 25:18 49:24
**loudly** 9:6
**lower** 60:9 61:8
**lowering** 60:23
**lunch** 54:15,21 54:24 55:10,13 55:15
**lunchtime** 54:19

**M**

**m** 1:19,19 4:2 31:16,17 55:10 55:11 67:13,25 70:24,25 74:6 78:24
**maam** 48:14
**major** 19:18
**making** 36:21 47:4,8 48:8
**managed** 42:22 43:11
**management** 34:6,7,8 47:11 47:12,13 49:1 49:3,7,17 73:12 75:17
**manager** 13:25 42:25
**managers** 43:3
**manner** 61:8
**manuals** 23:17 23:23
**manufactured** 39:14 41:1
**manufacturers** 38:20,23 73:20
**manufacturing** 33:5 39:2

**march** 25:15
**marked** 12:8,21 18:24 30:17 57:13 69:11
**materials** 36:14 36:15,17,20,20 36:21,22
**matters** 35:15 35:16 37:9 76:18
**maximum** 10:22 70:17
**mean** 14:22 16:22 21:10,23 22:15 23:22 24:14 26:7 33:3 34:7 35:8 36:7,12,13 39:20,21 47:12 49:4 50:17 73:16 78:5
**meaning** 6:5 36:3,14 43:25
**means** 36:11,16
**meant** 37:4,19 37:20,21 57:23 65:5
**medical** 12:2
**medication** 10:23 11:22
**meet** 13:23
**meeting** 44:8 51:4,8,16,24 51:25 52:7,10 52:16,24 55:19 55:25 56:1,5,7 56:10 64:3,25 65:1 68:8,14 68:15,19 69:2 71:18 72:4,9
**meetings** 43:23 43:25 44:4,6 44:11
**meets** 38:3
**mens** 67:25

| | | | | |
|---|---|---|---|---|
| **mentioned** 16:19 37:1 | 80:3,23 | 55:15 56:6,11 | **oath** 7:23 8:13 | 14:24,25 15:21 |
| **merchandise** 42:5 62:25 | **muddle** 62:23 | 56:11 57:1,10 | 80:7 | 20:2 24:21 |
| **meredith** 12:6 | | 57:15 60:20 | **object** 17:19 | 26:17 27:21 |
| 12:19 18:22 | **N** | 61:7 63:21 | 18:14 30:5 | 28:13,14,16,19 |
| 30:15 57:10 | **n** 3:1 4:4 59:9 | 69:8 71:13,18 | 44:18 49:19 | 29:11 31:11 |
| 71:6,8 | **name** 4:10,18 | 72:5,9,14 73:7 | 53:2 60:25 | 32:14,17,20 |
| **met** 51:21 55:17 | 5:17,21 6:24 | 73:9,24 74:3,9 | **objection** 27:14 | 34:23 35:6,13 |
| **method** 60:9 | 14:1 41:10 | 74:18,23 75:1 | 27:17,20 30:7 | 36:10 37:17 |
| **mgl** 61:14 | 52:21 73:23 | 75:9,13,16,18 | 45:16 46:22 | 38:18 39:5 |
| **mgllax** 62:14 | 78:8 79:23 | 75:20,20 76:2 | 48:4 50:5 | 40:23 45:24 |
| **mikki** 2:4 4:6 | **named** 40:12 | 76:5,16,20 | 53:14 56:25 | 46:20 51:24 |
| 5:1 11:1,4 54:9 | **names** 34:20 | 78:12 | 65:11,11 68:10 | 52:10,19 53:10 |
| 55:21 76:24 | 35:12,13 72:23 | **ngo** 48:10,11,11 | 70:13 72:19,24 | 54:3,8,9,16 |
| **mileage** 77:9,10 | **nancy** 1:15 3:3 | 48:11 | 73:1 76:6 | 55:23 56:5 |
| 78:19 | 5:9 11:5 54:10 | **ngs** 43:13 49:16 | **objections** 6:6 | 57:9,20 58:7 |
| **mind** 6:12 70:20 | 76:25 | 71:18,23 72:6 | 18:7,16 80:9 | 58:20 59:2,8 |
| **minor** 19:20,20 | **national** 2:7 | **nod** 9:10 37:17 | **obtained** 26:3,8 | 59:15,21 60:14 |
| **minutes** 28:8,10 | 53:1 | **notary** 79:20 | **occasionally** | 60:22 63:4 |
| 28:10 37:15 | **necessary** 36:15 | **notes** 80:13 | 44:7 | 64:15,15 66:8 |
| 70:17 | 36:17 38:4 | **notice** 1:17 | **oceanland** 20:2 | 66:17 68:16,21 |
| **mischaracteri...** | 79:7 | 16:24 21:14 | 20:13,18 21:21 | 69:21 70:9,21 |
| 27:14 | **need** 10:9 11:6 | **notices** 17:4,7,17 | 22:4,11,16,19 | 71:17,24 73:6 |
| **misclassificati...** | 28:17 37:23 | **notified** 20:21 | 22:25 23:10 | 76:11 77:4,5,8 |
| 53:12 | 77:24 | **notify** 41:17 | 24:2,16,23 | 77:9,11,16,22 |
| **misclassified** | **needed** 53:25 | **november** 1:12 | 25:11 | 78:3,14,15,16 |
| 52:3 | **needs** 54:12 | 1:20 4:1 80:20 | **october** 12:15 | 78:20 |
| **misclassifying** | **neglected** 71:5 | **number** 3:9 12:7 | **offer** 55:1 | **okiedokie** 68:6 |
| 28:1 | **never** 34:2,2 | 12:8,11,20,21 | **office** 29:20,21 | **once** 20:22 44:1 |
| **misheard** 58:17 | 44:7,8 | 12:24 18:23,24 | 29:24,25 33:16 | 44:1 |
| **misstates** 30:5 | **new** 24:5 73:11 | 30:17,20 31:6 | 33:22,25 34:3 | **ones** 67:24 |
| 53:14 | **newport** 2:14,15 | 33:15 36:3,7,9 | 38:2 43:23,25 | **online** 28:22,23 |
| **misunderstood** | **ng** 1:8,8,15 3:3 | 57:22 59:22 | 44:4 49:24 | 29:3 |
| 53:22 | 4:8,9,16 5:9 | 61:12 62:12,20 | **officer** 49:9 | **opportunity** |
| **moment** 45:5 | 6:8 7:6,17,19 | 68:7 69:7,9,11 | **officers** 80:1 | 28:20 |
| 55:7 61:9 | 7:19 11:18 | **numbers** 57:6 | **offices** 2:20 32:4 | **opposing** 8:12 |
| 62:18 78:1 | 12:7,11,19,24 | 57:12,24 59:3 | 73:16 | **order** 36:2,9 |
| **monday** 1:12,19 | 13:12 16:4,7 | 59:5,22 60:1,5 | **officials** 71:18 | 38:4,15 41:17 |
| 4:1 58:18 | 17:24 18:22 | 60:7 65:25 | 72:5 | 41:18 |
| **money** 24:24 | 19:2 28:7 | 66:19,21 68:8 | **oh** 14:24 30:8 | **orders** 33:6 |
| **months** 20:1 | 30:15 31:25 | 68:13,18 | 66:3,3 67:16 | 36:23 39:23 |
| **morning** 4:16,17 | 33:17,24 34:10 | **numerous** 51:2 | 69:14 | 41:15 47:1,2 |
| 5:18 12:16 | 35:2 40:6 | **nw** 2:6 | **okay** 5:5 6:10 | **original** 79:8 |
| **moskowitz** 1:20 | 42:17 43:11 | | 7:2 8:11,15 | **overbroad** 48:4 |
| | 49:7 50:10,14 | **O** | 10:3,7,8 11:15 | 50:5 |
| | 52:20,23 55:1 | **o** 4:4 | 11:16,18 14:24 | **overseas** 33:5 |

47:2,3
owed 52:8
owned 75:22
owner 43:18
owners 76:1

**P**

p 1:19 4:4 55:11
   70:24,25 78:24
packing 21:14
   21:24
page 3:3,9 58:10
   58:11 59:3,15
   61:20,25 62:5
   62:6,12
pages 61:13
paid 24:24
pamphlets 23:18
   23:23
paper 79:8
papers 57:25
   58:4
pardon 27:18
   54:22 60:14
   67:7
parentheses
   26:4
parking 77:10
   77:13
part 15:21 37:1
   40:16 47:15
   49:7,12 58:16
   75:23
participate
   71:17
participated
   72:4
particular 36:2
   36:2 42:12
   50:20
parties 6:11
   80:16
party 13:18
pass 78:9
passed 25:21

patrol 51:6
pay 48:18
paying 24:19
payment 48:2,3
   48:8,18 49:6
payments 48:9
   48:21
penalty 80:17
pending 4:14
people 25:18
   26:14,17 34:24
   35:2,12 42:13
   42:16 45:24
   46:3,7,10,15
   77:21
period 23:4
perjury 80:17
person 13:16
   32:4 40:5
   74:12
personnel 73:13
persons 75:22
pertain 67:11
pertained 72:9
phone 13:16,17
   42:7
physically 38:14
place 18:4,7
   29:19,24 55:16
   55:20 80:6
placed 38:15
plaintiff 1:5,16
   2:3 5:10
plaintiffs 3:9
please 5:4,15,20
   8:11 12:6,20
   14:3 27:23
   28:17 30:16
   57:2 58:12,13
   59:2 66:3 69:7
po 36:2,7
point 26:2 72:12
pollack 71:19
   72:6
portions 63:10

position 23:5
   24:6,7,10 29:1
   29:12
possible 60:22
posted 29:1
posting 28:22,25
   29:3
power 69:23
predate 64:11
pregnant 11:5
   12:1
preparation
   16:14
prepare 13:12
   21:9 58:3
presence 79:17
present 4:24
   8:14 71:4
preserved 6:7
president 43:16
press 55:3
pressing 35:14
presume 9:18
pretty 24:15
   25:20 78:4
prevent 10:23
   11:23 12:3
previously 56:21
   56:22 74:6
prices 36:20
prior 11:11 39:3
   63:18 68:8
probably 54:5
   75:12
problem 36:4
problems 36:6
procedure 6:3,5
   10:20
procedures 18:9
proceedings
   80:5
process 9:19
   20:25 42:6
   60:15,18
processes 73:12

produced 38:9
production
   32:18 33:2,4
   35:18,21,24,25
   37:11,19,22
   44:6,11,13,14
   45:6,8,10 46:3
   46:4,21
professional
   80:24
pronounce 4:10
   4:18 6:24
proper 26:3,8,19
protection 48:21
   51:1 55:17
   56:3 71:8 72:5
provide 30:24
   57:25
provided 18:3
   22:13 59:3,22
   60:1 64:6
provides 7:12
providing 60:2
provision 22:7
   61:16
provisions 64:21
   65:3 74:5
psdi 40:13,21,23
   41:8,13,14,20
   42:6 50:19
public 79:20
publications
   23:24
purchase 33:6
   36:9,23 38:4
   39:23 41:15
purposes 59:23
pursuant 1:17
   6:2,4
put 80:7

**Q**

qcs 34:19,22
quality 34:22,24
   35:6,11,15

36:21 37:2,10
   37:25 38:4
question 8:6,6
   9:11,13 10:3,5
   10:6,15,15
   15:5 17:20
   18:6,6,8,15
   37:6 39:20,21
   53:6 58:16
   61:5 62:20
   64:9 72:1
questioner 9:21
questioning 5:2
   8:7,12 71:11
questions 6:7,19
   7:23 8:16 9:15
   11:12,24 32:1
   37:9 69:18
   71:14,15
quickly 70:19
quote 67:12,13
   67:13,21,25
   68:3

**R**

r 4:4
rate 25:17 60:8
   60:9
read 6:8 7:9
   23:17,22 33:18
   66:18,21 78:13
   79:3
reading 6:20
ready 31:19
   41:18 57:19
   69:14,20 71:15
real 24:23
realized 71:25
really 24:22
   55:5 64:9
reason 10:10
recall 28:23,25
   34:17 37:13
   42:23 51:4
   55:19,25 56:14

65:10 70:8
**receipt** 48:3
  77:13
**receive** 7:8
  21:12,15 25:1
  38:8,11 41:15
  62:24 69:21
**received** 14:13
  14:19 15:2
  16:24 26:9
  38:10,10,13
**receiving** 21:23
  24:16 47:1
  48:8
**recess** 31:16
  55:10 70:24
**recipients** 59:19
**recognize** 12:12
  19:2
**recollection** 66:4
**recommend**
  70:6
**recommendati...**
  26:23
**recommended**
  27:1
**record** 5:16,20
  18:14 31:19
  55:6,8,13 58:9
  69:24 70:20
  71:2,5,6 79:5
**recorded** 80:10
**records** 66:8,10
**refer** 32:20
  57:21 61:13
**reference** 67:22
**referred** 37:11
  60:24
**referring** 6:18
  6:19 34:12
  65:14 71:9
**refers** 26:2
**refresh** 66:3
**regarding** 6:13
  6:18 15:8

16:24 17:4,8
  17:17 18:10
  23:18 35:15
  37:3 39:23
  42:12 47:5
  51:1 63:10,23
  76:18
**regards** 47:3
**registered** 80:24
**regular** 43:25
**regularly** 44:1
**related** 52:21
**relation** 15:25
**relationship**
  43:13 70:11
**relative** 80:14
**released** 20:22
**relevant** 15:11
**remember** 20:14
  30:14,21 32:11
  32:16 34:19
  35:12,13 40:24
  41:10 51:8,16
  51:17,23,25
  52:1 55:22
  65:25 68:20
  73:10
**remembered**
  15:15
**rep** 24:13 43:7
  44:25
**repeat** 9:3 71:25
**rephrase** 10:7
  61:5
**reported** 43:4
  44:24
**reporter** 5:2,11
  8:13 9:1,4 14:3
  71:21,22 72:2
  80:4,24
**represent** 4:7
**representing**
  4:22 5:18,22
  77:20 79:13
**request** 9:14

41:20 42:2
  76:25 77:2
  78:6
**requested** 53:13
**requesting** 6:8
  7:9 78:7
**require** 77:17
  78:2
**required** 23:17
**reread** 58:16
**resolved** 17:6
**respect** 17:3
  25:2,7 33:22
  40:7 41:14
  50:17 52:16,24
  56:18 61:9
  64:19
**respond** 9:14,24
**response** 9:11
  14:20 16:1
**responsibilities**
  24:21 35:21
  37:2 46:21
  47:16 48:2
  50:12,18
**responsible** 47:4
  47:8
**resume** 3:17
  71:11
**résumé** 19:4,6
  19:11,13 21:9
  26:1,7 32:8,17
**retailers** 39:16
  40:7,9
**return** 6:9 77:25
  78:2,6,13
**returning** 69:23
**review** 16:14
  57:18 69:17
  78:12
**reviewed** 38:2
**reviewing** 69:15
**revise** 52:5
**revised** 53:13
  54:1

**right** 8:9 15:3
  31:5,18 38:18
  44:23 45:3
  51:2 54:20,23
  58:5,22,25
  60:14 62:18,21
  67:9 72:16
  78:10
**roll** 54:14
**rpr** 1:21
**rules** 6:3,4 10:19
  77:3,16,24
**ryan** 4:9 7:19
  16:3 34:10
  35:2

———————
**S**
**s** 2:5 3:8 4:4
  33:16,22,25
  38:2 48:21
  51:1,6 55:17
  56:2 60:6,19
  62:15 63:20,24
  64:5,22 65:20
  71:8 72:5
**sales** 43:7,7
  44:25 45:8
  46:10,11,13,16
  46:17
**sample** 35:19
  37:3,12,20,21
  37:23 38:3
**samples** 38:1,8
  38:13 67:17,18
**satisfied** 38:15
**satisfy** 36:23
  38:4
**saw** 37:17
**saying** 38:5
  65:17
**says** 21:9 26:4
  59:2
**schedule** 31:14
  63:5,7 64:4
**schedules** 59:6

63:1
**scott** 51:7,13,21
  52:17,25 56:1
  68:9,23 69:2
  69:21 70:2,6
  70:10
**seattle** 68:24
  69:22 70:2,9
**second** 38:19
  58:10
**seconds** 14:15
**section** 2:7
**security** 71:7
**see** 7:10 36:3
  37:24,24,24
  53:17 58:13
  78:22
**seen** 63:7
**sell** 39:13
**seminars** 23:12
**sending** 47:2
**sent** 17:8 38:1
  58:11,11,25
  61:13 62:1,13
  78:12
**separate** 77:14
  79:7
**separately** 57:16
**served** 12:15
**service** 20:3,13
  20:19,20 22:12
  22:16,19,25
  23:10 24:3,12
  24:23 25:11
  41:16 45:9
  46:13,16,18
**services** 21:22
  22:4
**set** 21:15 80:6
**sets** 59:3
**seven** 10:20,24
  12:4
**seventh** 61:25
**shed** 11:14
**sheet** 79:7

shell 77:3,8
shes 66:20 69:14
shipment 50:21
shoe 36:4,5,15
　37:23,25 38:8
shoes 35:10
　36:17 39:13,15
　40:16,25 41:2
　60:11
shorthand 80:3
　80:13
shouldnt 62:6
side 33:5
sign 6:8 49:6
　78:13
signature 79:11
signing 6:20
single 38:11
sir 6:1
sitdown 44:8
site 28:23
sitting 10:24
　12:3
situation 18:11
six 20:1
sold 39:15 40:8
　40:12,14,20
　41:1 42:5
solely 23:14
　45:25 55:1
soles 60:11
somewhat 30:20
sonya 41:9 42:3
　42:10
sonyas 41:10
soon 21:15
sorry 8:8 14:23
　37:5 41:6
　51:18,19 53:22
　67:16 69:15
　71:24 76:24
sort 78:19
sounds 31:5
　78:20
sourcing 36:6,10

36:11,13,14,14
　36:19
south 31:4
speak 9:6 10:10
　10:16 13:16,21
　14:5 16:3,7,11
　29:15 42:10
speaking 8:8
　64:19
specialist 53:1
specialists 51:5
　51:9,21 52:6
　53:4 56:2 69:4
specific 60:5
　61:16 64:21
specifically 6:4
　6:8 32:7 50:17
　62:25 64:19
specify 61:21
speculation 61:1
　76:7
spell 14:3
spelled 48:11,14
spoke 13:14,15
　13:25 17:16
　29:8 56:6
　76:15
spreadsheet
　52:4
stand 26:5
stands 40:23
start 5:2 51:18
　66:24 69:17
started 23:8
　25:3 28:4 32:8
　32:12 64:7
　72:13 73:6
starting 32:1
state 80:4,18
stated 13:10
　52:7 62:24
　74:16
statement 11:11
states 1:1,4 4:7,8
　4:14,22 23:19

23:25 25:3,8
　32:17 38:2,16
　40:9 63:2,5,8
　64:23
status 33:5
　35:18,19 37:3
　37:11,12,20,21
　41:17 47:3
　50:20
stay 55:7
steamship 21:17
stenographica...
　80:10
sterling 1:7 4:8
　7:18 15:10,17
　15:19 16:12,23
　17:3,8,13 28:5
　28:21 29:12
　30:1,12,13,22
　30:25 31:3
　32:1,4,7,19,21
　33:9,14,24
　34:4 38:7,19
　39:2,3,6,13,19
　40:3,8 41:8
　42:3,13,19,24
　43:13,20 44:17
　47:6,9,17,24
　48:9,22,24
　49:10,12,15,17
　50:4,24 59:13
　59:23 60:6,19
　61:7,18 62:15
　63:13,19,24
　64:5,16,22
　65:20 68:25
　69:23,25 70:4
　70:11 72:13
　73:8,24 74:2
　74:19,24 76:1
　76:12
sterlings 52:25
stipulation 6:12
　6:18
stipulations

6:16,22
stop 38:18
stopped 72:12
street 2:6 31:4
structured
　42:19
studied 63:4
study 19:20
stuff 21:20,22
　78:19
style 37:23 38:8
　38:11 42:2
　68:7,13,18
styles 38:12,13
　41:20 67:12,12
　67:13,21,25
　68:3 74:5
subheading 62:2
　63:15 64:4,11
　65:17
subheadings
　61:22 62:8,15
　63:16,19
submit 58:4
　77:12,14
submitted 57:25
subpoena 3:10
　12:14 14:22
　15:3
subpoenaed
　77:7
suite 1:18 2:14
　2:21 31:6
summaries 58:4
supervise 43:1
supervisor
　22:14 44:14
　59:9
supervisors
　22:15 42:20
　43:3,8 45:2
sure 6:14 15:7,8
　15:11 16:2
　26:25 28:16
　34:1 37:6

45:18 50:8
　54:11 55:9,9
　59:20 60:7,11
　66:9 74:22
　76:9 77:5,12
swear 5:2
sworn 5:11
system 21:1,3,4
　26:6

**T**

t 3:8
take 9:6 10:9,15
　10:20,22 11:11
　11:13 18:4,7
　28:9,12 29:19
　53:19,24 54:5
　54:12 55:2,4
　56:11 57:9
　69:6 70:15,19
　74:14
taken 1:17 6:2
　8:20 31:16
　55:10 70:24
　80:5,13
talk 9:22 14:12
　32:6 42:11
　51:24 54:10
talked 37:18
talking 21:5
　32:23
tariff 22:7,10
　26:6 59:4,5
　61:16 63:1,5,7
　64:4 65:2,9
telephone 13:18
　34:15
tell 8:4 9:12
　14:11,14,15
　15:21 20:18
　24:2 25:15
　27:25 37:21
　42:1 49:15
telling 37:15
　52:1 56:18

ten 28:10
tenminute 70:15
terminated 70:10
terms 33:4 42:19
testified 5:12 8:23 56:5,9
testifying 56:14
testimony 27:15 30:6 53:14 79:5 80:8
textile 60:10,22
textiles 61:9
thank 4:21 5:6 6:1 7:2 11:9,21 12:18 13:9,9 18:20 27:21 31:11 33:1 37:17 41:12 48:13,16 55:23 58:23 61:6,11 70:23 72:2 76:19 77:19 78:21,23
thanks 5:14
thats 4:20 6:15 11:6,10 14:24 17:2,5 33:6 34:3,10 39:10 54:9 58:20,22 64:8,8 65:5,17 66:3,4,20 67:4 77:16,18
themself 22:14
theres 6:11 8:13 21:1 67:16
theyre 78:4
thing 14:17
things 7:14 9:12 9:13 14:25 24:15 42:9,9 71:14
think 11:10 18:12 31:12 32:2 44:3

55:22 69:9 70:16 78:9
thinking 28:7
thomas 2:12 5:21
three 5:23 26:16 38:25 39:1,6,9 39:14 61:13 75:4
time 18:2 23:4,8 23:8 25:20 26:22 30:12 31:12 47:19,24 50:23,24 54:4 54:12 58:8 64:13 65:9,12 70:19 71:19 75:3 76:6,20 78:1,5 80:6,7,9
times 29:14 77:23
title 23:5 42:23 48:24
today 9:5 13:13 13:24 16:10,15
told 14:14 15:7,9 34:3,4 44:24 53:24
tomorrow 78:22
top 25:19 66:1
totally 14:25
trade 1:1,17 4:15
trained 22:20 23:15
training 23:14 25:1 62:25
transcribed 80:11
transcript 6:9 6:14,20 7:9,12 7:14 77:22 78:11 79:4,8 80:13
transition 73:8

73:10
traveled 34:2
trial 6:7 8:23
truckers 24:17
trucking 20:23
true 79:4 80:12 80:19
truth 14:14
try 61:7 62:23
trying 5:14 64:9
turn 61:19 62:12
turnaround 78:5
turning 59:15 61:12
turnover 25:17
twice 32:3
two 6:16 23:2 29:16,18 43:8 44:1 59:3
twoyear 23:4
ty 48:10,11,14 48:15,19,23 50:1
type 18:10 33:9
types 7:14 35:16 37:9
typos 7:14
tys 48:24

_____
U
_____

u 2:5 33:16,22 33:25 38:2 48:21 51:1,6 55:17 56:2 71:8 72:5
uc 19:18
ultimately 29:25 74:11
understand 7:15 7:25 8:4,18 9:8 9:16,25 10:6 10:12,17 11:18 18:18 32:23 36:11,12,12

37:6,20 56:17 60:17
understanding 11:23 36:19,24 66:10
unemployed 20:1
united 1:1,4 4:7 4:7,14,22 23:19,25 25:3 25:8 38:1,16 40:9 63:1,5,8 64:22
university 19:14
unquote 67:12 67:13,14,21,25 68:3
update 41:17
updates 44:9
usa 61:14
use 7:11 9:14 36:22 60:3,6 64:10,20 65:9 66:7 68:13 74:3,4,7 76:12
uses 21:1
usually 27:9

_____
V
_____

v 1:6
vague 45:16 48:4 49:19 50:5 65:11 72:19 73:1 76:6
various 34:19,21
versions 19:10
vietnam 35:1 38:20,24 39:9 39:14,19,22 40:1 41:23 42:4,8 73:21
vs 4:8

_____
W
_____

w 67:12,21 74:5
wait 76:22
waived 77:18
walk 42:1,6
wang 41:11,11
want 5:1 7:22 16:17 18:12,21 28:9,12,16 36:11 37:18,20 38:19 54:9,11 54:24 58:8 62:22 65:24 66:23 69:17 70:18 71:14 78:6
wanted 11:4,7 14:12 24:4 25:21 49:25 52:4 53:17 54:25 56:12 71:1 77:4
wants 11:11
washington 2:8
wasnt 6:17 15:7 15:8,11 16:2 43:11
way 52:20 59:18 62:21,23
wed 28:7
week 44:1
weeks 44:1
went 27:9,24 28:2 35:9 52:13 53:11 66:4
west 13:6
whats 50:21
wholesale 33:11 33:12,13
witness 1:15 3:2 4:17,20,25 5:10,18 11:16 12:7 17:22 28:14 31:21 44:21 45:18

48:6 49:23
50:8 53:8,16
61:3 65:13
66:23 68:11
70:14 72:20
73:4 76:9,25
77:3 78:14,16
80:7,8
**witnesses** 9:10
77:7
**woman** 29:8
**womens** 67:22
**word** 7:11,12
9:5,5
**words** 9:14
**work** 20:9 23:7
25:6,10 30:13
44:12 45:13,22
46:17 47:23
74:18
**worked** 15:10
16:11 17:12
20:13 21:21
26:11,15 29:25
30:4,10,11
33:4 35:7 39:6
42:13 45:6,10
45:11,24,25
46:3,4,7,8,10
46:11,16 50:15
64:17 68:23
74:18
**working** 28:4
32:9,12 39:3,5
64:7 72:12,13
73:6
**world** 1:17
**worry** 14:25
**wouldnt** 38:10
**wrap** 71:14
**wrong** 27:6
**wrote** 48:17,20

**X**

**x** 1:3,10 3:1,8

**Y**

**yan** 61:14,15,21
**year** 25:20
**yearandahalf**
25:14
**years** 15:10 23:2
30:4,10
**yesterday** 14:6
16:18 17:15
29:9
**youll** 77:9
**youre** 7:23 8:16
18:8 21:4
34:12 38:5
39:10,15 45:18
47:19 52:21
59:16 69:18
77:20
**youve** 12:24
19:8 45:15
57:17
**yyu** 62:14

**Z**

**z** 21:10

**0**

**00** 12:15
**09** 3:13,14,15,16

**1**

**1** 1:19 3:10 12:7
12:8,11 59:15
70:24,25 78:24
**10** 3:10 31:16,17
42:15,16 70:24
**10816** 1:21
80:23
**10minute** 31:13
54:5,8 55:2
**11** 3:13,15,16
54:20,23 55:10
57:10,12 58:7
58:9 59:4 67:2
**1100** 2:6

**12** 3:10,11,14
55:11 57:11,12
59:15,16,22
67:4
**1200** 1:18
**120193** 1:6
**13** 28:8
**132** 13:6
**14** 3:10 61:14,21
**15** 14:15 28:8
42:15,16 70:17
70:25 74:14
**1501** 31:3
**15333** 2:21
**17** 1:12,20 4:1
**18** 3:17
**19** 3:15,16 69:7
69:9,11

**2**

**2** 3:11 12:20,21
12:24 59:3
**20** 3:10,13,16
57:11,12 58:11
58:14,18 61:12
62:12 67:3
**2004** 19:15,24
19:25
**2007** 25:15
**2008** 25:15,21
28:4 30:12
32:9
**2009** 51:5 55:18
58:11,19 61:14
61:21 62:7
**2014** 1:12,20 4:1
12:15 79:16
80:20
**202** 2:9
**20530** 2:8
**21** 3:14
**22** 3:17 18:23,24
19:2 58:13
**23** 80:20
**24** 31:16 51:5

**29** 1:19 55:18
78:24

**3**

**3** 3:12 6:5 30:16
30:17,20 33:15
**30** 3:12,15 54:20
54:23
**31** 55:11
**31st** 12:15
**32** 1:19 4:2 6:5
**33** 55:10
**340141** 2:21
**3530897** 2:9

**4**

**40** 63:15 65:17
65:21,23
**4010** 67:5
**4050** 67:5
**4061** 67:5
**4090** 58:14 67:3
**41** 31:17
**45** 13:8
**45minute** 55:4
**48** 13:6,8

**5**

**51** 58:13
**5512339** 2:23
**57** 3:13,14,16

**6**

**6** 62:7
**610** 2:14
**6402** 63:15
65:21 67:5,5,5
**6404** 58:14 67:3
**69** 3:15

**7**

**7** 3:4,13,14
12:15
**7063188** 2:16

**8**

**810** 2:14

**9**

**9** 1:19 4:2
**90065** 13:7
**91** 63:15 65:17
65:21 67:5,5,5
**92604** 2:22
**92660** 2:15
**9402** 65:17
**949** 2:16,23
**9902** 58:13

# EXHIBIT B

Deposition of Janet Huynh

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - -    X

UNITED STATES,                     :

        Plaintiff,               : Case No.

   v.                             : 12-0193

STERLING FOOTWEAR, INC., ALEX      :

NG, and NG Branding, LLC.,         :

        Defendants.              :

- - - - - - - - - - - - - - - -    X

                      Long Beach, California

                      Thursday, November 20, 2014

        Deposition of JANET HUYNH, a witness

herein, called for examination by counsel for

Plaintiff, pursuant to Notice, taken at One World

Trade Center, Suite 1200, Long Beach, California,

beginning at 9:38 a.m. and ending at 12:01 p.m.,

Thursday, November 20, 2014, before Lisa Moskowitz,

California CSR No. 10816, RPR.

## Page 2

APPEARANCES:

On behalf of the Plaintiff:
     MIKKI COTTET, ESQ.
     U.S. DEPARTMENT OF JUSTICE
     1100 L Street, NW
     National Courts Section
     Washington, DC 20530
     (202) 353-0897

On behalf of the Defendants:
     THOMAS A. FASEL, ESQ.
     FASEL LAW
     610 Newport Center Drive, Suite 810
     Newport Beach, California 92660
     (949) 706-3188

On behalf of the Deponent:
     JOHN D. EARLY, ESQ.
     LAW OFFICES OF JOHN D. EARLY
     15333 Culver Drive, Suite 340-141
     Irvine, California 92604
     (949) 551-2339

## Page 3

INDEX

WITNESS
JANET HUYNH                           PAGE
   BY MS. COTTET                         4


EXHIBITS
PLAINTIFF'S EXHIBIT NUMBER             PAGE
1A -  Subpoena                 10
1B -  Subpoena                 12
2 -   Resume                   14

## Page 4

LONG BEACH, THURSDAY, NOVEMBER 20, 2014
9:38 A.M.

PROCEEDINGS

whereupon,
     JANET HUYNH,
was called as a witness by counsel for Plaintiff and having been duly sworn by the court reporter, was examined and testified as follows:

EXAMINATION
BY MS. COTTET:

Q. Can you please state your full name for the record, please, and spell it.

A. Janet Huynh, J-a-n-e-t H-u-y-n-h.

Q. Thank you. Ms. Huynh, my name is Mikki Cottet. Can you hear me?

A. Yes.

Q. And I represent the United States in this action, United States versus Sterling Footwear, Inc., Ng Branding, LLC, and Alex Ryan Ng. And this case is currently pending before the Court of International Trade. This deposition is being taken pursuant to the Federal Rules of Civil Procedure. Specifically

## Page 5

it's being taken pursuant to Federal Rule of Civil Procedure 32(d)(3)(A) and 32(d)(3)(B).

What that means for your purposes, Ms. Huynh, is that all objections except those as to the form of my questions or foundation for my questions are preserved until trial. So realistically what that means is that even though there may be an objection to my question or any of my questions, you still have to answer them unless, of course, your attorney, Mr. Early, directs you not to, and then a different set of procedures will kick in after that.

Do you understand what I'm saying so far?

A. Yes.

Q. Okay. I am also requesting that after your deposition is transcribed, that you read it and sign it and return it.

Do you understand?

A. Yes.

MS. COTTET: Okay, Mr. Fasel?

MR. FASEL: Yes.

MS. COTTET: Do you agree to -- I just want to finish my statement that the deposition is being taken pursuant to the Federal Rules of Civil Procedure.

Alderson Reporting Company
1-800-FOR-DEPO

Page 6

Mr. Early, do you have any objection to the witness reviewing and signing the transcript?

MR. EARLY: She'll comply with the federal rules.

MS. COTTET: Thank you.

BY MS. COTTET:

Q. Ms. Huynh, am I pronouncing your last name correctly?

A. Yes.

Q. Thank you.

When you read your deposition transcript, you may see typographical errors. In some instances you might see that a word that you thought you used doesn't appear in the transcript or another word appears instead of it. When you see mistakes like that, typos or the wrong word, you can actually use a pen, and on the page where you see the mistake you can correct it.

Do you understand?

A. Yes.

Q. Thank you.

The only thing that I'll request that you do is you put your initials by any corrections that you make. Okay?

A. Okay.

Page 7

Q. Thank you.

Now, Ms. Huynh, you have been identified by the defendants Sterling Footwear, Inc., Ng Branding, LLC, and Mr. Alex Ryan Ng as having worked for Sterling Footwear, Inc., and/or Ng Branding, LLC, and as being someone who may know about some of the facts involved in this case.

Did you work for Sterling Footwear, Inc.?

A. Yes.

Q. Between 2007 and 2009?

A. Yes.

Q. Did you work for Ng Branding, LLC, in 2009 and 2010?

A. Yes.

Q. I'm going to ask you questions, and hopefully I'll phrase the questions in a manner that you can understand them. Sometimes I might make a mistake, and you might not be able to understand my question. If you don't understand something that I ask you, just let me know that you don't understand, and I will try to rephrase my question. Okay?

A. Okay.

Q. My questions are not designed to trick you. I just want to know what you know. You are not a party to this case. You're just someone that I

Page 8

understand knows something about the facts that may be involved in this case. Okay?

A. Okay.

Q. As you can see, to your right Lisa, our reporter, is taking down everything that you say and that I say and that everyone in that room says. So what I'm going to ask you to do is when I ask you a question, speak loudly enough for Lisa to hear you and also use words to answer my questions. Sometimes people nod up and down or shake their head. Sometimes they use their hands, but that doesn't really translate well onto the transcript.

Do you understand?

A. Yes.

Q. If you need to take a break at any time after you have answered a question, you may take a break. And I don't really care why you want to take a break. You can take a break for whatever reasons you want. Okay?

A. Yes. Okay.

Q. Thank you. Now, under the Federal Rules of Civil Procedure I am allowed seven hours for a deposition, but I think your deposition is going to last for about three or four hours. That's on the outside. It should be less than four hours. It

Page 9

should be around three hours.

Are you taking any medication that would prevent you from sitting here for about three to four hours?

A. No.

Q. Are you taking any medication that would prevent you from you understanding and answering my questions?

A. No.

Q. Are you under a doctor's care for any medical condition that would prevent you from sitting here for three or four hours or that would prevent you from understanding and answering my questions?

A. No.

Q. Do you know what a deposition is?

A. Yes.

Q. Can you tell me your understanding of what a deposition is?

A. When an attorney asks a question and -- what am I considered? -- a witness replies, answers the attorney.

Q. And it's all under oath, and it's all transcribed. Okay?

A. Okay.

Q. Have you ever had your deposition taken

3 (Pages 6 to 9)

Page 10

before?

A. No, never. This is the first time.

Q. Okay. Have you ever testified at a trial or a hearing before?

A. No.

Q. You received a subpoena on October 23, 2014, at about 11:45 a.m.; right?

A. Yes.

Q. Thank you. Can we hand Exhibit Number 1 to Ms. Huynh, please.

(Exhibit Number 1A was marked for identification.)

BY MS. COTTET:

Q. You've taken a look at Exhibit Number 1, Ms. Huynh?

A. Yes.

Q. And is it a copy of the subpoena that you were served with on October 23?

A. Yes.

Q. Thank you. Now, in the subpoena you were asked to bring to the deposition a copy of your résumé or curriculum vitae and a copy of all documents in your possession relating to your employment or ownership interest in Sterling Footwear, Inc., and/or Ng Branding, LLC.

Page 11

Did you produce documents today?

MR. EARLY: Mikki, this is John Early. I just had a question for you. I'm not sure that the subpoena she was served with is the same subpoena that is Exhibit 1.

MR. FASEL: It's not the same as what I was served with. That's for sure.

MS. JOHNSON: Did you provide me a different copy than what was served?

MS. COTTET: I have another copy. I'm going to have it faxed to you because the copy that she was served with was from November 20, 2014, at 9:30 that commands her to be here at 9:30 a.m. I don't know what copy is before her.

MR. EARLY: The one that's before her says for testimony on November 20 at 9:30, but it does not ask for a CV. The one you just asked her about you said there were two categories, a résumé or a CV and all documents in her possession relating to her employment. The one that's in front of her doesn't have any reference to requesting a CV. I'm not saying it didn't, but this doesn't appear to match what you had described.

MS. COTTET: We had -- and I apologize because I actually -- there were two subpoenas that

Page 12

were attempted to be served upon Ms. Huynh, and the one that was actually served upon Ms. Huynh that the affidavit of service for is the one that had the copy of her -- requests a copy of her résumé or curriculum vitae and a copy of all documents in her possession relating to her employment or ownership interest in Sterling Footwear, Inc., and/or Ng Branding, LLC.

A copy of this will be faxed and we can revisit this line of questioning in a few minutes. But I also have with this copy the affidavit of service.

MR. EARLY: Mikki, you can continue to ask her. I'm fine with it. I just want to make sure the record is clear that what is Exhibit 1 is not what is actually served. She did bring a copy of a résumé; so we're not objecting to anything other than to make sure the record is clear that this is not the subpoena that was served on her.

MS. COTTET: Thank you very much for bringing that to my attention. I'm going to take a brief break here for a second.

(Recess taken from 9:52 a.m. to 9:57 a.m.)

(Exhibit Number 1B was marked for identification.)

Page 13

BY MS. COTTET:

Q. So I'm asking you to take a look at Exhibit 1B, which is a subpoena that actually has a second page that was filled out as an affidavit of service providing that you were served with the subpoena on October 23, 2014, at 11:45 a.m.

Now, I had previously asked you whether or not you were served on October 23 at about 11:45 a.m., and you said yes; correct?

A. Yes.

Q. Okay. And Exhibit 1B, it states that you are commanded to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects). One, a copy of your résumé or curriculum vitae. And two, a copy of all documents in your possession related to your employment or ownership interest in Sterling Footwear, Inc., and/or Ng Branding, LLC.

MR. FASEL: I'm going to object --

BY MS. COTTET:

Q. Did you bring any documents -- pardon me?

MR. FASEL: I'm going to object. I'm just going to point out it doesn't actually say Ng Branding. It says Ne Branding, LLC.

4 (Pages 10 to 13)

Page 14

BY MS. COTTET:

Q. With that correction, did you bring any documents, ma'am, in response to this request?

A. No. I don't have any documents. Oh, except the --

Q. Did you bring a résumé today?

A. Yes, I brought a résumé.

Q. Okay. And so my question was actually related to Sections 1 and 2, either résumé or curriculum vitae and/or copies of any documents you may have had in your possession from Sterling Footwear, Inc., and/or as correctly pointed out by counsel there was a typo in there with respect to Ng Branding, LLC. But in any event you brought your résumé; correct?

A. Yes.

Q. Thank you. Can you take a look at Exhibit Number 3, please.

MS. JOHNSON: Do you mean Exhibit Number 2, Mikki?

MS. COTTET: Yes, that's what I meant. Oh, it's been a long day. Thank you.

(Exhibit Number 2 was marked for identification.)

///

Page 15

BY MS. COTTET:

Q. Ms. Huynh, is this a copy of your résumé that you produced today?

A. Yes.

Q. Thank you. Is this a full and complete résumé? And what I mean by that is does it include all the employment that you've had?

A. Yes.

Q. Since graduating from college?

A. Yes.

Q. I notice that it does not appear from the résumé that there is any employment after -- I apologize for that -- between 2010 and 2014. Is there a reason for that, ma'am?

A. Well, I was unemployed right after Sterling and Ng. I was laid off; so I was unemployment for almost two years. After that I went back to school. Right now I'm currently in real estate school; so I'm just working part-time.

Q. Okay. Thank you.

According to your résumé, Ms. Huynh, it states that you graduated from the California State University Northridge with a BS in business administration, marketing in 2005. Is that correct?

A. Yes.

Page 16

Q. Can you explain to me what that degree in business administration, marketing means?

A. It's a business administration degree with an emphasis in marketing.

Q. I'm sorry. I didn't understand.

A. My major was business administration. My emphasis is on marketing.

Q. What is marketing, Ms. Huynh?

MR. FASEL: Objection. Calls for expert opinion.

BY MS. COTTET:

Q. You still have to answer.

A. Oh, it's -- well, marketing is -- involves like -- is business, in general, but it focuses on marketing -- just -- just advertising and marketing, advertise a product or market a product.

Q. I'm just going to make a statement right now. These depositions sometimes are very scary for people who are being deposed, and I can't say anything to you that's going to help you relax, but it's okay if you take your time to answer my questions.

A. Okay.

Q. Because I'd really like to get information from you without it being painful for you to give it

Page 17

to me. Okay?

A. Okay.

Q. So I'm not looking for an expert opinion on what marketing is. My understanding from you and your résumé is that you graduated with a degree in marketing, and I wanted to understand what it is -- what marketing is with the context of your degree. So I thought I heard you saying advertising, buying. What else does marketing include?

MR. FASEL: Objection. Asked and answered.

BY MS. COTTET:

Q. If anything?

A. Promoting a product. It could be -- marketing could be promoting an event. It embodies a lot of elements from business in general.

Q. What was your first job after graduating from California State University?

A. I worked at a -- as a production coordinator for Philip Simon Development.

Q. What is a production coordinator?

A. Basically you coordinate in regards to production. Your job entails following up daily with vendors on product development and product-related issues and maintain and update work in progress reports, review and confirm all purchase order

5 (Pages 14 to 17)

Page 18

details and vendors, facilitate fabric, trims, and sample approvals, identify and inform potential production issues or risk to management and also track like -- analyze production progress to ensure all shipments arrive on time.

Q. When you started working at Philip Simon Development, was that in November, 2005?

A. Yes.

Q. Were you a production coordinator when you started there in November of 2005?

A. Yes.

Q. What kind of business was Philip Simon Development?

A. It was a footwear business.

Q. Does it still -- does Philip Simon Development still exist, to your knowledge?

A. To my knowledge, I don't think it exists anymore.

Q. Okay. What kind of footwear -- I take that question back.

Was Philip Simon Development a retail business?

A. It was a wholesaler.

Q. Okay. Do you know who owned Philip Simon Development when you worked there between November,

Page 19

2005, and June, 2007?

A. Philip Simon owned Philip Simon.

Q. Can you tell me what you mean by wholesaler?

A. A wholesaler is -- so they buy the product from the manufacturer, and they are -- they wholesale it. Wholesalers are a distribution outlet. They sell it to retails and stores.

Q. Does the wholesaler order from the manufacturers?

A. Yes -- not necessarily. Depending -- sometime they can order from manufacturer, or they buy it from the -- a third party. It all depends on the . . .

Q. Okay. Thank you.

When you worked at Philip Simon Development between November, 2005, and June, 2007, did you ever have occasion to deal with the brand called Girly Girl?

A. No.

Q. When you worked at Philip Simon Development between November, 2005, and June, 2007, did you ever have occasion to deal with Sterling Footwear, Inc.?

A. No.

Q. When you worked at Philip Simon Development between November, 2005, and June, 2007, did you ever

Page 20

have occasion to deal with One Ambition, LLC?

A. No.

Q. During the time that you worked at Philip Simon Development between November, 2005, and June, 2007, did you have occasion to meet -- did you ever have occasion where you met Alex Ryan Ng?

A. Yes.

Q. Do you know Alex Ryan Ng?

A. Yes.

Q. Are you related --

A. No.

Q. -- to Alex Ryan Ng?

A. No.

Q. When was the first time that you met Alex Ryan Ng?

A. I met him through my friends at a restaurant.

Q. So is it fair to say that when you met him, that was a social rather than a business meeting?

A. Yes.

Q. Okay. Did you meet him before or after you worked at Philip Simon Development?

A. Before.

Q. When did you meet him approximately? And by "him," I mean, Alex Ryan Ng.

Page 21

A. I would say around 2005.

Q. Did you have a romantic relationship with Alex Ryan Ng --

A. No.

Q. -- ever? Did you become friends with Alex Ryan Ng after you met him at the restaurant with your friends in 2005?

A. Yes.

Q. Why did you stop working at Philip Simon Development in June, 2007?

A. Well, after that I worked there for, I guess, two years almost, and then Alex opened a company Sterling Footwear; so he asked me to come over and work for him. So I switched to Sterling.

Q. So Alex started Sterling Footwear, Inc., sometime around 2007, summer 2007?

A. Yes.

Q. To your knowledge?

A. To my knowledge.

Q. I mean, do you know exactly when he started Sterling Footwear, Inc.?

A. I don't know. I don't know exact.

Q. Okay. But you left Philip Simon Development to go to Sterling Footwear, Inc.; correct?

A. Correct.

6 (Pages 18 to 21)

Page 22

Q. So on your résumé it says that you stopped working at Philip Simon Development in June, 2007, and that you started working at Sterling Footwear/Ng Branding in August, 2007. What did you do between June and August, 2007?

A. My normal hanging out with my friends, go relax, enjoy before I start the new job.

Q. Okay. Now, I just want to be clear so that when we move forward in this deposition that I always understand who you're talking about. I always say Alex Ryan Ng, and you know who I'm talking about; correct?

A. Correct.

Q. You say Alex because he's a friend of yours; correct?

A. Yes.

Q. Was there another Alex that worked with Sterling Footwear, Inc., or Ng Branding, LLC?

A. I don't understand your question.

Q. Was there any other person who had the name Alex who worked at Sterling Footwear or Ng Branding?

A. No.

Q. To your knowledge.

A. Yes.

Q. I just want to be clear so when you say

Page 23

Alex, you don't have to say Alex Ryan Ng, and I understand who you're talking about.

A. Okay.

Q. So this isn't a trick. I'm just trying to make sure you can always just say Alex. Okay?

A. Okay.

Q. Great. So I'm going to assume that when you say Alex, that you mean the defendant Alex Ryan Ng. Thank you.

So how did Alex -- I take that back.

How did you find out that Alex was starting Sterling Footwear, Inc.?

A. Well, he told me about -- he, I guess -- we're friends; so he told me about the company.

Q. So, to your knowledge, did he tell you he was going to start this footwear company called Sterling Footwear, and then he did start this company Sterling Footwear, Inc.?

A. I think he started before I -- actually I don't remember exactly if he started already or before he told me or after. I don't know.

Q. So what I'm trying to find out here and what I'm leading to is when did he approach you about working for Sterling Footwear, Inc.?

A. I don't remember when exactly like the

Page 24

dates. I don't remember.

Q. Okay. Is it fair to say that you didn't have to interview for a job at Sterling Footwear, Inc.?

A. Yes.

Q. Because you were friends, and he invited you to work for him or something like that; right?

A. Right.

Q. Now, when you started working at Sterling Footwear, Inc., in August, 2007 -- and I'm just using the date that's on your résumé -- is that when you started working there, August, 2007?

A. Yes.

Q. Okay. When you started working there, did you start off as the general manager as it states on your résumé?

A. I was production. I put general manager/production. So I was -- I mean, I was doing more production side. And both --

Q. In the beginning?

A. Yeah, production, focusing more on production, but as the company grows, I became a general manager.

Q. How long were you involved in production before you became general manager?

Page 25

A. I don't -- I can't pinpoint a time. I can't tell you exact time like when or how long.

Q. Was it -- so I'm going to try to pick your brains just a little bit on this. So was it for three to six months that you worked in production before you became a general manager?

A. I would say within three months if I recall correctly, yeah.

Q. Okay. Thank you. When you started at Sterling Footwear, Inc., in August, 2007, to your knowledge, how many employees worked there at that time?

A. Can you repeat the question again?

Q. Yes. When you started at Sterling Footwear, Inc., in August, 2007, how many other employees worked there at that time?

A. There was two other employees.

Q. Two other employees?

A. Yes.

Q. Can you tell me who those other employees were?

A. Sonya and -- Sonya Wang and Xiao, Xiao Liu.

Q. And that's X-i-a-o L-i-u --

A. Correct.

Q. -- is that how you spell her name? Okay.

7 (Pages 22 to 25)

Page 26

Do you know what Sonya Wang's responsibilities were when you started at Sterling Footwear, Inc., in August, 2007?

A. Her job was more of like pre-production meaning she would more of sampling and handling the samples, things that were before -- pre-production so before production. So it's samples, fabrics, day to day like communication, making sure that everything runs smoothly as far as with the sampling and working with clients. Basically her job was more on the samples, everything -- sample approval, sample buying fabrics, ordering fabrics.

Q. Thank you. And Ms. Liu, what were her duties and responsibilities, if you know, when you started in August, 2007, with Sterling Footwear, Inc.?

A. She was a designer. She was hired as a designer.

Q. Okay. So is it fair to say that you started and your responsibilities were with production?

A. Yes.

Q. Correct?

A. Yes.

Q. And can you -- thank you. Can you tell me what that means or what that meant when you first

Page 27

started at Sterling Footwear, Inc.? And the "that" I'm talking about production. What did production mean in terms of your duties and responsibilities at Sterling Footwear, Inc., when you started in August, 2007?

A. I was handling all the production process, day-to-day communication with overseas and with vendors. Just anything that deal with production, the production of the product, of the shoes. I mean I list it on my description of what I do. Do you want me to read each one?

Q. No, I don't want you to read from your résumé because I can read too so thank you. What I was -- you used the word "production," but I don't know what you mean by production. So that's really what I'm asking you. You can say production 20 times, and you can have it written 20 times, but I need to understand what that means in terms of what you did at Sterling Footwear, Inc., when you started.

So what do you mean by the word "production"?

MR. EARLY: Objection. Asked and answered.

MR. FASEL: Asked and answered.

MR. EARLY: And can we stipulate that this incorporates her last answer where she gave you a

Page 28

number of -- listed a number of things that it includes.

MR. FASEL: And referenced her résumé.

BY MS. COTTET:

Q. Again, I'm asking you specifically what is your understanding of the meaning of the word "production" as you use it?

MR. FASEL: Objection. Asked and answered.

MR. EARLY: Join.

You can answer it again.

THE WITNESS: Say the same thing? Well, my job was to handle all aspects of production meaning I would check on the samples, the shipment, dealing with vendors, with overseas clients, you know, factories or with the arrival of shipments, the sample -- everything that I mentioned.

BY MS. COTTET:

Q. Is it fair to say that you dealt with everything that you mentioned a few moments ago regarding streamlining procedures, dealing with vendors, and what we're talking about here is with respect to making footwear? Is that what you mean by production, the production -- the making of footwear?

A. Oh, no, the production of footwear is --

MR. FASEL: Objection. Asked and answered.

Page 29

BY MS. COTTET:

Q. You can answer. Please answer.

A. Can you repeat the question? Sorry.

Q. Oh, no, it's okay. Don't worry. These things happen. It's okay. I'll repeat the question for you.

I'm trying to understand if what you mean by the word "production" is that you dealt with everything necessary to making footwear dealing with vendors, dealing with manufacturers, dealing with all kinds of issues related to the making of footwear including dealing with the sampling, dealing with the designer. That's what I'm trying to understand.

So is it fair to say that when you talk about production, that you're talking about the making of footwear?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: What -- can you define what's the making of footwear? What does that mean? The making of footwear like actually making the footwear or the production process in delegating the shipment for the footwear?

BY MS. COTTET:

Q. Well, that's what I'm trying to understand. To produce could mean to make; right? So I'm trying

Alderson Reporting Company
1-800-FOR-DEPO

Page 30

to understand what you mean by production. Does that have to deal with actually the production and manufacturing of footwear, or does that have to deal with other things?

MR. FASEL: Objection. Vague and ambiguous as to "production" and asked and answered.

THE WITNESS: In this case production to my understanding is not the manufacturing or making of footwear but the process of -- the whole process of -- how do I say this? The whole process of like -- can you give me one second?

It's not the manufacturing of footwear. It's more on the, like, you delegate the work that when the footwear arrives here, the distribution, the coordination. What other term can I use? Everything that involves the production when the shoes are here.

BY MS. COTTET:

Q. Okay. Now I understand so thank you very much. Sometimes it gets tough, but I need to -- I needed to understand what you were talking about. So thank you.

I think this is probably a good time for a ten-minute break. So we're going to go off the record for ten minutes. Okay?

A. Okay.

Page 31

(Recess taken from 10:34 a.m. to 10:51 a.m.)

BY MS. COTTET:

Q. We're back on the record now, and I remind you, Ms. Huynh, that you are still under oath.

I neglected to ask you what did you do to prepare for today's deposition?

A. Can you -- what do you mean by that like what did I do to prepare for . . .

Q. What did you do to prepare for today's deposition?

A. I just went over -- well, I spoke to my attorney.

MR. EARLY: She doesn't want to know what you and I talked about.

THE WITNESS: Oh.

BY MS. COTTET:

Q. Okay. Did you speak with anyone else in preparation for today's deposition?

A. I spoke to a few former Sterling Footwear's employees.

Q. Who did you speak with?

A. I spoke to Nancy, Fernanda, and Sonya.

Q. Can you tell me these -- the last names of the people you just identified?

Page 32

A. I think Fernanda Calvo, Sonya Wang, and Nancy Ng.

Q. Thank you. Did you speak with Mr. Fasel before today's deposition?

A. Yes.

Q. When did you speak with Mr. Fasel?

A. I don't remember when.

Q. Was it before or after you received the subpoena to come here today for your deposition?

A. Before.

Q. Okay. And approximately how long ago did you speak with Mr. Fasel?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: I remember about a week ago.

BY MS. COTTET:

Q. How many times did you speak with Mr. Fasel about this case?

A. A few times.

Q. When you say a few times, is that more than two times that you spoke with Mr. Fasel?

A. Yeah, more than two times.

Q. Was it more than ten times that you spoke with Mr. Fasel?

A. No.

Q. About how many times did you speak to

Page 33

Mr. Fasel about this case?

MR. EARLY: Objection. Asked and answered.

MR. FASEL: Join.

THE WITNESS: I don't remember how many times.

BY MS. COTTET:

Q. Okay. What did you talk about with Mr. Fasel when you spoke to him about this case?

A. He just asked me for the contacts for the former employees because I'm still friends with them; so I have contacts.

Q. Is that all he asked you for was contact information of former employees of Sterling Footwear, Inc. --

A. Yes.

Q. -- or Ng Branding, LLC?

A. Yes.

Q. Did you speak with Mr. Fasel today about today's deposition?

A. No.

Q. When you spoke with Nancy Ng about your deposition, what did you talk about with Nancy Ng?

A. We talked about what this subpoena would be, like, what is it, what is it about, you know? We just asked each other, and she said it could be about

Page 34

the shipments with customs.

Q. Did you understand what she meant by "shipments with customs"?

A. We talked about we dealt with this during when we worked with Sterling Footwear; so we just said maybe this could be about that. We really don't know what the subpoena would be, but we just discussed among ourselves to see what -- none of us have an answer.

Q. Did you have that same conversation with Sonya Wang?

A. Well, Sonya contact me to -- that she got the subpoena. Did I get the same thing? I said yes, and that was pretty much what we talked about. But she didn't ask me anything. I didn't ask her anything about.

Q. Okay. How about with Fernanda Calvo? Did you talk about what this case was about when the two of you talked?

A. She asked me about it, but I said I don't know what it's about, and we just have to go to -- go on that day and see what it's about.

Q. Okay. Now, a moment ago you mentioned the word "shipment." What did you mean by shipment?

A. Shipment is the entries that we had to dealt

Page 35

with during the customs -- when we had -- customs was -- when we working with Ng Branding and Sterling, we had the shipments coming through and, you know, I guess, the classifications that . . .

Q. When you started with Sterling Footwear, Inc., in August, 2007, do you know who handled shipments, entries, and classification for Sterling Footwear, Inc., when you first started?

MR. EARLY: Objection. Compound.

MR. FASEL: Join.

THE WITNESS: I was doing -- I was sending the paperwork to the broker to handle the shipments.

BY MS. COTTET:

Q. Had you ever had any experience dealing with customs matters before you started working at Sterling Footwear, Inc.?

A. No.

Q. When you started with Sterling Footwear, Inc., in August, 2007, did Sterling Footwear, Inc., to your knowledge, already have customs brokers?

A. Yes.

Q. Did anyone teach you how to deal with entering Sterling's footwear for customs purposes?

MR. FASEL: Objection as --

MR. EARLY: Objection. Vague.

Page 36

MR. FASEL: Join.

THE WITNESS: Can you repeat the question?

BY MS. COTTET:

Q. Sure. I'll just rephrase it.

A moment ago I asked you whether or not you had any prior experience dealing with customs paperwork, and your answer was no, you did not have any prior experience. And what I want to know is how did you learn how to prepare customs paperwork to forward to Sterling's customs brokers?

A. Well, Alex -- Alex Ryan Ng -- is the one that showed me how to submit the paperwork because I don't have experience in that.

Q. When Alex showed you how -- withdraw that question.

I'm going to ask the reporter to please read back Ms. Huynh's response to my last question.

(Record read by the reporter as follows:

"ANSWER: Well, Alex -- Alex Ryan Ng -- is the one that showed me how to submit the paperwork because I don't have experience in that.")

BY MS. COTTET:

Q. And this is paperwork -- the paperwork that you were talking about is the paperwork that you

Page 37

submitted to the customs brokers --

MR. EARLY: Objection. Misstates her testimony --

BY MS. COTTET:

Q. -- that worked for Sterling?

MR. EARLY: Sorry.

MS. COTTET: I haven't finished my question, and I did not take a pause.

MR. EARLY: Well --

MR. FASEL: I'm going to disagree with that.

MR. EARLY: Yeah, I disagree with that too. Please, you can restate your question, and I'll object when you're completed.

BY MS. COTTET:

Q. What was the paperwork that Alex Ryan Ng showed you how to submit?

MR. FASEL: Objection. Vague and ambiguous as to "paperwork."

THE WITNESS: The basic documentation that needs to be sent to the broker in order to clear customs.

BY MS. COTTET:

Q. In connection with submitting paperwork to customs brokers on behalf of Sterling Footwear, Inc., did you also submit to those customs brokers

Alderson Reporting Company
1-800-FOR-DEPO

Page 38

classification numbers?

A. The classification numbers are written on the documents.

Q. And these are the documents that you submitted to the customs brokers for Sterling Footwear, Inc.?

A. Yes.

Q. How did you know what classification number to put on the documentation that was provided to -- by you to customs brokers who worked for Sterling Footwear, Inc.?

A. The classification number was already there when I worked there. I believe -- it was already given -- it was already there when I got there; so Alex said to use that number. That's the classification number that we're -- that's for the shipments.

Q. Okay. Did you use the same classification number for all of Sterling Footwear's -- I take that back.

Did you use the same classification number in the paperwork that you submitted to Sterling Footwear's customs brokers for all of Sterling Footwear's entries of footwear?

A. Sorry. Can you repeat the question one more

Page 39

time?

Q. Sure. I'm going to ask the reporter to repeat my question. And, again, if you don't understand a question that I ask, just let me know, and I'll rephrase it. So we'll start with her rereading it, and if you don't understand, I'll rephrase it. Okay?

A. Thank you.

(Record read by the reporter.)

THE WITNESS: Yes.

BY MS. COTTET:

Q. Were you responsible for --

A. Oh, can I take that back? I just remembered something.

Q. Sure. I haven't asked you a question. Please.

A. From what I remembered, I think most of the shipments were -- there's other shipment with different -- I believe it's HTS number, the customs number. There's -- because I answered yes, and I remember that is not all the shipment but most of the shipment.

Q. Okay. And thank you. If ever during this deposition, which isn't going to last for much longer, if ever you want to correct something that

Page 40

you've said to me, you can do just what you did.

A. Okay.

Q. Just let me know, and you can make a correction. Okay?

A. Okay. Thank you.

Q. You're welcome. For most of Sterling's importations of footwear, the same classification was used. Did I understand you correctly?

A. Yes. Most, not all.

Q. Right. I thought I said most. Okay.

Now, were you always responsible for communicating with the customs brokers on behalf of Sterling Footwear, Inc.?

A. No. It was Nancy who handles more of that side. I was more of a production and general manager. So overseeing but I specifically like -- Nancy was more dealing directly with the broker.

Q. But Nancy didn't start at the same time at Sterling Footwear, Inc., as you; correct?

A. Yes.

Q. Because she started later after you?

A. Yes.

Q. Correct?

A. Yes.

Q. Who showed Nancy -- I take that back.

Page 41

So after Nancy started with Sterling Footwear, Inc., is it fair to say that she became responsible for dealing with the customs brokers?

A. Yes.

Q. Did you instruct Nancy Ng on how to prepare paperwork to be submitted to customs brokers?

A. Yes.

Q. Did you instruct Nancy Ng on what HTS classification numbers to be used when communicating with Sterling's customs broker?

A. Yes. We used the same, yes.

Q. Okay. And there came a time, Ms. Huynh, when Sterling Footwear, Inc., received communications from customs, U.S. Customs and Border Protection, that Sterling was using the wrong classification number for its entries of footwear. Isn't that right?

A. Yes.

Q. Now, how did Sterling learn that U.S. Customs and Border Protection determined that Sterling was using the wrong classification number for most of its entries, if you know?

A. Can you repeat the question?

Q. Are you asking me to repeat the question? We can have the reporter repeat it for you.

Page 42

MR. EARLY: How about I try and then maybe just save a little bit of time for the reporter.

How did Sterling learn that customs has indicated that Sterling was using the wrong classification number, if you know?

MS. COTTET: I'm sorry. Mr. Early, why are you reading the question?

MR. EARLY: I was trying to expedite things. If you don't want me to expedite it, we can just let the court reporter stop and read it.

MS. COTTET: No, I asked the reporter to read and not you, sir, but thank you very much.

(Record read by the reporter as follows:

"QUESTION: Now, how did Sterling learn that U.S. Customs and Border Protection determined that Sterling was using the wrong classification number for most of its entries, if you know?")

THE WITNESS: I don't remember exactly how.

BY MS. COTTET:

Q. But at some point you became aware that U.S. Customs and Border Protection had determined that the wrong classification numbers had been used on some of Sterling Footwear's entries of footwear; correct?

A. Correct.

Page 43

Q. Now, when you learned about customs determination that certain of Sterling Footwear's entries of footwear had been misclassified, did you have any discussions with Alex Ryan Ng about that matter?

A. I don't remember exactly if -- I don't remember exactly what happened because that was four years ago. I can't pinpoint if that was what happened like we discussed it or not.

Q. Do you recall meeting with U.S. Customs and Border Protection officials in July of 2009, you and Nancy Ng?

A. I remember we met with them, but I don't remember if that was the date that you just mentioned.

Q. Okay. How many times did you meet with U.S. Customs and Border Protection between 2009 and 2010?

A. I don't remember how many times.

Q. Do you recall meeting with them once?

A. To be honest with you, once, but I don't after -- for sure one time. I don't remember how many times afterward if we met.

Q. Did you meet with U.S. Customs and Border Protection once with Nancy Ng?

A. Yes.

Page 44

Q. And was Scott Kauffman also there when you met with U.S. Customs and Border Protection with Nancy Ng?

A. We met with Scott. I don't remember if -- specifically if Scott and myself and Nancy met with customs. I don't remember that at all.

Q. Who is Scott Kauffman?

A. He's our broker.

Q. And you mean customs broker?

A. Customs broker, correct.

Q. Okay. Did you meet with U.S. Customs and Border Protection with Alex Ng and attorneys for Alex Ng about any of Ng Branding, LLC's entries?

A. Can you repeat the question? Ma'am?

THE REPORTER: You need to ask her first, and then she'll instruct me.

THE WITNESS: Ma'am, can you repeat the question one more time?

BY MS. COTTET:

Q. Yes. Did you meet with U.S. Customs and Border Protection officials with Alex Ryan Ng regarding Ng Branding, LLC's entries?

A. I don't remember if -- I don't recall -- I don't remember that if Alex was there. Sorry. I don't remember if --

Page 45

Q. Earlier when I asked you about your conversation with Nancy Ng prior to you coming to this deposition, you mentioned that you had spoken with her about classifications. Correct?

A. Yes --

MR. EARLY: Object. Well, go ahead.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Is it fair to say that there was an issue regarding Sterling's classification of footwear in 2009?

MR. EARLY: Objection. Asked and answered twice.

BY MS. COTTET:

Q. With customs?

MR. FASEL: Join.

THE WITNESS: Sorry. Can you repeat the question again?

BY MS. COTTET:

Q. Yes. Is it fair to say that there were issues regarding Sterling Footwear, Inc.,'s classification of its footwear in 2009?

MR. EARLY: Objection. Asked and answered twice.

You can answer.

Alderson Reporting Company
1-800-FOR-DEPO

Page 46

MR. FASEL: Join. Vague and ambiguous as to "issues."

THE WITNESS: Yes.

MS. COTTET: I'm going to make a statement for the record right now. While I have absolutely no problems with attorneys objecting because they're allowed to do so, I think that these objections are inhibiting the witness from remembering questions, and I am making that statement for the record.

MR. EARLY: And I'm making this statement: This witness was just asked for the third time whether there were issues with classification. She was asked previously did there come a time when customs advised Sterling that it used the wrong classification number. That was followed up by a question that was asked when she learned about the issue regarding classification numbers. Then there was a substantial discussion and question and answer regarding the classification number.

MS. COTTET: Sir, you are inhibiting my inquiry of this witness right now. You are obstructing the deposition. If I wanted to ask the same question a hundred times in different ways, I actually could. However, I have not done that.

MR. EARLY: Okay. You just interrupted --

Page 47

MS. COTTET: What you are doing is obstructing this deposition.

MR. EARLY: You just interrupted me. You created a false record. I am correcting the record which I have a right to do. You stated you are making a statement. I am responding to your statement. If you don't want me to respond to your statements, ask questions, don't make statements, and madam, you do not have a right to ask the same question a hundred different ways. Please continue.

BY MS. COTTET:

Q. Ms. Huynh, I'm trying to make certain that this deposition goes smoothly and that you are out of here as soon as possible. Unfortunately the manner in which things are taking place right now is going to inhibit me from getting you out of here quicker. But I will try my best. Okay?

We're going to take a ten-minute break right now.

(Recess taken from 11:26 a.m. to 11:33 a.m.)

BY MS. COTTET:

Q. We're back on the record, Ms. Huynh.

Do you remember how the issues regarding Sterling Footwear, Inc.,'s entries of footwear were

Page 48

resolved?

MR. FASEL: Objection. Vague and ambiguous as to "resolved" and which entries.

THE WITNESS: I don't know.

BY MS. COTTET:

Q. Do you know how many customs brokers Sterling Footwear, Inc., had in 2009?

A. I cannot remember how many. I don't remember.

Q. Was it more than one?

A. It was more than one, but I can't remember how many.

Q. Was Seattle Logistics one of Sterling Footwear, Inc.,'s customs brokers?

MR. FASEL: Vague as to time.

BY MS. COTTET:

Q. In 2009.

A. I believe Seattle Logistics was one of them, but I don't remember the -- was it 2009.

Q. Okay. You worked with Sterling Footwear, Inc., starting in August, 2007. When did Sterling Footwear, Inc., stop making importations of footwear?

A. I think 2010.

Q. Was it making import -- was Sterling Footwear, Inc., making importations under the name of

Page 49

Sterling Footwear, Inc., in 2010?

A. I don't remember.

Q. Okay. On your résumé it states that you worked for Sterling Footwear/Ng Branding from 2007 to December, 2010; correct?

A. Yes.

Q. Okay. When did you start working for Ng Branding?

A. I worked for both company. I don't know if -- I don't know when.

Q. Was Ng Branding a new name for Sterling Footwear, Inc.?

MR. EARLY: Objection. Speculation, foundation.

MR. FASEL: Join.

THE WITNESS: I don't know.

BY MS. COTTET:

Q. Did Ng Branding do the same kind of business that Sterling Footwear, Inc., did?

MR. FASEL: Objection. Vague and ambiguous as to doing business.

THE WITNESS: I don't know if -- I don't know if that -- doing business is . . .

BY MS. COTTET:

Q. Did Ng Branding also import footwear during

Page 50

the time that you worked for Ng Branding?

A. Yes.

Q. Did Ng Branding at the time that you worked at Ng Branding have some or all of the same employees that worked for Sterling Footwear?

MR. EARLY: Objection. Vague and compound.

THE WITNESS: I don't know.

BY MS. COTTET:

Q. As the general manager for Sterling Footwear, did you know all of the employees that worked for Sterling Footwear, Inc., while you were the general manager for that company?

A. I know all of them, yes.

Q. Were you also the general manager for Ng Branding when you worked for Ng Branding?

A. I was more general manager for Sterling, but Ng and Sterling have the same employees. So I don't know how to classify that.

Q. I don't know what you mean by what you just said. Can you explain that to me, please.

MR. FASEL: Objection. Vague and ambiguous.

MR. EARLY: Objection. Vague.

BY MS. COTTET:

Q. You have to answer my question.

MR. EARLY: I'm not sure there is a

Page 51

question. Explain what?

BY MS. COTTET:

Q. Explain your answer to me.

MR. FASEL: Same objection.

MS. COTTET: Can we please read back Ms. Huynh's answer to my last question.

MR. FASEL: Calls for a narrative.

(Record read by the reporter as follows:

"ANSWER: I was more general manager for Sterling, but Ng and Sterling have the same employees. So I don't know how to classify that.")

MR. EARLY: Next question.

BY MS. COTTET:

Q. What was your position with Ng Branding?

A. I was general manager for both companies; so I -- it's the same description as Sterling.

Q. Was it the same company as Sterling?

MR. EARLY: Objection. Calls for a legal conclusion, foundation.

MR. FASEL: Join. Vague and ambiguous.

THE WITNESS: Can you repeat the question?

BY MS. COTTET:

Q. Was Ng Branding the same company as Sterling Footwear?

Page 52

MR. FASEL: Same objection.

MR. EARLY: Same objections.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Was Alex Ryan Ng the person that you reported to when you worked for Sterling Footwear and Ng Branding?

A. Yes.

Q. Was Alex Ryan Ng the ultimate decisionmaker when you worked at Sterling Footwear and Ng Branding?

MR. FASEL: Objection. Vague and ambiguous as to "ultimate decisionmaker."

THE WITNESS: Yes.

BY MS. COTTET:

Q. Do you know why Sterling Footwear became Ng Branding?

MR. FASEL: Objection. Assumes facts not in evidence.

THE WITNESS: Why? I don't know why.

BY MS. COTTET:

Q. After you met with U.S. Customs and Border Protection with Nancy Ng, did you tell Alex Ryan Ng about what took place at the meeting with U.S. Customs and Border Protection?

A. Yes.

Page 53

Q. Did you tell him about what took place at that meeting with U.S. Customs and Border Protection that you attended with Nancy Ng immediately after the meeting --

MR. FASEL: Objection. Vague --

BY MS. COTTET:

Q. -- that you had with U.S. Customs and Border Protection?

MR. FASEL: Objection. Vague and ambiguous as to "immediately after."

THE WITNESS: I don't know if it was immediate.

BY MS. COTTET:

Q. How long -- how much time passed between when you met with U.S. Customs and Border Protection with Nancy Ng and the time that you spoke to Alex Ryan Ng about that meeting?

A. I don't know the time.

Q. Was it the same day that you spoke with him about what took place at that meeting?

A. I can't remember.

Q. Would you have waited a whole week to tell him about that meeting that you had with U.S. Customs and Border Protection?

MR. EARLY: Objection. The question

14 (Pages 50 to 53)

Page 54

expressly calls for speculation.

MR. FASEL: Join.

MS. COTTET: I'll withdraw that question.

BY MS. COTTET:

Q. Did you wait a week to tell him about the meeting that you had with U.S. Customs and Border Protection?

A. I don't remember.

Q. Do you recall instructing Nancy Ng to continue using the same classification after you met with Alex Ng to discuss your meeting with U.S. Customs and Border Protection?

MR. FASEL: Objection. Vague and ambiguous as to "instructing."

THE WITNESS: I don't remember.

BY MS. COTTET:

Q. Do you recall whether or not Sterling Footwear, Inc., continued to use the same classification HTS numbers for the entry of its footwear after you met with U.S. Customs and Border Protection?

A. I don't recall that.

Q. Do you know Angela Kimbrough?

A. No.

Q. Was A.N. Deringer, Inc., one of the customs

Page 55

brokers for Sterling Footwear, Inc.,?

A. Yes.

Q. Do you know Jessie Chen?

A. No.

Q. Was Chiu Chou Lee a customs broker for Sterling Footwear, Inc.?

A. I don't remember.

Q. Was Frontier Logistics Services a customs broker for Sterling Footwear, Inc.?

A. Yes.

Q. Was Marina Bay a customs broker for Sterling Footwear, Inc.?

A. I don't know that.

Q. Was Uniway a customs broker for Sterling Footwear, Inc.?

A. I don't know that name.

Q. Was ClearPoint a customs broker for Sterling Footwear, Inc.?

A. I don't remember.

Q. Ms. Huynh, I'm going to take about two or three minutes sitting right here, and I'm going to try to wrap up everything so you can be released from this deposition. So bear with me for about two minutes. Okay?

A. Yes. Thank you.

Page 56

(Recess taken from 11:57 a.m. to 12:01 p.m.)

MS. COTTET: Thank you. You are released from this deposition.

THE WITNESS: Thank you.

MS. COTTET: You can go now.

MR. EARLY: She's going to request her witness fees.

MS. COTTET: Okay. Noted.

(Whereupon at 12:01 p.m. the taking of the instant deposition ceased.)

Page 57

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____
Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of _____, 2014, and executed the above certificate in my presence.

_____
NOTARY PUBLIC IN AND FOR

_____
County Name

MY COMMISSION EXPIRES:

Alderson Reporting Company
1-800-FOR-DEPO

Page 58

DEPOSITION OFFICER'S CERTIFICATION

I, Lisa Moskowitz, a Certified Shorthand Reporter in the State of California, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me.

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed.

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney or of any of the parties, nor financially interested in the action.

I declared under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this date:  November 23, 2014.

_____

LISA MOSKOWITZ, CA CSR No. 10816

Registered Professional Reporter

Alderson Reporting Company
1-800-FOR-DEPO

# EXHIBIT C

Deposition of Fernanda Calvo

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - X

UNITED STATES,                          :

       Plaintiff,                  : Case No.

  v.                                    : 12-0193

STERLING FOOTWEAR, INC., ALEX           :

NG, and NG Branding, LLC,               :

       Defendants.                 :

- - - - - - - - - - - - - - - - X

                   Long Beach, California

                   Wednesday, November 19, 2014

      Deposition of FERNANDA CALVO, a witness

herein, called for examination by counsel for

Plaintiff, pursuant to Notice, taken at One World

Trade Center, Suite 1200, Long Beach, California,

beginning at 2:15 p.m. and ending at 3:40 p.m.,

Wednesday, November 19, 2014, before Lisa Moskowitz,

California CSR No. 10816, RPR.

Page 2

APPEARANCES:

On behalf of the Plaintiff:
   MIKKI COTTET, ESQ.
   U.S. DEPARTMENT OF JUSTICE
   1100 L Street, NW
   National Courts Section
   Washington, DC 20530
   (202) 353-0897

On behalf of the Defendants:
   THOMAS A. FASEL, ESQ.
   FASEL LAW
   610 Newport Center Drive, Suite 810
   Newport Beach, California 92660
   (949) 706-3188

Page 3

              I N D E X
WITNESS
FERNANDA CALVO                      PAGE
   BY MS. COTTET                      4


           E X H I B I T S
PLAINTIFF'S EXHIBIT NUMBER              PAGE
1 -  Subpoena                      9
2 -  Copy of Driver's License             10
3 -  Printouts of Social Media Pages        13
      Provided by the Deponent

Page 4

LONG BEACH, WEDNESDAY, NOVEMBER 19, 2014
2:15 P.M.

P R O C E E D I N G S

whereupon,
        FERNANDA CALVO,
was called as a witness by counsel for Plaintiff and having been duly sworn by the court reporter, was examined and testified as follows:

        EXAMINATION
BY MS. COTTET:
   Q.  Good morning -- or good afternoon for you, Ms. Calvo.  We met a moment ago.  My name is Mikki Cottet, and I represent the United States in this case, the United States versus Sterling Footwear, Inc., Ng Branding, LLC, and Alex Ryan Ng.
   I'm going to be taking this deposition pursuant to the Federal Rules of Civil Procedure.
   Mr. Fasel, will you agree to the same stipulations that we had previously with the other depositions that this will be taken pursuant to the Federal Rules of Civil Procedure?
   MR. FASEL:  I agree.

Page 5

   MS. COTTET:  Thank you very much.
BY MS. COTTET:
   Q.  Ms. Calvo, for your purposes, I'm going to ask that you read and sign the deposition transcript.  It will be sent to you, and you'll be told how much time you'll have to review it and then send it back.  Okay?
   A.  Okay.
   Q.  You can make corrections on the transcript where you see that there are typos or a maybe word that you used is not in there.  You can correct it right on the page where you see the error.  Okay?
   A.  Okay.
   Q.  Now, you're here because you have been identified by the defendants in this case as being someone who worked at Sterling Footwear, Inc., and/or at Ng Branding, LLC, and also as being someone who may know about some of the facts involved in this case.  I want to know what you know; so I'm going to be asking you questions, and you'll be giving me answers.  Okay?
   A.  Okay.
   Q.  I'm going to ask you to speak just a little louder because I can't hear you.
   A.  Okay.  Perfect.

2 (Pages 2 to 5)

Page 6

Q. Okay. Great. Thank you.

Now, as you can see, Lisa, our reporter, is sitting right next to you, and she's taking down everything that I say and everything that you say and everything that Mr. Fasel says during the course of this deposition. So because she's taking everything down word for word, I need you to speak clearly for her as well as for me. And I see you nodding your head up and down.

A. Yes.

Q. That's okay, but when you nod your head up and down after I've asked you a question, I need you to actually use a word to answer my question so the word can be written down. Okay?

A. Of course. Yes, I will do that.

Q. Thank you. If I ask you a question and you don't understand my question, just let me know, and I'll rephrase my question. Okay?

A. Okay.

Q. If you need to take a break during the deposition for whatever reason, just let me know, and you'll be able to take a break. Okay?

A. Great.

Q. The only time that I will not allow you to take a break immediately is if I've asked you a

Page 7

question and you haven't answered that question yet. So the way this works is I ask you a question, you answer the question. After you answer the question, you can take a break for whatever reason.

Do you understand?

A. Yes.

Q. Great. Now, under the rules I am allowed seven hours to take your deposition, but I think that this will probably last maybe two hours. It might last a little bit longer than that, but certainly not even three hours.

Are you taking any medication that would prevent you from sitting here for three hours?

A. No.

Q. Are you taking any medication that would prevent you from understanding me?

A. No.

Q. And answering my questions?

A. No.

Q. Are you under a doctor's care for any medical condition that would prevent you from sitting here for about three hours and answering my questions?

A. No.

Q. Do you know what a deposition is?

Page 8

A. Not really. This is the first time I've been in this kind of environment, but I'm getting it.

Q. Well, a deposition is a question and answer process that is actually transcribed by a reporter as you can Lisa is doing now. It's very similar to a trial in some respects because there will be questions and sometimes objections. The difference between this and a trial -- and I'm sure you've seen trials on TV; right?

A. Yes.

Q. The difference between this and a trial is, number one, there's no judge here. And number two, even though there may be an objection, you still have to answer the question.

Do you understand?

A. Yes.

Q. Very good. So because this is the first time you've ever been in this kind of environment, I'm going to assume you've never had your deposition taken before; right?

A. No, you'll be the first one.

Q. Have you ever testified at a trial or a hearing?

A. Never.

Q. So I'm going to have Ms. Johnson,

Page 9

Ms. Meredith Johnson, who is an attorney with U.S. Customs and Border Protection who's assisting me in this case, hand you Exhibit Number 1. I'm asking you to take a look at Exhibit Number 1.

(Exhibit Number 1 was marked for identification.)

MS. JOHNSON: Mikki, I think you sent the wrong subpoena. I can go print out the correct one for Fernanda.

MS. COTTET: Oh, my goodness.

(Recess taken from 2:25 p.m. to 2:26 p.m.)

BY MS. COTTET:

Q. Since we just copied the copy given to us by Ms. Calvo, I'm just going to assume, Ms. Calvo, that you recognize this document.

Is that fair to say?

A. Yes.

Q. And that is because it is the subpoena that was served upon you that brought you here today?

A. Yes.

Q. Thank you.

Ms. Johnson, can you please hand Ms. Calvo Exhibit Number 2.

///

Alderson Reporting Company
1-800-FOR-DEPO

Page 10

(Exhibit Number 2 was marked for identification.)

BY MS. COTTET:

Q. Ms. Calvo, Exhibit Number 2 is a copy of your California driver's license; correct?

A. Yes.

Q. Is the address on your driver's license your current address?

A. Yes, it is correct.

Q. Can you please tell me -- state your address for the record for me?

A. 3707 Exposition Boulevard, Los Angeles.

Q. And that's California. Can you give me your zip code too, please?

A. It's zip code 90016.

Q. Thank you very much.

Ms. Calvo, what did you do to prepare for today's deposition?

A. I looked for items that I had in relationship to the company, and I brought some printouts of what I used to do for them. And that's pretty much it.

Q. Did you speak to anybody that you worked for or worked with at Sterling Footwear, Inc.?

A. Yes. We are all friends right now, and we

Page 11

have been since then and before Sterling. So we were notified, and of course we asked each other, but nobody knows; so we're going to find out today.

Q. So when you said we're all friends, who did you speak to about receiving a subpoena in connection with this case?

A. I'm very good close friends with Janet, and I'm very close friends with Xiao, which I don't think she got anything. Those are my very good friends.

Q. So Janet Ng?

A. She has a different last name.

MS. JOHNSON: Mikki, I think you mean Huynh.

MS. COTTET: Oh, I'm sorry. Yes. Huynh.

BY MS. COTTET:

Q. Janet Huynh?

A. Yes.

Q. Is that who you meant?

A. Yes.

Q. Okay. And who else, Ms. Calvo, did you speak with?

A. I speak with Xiao because she is my friend. You asked me if I've been in touch with anyone that worked there, and the answer is yes. And those are the only two people that I normally speak with, not necessarily for this. We don't necessarily spoke

Page 12

about this. We just are good friends, you know.

Q. Okay. No, that's not a problem. There's no problem with having friends, and can I tell you also there's no problem with you having spoken to them about this case either. Okay?

A. Okay.

Q. So I'm just asking you questions, and you're just going to give me answers. There's no right or wrong answer. There's just your answer.

Do you understand?

A. Yes.

Q. Very good.

So did you speak with Janet Huynh about this case and the upcoming deposition?

A. Yes.

Q. Can you tell me what you talked about?

A. I just asked her if she knew anything because I received a letter, and she told me, "I have no idea, but I also got a letter." And that was pretty much it. Then I went ahead and called the office here to get a little bit more information, and she told me to prepare some stuff, and I confirm the address, and that was it.

Q. Very good. Thank you.

Now, the documents that you mentioned a few

Page 13

minutes ago that you said you had in your possession that you produced today, Ms. Johnson, can you hand Ms. Calvo Exhibit Number 3, please.

(Exhibit Number 3 was marked for identification.)

BY MS. COTTET:

Q. Now, Exhibit Number 3, do you recognize these documents, Ms. Calvo?

A. Yes.

Q. And these are the documents that you produced to us today?

A. Yes.

Q. Now, can you tell me what these documents represent?

A. They represent what I did for the company, my job position which was brand awareness, branding, and sales.

Q. So Exhibit 3 looks like -- and you can correct me if I'm wrong. They look like they're printed versions of websites that contain photos of shoes, footwear, a variety of different kinds of footwear, for Robin's Jeans Footwear. Am I right?

A. Yes.

Q. Okay. There are also other things included in the photographs or the documents that you produced

Page 14

like clothing and watches. Were those also items that you were responsible for?

A. No.

Q. Okay. Were you responsible -- when you mentioned that you were responsible for brand awareness, branding, and sales, was it just of the footwear that's depicted in the pages in Exhibit 3?

A. Yes. Only the footwear.

MR. FASEL: I'm going to object as to vague and ambiguous as to which company she's referring to, whether it's Ng Branding or Sterling.

MS. COTTET: Well, I was going to get to that in a second, but thank you very much. You definitely are on point.

BY MS. COTTET:

Q. So, Ms. Calvo, the footwear that's represented in the photos in Exhibit Number 3, was that footwear in connection with Girly Girl?

A. It's a combination of both brands. They're mixed.

Q. I'm going to just break it down. Was it in connection with Girly Girl, the company Girly Girl?

A. Yes, some pictures are in connection to that.

Q. Was it in connection -- how about One

Page 15

Ambition, LLC? Did you work for One Ambition, LLC?

A. I don't know what that is or who that is.

Q. Okay. How about for Sterling Footwear, Inc.? Are these, the shoes depicted in this photo, shoes that or footwear that you branded or marketed or sold in connection with your job with Sterling Footwear, Inc.?

A. Yes. I believe that was the first name.

Q. Okay. How about in connection with Ng Branding, LLC? Is the footwear depicted in Exhibit Number 3 footwear that you marketed and sold and branded as a part of your job with Ng Branding, LLC?

A. Yes. I'm not sure which styles in particular from before and after. I don't remember the count of time from one company to the next.

Q. Okay. But the pictures are of pictures that you marketed of footwear that you marketed and branded and sold during the time that you worked with Sterling Footwear, Inc., and Ng Branding, LLC; correct?

A. Yes.

Q. Or similar to?

A. Yes. Those are the shoes.

Q. Okay. Thank you.

So I kind of jumped ahead of myself just a

Page 16

little bit. So you worked for Sterling Footwear, Inc., and/or Ng Branding, LLC; correct?

A. Yes.

Q. Do you know Alex Ryan Ng?

A. Yes.

Q. How do you know Alex Ryan Ng?

A. He was the owner of the company while I was working there.

Q. Which company? Which company?

A. Both companies.

Q. And when you say "both companies," you mean Sterling Footwear, Inc., and Ng Branding, LLC?

A. On my knowledge, yes.

Q. Okay. Before you worked for Sterling Footwear, Inc., did you work for Alex Ryan Ng at any other company?

A. No.

Q. Okay. Do you have a résumé, Ms. Calvo?

A. No, I don't have a résumé. I'm sorry. I haven't made a résumé in four years.

Q. That's okay. It just means that I need to ask you did you ever work for Fashion Source 2000?

A. No.

Q. Okay. I just need to ask you a little bit about your background before I jump into the Sterling

Page 17

and Ng Branding.

A. Okay.

Q. Did you go to college, Ms. Calvo?

A. Yes. I went to college in -- I'm from Argentina; so I went to the university in Argentina, Buenos Aires for graphic design and architecture. Then I moved here in about 2001, and I started studying at Los Angeles Trade Tech for fashion design. Then I started working with some clothing companies as a sample maker and concept developer. Long story short, I've been in sales for multiple companies, brands, imports/exports of sales always, denim most of the time and T-shirts.

Q. All right. Can you do me a favor? Can you slow down when you talk?

A. Yes, I can.

Q. Because I caught almost everything that you said, but I missed a couple of things.

A. Okay.

Q. So you said that you were a sample maker and a concept what?

A. Developer, designer.

Q. Okay. But mostly was that with clothes, or was that with footwear too?

A. It was clothes, tops, bottoms. Then I did

5 (Pages 14 to 17)

Page 18

some swimwear. I also used to have a collection that I represent for accessories, necklaces, and so forth. And mostly -- it was everything pretty much. I had nine brands that I used to represent.

Q. You had nine what?

A. Nine brands of mixed clothing, accessories, swimwear, couture dresses.

Q. Okay. Thank you.

How did you -- prior to you working with Sterling Footwear, Inc., had you done anything with footwear?

A. No. I did go with -- I used to do shows with my collections, and there was this other sales rep that had a footwear line, and we used to go to trade shows together. And I always liked shoes. I think that's normal for all girls; so it was perfect. It was a good fit.

Q. Okay. How did you come about getting a job with Sterling Footwear, Inc.?

A. I went through a regular interview with Alex and gave him my experience, and I present what I could do for the brand. And then I started working there.

Q. But how did you find out there was a position available there?

Page 19

A. Well, in fashion there's a very small world. Everyone knows of everything. New brands, new collections, and especially the concept of Girly Girl caught my attention to work with a brand that was more me, and I wanted to try it.

Q. So can you tell me what the concept of Girly Girl was that caught your attention?

A. It was a young collection that yet well-made was affordable. It was trendy, fashion forward, had the elegant high-end look with a very good price. So you can stay on trends without keeping your credit cards too high.

Q. And Girly Girl was a brand that was sold by whom?

A. It was sold by the company --

Q. Or was it a brand?

A. It was a brand.

Q. It was a brand?

A. Yes.

Q. Okay. And it was sold by what company?

A. By the same office, Sterling or Ng Branding. I'm not sure when which one transferred, but it was my job to sell it.

Q. Now, Girly Girl, does that include clothing and footwear?

Page 20

A. No.

Q. Just footwear?

A. Yes.

Q. I don't want to put words in your mouth. Actually I just want to know what the brand covered en toto.

A. Yeah, shoes, flip-flops, sandals, heels, sneakers. Pretty much young approach. The demographic was junior going into college. They're fun. It was a very fun line. I loved it.

Q. So when did you start working at Sterling Footwear, Inc.?

A. I think it was somewhere in the beginning of 2009.

Q. And when you were hired, you said you met with Alex. And that's Alex Ng?

A. Yes.

Q. Okay. Did you meet with anyone else for interviews, or was it just him?

A. I don't remember. For sure I met with him. I believe I was talking to Xiao as well who was the designer for the brand.

Q. Can you give me that person's full name and spell the full name for me, please.

A. I don't know her last name, but I can check

Page 21

on my Facebook. I don't know her last name. Xiao is X-i-a-o.

Q. And is it Liu, L-i-u, for the last name?

A. I don't know.

Q. Okay. That's fine. Do you have something with you that you can check --

A. Yes.

Q. -- that will refresh your memory? Please do.

A. Yes. Xiao Qiao Liu. Long name.

Q. And that's X-i-a-o?

A. Yes.

Q. L-i-u; right?

A. Yes.

Q. Thank you. She was the designer?

A. Yes.

Q. Very good. So what I want to know is -- now we're going to just talk -- this whole part of the deposition I want to talk about Sterling Footwear, Inc., and how the business was set up.

A. Okay.

Q. So you started working there in early 2009; correct?

A. Yes.

Q. And who paid you?

6 (Pages 18 to 21)

Page 22

A. Who what?

Q. Paid --

A. Oh, paid.

Q. -- you.

A. Started with Sterling Footwear, and then it switched to Ng Branding.

Q. How much were you paid when you started? Do you remember?

A. No, I don't. I don't.

Q. Okay. Was it a salary, or was it hourly --

A. It was a salary.

Q. -- rate. Okay.

A. Yes.

Q. And did you have specific hours that you had to work like a 40-hour workweek?

A. Yes. I think we opened at 8:00 every day.

Q. Okay. And that's every day Monday through Friday or every day of the week?

A. Every day Monday through Friday. The standard was 8:00 to 5:00, but in my position I had to travel a lot to meet clients and go to events, expos and so forth, bringing the collections to them. So sometimes I wasn't physically at the office.

Q. Okay. Now, how many different divisions were there in Sterling Footwear, Inc.? Like you

Page 23

worked with the designer I think you said earlier. Was that a department separate?

A. She was the one that you asked me who else did I talk to, and I mentioned I talk to also the designer when I was hired. As a sales rep in this career, you are very connected with the designers as you are that feedback from the clients or boutique owners to the designer. So you are able to communicate what they're looking for, what they need, what they think is the new thing that's going to sell, and you have to communicate that to the designer so it can be produced, and then you have a hot ticket design and then sell more.

Q. So what I wanted to know was how many -- so was that a separate department from everything else at Sterling? Was there a design department? Was there a marketing department? Was there a customer relations department? A finance department? An importing manufacturing department? That's what I'm trying to understand. How was Sterling set up?

A. Oh, it was definitely a design team that created a look for trims, garments, color trends, shop for new styles, and develop the new collection. There was a marketing team which was me, and I was able to not only know the collection left and right

Page 24

for brand placement, but I used to contact publisher, put shoes in magazines, talk to bloggers, build the website, anything that had to do with social media, brand awareness.

Then there was a sales department that was me as well, and that was a department that had to talk to potential buyers, bring the line to them, participate at all large footwear conventions, and follow up with the clients as well as the customer service person.

Q. So is it fair to say that you worked directly with the design team for purposes of doing your job with marketing, branding, and sales?

A. Yes. Yes.

Q. Okay. So is it also fair to say that you didn't really pay too much attention to the other departments because you had your -- you had basically three departments that you were kind of working with?

A. Yeah, I didn't want anything else on my plate. I learned that the more I know about it, the worse it is because then you had to do things. So I didn't want to know about anything else. Shoes just showed up, and I had to sell them.

Q. All right. So this is what I want to talk about. Who were some of the companies or businesses

Page 25

that you sold shoes to?

A. We sold to -- depends on the brands; right? Mostly was boutique independent retailers. We also sold online, not directly from us but stores or companies that sold online only such as Zappos or other boutiques online. That was pretty much the main distribution. We had a few distributors in different countries. So we will ship the shoes to them, and they will redistribute through the boutiques within the country.

Q. How many different brands did Sterling Footwear, Inc., market and sell?

A. Two.

Q. What were those two brands?

A. Robin's Jeans and Girly Girl.

Q. And were you responsible for marketing Robin's Jeans Footwear as well?

A. Yes.

Q. So you told me about Girly Girl and what that brand, that concept was about. Can you tell me what Robin's Jeans concept was about?

A. Yes. Robin's Jeans was -- it is actually still today a great, well-established denim brand that just wanted to add footwear to their collection. So inside of doing it themself, I believe they had a

7 (Pages 22 to 25)

Page 26

licensing agreement where Alex was developing this
collection for them and selling the collection.

So the concept behind the brand was a lot
more Americana, USA, denim met motorcycle concept,
per se. It's still great. They have many boutiques
that just opened. They have a store on Rodeo Drive
or Beverly Drive. It's a very good brand. Price
point is a lot higher than Girly Girl. It was all
leather shoes compared to Girly Girl was more
affordable. I used to do also all the marketing for
them when it comes to footwear, go to all the shows
with them to sell the footwear as well as developing
the website or online awareness of the brand.

Q. All right. So what I want to do now is talk
about the different kinds of footwear that was
available under both of these brands and just
generally speaking. The footwear that was available
under Girly Girl, let's start with Girly Girl. What
was the footwear made out of?

A. It was mostly PU and flip-flops, tennis
shoes, pumps. It was, I think, if I remember right,
it was lined, some shoes, by pig skin or some kind of
leather to make it more comfortable. But it was an
affordable brand so nothing too fancy.

Q. I guess what I want to know is let's start

Page 27

with this: When we're talking about footwear
generally speaking -- and correct me if I'm wrong
because this is what you do for a living and not what
I do. I buy it. I don't market and sell it. So
that's your expertise. When it comes to footwear,
the footwear is made up of different components;
right?

A. Yes.

Q. The upper, the sole, the heel.

A. Yes.

Q. I mean, you tell me. What are the
components of footwear?

MR. FASEL: I'm going to object. Calls for
an expert opinion.

THE WITNESS: I have to say as a salesperson
my job was to sell to boutiques. Most of the time
the boutique owners or buyers, they're looking for a
look. They're looking for the trend. They're
looking for the color, the texture. They weren't
particularly worried about the components. Due that
reason I wasn't involved too much. I don't know too
much what was involved in the making of them.

We didn't sell specific athletic footwear
that on that case you have to be way more specific on
the production and on the sales process of that

Page 28

particular item. It was a casual wear, everyday,
trendy item. So components, yeah, PU, some leather,
rubber, cloth, like regular cotton. I'm trying to
break down, shoelaces, cotton. I mean, it was a
combination. I think the rubber, the one for the
flip-flops, I don't know the name. It's like a foam.
But nothing --

BY MS. COTTET:

Q. Well, I'm not really interested in the
flip-flops so much as the other types of shoes
because I think, you know, what I'm interested in is
like the pictures that you showed that you produced
of the various kinds of shoes in some instances --
like let's look at Exhibit Number 3.

A. Yes.

Q. The first page of that or the second page
rather for the Robin's Jeans Footwear, it looks like
there are several -- one, two, three, four, five,
six, seven, eight different types of what look like
high-top tennis shoes or shoes to me. I can't call
them tennis shoes but high-top shoes to me.

Is that fair to say?

A. Yes. But I believe we were talking about
Girly Girl. Do you want to talk now about Robin's
Jeans?

Page 29

Q. No, no, no. What I was trying to do is get
you to understand the question that I was asking
about components. You mentioned that you don't get
into the technical aspects of the shoes. You get
into the texture, the design, the trend. That's what
I understood you to say a moment ago. But you also
mentioned something about some of the shoes being
made out of combinations of components whether that
was rubber, leather, you mentioned cotton.

So the question that I have for you is just
kind of looking at even though it's for Robin's
Jeans, is this kind of what you're talking about in
that it looks from these pictures like some of the
shoes are made out of leather, some of the shoes look
like they might be made out of textiles?

MR. FASEL: I'm going to object as to --

BY MS. COTTET:

Q. -- as well as other things?

MR. FASEL: I'm going to object as to calls
for speculation and calls for expert opinion.

BY MS. COTTET:

Q. You can still answer.

A. So the answer to your question, this
particular Robin's Jeans collection was leather.
There's some items in Girly Girl that were not

Page 30

leather. There are some items in Robin's Jeans that are not leather. So it was a combination of items, metal because the buckles, the eyelets, zippers.

Q. And these are all shoes that you actually saw?

A. Yes.

Q. And marketed and sold?

A. Yes.

Q. So I'm not asking you about expertise, per se. I'm just asking you about something that you've dealt with. How long did you sell Girly Girl and Robin's Jeans brand footwear?

A. I think it was about two years.

Q. So if I understood you correctly, both brands had a variety of different textiles or leathers or rubber that was used or combinations of them. Is that fair to say?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Okay. Thanks.

By the way, did Alex Ng ever go with you to any of the shows and expos that you went to that you mentioned a little earlier?

A. Yes.

Page 31

Q. Was Alex Ng aware of how you marketed Girly Girl shoes and brand shoes?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: I hope so. He was the owner. Right?

BY MS. COTTET:

Q. All right. So I think a little bit earlier you told me that you created a website. You had to fill -- I think the word you used was build a website and social media.

A. Yes.

Q. Can you explain that to me, please?

MR. FASEL: Objection. Calls for a narrative.

THE WITNESS: Well, building a website means building a website. Girly Girl was a website for the Girly Girl site. For the Robin's Jeans I don't remember building it myself. I don't even remember if we had one because there was a license agreement; so it was different. But I did build both Facebook accounts. This was two years ago. There was no InstaGram, no Twitter. It was more basic back then. So Facebook, yes.

///

Page 32

BY MS. COTTET:

Q. And this was just for Girly Girl?

A. No. Facebook was also for Robin's Jeans.

Q. Did you design a website for Sterling Footwear, Inc.?

A. I remember talking about it, but I don't think we ever finished doing anything with that.

Q. Okay. Is that the same -- would that be -- did you also help out or talk about building a website for Ng Branding, LLC?

A. Yes. We talked about it.

Q. Was there anything ever put up online for Sterling Footwear, Inc.?

A. I don't know. My job was to push these two brands, and this kind of presents hot online exposure. Actually this is from the Facebook page from Exhibit 3.

Q. Which exhibit?

A. Yes.

Q. Exhibit 3?

A. Yes.

Q. Okay. Did you -- were you involved at all with the Ed Hardy shoe line or brand?

A. No.

Q. How did you -- tell me how you went from

Page 33

working for Sterling Footwear, Inc., to Ng Branding, LLC.

MR. FASEL: Objection. Vague and ambiguous as to "went from."

BY MS. COTTET:

Q. How did you stop working for Sterling Footwear, Inc., and start working for Ng Branding, LLC?

A. I don't recall a specific break point. It was just -- it didn't change my daily job. That was -- for me it was like an internal paperwork that was done.

Q. So is it fair to say you worked out of the same office?

A. Yes. Yes. Same office. Same thing. Nothing changed.

Q. Except the name of the company?

A. Yes. My pay stub will change, but these were my names; so nothing changed on my side of line of work.

Q. Did your email address change?

A. Oh, good question. I don't remember. I don't remember.

Q. So you had an email address with Sterling Footwear; correct?

Page 34

A. I don't remember what my email address was. I'm sorry. I should know this. I don't know. I don't remember --

Q. No, no. I'm not -- I'm not asking you to tell me what your email address was. I'm just asking you whether or not you had an email address with Sterling Footwear, Inc.

A. I had an email --

Q. A business email address.

A. No, I had an email address, but now that I'm thinking, you pointed it out, I don't remember if it was Ng Branding or Sterling Footwear. But, of course, I had an email address. I haven't been in touch with that email or have access to the email for so long. I wouldn't be able to check on my phone right now.

Q. When did you stop working for Ng Branding, LLC?

A. It was at the end of 2010. Yes.

Q. And why did you stop working for Ng Branding, LLC?

A. It wasn't the big success that everyone wanted to be; so it was a natural kind of decision to stop the company. And I had to go look for something new.

Page 35

Q. So are you saying that the entire company ended and closed shop?

A. Yes. I think I was one of the last ones left at the office.

Q. But who's selling Girly Girl -- the Girly Girl brand now?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: I will not know --

BY MS. COTTET:

Q. Is the Girly Girl --

A. It's not longer available that I know of.

Q. Okay. Can we take a ten-minute break? I think after the ten minute break I'll probably only have maximum a half an hour for you.

A. Okay.

Q. Thank you.

(Recess taken from 3:12 p.m. to 3:21 p.m.)

BY MS. COTTET:

Q. So we're back on the record now. Ms. Calvo, can you tell me a little bit about the trade shows that you attended and what it is that the trade -- how the -- just how the trade shows played a part in what you marketed and sold for

Page 36

Sterling Footwear, Inc., and Ng Branding, LLC?

A. For this kind of products, the best way for distribution is to attend to the trade shows. The trade shows are pretty much large conventions at different key locations in U.S. and internationally where each brand will present their collection and buyers from all different retail stores will come and buy ahead of time.

This is something that is done mostly in New York, L.A., Vegas, Miami, Dallas. We had San Francisco. Pretty much, yeah, those were like the biggest markets. We will bring all the footwear collection. I'm talking collections that were not in the market yet, and we will bring those samples to show the buyers and take orders.

The way the order work is pretty much you write the order, and these are collections that will not be sold for about three to six months after they take the order. So then you take all those orders in. You give it to production. Production does their numbers. Some styles that didn't get that many orders, they are dropped naturally; so they don't get produced for small amounts, and all the big order items they go in production.

A few months later they're received, and

Page 37

they're shipped to the boutiques. So the main, you know, shows was when you talk to your clients one on one personally.

Q. So you take a collection, samples of the collection to a trade show. You attract potential buyers at a trade show. Is that what I'm hearing you say?

A. Yes. You have to do some little homework before, calling the boutiques, make appointments with the owner so they know where to find you. These conventions have maybe 2,000 retailers or brands exhibiting their collection; so they have to find you. You show them your collection, and hopefully they place an order for you, your line.

Q. And when an order was placed by a customer or buyer, were the orders based on a style, a specific style of a brand --

A. Yes.

Q. -- or a style within a brand?

A. Yes. We will have different booths. So one booth will be for Robin's Jeans or Robin's Footwear, and the other booth will be for Girly Girl. The look of the booth will be completely different, and most of the time because I was there by myself I will have to do either one collection each show was

Alderson Reporting Company
1-800-FOR-DEPO

Page 38

represented. I wasn't able to have both lines at the same time.

Q. So the samples that you would have there would be of the various styles within a particular brand?

A. Yes. And the orders were placed specific to the style and the color.

Q. Okay. So a style, can you explain to me -- or did a style represent the fabric, the color, and the other materials that were used for a particular article of footwear?

MR. FASEL: Objection. Calls for expert opinion.

THE WITNESS: Usually a style was a shape, per se. Let's say I have a wedge shoe that has two straps in the front and a buckle. That was one style. That style came on maybe five different colors, and each of those style and color combinations required specific materials for that one style and color.

BY MS. COTTET:

Q. Now, for the kinds of shoes that look like sneakers like some of the ones that are represented in Exhibit 3 which are the documents that you produced today --

Page 39

A. Yes.

Q. -- how -- can you explain to me -- just let's take a look at the Robin's Jeans Footwear which is the second page of the documents that you gave me that had eight different styles of or eight different what look like high-top sneakers on them.

A. Yes.

Q. Were those sneakers?

Okay. So for this particular shoe, was this all the same style but a different material?

A. No.

MR. FASEL: Mikki. I'm sorry. You heard a "yes" that was preceding that she didn't say "yes" to.

THE WITNESS: I didn't answer anything.

MR. FASEL: Yeah, because of the delay you heard a "yes" right after your question, but she had actually said it a couple seconds before.

MS. COTTET: Okay. Thank you. I'm sorry.

BY MS. COTTET:

Q. So can we read back my question that should have come after the "yes."

(Record read by the reporter as follows:

"QUESTION: Were those sneakers?")

MR. FASEL: Objection. Calls for expert

Page 40

opinion.

THE WITNESS: I personally call anything on this group sneakers.

BY MS. COTTET:

Q. When you sold them, when you took orders for them, did you refer to them as being sneakers --

A. Yes. And then you had high top and low top.

Q. -- to the potential buyers?

A. Yeah, yes.

Q. Okay. When the buyers, potential buyers communicated with you, did they refer to these shoes as being sneakers as well?

A. Yes.

Q. Okay. So when you took orders for shoes like those that are on the second page of the documents that you produced, you referred to them as sneakers?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: In general, sneakers, yes. And within those there's different styles. So they're not all the same. Some are high top, some are low top, some are boot. Some are, you know, metallic, textured leather.

BY MS. COTTET:

Q. Okay. And on the next page of Exhibit 3

Page 41

what kind of footwear is that?

MR. FASEL: Objection. Calls for expert opinion.

THE WITNESS: In this page, by the way, that is just showing that one of the Robin's Jeans Footwear collection item was represented or in a magazine for brand awareness. So not all those shoes are part of the brand. Only the top --

BY MS. COTTET:

Q. Which one is the one that's part of the brand?

A. The top right one. I don't know if you can see, but right below it says the brands that the other ones are a part of. It's very small.

Q. Okay. So that's the only one that you had anything to do with?

A. Right. So my job was to put these shoes into different magazines for, you know, people to see it and want to buy more. And this is one of the magazines.

Q. And the next page, is that also a magazine?

A. Yeah, that's a blog actually. It's another way of exposure, but it's a blog presented as a trend. That one shoe that is there, it is part of the collection, yes.

Page 42

Q. Which collection? The Robin's Jeans Footwear collection?

A. This is Robin's Jeans, yes. Each page it says on the top right which collection it is from and when it was posted. So if you have --

Q. Go ahead.

A. If you need to know which one it is, it's on the same page of the Exhibit 3.

Q. Now, I notice that each one of these documents has a date of March 25, 2010, or some of the document do. What's the -- or February 23, 2010. Were these all shoes that you marketed and sold for Sterling Footwear, Inc., and Ng Branding, LLC?

A. I don't know which brand was at that time, but one of those two.

Q. And were all the shoes that you marketed and sold for Sterling Footwear, Inc., and Ng Branding, LLC, similar?

MR. FASEL: Objection. Vague and ambiguous.

THE WITNESS: Similar to what? It is a shoe?

BY MS. COTTET:

Q. Okay. Similar in that if you sold, let's say, sneakers, marketed and sold sneakers for Girly Girl, were the shoes that you sold in 2009 for Girly

Page 43

Girl similar to the shoes that you sold in 2010 for Girly Girl?

MR. FASEL: Objection. Improper hypothetical and vague and ambiguous.

THE WITNESS: The collection has a lot of categories of shoes. They were similar on the mean that yes, they were, again, a large category of shoes on the next collection including heels, sneakers, flip-flops, slip-ons, boots, combination.

BY MS. COTTET:

Q. Were these style numbers -- would the style numbers for a particular shoe change from 2009 to 2010, or would the style number remain the same?

MR. FASEL: Objection. Overly broad, vague and ambiguous as to which shoe.

THE WITNESS: The style -- if it was a great style, which it doesn't happen that much in fashion, it will continue in the same style number. But most of the time each collection will change completely meaning there's going to be new style numbers assigned to those shoes. Is that clear?

BY MS. COTTET:

Q. For me I don't understand that. So if the style changed completely, then there's a different style; right?

Page 44

A. Yeah, yeah, exactly. Even if you change one color or one lace, it's a new thing.

Q. I see. Now, when you took orders for the different brands for Robin's Jeans or Girly Girl, who would you submit those orders to?

A. They will be entered in the system. Sometimes I will enter them. Eventually I had a girl that was helping me enter them. That's where they went. And then from that data they were processed and go through, you know, the next channel to evaluate which one was going to be produced and which one wasn't.

Q. Who made that decision as to which ones would be produced and which ones wouldn't be?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: I don't think there was one person in particular that made that decision. It was something that as a company had to determine. Sometimes I personally loved that style, and maybe it didn't have a great response on the first show, and I was so in love with it that I kept pushing it, don't worry, let me send it somewhere else, let me call these other buyers. They might want it, and we will say, okay, go into production even though we didn't

Page 45

have the minimum requirement, taking a risk, you know. And sometimes we had styles that didn't even blink anyone's eye or I didn't care for them either; so they will automatically be dropped meaning they will never make the cut.

But it was a group decision. It was an analysis of where the brand needed to go, what we thought was good, what items were, something that we wanted to be in the brand although the clients didn't respond yet. We were willing to go through production and take a chance.

BY MS. COTTET:

Q. Who participated in the group decisions regarding which styles went into production?

A. It was usually the designer. I was there. It was a -- we were a very close office meaning everyone talked to everyone. It wasn't such a defined job. We all helped each other when we needed to, and I had to ask what do you think about this style? We had X amount of sales. In theory it's not a great style, but do you think we can -- it's a good look? And we will determine that. Sometimes it was Janet, sometimes it was Xiao, sometimes it was me, and we would all together, brainstorm. The other girls that were working on the designing as well.

Page 46

Q. Okay. And then after you brainstormed and a decision was made by the group as to which styles go into production, who took over from there with respect to having the styles produced?

MR. FASEL: Objection. Calls for speculation.

BY MS. COTTET:

Q. If you know.

A. Honestly there was a group of girls that did all the buying, the sourcing, and the production. I don't know who did what.

Q. Okay. And after the shoes were made, if you know, how did they then come to you and get delivered to your clients, your customers?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: They will be actually put in a warehouse, and then we will ship the shoes per order. So that was something done --

BY MS. COTTET:

Q. Do you know where the shoes were made?

A. They were made in Vietnam -- yes, Vietnam.

Q. Okay.

A. Some shoes actually were made in China maybe. Sorry?

Page 47

Q. No, I think I asked you if you knew where they were made.

A. Yes. My answer was Vietnam. I'm not sure on this one flip-flop, but I think that might have been China. I don't remember that one specifically. But I will say 99 percent it was Vietnam.

Q. Did you have any involvement with the manufacturing end of the shoes?

A. No.

Q. All right. Thank you so very much for your time. This deposition is over.

A. Okay. Thank you.

(Whereupon at 3:40 p.m. the taking of the instant deposition ceased.)

Page 48

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____
Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this \_\_\_\_\_ day of _____, 2014, and executed the above certificate in my presence.

_____
NOTARY PUBLIC IN AND FOR

_____
County Name

MY COMMISSION EXPIRES:

Page 49

DEPOSITION OFFICER'S CERTIFICATION

I, Lisa Moskowitz, a Certified Shorthand Reporter in the State of California, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me.

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed.

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney or of any of the parties, nor financially interested in the action.

I declared under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this date: November 23, 2014.

_____
LISA MOSKOWITZ, CA CSR No. 10816
Registered Professional Reporter

Alderson Reporting Company
1-800-FOR-DEPO

# EXHIBIT D

Deposition of Ty Ngo

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - -     X

UNITED STATES,                    :

          Plaintiff,              : Case No.

     v.                           : 12-0193

STERLING FOOTWEAR, INC., ALEX     :

NG, and NG Branding, LLC,         :

          Defendants.             :

- - - - - - - - - - - - - - -     X

                    Long Beach, California

                    Tuesday, November 18, 2014

          Deposition of TY NGO, a witness herein, called for examination by counsel for Plaintiff, pursuant to Notice, taken at One World Trade Center, Suite 1200, Long Beach, California, beginning at 9:55 a.m. and ending at 12:02 p.m., Tuesday, November 18, 2014, before Lisa Moskowitz, California CSR No. 10816, RPR.

Page 2

APPEARANCES:

On behalf of the Plaintiff:
MIKKI COTTET, ESQ.
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
National Courts Section
Washington, DC 20530
(202) 353-0897

On behalf of the Defendants:
THOMAS A. FASEL, ESQ.
FASEL LAW
610 Newport Center Drive, Suite 810
Newport Beach, California 92660
(949) 706-3188

On behalf of the Deponent:
JOHN D. EARLY, ESQ.
LAW OFFICES OF JOHN D. EARLY
15333 Culver Drive, Suite 340-141
Irvine, California 92604
(949) 551-2339

Page 3

I N D E X
WITNESS
TY NGO                              PAGE
  BY MS. COTTET                       4


        E X H I B I T S
PLAINTIFF'S EXHIBIT NUMBER           PAGE
1 -  Subpoena                          8
2 -  Copy of Driver's License          8
3 -  Resume                           12
5 -  Defendants' First Amended Responses to    36
     Plaintiff's First Set of
     Interrogatories
6 -  Customs Power of Attorney        49

Page 4

LONG BEACH, TUESDAY, NOVEMBER 18, 2014
9:55 A.M.

P R O C E E D I N G S

whereupon,
          TY NGO,
was called as a witness by counsel for Plaintiff and having been duly sworn by the court reporter, was examined and testified as follows:

          EXAMINATION
BY MS. COTTET:
   Q. Good morning, Mr. Ngo. My name is Mikki Cottet, and I represent the United States in this case, which is called The United States vs. Sterling Footwear, Inc., NG Branding, LLC, and Alex Ryan Ng. This case is currently before the Court of International Trade. So this is your deposition, and I am here representing the United States.
      This deposition is being taken pursuant to the Federal Rules of Civil Procedure, specifically pursuant to Federal Rule of Civil Procedure 32(d)(3)(A) and 32(d)(3)(B). So all objections except those as to form and foundation of questions

Page 5

are preserved until trial.
      I am requesting at this time that Mr. Ngo read and sign the transcript of this deposition.
      So, Mr. Fasel, do you agree with the stipulation?
      MR. FASEL: I agree.
      MS. COTTET: Thank you, sir.
      Mr. Early, do you have any objection to Mr. Ngo reading and signing the transcript?
      MR. EARLY: We'll go along with stipulations and the Federal Rules.
BY MS. COTTET:
   Q. There being no objection, sir, I'm going to begin this deposition by asking you a couple of questions that have nothing to do with what we're really here for, but just so that we understand how this process is going to take place.
      Okay, Mr. Ngo?
   A. Okay.
   Q. Can you hear me okay?
   A. Yes.
   Q. Very good.
      Do you know what a deposition is, sir?
   A. I believe it's a question and answer.
   Q. That's good enough. Thank you.

Alderson Reporting Company
1-800-FOR-DEPO

Page 6

Have you ever been deposed before?

A. No.

Q. Have you ever testified at trial or at a hearing before?

A. No.

Q. The court reporter is taking down your testimony word for word. So you must speak loudly enough for her so that she can hear what you say and take down your answers.

Do you understand?

A. Yes.

Q. Now, also, because she's taking down your answers to my questions, an answer with the shake of the head or a nod of the head doesn't work. So you have to say your answer. Okay?

A. Okay.

Q. I will ask you questions, and if you don't understand a question that I ask you, can you please let me know?

A. Yes.

Q. And if you let me know that you don't understand a question that I ask you, I will rephrase it for you until you understand it. Okay?

A. Okay.

Q. If you need to take a break for whatever

Page 7

your reasons are, let me know, and I'll let you do that. Okay?

A. Okay.

Q. If you need to speak with your attorney, you may speak with your attorney but only after you answer whatever question I have asked you. Okay?

A. Okay.

Q. Now, I think that this deposition is going to last for about three hours. Are you taking any medication that would prevent you from sitting here for three hours?

A. No.

Q. Are you taking any medication that would prevent you from understanding and answering my questions?

A. No.

Q. Are you under a doctor's care for any medical condition that would prevent you from sitting here for three hours and understanding and answering my questions?

A. No.

Q. All right. I'm going to have Ms. Johnson, who is also present, Meredith A. Johnson from the U.S. Customs and Border Protection, who is my co-counsel as well as my client in this case, hand

Page 8

you Exhibit Number 1.

(Exhibit Number 1 was marked for identification.)

BY MS. COTTET:

Q. So, sir, can you take a look at this document, and after you've looked at it, can you let me know that you've completed your review of it?

A. Okay.

Q. Mr. Ngo, you are appearing here today because you received a subpoena on October 23rd, 2014, at 12:40 p.m.; correct?

A. Yes.

MS. COTTET: Can you hand Mr. Ngo Exhibit Number 2, please.

(Exhibit Number 2 was marked for identification.)

BY MS. COTTET:

Q. Mr. Ngo, is Exhibit Number 2 a copy, a photocopy of your California driver's license?

A. Yes.

Q. And is the address on this driver's license your current address, sir?

A. Yes.

Q. And can you state for the record what that address is, please?

Page 9

A. It's 1326 South Fourth Avenue, Arcadia, California 91006.

Q. Thank you, sir.

Mr. Ngo, what did you do to prepare for today's deposition?

A. Not much.

Q. Did you speak with anyone about it?

A. No.

Q. When was the last time that you spoke with Alex Ryan Ng?

A. A couple weeks ago.

Q. Was that before or after you received your subpoena, sir?

A. Before.

Q. What did you speak with Mr. Ng about a couple of weeks ago, sir?

A. Just family stuff.

Q. Are you related to Alex Ng, sir?

A. Yes.

Q. How are you related to Alex Ng?

A. I'm his brother.

Q. I'm going to take a momentary break here. I've got a call coming in on this screen.

(Recess taken from 10:03 a.m. to 10:03 a.m.)

Alderson Reporting Company
1-800-FOR-DEPO

Page 10

BY MS. COTTET:

Q. So Alex Ng is your brother?

A. Yes.

Q. You have different last names, sir. Can you explain that to me?

A. He changed his last name.

Q. Do you know when your brother changed his last name?

A. No, I don't.

Q. Is he your older brother?

A. Yes.

Q. How much older is Alex Ng than you?

A. Six years.

Q. Is Nancy Ng a relative of yours?

A. No.

Q. Is Janet Huynh a relative of yours?

A. No.

Q. Do you know Janet Huynh?

A. Yes.

Q. How often do you speak with your brother Alex Ng?

A. Not very often.

Q. Did he tell you that the United States had filed a lawsuit against Sterling Footwear, Inc., Alex Ryan Ng, and NG Branding, LLC?

Page 11

A. Yes.

Q. Do you know when approximately your brother Alex Ng told you about the lawsuit?

A. I don't remember.

Q. Was it this year?

A. I don't think so.

Q. Could it have been last year, sir?

A. Possibly, yes.

Q. Okay. Thank you.

You are familiar with the company Sterling Footwear, Inc.; right?

A. Yes.

Q. And you're also familiar with NG Branding, LLC; correct?

A. Yes.

Q. Are you also familiar with Girly Girl?

A. Yes.

Q. Are you also familiar with One Ambition --

A. Yes.

Q. -- LLC?

Did you work for Girly Girl?

A. No.

Q. Did you work for One Ambition, LLC?

A. Yes.

Q. Did you work for Sterling Footwear, Inc.?

Page 12

A. Yes.

Q. Did you work for NG Branding, LLC?

A. Yes.

MS. COTTET: Ms. Johnson, could you please hand Mr. Ngo Exhibit Number 3, please.

(Exhibit Number 3 was marked for identification.)

BY MS. COTTET:

Q. Have you taken a look at Exhibit Number 3, sir?

A. Yes.

Q. This is your résumé, correct, sir?

A. Yes.

Q. And it's the résumé that you produced today --

A. Yes.

Q. -- correct?

In looking at your résumé, sir, I notice that One Ambition, LLC, is not on this document. Correct? It's not on it; right?

A. Yes.

Q. Can you tell me what Fashion Source 2000, LLC, is?

A. Fashion Source 2000, LLC, was a d/b/a of One Ambition.

Page 13

Q. When you say d/b/a, do you mean doing business as?

A. Yes.

Q. So Fashion Source 2000, LLC, is the same company as One Ambition?

A. Yes.

Q. Do you know when Fashion Source 2000, LLC, became a business?

A. I don't remember.

Q. Was it a business before you started working there?

A. I think so.

Q. Do you know when Fashion Source 2000, LLC, started doing business under the name of One Ambition, LLC?

A. I don't know.

Q. Did you know, sir, that One Ambition, LLC, became a California business on or around March 26, 2004?

A. I don't remember.

Q. Were you one of the owners of Fashion Source 2000, LLC?

A. I don't think so.

Q. I don't understand that. You don't know whether or not you were an owner of that company?

Page 14

A. I don't believe I was.

Q. Was Girly Girl also a d/b/a for Fashion Source 2000, LLC?

A. No.

Q. Were you the agent for service of process for One Ambition, LLC?

A. I don't understand the question.

Q. Pardon me?

A. I don't understand the question.

Q. Well, I'll circle back to that one in a few minutes, sir.

All right. Let's -- for One Ambition, sir, were you an officer of the company? And what I mean by that is president, vice president, secretary, something -- a position like that with that company.

A. I -- yes.

Q. Pardon me?

A. Yes.

Q. What was your position with One Ambition?

A. Secretary.

Q. Did One Ambition have board meetings?

A. No.

Q. Who's the president of One Ambition?

A. Alex.

Q. Who was the vice president of One Ambition?

Page 15

A. There wasn't one.

Q. Who was the treasurer of One Ambition?

A. There wasn't one.

Q. Who owns One Ambition?

A. Alex.

Q. Was there any other owner of One Ambition?

A. Not to my knowledge.

Q. Did Janet Huynh work for One Ambition?

A. I don't think so.

Q. What happened that caused One Ambition to stop doing business?

A. I don't know.

Q. Well, let me ask you this: As secretary for One Ambition, what were your responsibilities?

A. I just handled, like, the daily activities for the company.

Q. Well, can you explain what that means to me?

A. I did, like, invoicing. I handled all the paperwork, the mail. I handled bills, things like that.

Q. Well, on your résumé it says that you were an office clerk. Is that what you mean by handling invoices, paperwork, and bills, or did you do that stuff as the secretary of the company?

MR. EARLY: Objection. Compound.

Page 16

You can answer if you understand her question.

THE WITNESS: I don't understand the question.

BY MS. COTTET:

Q. All right. I just asked you a few minutes ago whether or not you were an officer of One Ambition and the answer to my question was yes, you were the secretary. I asked you a moment ago what did you do as secretary? What was your duties and responsibilities as secretary for One Ambition? And you responded that you handled daily activities for the company, which included invoicing, paperwork, and bills.

I'm trying to understand here whether or not what you explained to me as your duties and responsibilities as a secretary were really the duties and responsibilities your résumé refers to as being an office clerk for Fashion Source 2000, LLC.

MR. FASEL: I'll object as argumentative.

BY MS. COTTET:

Q. So I'm explaining my question, sir, and so please do answer, Mr. Ngo.

MR. EARLY: What is the questions that's pending?

Page 17

BY MS. COTTET:

Q. My question is as it was before. Were you confusing, sir, your responsibilities as a secretary with your responsibilities as an office clerk?

MR. FASEL: I'm going to object as argumentative.

MR. EARLY: I join in that objection. It's also compound and misstates the testimony.

If you understand the question, you can answer it.

THE WITNESS: Essentially, they were the same -- same position.

BY MS. COTTET:

Q. I just want to make sure that we're always on the same page here. So do you know the difference between a secretary who is an administrative assistant and a secretary that is a board member and officer of a company?

MR. EARLY: Objection. Vague, unintelligible.

MR. FASEL: Calls for a legal conclusion.

THE WITNESS: Yes.

BY MS. COTTET:

Q. You may answer. So I asked if you knew the difference between the two.

5 (Pages 14 to 17)

Page 18

A. Yes.

Q. Okay. So when I asked you if you were a board member -- an officer, rather, and you said, yes, that you were a secretary, you understand that your being a board member and officer is different than being an administrative assistant?

MR. EARLY: Objection. Calls for a legal conclusion, misstates his testimony, argumentative, and compound.

MR. FASEL: Asked and answered.

BY MS. COTTET:

Q. You may answer, sir.

A. I'm sorry. Can you repeat the question?

MS. COTTET: I'm going to ask our reporter to please repeat my question.

(Record read by the reporter.)

THE WITNESS: Yes.

BY MS. COTTET:

Q. Where were the offices for One Ambition, LLC?

A. It was in Alhambra.

Q. Would that have been, sir, 801 South Raymond Avenue, Number 43, Alhambra, California?

A. Yes.

Q. And that was the same address that Sterling

Page 19

Footwear, Inc., had; right, sir?

A. Yes.

Q. You stopped working with Fashion Source 2000, LLC, and One Ambition, LLC, in March, 2007; right?

A. Yes.

Q. And in April, 2007, you began working for Sterling Footwear, Inc.; correct?

A. Yes.

Q. Were they the same offices, sir, for One Ambition and Sterling?

A. No.

Q. Was it the same building?

A. No.

Q. Did the same person own both companies?

A. Yes.

Q. So your brother Alex owned One Ambition and Sterling Footwear, Inc.; correct?

A. Yes.

Q. Was there another owner of Sterling Footwear, Inc.?

A. No.

Q. Did you own 5 percent of Sterling Footwear, Inc.?

A. I think I did, yeah.

Page 20

Q. I'd like to understand what you mean by you think you did. Did you put money into that company --

A. No, I did not.

Q. -- Sterling Footwear, Inc.?

A. No, I did not.

Q. Did your brother tell you that he would give you stock or shares in Sterling Footwear, Inc.?

A. Yes.

Q. Were you ever given any stock or shares in Sterling Footwear, Inc.?

A. I don't think so.

Q. Did you ever receive any stock certificate for Sterling Footwear, Inc.?

A. No.

Q. Did your brother Alex Ng ever give you any document stating that he was giving to you 5 percent of Sterling Footwear, Inc.?

A. No.

Q. Did your brother Alex Ng ever give you any documents stating that he would give you any part of ownership in Sterling Footwear, Inc.?

A. No.

Q. Did Alex Ng ever give you any documents stating that he would give you any shares in Sterling

Page 21

Footwear, Inc.?

A. No.

Q. Do you know whether or not Sterling Footwear, Inc., was a publicly traded company?

A. Not to my knowledge.

Q. So to your knowledge, it was not a publicly traded company?

A. Correct.

Q. To your knowledge, did the same people who worked for One Ambition also work for Sterling Footwear, Inc.?

MR. EARLY: Objection. Vague.

MR. FASEL: Join.

THE WITNESS: No.

BY MS. COTTET:

Q. Did any of the people who worked for One Ambition, LLC, work for Sterling Footwear, Inc.?

A. Just myself and Alex.

Q. Thank you.

Who was in charge of One Ambition, LLC?

A. Alex.

Q. Did Alex make all of the decisions regarding One Ambition, LLC?

A. Yes.

Q. And what I mean by that is all of the

Page 22

business decisions. Did Alex make all of the business decisions for One Ambition, LLC?

A. Yes.

Q. Do you know whether or not it was Alex's decision to end One Ambition, LLC?

MR. EARLY: Objection. Asked and answered.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Was it his decision to end One Ambition, LLC?

A. I believe so, yes.

Q. Do you know why he decided to end One Ambition, LLC?

MR. EARLY: Objection. Asked and answered.

MR. FASEL: Join.

THE WITNESS: No, I don't know why.

BY MS. COTTET:

Q. You can still answer.

A. No, I don't know --

Q. Pardon me?

A. No, I don't know why.

Q. Okay. Thank you, sir.

Was your brother Alex Ng in charge of Sterling Footwear, Inc.?

MR. FASEL: Objection. Vague and ambiguous

Page 23

as to "in charge."

MR. EARLY: Join.

You can answer.

THE WITNESS: Yes.

BY MS. COTTET:

Q. And what I mean by "in charge," sir, is did your brother Alex Ng make all business decisions regarding Sterling Footwear, Inc.?

MR. FASEL: Objection. Vague and ambiguous as to "business decisions."

MR. EARLY: Join and add foundation.

You can go ahead and answer.

THE WITNESS: Yes.

BY MS. COTTET:

Q. You worked at Sterling Footwear, Inc.; correct?

A. Yes.

Q. And you worked there, according to your résumé, from April, 2007, to December, 2009?

A. Yes.

Q. Correct?

A. Correct.

Q. And a few moments ago I asked you whether or not you were a part owner of Sterling Footwear, Inc. Do you remember I asked you that question?

Page 24

A. Yes.

Q. And we discussed that your brother told you that he was giving you shares or stocks in that company; correct?

A. Correct.

Q. So you worked for the company, and your brother told you that he was giving you shares or stocks in that company; correct?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Correct.

BY MS. COTTET:

Q. Were you an officer of Sterling Footwear, Inc., sir?

A. No.

Q. So you did not have a position of secretary, treasurer, vice president, or president; correct?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Correct.

BY MS. COTTET:

Q. By the way, sir, I neglected to ask you, do you know how many people worked at One Ambition?

MR. EARLY: Objection. Vague as to time.

THE WITNESS: I don't remember.

BY MS. COTTET:

Q. Was it a lot of people or a few people?

Page 25

A. A few people.

Q. Would the most number of employees of that company, from the time that you worked there until the time that you stopped working there, would that have been more than ten or less than ten?

MR. EARLY: Objection. Vague, calls for speculation.

THE WITNESS: Less than ten.

BY MS. COTTET:

Q. Okay. Would that include you and Alex in the less than ten?

A. Yes.

Q. All right. Mr. Ngo, I'm going to let us all take a 10-minute break. And, again, I do believe that this will be over now in about two hours. So 10-minute break.

A. Okay.

(Recess taken from 10:40 a.m. to 10:51 a.m.)

BY MS. COTTET:

Q. All right. We're back on the record after our 10-minute break, Mr. Ngo, and I remind you that you're still under oath.

What type of business was One Ambition, sir?

A. It was a wholesale of garments.

7 (Pages 22 to 25)

Page 26

Q. Did it also import footwear?
A. Yes.
Q. Do you know where it imported footwear from?
A. No.
Q. Sterling Footwear, when it started -- you worked there when it started; right?
A. Yes.
Q. When it started, how many people worked for Sterling Footwear?
A. About ten.
Q. And did these ten people include you and your brother Alex Ng?
A. Yes.
Q. Do you know who the other eight people are?
A. You mean do I know the names?
Q. Yes, sir.
A. Yes.
Q. Can you tell me their names, please?
MR. FASEL: Objection, calls for a narrative.
THE WITNESS: I don't remember all of them right now off the top of my head.
BY MS. COTTET:
Q. Well, just tell me the ones you remember.
A. Janet Huynh, Nancy Ng, Fernando Calvo, Ruby

Page 27

Chang, Ariel Chang. That's the only ones I can remember right now.
Q. Did Sonya Wang work there initially?
A. Oh, yes, Sonya Wang, yes.
Q. Was there somebody by the name of Liu, L-i-u?
A. First name? Liu?
Q. I don't know how to pronounce the first name. X-i-a-o?
A. Yes.
Q. How about Andrew Parkman?
A. Yes.
Q. How about Jida Morra, did that person also work with Sterling Footwear, Inc., at about the time you started?
A. I believe she came in later on.
Q. What kind of business was Sterling Footwear, Inc.?
A. It was a wholesaler of footwear.
Q. By the way, sir, did Nicole Woo also work at Sterling Footwear, Inc.?
A. Yes.
Q. Sir, do you know a Kenny Chan?
A. Yes.
Q. Did Kenny Chan work at Sterling Footwear,

Page 28

Inc.?
A. Yes.
Q. Did Alan Wu, W-u, work at Sterling Footwear, Inc.?
A. No.
Q. Do you know Alan Wu?
A. Yes.
Q. Did Alan Wu work at NG Branding, LLC?
A. No.
Q. Was Alan Wu one of the owners of NG Branding, LLC?
MR. EARLY: Objection. Foundation, calls for speculation.
THE WITNESS: Not to my knowledge, no.
BY MS. COTTET:
Q. According to your résumé, you worked at NG Branding, LLC; right?
A. Yes.
Q. Your brother Alex Ng owned NG Branding, LLC, didn't he?
MR. EARLY: Objection. Asked and answered.
THE WITNESS: Yes.
BY MS. COTTET:
Q. Were there any other owners of NG Branding, LLC?

Page 29

A. Not to my knowledge.
Q. Sterling Footwear, Inc., also imported footwear; correct?
A. Yes.
Q. Did Sterling Footwear, Inc., have an international branch?
A. Not to my knowledge.
Q. What did you do Sterling Footwear, Inc., when you worked there?
A. I assisted the controller, and I did pick-ups and deliveries.
Q. Who was the controller?
A. Kenny Chan.
Q. What did the controller do? What were the controller's duties and responsibilities?
A. He handled the finances, the bookkeeping.
Q. So Kenny Chan handled the finances and bookkeeping for Sterling Footwear, Inc.?
MR. FASEL: Objection. Asked and answered.
MR. EARLY: Join.
THE WITNESS: Yes.
BY MS. COTTET:
Q. And when you assisted him as the controller's assistant, what did you do?
A. I would help him with mailing out

Page 30

statements, checks that we received, wrote out checks.

Q. Did you have the authority to sign checks for Sterling Footwear, Inc.?

A. Yes.

Q. The checks that you -- did you ever sign checks for Sterling Footwear, Inc.?

A. Yes.

Q. The types of checks that you signed, were they payroll checks?

A. Yes.

Q. Did you also sign checks for payments to U.S. Customs and Border Protection?

A. Yes.

Q. Did Kenny Chan also sign checks?

A. No.

Q. Who had the authority at Sterling Footwear, Inc., to sign checks?

A. Myself and Alex.

Q. Who made the determination as to which checks you signed and which checks your brother Alex Ng signed?

MR. EARLY: Objection. Vague.

THE WITNESS: No one made that decision.

///

Page 31

BY MS. COTTET:

Q. Well, how is it that sometimes you signed checks for payroll and checks to U.S. Customs and Border Protection and sometimes Alex Ng signed other checks?

A. It was whoever was around at the time.

Q. All right. Let's talk about how Sterling Footwear, Inc., was structured as a business. Did Sterling Footwear, Inc., have different departments that handled different aspects of the wholesale footwear business?

A. Yes.

Q. What were those different departments?

A. There was designing, finance, and then the people who handled the paperwork for customs.

Q. So there was a design department?

A. Yes.

Q. A finance department?

A. Yes.

Q. Customer relations department?

A. Yes.

Q. Did you say there was another department, sir?

A. Yeah, they handled the shipments.

Q. I know this is going to sound like a silly

Page 32

question, but I do want to know, what does the design department do?

A. They came up with designs for the footwear.

Q. Okay. Now, were you -- did you deal with the design department when you worked for Sterling Footwear, Inc.?

A. No.

Q. What did the finance department do?

A. Handled the bills.

Q. Is that the controller's office?

A. Yes.

Q. So all the stuff that we talked about a few minutes ago with respect to Kenny Chan and his responsibilities, as well as your own responsibilities as an assistant to the controller, that's what fell under finance?

A. Yes.

Q. Was there anything more that fell under finance?

A. No.

Q. Now, shipping, that shipping department, did that department handle importations of samples and products that were sold by Sterling Footwear, Inc.?

A. Yes.

Q. As a part of your duties and

Page 33

responsibilities with Sterling Footwear, Inc., did you work with the shipping department as well?

A. Yes.

Q. What did you do in relation to the shipping department?

A. Pay the bills that were due for customs.

Q. So can you explain to me how it is that you went about paying the bills to customs? How did that work on a daily basis?

A. I was given the bills that needed to be paid by the people in the shipping department, and then I would write a check for that amount.

Q. Did you also pay customs brokers?

A. Yes.

Q. And they would submit bills and you would pay those checks, pay them by check?

A. Correct.

Q. What happened when a bill was received by U.S. Customs and Border Protection for additional duties for the importation of footwear? Did you pay those checks as well?

A. It was given to the shipping department first.

Q. Okay. So if when -- and you're aware customs sent bills to Sterling Footwear, Inc.;

Page 34

correct? You were aware of that; right?

A. Yes.

Q. And those bills went to the shipping department --

A. Yes.

Q. -- when they were received?

A. Yes.

Q. Now, the shipping department, we discussed a few minutes ago, would give you the bills and you would write the checks. So did that happen as well when customs sent a bill and it went to shipping? Would it then come back to you for payment?

MR. FASEL: Objection. Vague and ambiguous as to which bill.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Was the answer yes?

A. Yes.

Q. Did you write checks to U.S. Customs and Border Protection for bills that they sent to Sterling Footwear, Inc.?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Did your brother Alex Ng also write bills to

Page 35

U.S. Customs and Border Protection --

MR. FASEL: Objection. Vague and ambiguous.

BY MS. COTTET:

Q. -- for Sterling Footwear, Inc.'s, importations?

MR. EARLY: Mikki, I think you misspoke.

MS. COTTET: I'm sorry, sir. I'm sorry, sir. When I am asking a question, I'd appreciate that you wait until I complete my questions before you state your objection.

MR. FASEL: I'm trying to. You're taking such long pauses it's hard for me to determine when your question is ending.

MS. COTTET: I'm going to ask the reporter to please read my last question back.

(Record read by the reporter.)

MR. EARLY: I object to the phrase "write bills" as vague and ambiguous.

MR. FASEL: I join.

THE WITNESS: Not that I'm aware of.

BY MS. COTTET:

Q. Did your brother Alex Ng also write checks on behalf of Sterling Footwear, Inc., for bills that were sent to Sterling Footwear, Inc., by U.S. Customs and Border Protection?

Page 36

A. Not to my knowledge.

Q. Were you ever instructed not to pay a bill sent to Sterling Footwear, Inc., by U.S. Customs and Border Protection for duties due to the United States for Sterling Footwear's entries?

MR. FASEL: Objection. Vague and ambiguous as to "duties due to the United States."

THE WITNESS: No.

BY MS. COTTET:

Q. Sir, do you recall ever receiving a bill from U.S. Customs and Border Protection identified as a rate advance?

A. I don't recall.

Q. So is it fair to say that you would not know whether or not you paid a check or made a check payable to U.S. Customs and Border Protection for a bill referred to as a rate advance?

A. Correct.

MS. COTTET: Ms. Johnson, could you please hand to Mr. Ngo Exhibit Number 5, please.

(Exhibit Number 5 was marked for identification.)

BY MS. COTTET:

Q. Sir, I'm going to direct your attention to page 5, and at the top of page 5 it refers to

Page 37

Interrogatory Number 6 and Amended Response to Interrogatory Number 6. And I'm just going to ask you to read that section for me, please.

A. "Sterling Footwear, Inc., Alex Ng, and Ty Ngo, NG Branding, LLC" --

Q. You don't have to read it out loud. You can read it to yourself, sir. I'm sorry. Read it to yourself.

A. Oh, okay.

Q. Have you finished reading it, sir?

A. Yes.

Q. Okay. In Interrogatory Number 6, the government requested that the defendants in this case, Sterling Footwear, Inc., Alex Ryan Ng, and NG Branding, LLC, quote, "identify all corporate board members of Sterling Footwear, Inc., and/or NG Branding, LLC, and state the period of time during which any person identified was a board member of Sterling Footwear, Inc., and/or NG Branding, LLC."

In response -- in an amended response to Interrogatory Number 6, the defendants in this case identified you as being a board member of Sterling Footwear, Inc. And I believe I asked you earlier whether or not you were a board member of Sterling Footwear, Inc.

Page 38

Were you a board member or not, sir?

A. No, I had no title.

MR. FASEL: Object to that last question, that it calls for a legal conclusion.

MS. COTTET: Pardon me? I did not hear the objection.

MR. FASEL: Calls for a legal conclusion.

BY MS. COTTET:

Q. Earlier today I asked you whether you were a part owner in Sterling Footwear, Inc. Do you remember me asking you that question, sir?

A. Yes.

Q. And do you recall telling me that you were not an owner of Sterling Footwear, Inc.?

MR. EARLY: Objection. He amended that answer.

MR. FASEL: Join.

THE WITNESS: Yes, I remember.

BY MS. COTTET:

Q. Sir, you still have to answer.

A. Yes, I remember.

Q. Were you an owner of Sterling Footwear, Inc., or not?

MR. FASEL: Objection. Asked and answered.

MR. EARLY: Join.

Page 39

THE WITNESS: Yes.

BY MS. COTTET:

Q. You were an owner of Sterling Footwear, Inc.?

MR. EARLY: Objection. Asked and answered four times.

MR. FASEL: Join.

THE WITNESS: Yes.

BY MS. COTTET:

Q. How much of an ownership interest in Sterling Footwear, Inc., did you have, sir?

MR. EARLY: Objection. Asked and answered.

MR. FASEL: Join.

THE WITNESS: 5 percent.

BY MS. COTTET:

Q. And just to be clear, you put no money into the business; correct?

MR. FASEL: Objection. Asked and answered.

MR. EARLY: Join.

THE WITNESS: Correct.

MR. FASEL: She's just repeating herself.

BY MS. COTTET:

Q. And there are no documents that would demonstrate that you owned 5 percent of the business; correct?

Page 40

MR. FASEL: Objection. Asked and answered.

MR. EARLY: Join.

THE WITNESS: Correct.

BY MS. COTTET:

Q. Who were -- did you fill out any paperwork with the California Secretary of State for or on behalf of Sterling Footwear, Inc.?

A. I don't recall.

Q. Who were supervisors at Sterling Footwear, Inc.?

A. Alex.

Q. Alex supervised everybody?

A. Yes.

Q. Did he have any people who were under him in terms of responsibility who also supervised people?

A. Yes.

Q. Who? Who were those people?

A. Kenny Chang and Janet Huynh.

Q. Who did Janet Huynh supervise?

A. The shipping department.

Q. So she was in charge of the shipping department under Alex Ng?

A. Yes.

Q. Is Sterling Footwear, Inc., the company that you owned 5 percent interest in, still a business?

Page 41

A. No.

Q. When did it stop being a business?

MR. FASEL: Object. Vague and ambiguous as to "business."

THE WITNESS: I don't remember.

BY MS. COTTET:

Q. Do you know when Sterling Footwear, Inc., stopped doing wholesale business?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: I don't remember.

BY MS. COTTET:

Q. Do you remember when Sterling Footwear, Inc., stopped importing footwear?

A. No, I don't remember.

Q. Do you know how Sterling Footwear, Inc., stopped doing business?

MR. FASEL: Objection. Vague and ambiguous and unintelligible.

MR. EARLY: Join.

THE WITNESS: I don't understand the question.

BY MS. COTTET:

Q. Okay. So Sterling Footwear, Inc., was a business that you owned 5 percent of; correct?

MR. FASEL: Objection. Asked and answered.

Alderson Reporting Company
1-800-FOR-DEPO

Page 42

THE WITNESS: Yes.

BY MS. COTTET:

Q. And you also worked there; correct?

MR. FASEL: Objection --

MR. EARLY: Objection. Asked and answered. Come on. Let's keep moving.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Correct?

A. Correct.

Q. You worked at Sterling Footwear, Inc., according to your résumé, from April, 2007, to December of 2009; correct?

A. Yes.

Q. Why did you stop working at Sterling Footwear, Inc.?

A. The company closed.

Q. What happened with the -- take that back. Did Sterling Footwear, Inc., have office furniture?

A. Yes.

Q. Did it have computers?

A. Yes.

Q. Did it have accounts receivable?

A. Yes.

Page 43

MR. EARLY: Vague as to time. Objection.

BY MS. COTTET:

Q. And I'm talking all of this is at the time that it closed in 2009, sir. So did Sterling, at the time that it closed, have office furniture?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Did it have computers at the time that it closed?

A. Yes.

Q. Did it have accounts receivables at the time that it closed?

A. Yes.

Q. Did it have a bank account with money in it at the time that it closed?

A. I believe so, yes.

Q. Did it have employees at the time that it closed in December, 2009?

A. Yes.

Q. What happened with the furniture that Sterling Footwear, Inc., had at the time it closed in 2009?

A. I don't know.

Q. What happened with the computers that

Page 44

Sterling Footwear, Inc., had at the time that it closed in 2009?

A. I don't know.

Q. How about the checking account that Sterling Footwear had at the time that it closed in 2009? What happened to the money in the checking account?

A. I don't know.

Q. What happened to the money that was in Sterling Footwear's savings account at the time that it closed in 2009?

A. Again, I don't know.

MR. FASEL: Objection. I don't think he ever testified that there was a savings account.

BY MS. COTTET:

Q. Did Sterling Footwear, Inc., have a savings account and a checking account at the time that it closed in 2009?

A. I'm only aware of the checking.

Q. Okie-dokie.

What happened to Sterling's employees at the time that it closed in 2009?

MR. EARLY: Objection. Vague.

MR. FASEL: Calls for speculation.

THE WITNESS: I don't know.

///

Page 45

BY MS. COTTET:

Q. Isn't it true, sir, that many of Sterling's employees started working for NG Branding, LLC, at the time that Sterling closed?

A. Yes.

Q. So actually, you do know what happened to some of the employees; right?

MR. EARLY: Objection. Argumentative, mischaracterizes his testimony.

MR. FASEL: Join.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Okay. Did Janet Huynh work for NG Branding, LLC, at the time that Sterling Footwear, Inc., closed in 2009?

MR. FASEL: Objection. Vague and ambiguous and unintelligible.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Did Nancy Ng work for NG Branding, LLC, when Sterling Footwear, Inc., closed in 2009?

MR. FASEL: Same objections.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Did you work for NG Branding, LLC, at the

Alderson Reporting Company
1-800-FOR-DEPO

Page 46

time that Sterling Footwear, Inc., closed in 2009?

MR. FASEL: Same objections.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Did Fernando Calvo work for NG Branding, LLC, when Sterling Footwear, Inc., closed in 2009?

MR. FASEL: Same objections.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Did Ruby Chang work for NG Branding, LLC, when Sterling Footwear, Inc., closed in 2009?

MR. FASEL: Same objections.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Did Ariel Chang work for NG Branding, LLC, when Sterling Footwear, Inc., closed in 2009?

MR. FASEL: Same objections.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Did Sonya Wang work for NG Branding, LLC, when Sterling Footwear, Inc., closed in 2009?

MR. FASEL: Same objections.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Did Nicole Woo work for Sterling Footwear,

Page 47

Inc. -- or for NG Branding -- I apologize. Did Nicole Woo work for NG Branding, LLC, when Sterling Footwear, Inc., closed in 2009?

MR. FASEL: Same objections.

THE WITNESS: Yes.

BY MS. COTTET:

Q. How about Andrew Parkman? Did he also work with NG Branding, LLC, when Sterling Footwear, Inc., closed in 2009?

MR. FASEL: Same objections.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Sir, did Kenny Chan also work for NG Branding, LLC, when Sterling Footwear, Inc., closed in 2009?

MR. FASEL: Same objections.

THE WITNESS: Yes.

BY MS. COTTET:

Q. It is true, sir, that NG Branding, LLC, started doing business, footwear wholesale business, before Sterling Footwear, Inc., closed in 2009, isn't it?

A. Not that I'm aware of.

Q. Did NG Branding, LLC, have the same street address as Sterling Footwear, Inc., sir, when it

Page 48

started?

A. Yes.

Q. I think this is a good time to take a 10-minute break.

Well, actually, I'm going to ask you, sir, I have about one more hour to go with you. So it's your choice. We can take a 10-minute break or a 20-minute break, or you can take a lunch at this time. It's up to you.

MR. EARLY: He has work to get back to. I prefer we just keep going. I don't think we need a break.

THE WITNESS: I'm fine with that.

BY MS. COTTET:

Q. Well, you may not, but I am taking a break. I'm giving you an opportunity to take 10 or 20 minutes.

A. 10 is fine.

Q. Thank you.

MS. COTTET: So we're going off the record now for a 10-minute break.

(Recess taken from 11:40 a.m. to 11:49 a.m.)

BY MS. COTTET:

Q. All right. We're back on the record.

Page 49

Mr. Ngo, were you an officer of NG Branding, LLC?

A. No.

Q. Were you the corporate secretary for NG Branding, LLC?

MR. EARLY: Object --

THE WITNESS: No. No.

MS. COTTET: I would like Exhibit Number 6 handed to Mr. Ngo.

(Exhibit Number 6 was marked for identification.)

BY MS. COTTET:

Q. Sir, please take a look at Exhibit Number 6, and when you're done, if you could let me know, please.

A. Okay.

Q. So, sir, on Exhibit Number 6 this is a Customs Power of Attorney. Near the bottom of the page it refers to NG Branding, LLC, and it contains a signature. Is that your signature, sir?

A. Yes.

Q. And under your signature, sir, it states "capacity" in parentheses, and written in that space is "Corporate secretary," dated August 25, 2009; correct?

Alderson Reporting Company
1-800-FOR-DEPO

Page 50

A. Correct.

Q. So is it fair to say, sir, that you signed a Customs Power of Attorney for NG Branding, LLC, as its corporate secretary on August 25, 2009?

MR. FASEL: Objection. Argumentative.

THE WITNESS: Yes.

BY MS. COTTET:

Q. Now, that means that NG Branding, LLC, existed on August 25, 2009; correct?

MR. EARLY: Well, that -- objection -- calls for a legal conclusion.

MR. FASEL: Join.

THE WITNESS: Yes.

BY MS. COTTET:

Q. And a little while earlier before we took the break, you stated that Sterling Footwear, Inc., closed at the end of 2009; correct?

A. Yes.

Q. Okay. Can you tell me why, sir, you're signing a document as the corporate secretary when you were not an officer of the company --

MR. FASEL: Objection --

BY MS. COTTET:

Q. -- NG Branding, LLC?

MR. FASEL: Objection. Argumentative.

Page 51

THE WITNESS: I don't remember why.

BY MS. COTTET:

Q. Okay. Did NG Branding, LLC, do the same kind of business as Sterling Footwear, Inc., sir?

MR. FASEL: Objection. Vague and ambiguous as to "same kind of business."

THE WITNESS: Yes.

BY MS. COTTET:

Q. It imported footwear, sir?

A. Yes.

Q. It imported the same kind of -- and when I say "it," I mean NG Branding, LLC, imported the same kind of footwear that Sterling Footwear, Inc., imported; correct?

A. Yes.

Q. Sir, were you aware that U.S. Customs and Border Protection believed that Sterling Footwear, Inc., misclassified entries of its footwear into the United States?

A. Yes, I was aware of that.

Q. Okay. Who told you about that?

A. It was Alex.

Q. What did Alex tell you about U.S. Customs and Border Protection's belief that Sterling Footwear, Inc., misclassified entries of its

Page 52

footwear?

A. Just that. Nothing specific.

Q. Did your brother, Alex Ng, tell you about that, and I mean about U.S. Customs and Border Protection's belief that Sterling Footwear, Inc., misclassified entries of its footwear before Sterling Footwear, Inc., closed in 2009?

A. No.

Q. When did he tell you about that?

A. When he was served with the lawsuit.

Q. Did you know that your brother Alex Ng sent a check to U.S. Customs and Border Protection for $62,370 to pay for some of the misclassified footwear that Sterling Footwear, Inc., had entered into the United States?

A. I can't recall that, no.

Q. Okay. Did you have any involvement other than paying customs brokers with -- customs brokers on behalf of Sterling Footwear, Inc.?

A. No.

Q. Did you have any involvement in the classification of any of Sterling Footwear, Inc.'s, entries of footwear?

A. No.

Q. Were you aware that Sterling Footwear, Inc.,

Page 53

had a website?

A. No, I wasn't aware of that.

Q. Sir, were you aware that NG Branding, LLC, became a business in February 13 -- on February 13, 2009?

MR. FASEL: Objection as to "business." Calls for a legal conclusion.

THE WITNESS: I'm not aware of the specific date.

BY MS. COTTET:

Q. What did you do, sir, for NG Branding, LLC?

MR. FASEL: Objection. Vague and overly broad as to "do."

THE WITNESS: Pretty much the same thing as for Sterling Footwear.

BY MS. COTTET:

Q. Okay. Does NG Branding, LLC, still operate as a business importing footwear?

A. Not to my knowledge, no.

Q. When did it stop -- when did NG Branding, LLC, stop importing footwear?

A. I don't know.

Q. Where do you work right now, sir?

A. I work for The Crawfish Spot, in West Covina.

14 (Pages 50 to 53)

Page 54

Q. Pardon me?

A. I work for The Crawfish Spot in West Covina.

Q. You said Crawfish?

A. Yes.

Q. Okay.

MS. COTTET: Thank you very much, sir. You're released from the deposition.

MR. EARLY: He's requesting his --

MS. COTTET: We're done.

MR. EARLY: He's requesting his witness fees.

MS. COTTET: Okay.

(Whereupon at 12:02 p.m. the taking of the instant deposition ceased.)

Page 55

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____
Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of _____, 2014, and executed the above certificate in my presence.

_____
NOTARY PUBLIC IN AND FOR

_____
County Name

MY COMMISSION EXPIRES:

Page 56

DEPOSITION OFFICER'S CERTIFICATION

I, Lisa Moskowitz, a Certified Shorthand Reporter in the State of California, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me.

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed.

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney or of any of the parties, nor financially interested in the action.

I declared under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this date: November 23, 2014.

_____
LISA MOSKOWITZ, CA CSR No. 10816
Registered Professional Reporter

15 (Pages 54 to 56)