# EXHIBIT E

Deposition of Alex Ng

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

_____

                                          )

UNITED STATES,                            )

                                          )

                    Plaintiff,            )

                                          ) Case No. 12-0193

          vs.                             )

                                          )

STERLING FOOTWEAR, INC., ALEX NG,         )

and NG BRANDING, LLC                      )

                                          )

                    Defendants.           )

_____)

                              Thursday, January 15, 2015

                              Long Beach, California

          Videotaped Deposition of ALEX NG, taken on

     behalf of the Plaintiff, at 1 World Trade Center,

     Suite 1200, Long Beach, California, commencing at

     9:37 a.m. and ending at 4:00 p.m., on Thursday,

     January 15, 2015, before Elizabeth Borrelli, a

     Certified Shorthand Reporter in the State of

     California, License No. 7844, CCLL, CLR.

Job No. 55352

Pages 1 to 211

Page 2

APPEARANCES

For the Plaintiff:
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
BY: VINCENT D. PHILLIPS
Attorney at Law
1100 L Street N.W.
Washington, DC 20530
(202) 305-4591
vincent.phillips2@usdoj.gov

For the Defendants:
FASEL LAW
BY: THOMAS A. FASEL
Attorney at Law
610 Newport Center Drive
Suite 810
Newport Beach, California 92660
(949) 706-3188
taf@fasellaw.com

Also Present:
MEREDITH A. JOHNSON
RYAN WONG, Videographer

Page 4

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:37 a.m. Today's date is January 15th, 2015. This is Volume No. 1, Media Unit No. 1 of the video deposition of Alex Ng in the matter of United States versus Sterling Footwear and others filed in the United States Court of International Trade. And the case number is 120193.

This deposition is being held at One World Trade Center, Suite 1200, Long Beach, California, 90831.

My name is Ryan Wong, I'm the videographer representing Alderson Court Reporting.

Will counsel and all present state their appearances and affiliations for the record, please?

MR. PHILLIPS: Vincent Phillips for the United States Department of Justice representing the plaintiff.

MS. JOHNSON: Meredith Johnson, U.S. Customs and Border Protection representing the plaintiff.

MR. FASEL: Thomas Fasel for defendants.

THE WITNESS: Alex Ng.

THE VIDEOGRAPHER: The court reporter is Elizabeth Borrelli, representing Alderson Court Reporting and will now swear in the witness.

Page 3

INDEX

WITNESS: ALEX NG                    PAGE
Examination by Mr. Phillips          5


EXHIBITS

EXHIBIT NO.                         PAGE
Exhibit 1   California Secretary of State     44
                entry for Sterling Footwear, Inc.
Exhibit 2   Defendants' First Amended     148
                Responses to Plaintiff's First
                Set of Interrogatories
Exhibit 3   Complaint                  191
Exhibit 4   Defendants' Answers to Complaint   191
Exhibit 5   Attachment A to the Complaint     201


INSTRUCTION NOT TO ANSWER    INFORMATION REQUESTED
     Page   Line          Page   Line
     154    20            169    5
     163    5
     171    9
     193    18
     194    18
     196    1

Page 5

ALEX NG,
having been duly administered
an oath in accordance with CCP 2094,
was examined and testified as follows:

EXAMINATION

BY MR. PHILLIPS:

Q. Please state your full name for the record, sir?

A. My name is Alex Ryan Ng.

Q. Mr. Ng, have you ever been deposed before?

A. Yes.

Q. In what -- in what cases have you been deposed before?

A. On a case of Moua versus Ng.

Q. And what was that case about?

A. Relates to civil. I'm not 100 percent --

Q. Where you the defendant in that matter?

A. Yes, I am.

Q. And when you say relates to civil, was it a case involving your businesses or a case involving you personally?

A. Personally.

Q. And in -- just the general topic, what was it personally? Was it some dispute with someone over --

Page 6

A. Ex-girlfriend.

Q. Dispute with ex-girlfriend, okay.

Sir, so you -- you have been deposed before, correct?

A. Yes.

Q. So you understand that you are under oath and I'm going to ask you questions and you are going to provide answers?

A. Yes.

Q. And just so we can make sure this runs smoothly, I'm going to ask you to allow me to finish my question before you start to answer. And I, in return, will allow you to finish your answer before I ask a new question. Is that --

A. Yes.

Q. -- acceptable?

Is there any reason why you couldn't testify truthful and accurately today?

A. No.

Q. Where do you reside currently?

A. I'm currently reside in Ho Chi Minh, Vietnam.

Q. And are you a Vietnamese citizen?

A. No.

Q. What country are you a citizen of?

Page 7

A. U.S.

Q. And where in Vietnam in Ho Chi Minh City do you reside?

A. In the -- District 7, Vietnam.

Q. And in a given year, what percentage of your time do you reside in Vietnam as opposed to elsewhere?

A. Majority of my time is in Vietnam.

Q. When you're not in Vietnam, where do you reside?

A. Just Vietnam and I come back here for deposition.

Q. And when you say you come back here, do you mean to United States generally or to California specifically?

A. Just to California.

Q. And how many times in the last year -- I'm looking for 12 calendar months -- have you been in California?

A. Approximate, three to five times a year.

Q. And when you're here those three to five times, where do you stay?

A. I stay at my brother's house.

Q. And who is your brother?

A. Alan Wu.

Page 8

Q. And where does Mr. Wu reside?

A. He reside in Arcadia, California.

Q. And can you give me a street address for that, please?

A. Yes, Santa Anita Avenue.

Q. Have you ever lived in the United States at any point?

A. Yes.

Q. And when was the last time you lived in the United States?

A. I live in the United States when I immigrate to U.S., since 1980 until up to 2005, estimate that I start living in Vietnam.

Q. And up until 2005, where did you live in the United States?

A. I -- I live in Arcadia, California.

Q. All right. At what address?

A. Did you -- you need the year from the time I arrive in the United States 'til 2005 or --

MR. FASEL: I'm going to object as to vague and ambiguous --

BY MR. PHILLIPS:

Q. Let's start --

MR. FASEL: -- as to time.

BY MR. PHILLIPS:

Page 9

Q. -- with the last time that you lived in the United States, which I understood from your answer to be 2005. Where, in 2005, did you live? What was that address?

A. 3311 Bartlett Avenue in Rosemead, California.

Q. And did you own or rent at that address?

A. It's a family home.

Q. And who is the family member that owns or rents that property?

A. It was my brother.

Q. And what is your brother's name?

A. Andy Wu.

Q. And is this the same Mr. Wu that you referenced a few questions before about where you said --

A. I don't understand.

Q. -- you stay?

I just want to know if -- if the individual you're talking about is a different person from the previous --

A. Yes.

Q. -- one.

Okay. So this is a different person?

A. Yes.

Alderson Reporting Company
1-800-FOR-DEPO

Page 10

Q. Okay. So the -- the Mr. Wu that you resided with in 2005 was a family member?

A. I -- Andy Wu is my older brother.

Q. Okay.

A. He's at the 3311 Bartlett Avenue. And Alan Wu is the younger brother over at Santa Anita address.

Q. And I may just be confused, sir. Is Alan Wu also your brother?

A. Yes.

Q. Okay. During the period -- well, any time after 2005 are you -- is it your testimony that you have not held a residence in the United States?

A. I travel back and forth.

Q. And when you travel back and -- actually, I don't think that answered my question, sir. After 2005 to the present, have you ever lived in the United States? Have you ever owned or rented a property in the United States where you resided?

MR. FASEL: I'm going to object as vague and ambiguous as resided.

THE WITNESS: I don't own or rent, I stay at my brother's house.

BY MR. PHILLIPS:

Page 11

Q. Okay. Do you use any aliases? And by aliases I mean have you ever used another name?

A. Yes.

Q. And what was that other name that you've used?

A. First name is spelled T-R-I, last name is spelled N-G-O.

Q. And in what situations have you used that other name?

A. That was before citizenship.

Q. And -- okay. So are you -- I'm just -- I'm -- I just want to understand a little about that. So prior to becoming a U.S. citizen, which I think you stated was sometime around 1980, you used another name?

A. That was my birth name.

Q. Okay.

A. Given -- when I -- before -- when I -- before I arrived here. And in 1992, when I became a citizen, that's when I changed my name legally.

Q. And you changed your name legally from that first name to your current name?

A. That's correct.

Q. Okay. Have you ever used any other names, other than those two?

Page 12

A. No.

Q. Okay. Sir, in preparing for this deposition, could you tell me what you did, generally? Did you review documents? Did you talk to people?

MR. FASEL: I'm going to object as far as it violates the attorney-client privilege.

BY MR. PHILLIPS:

Q. And I don't want to -- I'm not trying to get into anything that you and your attorney may have discussed in preparation. But I assume you were told by your attorney that you would be deposed in this case, correct?

MR. FASEL: I'm going to object as to attorney-client privilege.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. And after you learned that you would be deposed, did you look at any documents in preparation for this deposition?

A. No.

Q. Did you talk to anyone, aside from your attorney, about the subject matter of this case?

A. No.

Q. Did you talk to a woman by the name of

Page 13

Ms. Nancy Ng about this case?

A. No.

Q. Okay. Did you talk to a woman by the name of Ms. Janet Huynh about this case?

A. No.

Q. Did you talk to anyone that you have worked at -- worked with at either Sterling Footwear, Incorporated about this case?

A. No.

Q. Did you talk with anyone that you may have worked with at Ng Branding, LLC about this case?

A. No.

Q. Did you read any deposition transcripts from depositions taken in this case?

A. No.

Q. Just stepping back for a second, sir. I usually go about an hour and a half between breaks. If at any point you need a break, please tell me. We have no problem taking a break. I would just ask that you not ask for a break when there's a question pending. So if there's a question pending, I would like an answer before we would go for a break. So that goes for the entire day.

A. Okay.

MR. FASEL: Do you have an estimate too,

4 (Pages 10 to 13)

Page 14

as far as today?

MR. PHILLIPS: I'm --

MR. FASEL: I understand that it all depends on how we go so far. But if you have an estimate, I would appreciate it.

MR. PHILLIPS: I -- I don't now. I hope to not go all day. But I -- I imagine it will be comparable to what we've done before, maybe a little longer. So I'd -- a few hours.

MR. FASEL: Would 4:00 be a target? Would that be --

MR. PHILLIPS: If -- if you have a prior engagement, we can certainly aim for 4:00.

MR. FASEL: Okay.

MR. PHILLIPS: That's possible.

MR. FASEL: That would be great. Thank you.

BY MR. PHILLIPS:

Q. Sir, are you familiar with the Harmonized Tariff Schedule of the United States of America?

A. No.

Q. Have you ever heard of the Harmonized Tariff Schedule of the United States?

A. No.

Q. Are you or have you ever worked as a

Page 15

customs broker in the United States of America?

A. No.

Q. Do you now or have you ever held a customs brokers license?

A. No.

Q. Do you have any experience in making tariff classification determinations under the Harmonized Tariff Schedule of the United States?

A. No.

Q. Have you ever worked for a customs broker business?

A. No.

Q. Have you ever worked under a licensed customs broker clearing entries into the United States?

MR. FASEL: I'm going to object as to vague and ambiguous as to clearing Customs in the United States. Calls for expert opinion.

BY MR. PHILLIPS:

Q. Do you understand what I mean, sir, when I say about clearing entries of merchandise into the United States?

A. Yes.

Q. Have you ever worked under a licensed customs broker in completing the entries or clearing

Page 16

entries of merchandise into the United States?

A. No.

Q. Have you ever filed entries for import with Customs and Border Protection?

A. No.

Q. Have you ever read any manuals, pamphlets or books regarding -- regarding the classification of merchandise and the entry of goods into the United States?

A. No.

Q. Have you ever received any training in importing merchandise into the United States?

A. No.

Q. Have you ever attended any seminars, conferences for customs brokers or regarding the customs process of entering merchandise into the United States?

A. No.

Q. Have you ever received, in any job you've had, training regarding the classification and entry of goods into the United States?

A. No.

Q. Have you done anything else, at any point, to educate yourself about the classification and entry of merchandise into the United States?

Page 17

A. No.

Q. Are you familiar with the customs broker examination?

A. No.

Q. Did you ever sit for the customs broker examination?

A. No.

Q. Sir, are you familiar with a business called One Ambition, LLC?

A. Yes.

Q. And how are you familiar with that company?

A. I was working at the company.

Q. And what kind of company was that?

A. That's a clothing company.

Q. And what did that company do?

A. They import clothing.

Q. Where did the -- where did One Ambition, LLC import clothing from?

A. I believe it was in -- from China.

Q. You said you worked for that company. What role did you have at that company?

A. Design.

Q. And when you say design, what do you mean?

A. I developed and I -- I handled the

5 (Pages 14 to 17)

Page 18

production side.

Q. Okay. What did you develop for One Ambition, LLC?

A. Clothing.

Q. What kind of clothing?

A. Missy contemporary clothing.

Q. And what --

A. Missy contemporary.

Q. And could you explain to me what it means to develop clothing for a company like One Ambition, LLC?

A. Well, what -- what they do is customer would give us a tech pack with -- which shows the specs of how the clothing being made. And I take that and I go and develop with the factories oversea.

Q. And how would you develop with the factories overseas?

MR. FASEL: Objection. Vague and ambiguous. And calls for an narrative.

THE WITNESS: I would go there, bring the samples and I would tell them: "This is what they want." The color. The design. The print. The size. And that's -- and they take it from there.

BY MR. PHILLIPS:

Page 19

Q. Were you working directly with the companies overseas?

MR. FASEL: Objection. Vague and ambiguous as to directly.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. Were you in contact with people at these companies overseas?

A. Yes.

Q. Where were these companies overseas located?

A. They're in China.

Q. What was your position at One Ambition, LLC?

A. My position is development and production.

Q. Did you have any other positions at One Ambition, LLC?

A. Not that I recall.

Q. Do you remember how many employees worked for One -- One Ambition, LLC?

A. No.

Q. Were you an owner of One Ambition, LLC?

A. I don't remember.

Q. Is there anything that would refresh your recollection about whether or not you were an owner

Page 20

of One Ambition, LLC?

MR. FASEL: Objection. Calls for speculation.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. It's been so long, I need to look.

Q. Do you recall who the owners of One Ambition, LLC were?

A. It might have been my brother.

Q. And what is your brother's name?

A. Ty Ngo.

Q. And Mr. Ngo was the -- an owner of One Ambition, LLC?

MR. FASEL: Objection. Misstates testimony.

THE WITNESS: I'm not sure.

BY MR. PHILLIPS:

Q. Is it your testimony that you were not an owner of One Ambition, LLC?

MR. FASEL: Objection. Misstates testimony.

THE WITNESS: No, I -- I have to look. I'm not sure.

BY MR. PHILLIPS:

Q. But you don't know, sitting here today,

Page 21

whether or not you were an owner of One Ambition, LLC?

MR. FASEL: Objection. Asked and answered.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. I have to look. It's been so long.

Q. Okay. Do you recall anyone in the management of One Ambition, LLC, what their names were?

A. Could have been my brother and maybe myself.

Q. And when you say maybe yourself, what do you mean?

A. Means I could be -- shareholders.

Q. So is it your testimony, sir, that you think that you could have been a shareholder of One Ambition, LLC?

A. Maybe.

Q. Did you act as either the president or CEO of One Ambition, LLC?

A. I believe so.

Q. And which role did you serve?

A. Can you explain that?

Q. I -- I asked you, sir, if you were either

Page 22

president or CEO of One Ambition, LLC. And I thought your response was that you thought you were. I was just trying to clarify, were you either president or CEO individually? Or were you both? Or what position did you have?

A. I believe I was president.

Q. And as president of One Ambition, LLC, what were your responsibilities and duties?

A. My responsibility is to make sure that our company operates on a daily basis and that everybody is doing their work and be responsible for their -- their work.

Q. And how did you ensure that the employees of One Ambition, LLC did their work on a daily basis?

A. They would notify me if anything happens.

Q. Sir, you're referencing "they". Do you remember anyone in particular who worked for you at One Ambition, LLC?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Yes. Ty Ngo.

BY MR. PHILLIPS:

Q. Is there anyone else who worked there?

A. I'm not sure, because sometime -- sometime

Page 23

he hires the employee for me.

Q. And in situations where your brother, Mr. Ngo, would hire employees for you, who was ultimately responsible for the employees that he hired at One Ambition, LLC?

MR. FASEL: Objection. Misstates testimony.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. I would be responsible.

Q. If you answered this, sir, I apologize. I don't know seem to recall an answer. One Ambition, LLC, you said imported clothing from overseas. And that was from China, correct?

A. Yes.

Q. Okay. In importing this clothing from China, how did One Ambition, LLC handle the paperwork involved with importing merchandise from China?

MR. FASEL: Object as vague and ambiguous as to paperwork.

BY MR. PHILLIPS:

Q. Sir, when I say paperwork do you understand -- do you -- well, let me ask you: Do you understand that when merchandise is entered into

Page 24

the United States certain things have to be filed with Customs and Border Protection?

MR. FASEL: Objection. Assumes facts not in evidence.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. Okay. And what do you understand the paperwork that has to be filed with CBP is?

MR. FASEL: Objection. Calls for expert opinion.

MR. PHILLIPS: It doesn't.

BY MR. PHILLIPS:

Q. Sir, you can answer the question.

A. I don't handle that area.

Q. Who would have handled that for One Ambition, LLC?

A. The company hires customs brokers to handle that.

Q. And what customs brokers do you recall that One Ambition, LLC hired?

A. I don't -- I don't know. Because I -- I let -- give the responsibility to the employee to work with the custom broker. I only handle development.

Q. And which employees did you give

Page 25

responsibility, at One Ambition, LLC, to handle issues with Customs?

A. The people that we hire for the -- at the company.

Q. And do you recall who those people were?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Not that I recall at this time.

BY MR. PHILLIPS:

Q. Did One Ambition, LLC import any footwear?

A. Yes.

Q. Where did it import footwear from?

A. I believe it's China.

Q. And what type of footwear did One Ambition, LLC import?

A. Sandals.

Q. And were the sandals that One Ambition, LLC imported manufactured in China?

A. Yes.

Q. Did One Ambition, LLC import any footwear from countries other than China?

A. Maybe Vietnam.

Q. And what type of footwear did One Ambition, LLC import from Vietnam?

Page 26

A. Was a mixture of shoes.

Q. What were some of the types of shoes in that mixture of shoes?

A. Sandals and samples of sport shoes.

Q. What do you mean when you use the phrase "sport shoes"?

A. Like running shoes, athletic shoes.

Q. How was One Ambition, LLC structured?

MR. FASEL: Objection. Vague and ambiguous as to structured.

BY MR. PHILLIPS:

Q. Do you recall what type of company One Ambition, LLC was? Was it a corporation? Or was it a sole proprietorship? Or --

A. It's a limited liability company.

Q. And where was One Ambition, LLC registered?

A. California.

Q. Were you the agent for service of process at One Ambition, LLC?

A. Can you clarify that?

Q. Corporate form in California requires as one of the conditions that there be a person or an agent designated to accept service of process for that corporation. Do you understand that?

Page 27

A. Yes.

Q. Okay. And I'm asking you: Were you listed with the state of California as that registered agent for service of process for One Ambition, LLC?

A. Yes.

Q. Okay. Do you know if One Ambition, LLC, of which you were president, had any internal compliance procedures or a department that dealt with issues related to importing goods from various countries?

MR. FASEL: Object as to compound.

MR. PHILLIPS: Fair enough. Let's break that up.

BY MR. PHILLIPS:

Q. Sir, you were president of One Ambition, LLC, correct?

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. And One Ambition, LLC imported various merchandise from, as you've said, China and Vietnam?

A. Yes.

Q. And those -- that merchandise had to be imported through -- to the United States, correct?

A. Yes.

Page 28

Q. And in importing that merchandise to the United States, certain things had to be filed with Customs and Border Protection to get that merchandise entered into the United States, correct?

A. Yes.

Q. And I think that you've testified that One Ambition, LLC utilized customs brokers to assist it in entering that merchandise into the United States?

A. That -- yes.

Q. My question was: Is there anyone -- was there any department within One Ambition, LLC that -- it may be characterized as internal compliance or not -- that was charged with working with those brokers to get that merchandise entered into the United States?

A. We have employees that worked with the custom broker.

Q. And do you recall who those employees were?

A. No.

Q. Did those employees have a particular designation to work with the customs brokers? Let me strike that question and rephrase it.

Were the employees that worked with the customs brokers one that you told to work with the

Page 29

customs brokers as -- in your position as president of One Ambition, LLC?

MR. FASEL: Object as to vague and ambiguous.

THE WITNESS: Is that a question?

BY MR. PHILLIPS:

Q. Yes, it was, sir.

A. Can you --

Q. But if you didn't understand it, we will -- I will repeat the request.

A. Please. Thank you.

Q. What I'm trying to understand, sir, is: I understand that you had someone at One Ambition, LLC who worked with the customs brokers, correct?

A. Yes.

Q. I want to know what that person did in relation to working with the customs brokers.

MR. FASEL: I'm going to object as to calls for speculation.

THE WITNESS: Oh, I don't know. I -- I know that when goods are coming in from other countries, that they supposed to work with the cust- -- custom broker to clear the product and bring them in in compliance.

BY MR. PHILLIPS:

Alderson Reporting Company
1-800-FOR-DEPO

Page 30

Q.  Okay.  And you were president of this company, correct?

A.  Yes.

MR. FASEL:  Objection.  Asked and answered.

BY MR. PHILLIPS:

Q.  So who assigned the duty of working with the customs broker to these employees whose names you don't remember from One Ambition, LLC?

A.  Oh, I don't know, sir.

Q.  Did you assign anyone, in your position as president, to work with Customs in importing merchandise for One Ambition, LLC?

A.  No.

Q.  Who at One Ambition, LLC would have had the responsibility of assigning this duty to any of the employees at One Ambition, LLC?

A.  The people that the company hires that -- would work with the broker to clear the product -- the shipment.

Q.  I understand that, sir.  I think I'm just asking the question maybe -- maybe in a way that is confusing.  I understand that One Ambition, LLC had employees that worked with customs brokers.  I want to try to understand how those employees at One

Page 31

Ambition, LLC who were working with the customs brokers were chosen withing One Ambition, LLC to fill that position.

MR. FASEL:  Objection.  Lacks question. There's no question.  There's no question pending.

THE WITNESS:  Hmm.

MR. PHILLIPS:  I'm sorry, was that an instruction --

MR. FASEL:  You just explained, sir.

MR. PHILLIPS:  -- not to answer?

MR. FASEL:  You just explained what your question was, but you didn't ask him a question.

MR. PHILLIPS:  So I -- that's fine.  We'll move on.

BY MR. PHILLIPS:

Q.  Sir, as I stated, I understand that certain individuals at One Ambition, LLC worked with Customs.  What I want to know is:  How were those people chosen within One Ambition, LLC to be the ones designated to work with Customs?

MR. FASEL:  Objection.  Asked and answered.

BY MR. PHILLIPS:

Q.  You can answer the question.

A.  I don't know.

Page 32

Q.  In your position as president, did you have any involvement in ensuring that the merchandise One Ambition, LLC was importing was imported correctly?

A.  Again, my role is to develop and produce the product.  And I hired employees to handle the clearance for the product that -- when they come to the United States.  I do not handle any shipments that's coming to the United States.

Q.  Who did you hire to handle the importation of those shipments?

MR. FASEL:  Objection.  Assumes facts not in evidence.

BY MR. PHILLIPS:

Q.  You can answer the question, sir.

A.  The company hires the employee.  I -- like, again, I spend most of my time oversee on the development and the production.  I do not handle the logistic here in the United States.

Q.  As president of One Ambition, LLC, who did you put in charge of handling, as you said, the logistics of importing this merchandise and dealing with Customs?

A.  Again, I hire employees and then they work with the custom broker to clear the -- the shipment.

Page 33

Q.  Sir, can you give me the name of any of the employees that you hired at One Ambition, LLC to work with the customs brokers at Customs?

A.  I didn't do the hiring.  I was hired by someone from the company.

Q.  And who, from the company, hired this person?

MR. FASEL:  Objection.  Calls for speculation.

THE WITNESS:  I believe it's Ty Ngo.

BY MR. PHILLIPS:

Q.  And did you delegate the responsibility to Mr. Ngo, in your role as president of One Ambition, to hire people to deal with Customs and the brokers?

A.  Yes.

Q.  And did you do anything to -- did you provide Mr. Ngo any instruction as to the type of person he was supposed to hire to deal with Customs and the brokers?

A.  Yes.

Q.  What instruction did you give him?

A.  I gave him that we -- that the person must know or have little education on productions and how to quality control the product and that they need to able to communicate in English to work with the

Page 34

custom broker.

Q. What do you mean by production in your last response?

A. Production means finished product.

Q. And does that -- and just so that I understand, does production, then, deal with issues surrounding -- you said production in connection with quality control. Does that mean that production deals with issues surrounding the actual manufacturer and that the product is that what you intended it to be?

A. Yes.

Q. Did you give Mr. Ngo any instructions about any knowledge or education the employees he was hiring to deal with these logistics issues -- give him any instruction about them having knowledge or experience in actually working with Customs or working with the brokers?

A. I don't understand, sir.

Q. You said one of the things you asked Mr. Ngo to do was to make sure that the employee he hired could speak in English to the brokers. Did you ask Mr. Ngo to hire employees who had experience actually importing goods and working with brokers in CBP?

Page 35

A. No, just in production.

Q. As president of One Ambition, LLC, did you create any internal procedures or guidelines that your employees should follow?

A. No.

Q. Do you know any of the brokers that One Ambition, LLC worked with?

A. No.

Q. Do you know anything about the process -- how the process worked between One Ambition, LLC and its brokers regarding actually getting the merchandise imported into the states?

A. No.

Q. Were you involved at all in providing the brokers with any information about the merchandise that was going to be entered?

A. No.

Q. Do you know who at One Ambition, LLC would have provided any information to the brokers?

A. I don't know.

Q. Do you know if One Ambition, LLC ever provided information to its brokers about the merchandise that was being imported?

A. I don't know.

Q. Are you familiar with a business called

Page 36

Fashion Source 2000, LLC?

A. Yes.

Q. And what is that business?

A. It's a clothing business.

Q. And what did that business do?

A. Importing of clothing.

Q. What type of clothing did Fashion Source 2000, LLC import?

A. Missy contemporary and junior-wear.

Q. Did Fashion Source 2000, LLC import any footwear?

A. Maybe.

Q. Is there anything you could look at to refresh your recollection of whether or not Fashion Source 2000, LLC imported footwear?

A. They might have. I'm -- I'm not sure.

Q. Were you an owner of Fashion Source 2000, LLC?

A. Not that I recall.

Q. Were you the president or CEO of Fashion Source, LLC?

A. Not that I recall.

Q. What position did you hold at Fashion Source 2000, LLC?

A. Design and development.

Page 37

Q. And what did you do in your role in design and development for Fashion Source 2000, LLC?

A. Again, I -- I take the tech pack that's design and have it developed and manufactured oversea.

Q. So were you working in a similar position in Fashion Source 2000, LLC to the one you were -- were working in at One Ambition, LLC?

A. Yes.

Q. Okay. Did you deal with -- directly with the manufacturers when you were working for Fashion Source 2000, LLC?

A. Yes.

Q. And where were those manufacturers located?

A. Vietnam and China.

Q. Do you know what type of company Fashion Source 2000, LLC was?

MR. FASEL: Objection. Asked and answered.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. What kind of company.

Q. Was it a corporation? Was it an -- an LLC? Was it a sole proprietorship?

Page 38

A. Oh, I don't know.

Q. Do you know who any of the owners of Fashion Source 2000, LLC were?

A. No.

Q. Do you know who the president or CEO of Fashion Source 2000, LLC was?

A. I don't know.

Q. Do you know how many employees Fashion Source 2000, LLC had?

A. No.

Q. Do you know any of the others employees of Fashion Source 2000, LLC?

A. I don't know.

Q. Was Mr. Ngo, your brother, an employee of Fashion Source 2000, LLC?

A. I believe so.

Q. What position did he hold at Fashion Source 2000, LLC?

A. I don't know.

Q. Did you work for you brother, Mr. Ngo, at Fashion Source 2000, LLC?

A. Yes.

Q. And how did you work for him?

A. Can you clarify that?

Q. Was he your manager or...

Page 39

A. Yes.

Q. What was his title at Fashion Source 2000, LLC?

A. I don't know.

Q. What was your title at Fashion Source 2000, LLC?

A. I was design and development.

Q. But you do not know what Mr. Ngo's title was at Fashion Source 2000, LLC?

MR. FASEL: Objection. Asked and answered.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. No.

Q. Do you know of the names of any other employee at Fashion Source 2000, LLC?

A. No.

Q. Do you know if the company had any other employees other than you and Mr. Ngo?

A. I don't know.

Q. Did you work with anyone, other than Mr. Ngo, when you were at Fashion Source 2000, LLC?

A. No.

Q. Do you know how Fashion Source 2000, LLC imported merchandise?

Page 40

MR. FASEL: Objection. Vague and ambiguous.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Do you know if Fashion Source 2000, LLC used brokers to import its merchandise?

A. I don't know. I don't handle that.

Q. Do you know who did handle that at Fashion Source 2000, LLC?

A. No.

Q. Sir, are you familiar with Sterling Footwear, Incorporated?

A. Yes.

Q. And what is Sterling Footwear, Incorporated?

MR. FASEL: Objection. Vague and ambiguous.

BY MR. PHILLIPS:

Q. What do you understand Sterling Footwear, Incorporated does?

A. Importing of shoes.

Q. And what positions do you hold or did you hold at Sterling Footwear?

A. President.

Q. Is Sterling Footwear, Incorporated still

Page 41

in existence?

A. Yes, but it's inactive.

Q. Between July 2007 and August 2009 were you the president and only corporate officer of Sterling Footwear, Incorporated?

A. Yes.

Q. Were you also the registered agent for service of process for Sterling Footwear, Incorporated between 2000 -- July 2007 and August 2009?

A. Can you explain register?

Q. Were you the -- in the previous question, sir, we discussed that a corporation needs to have an agent for service of process. Did you understand that?

A. Yes.

Q. Okay. Were you the agent for service of process for Sterling Footwear, Incorporated between July 2007 and August 2009?

A. Yes.

Q. Where -- you said Sterling Footwear, Incorporated is currently inactive, correct?

A. Yes.

Q. What off- -- what is its office location presently?

Alderson Reporting Company
1-800-FOR-DEPO

Page 42

A. Present location? There's -- there's no location.

Q. Prior to going inactive, what was the business address of Sterling Footwear, Incorporated?

A. Los Angeles, California.

Q. Do you have a street address, sir?

A. I believe it's 15 street.

Q. Does 1501 South Alameda Street, Suite B, Los Angeles, California, 9000 -- I'm sorry, 90021, does that sound like the business address of Sterling Footwear, Incorporated?

A. Yes.

Q. At that business address, what did Sterling Footwear, Incorporated have there?

MR. FASEL: Objection. Vague and ambiguous. Calls for a narrative.

BY MR. PHILLIPS:

Q. What type of facility did Sterling Footwear, Incorporated have at that 1501 South Alameda Street address?

A. Just office.

Q. And how large was that office?

A. I -- I don't -- I'm not sure.

Q. Was that office owned or rented by Sterling Footwear, Incorporated?

Page 43

A. Rented.

Q. And how much was the rent, if you recall?

A. I don't remember.

Q. About how many people worked in that office space on South Alameda Street?

A. Approximate 12.

Q. Did each of those 12 individuals have an office or how was the building set up?

A. It was individual office in the building.

Q. Sir, does the address of 333 West Garvey Avenue, Unit B1204 in Monterey Park, California, 91754 mean anything to you?

A. Yes.

Q. What is that address?

A. It's a P.O. Box.

Q. And is that a P.O. Box for Sterling Footwear, Incorporated?

A. No.

Q. Who was that a -- a P.O. Box for?

A. Myself and, I believe, my brother.

Q. And that P.O. Box is not used for any business of Sterling Footwear, Incorporated?

A. Not that I'm aware of.

MR. PHILLIPS: I'm going to mark this as Exhibit 1.

Page 44

(Whereupon Exhibit 1 was marked for identification.)

BY MR. PHILLIPS:

Q. And what you have been presented with, sir, marked as Exhibit 1, is a printout from the California Secretary of State. It's a printout of an entry for Sterling Footwear, Incorporated. And in that entry, under the address for Sterling Footwear, Incorporated is listed 333 West Garvey Avenue, B1204, Monterey Park California, 91754.

And, sir, is the same P.O. Box that you said was not used for business -- the business of Sterling Footwear, Incorporated?

A. Yes. I didn't set up this P.O. Box.

Q. Who set up this P.O. Box?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: My brother.

BY MR. PHILLIPS:

Q. But you used this P.O. Box, you said, sir, correct?

A. For my personal, yes.

Q. What do you receive at this P.O. Box?

A. My personal mail.

Q. Do you know what your brother, Mr. Ng -- I

Page 45

mean, Mr. Ngo receives at this P.O. Box?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Do you know who provided this P.O. Box address to the California Secretary of State as the business address of Sterling Footwear, Incorporated?

A. No.

Q. All right. You can set that document aside for now, sir.

MR. FASEL: Do you want a break? Can we take a break?

MR. PHILLIPS: Sure. Let's take 10 minutes.

MR. FASEL: Sure. Thank you.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: We're going off the record. The time is 10:25 a.m.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:45 a.m.

BY MR. PHILLIPS:

Q. Welcome back, sir. Before the break we were talking about Sterling Imports -- I'm sorry,

Alderson Reporting Company
1-800-FOR-DEPO

Page 46

Sterling Footwear, Incorporated.  And -- so just to recap, sir, you were the president and CEO of Sterling Footwear, Incorporated between July 2007 and August 2009, correct?

MR. FASEL:  Asked and answered.

BY MR. PHILLIPS:

Q.  You can answer the question, sir.

A.  Yes.

Q.  Okay.  And as president and CEO, what were your duties and responsibilities?

MR. FASEL:  Object as to compound.

BY MR. PHILLIPS:

Q.  Okay.  Let's break it down into two.  What were your responsibilities at Sterling Footwear, Incorporated as president?

A.  Design, develop and production.

Q.  And was that the extent of your responsibilities as president?

A.  Yes.

Q.  What were your responsibilities and duties as CEO of Sterling Footwear, Incorporated?

A.  To oversee the company's operations.

Q.  And could you explain that a little -- in a little more detail?  What did you do or how did you oversee the company's operations?

Page 47

A.  I hire employees for each area or each department and they would report back to me.

Q.  And let's discuss a little bit about how Sterling was structured.  You said that you oversaw the operations and you hired employees.  Can you explain to me the various departments that Sterling Footwear, Incorporated had?

A.  Yes.  We have design department.  We have production department.  And we have also showrooms, marketing department.

Q.  Were those three -- the design department, production department and marketing department -- the only departments that Sterling Footwear, Incorporated had?

A.  That -- yes, to my knowledge.

Q.  What did the design department do?

A.  They would design and develop by putting tech packs together to --

[Reporter requests clarification.]

THE WITNESS:  Tech packs.

-- to be ready to be sent oversea for development.

BY MR. PHILLIPS:

Q.  And what -- what is a tech pack?

A.  A tech pack is a pattern with

Page 48

measurements.  It's a spec of a product that -- that we use to develop an item.

Q.  And were you involved in developing these tech packs?

A.  No.

Q.  Who was involved with developing these tech packs?

A.  A designer.

Q.  Okay.  And who were the designers at Sterling Footwear, Incorporated who designed these tech packs?

A.  We have Andrew -- I don't remember his last name -- and Chau Lu, I think.

Q.  Mr. -- I'm sorry, Mr. Ng you stated that one of your duties as president was to deal with design.  And I also understand that you said you were not developing these tech packs.  What role or involvement did you have, as president, in the design department at Sterling Footwear, Incorporated?

A.  Well, my designer designs the product.  And what I do is I take it oversea and I would look through it with the manufacturer or the person that produces the products and I would evaluate to see if the product, in terms of colors, style, design, is

Page 49

appropriate.

Q.  Do you have any training or background in designing products like footwear?

A.  Do I have -- I -- I didn't go to school, if that's your question.

Q.  And I'm not just asking for school, sir.  I -- you said that -- I think I understand your last question -- your last answer to be that you would go overseas to the manufacturers in the first step, right?

A.  Yes.

Q.  And then when you're with the manufacturers, you're discussing these tech packs with them.  You're talking about the design of the product that -- am I correct, the product that you as an importer want the manufacturer to create; is that what you're discussing?

A.  Yes.

Q.  So you said in your previous answer that you're discussing with the manufacturer whether these designs are appropriate.  And I would like to explore sort of that -- what you mean by appropriate.  How do you determine whether something is or is not appropriate?

A.  Well, it's -- when it's appropriate means

Page 50

it has to go with the color theme. It has to go with the season that we're developing for. And it has to go with how it would look like. And little things like if it's -- if it's sellable, in other word.

Q. So when you're di- -- are you -- when you're discussing with the manufacturers, are you talking with them about any of the actual construction of the footwear?

A. No, I -- I mostly talk to them is about the -- again, the colors, the designs, the shape perhaps and the look of it.

Q. Is anyone else from Sterling Footwear with you when you go to discuss this with the manufacturers?

MR. FASEL: Objection. Vague and ambiguous as to time of the trip.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. So you go by yourself to meet with these manufacturers?

A. Yes.

Q. Do you go to their place of manufacture when you -- sorry to cut you off, sir.

Do you travel to the manufacturer's

Page 51

location when you have these discussions with them about the product they're going to manufacture for you?

A. Yes.

Q. And where are these manufacturers located?

A. Vietnam.

Q. And what are the names of some of the manufacturers that you would have gone and worked with when you were president and CEO of Sterling Footwear, Incorporated?

A. The first one is Dong Hung, D-U-N-G [sic], H-U-N-G. Other one would be Tado, T-A-D-O. And the third one would be Phuc Binh, it's -- I believe it's spelled P-H -- I -- I don't know. It's Vietnamese, so I'm not as -- Binh is B-I-N-H.

Q. And were those the -- the business names of the entities you were dealing with or were those names of people? And I apologize --

A. Company names.

Q. Those were the company names. Okay.

So were those the only -- I think you mentioned three. Were those the only three companies that you dealt with manufacturing footwear for Sterling Footwear, Incorporated?

A. To my best knowledge, yes.

Page 52

Q. Okay. You had given me the three departments. And we were just discussing the first department, design. I would like to move to the second department, which you said was the production department.

Can you explain for me what the production department at Sterling Footwear, Incorporated did?

A. Yes, they would -- I -- their -- their role is to handle the finished product that arrive here in the United States. And also their role is to handle the logistic for all the shipment that's coming to the United States. They -- they work with the broker to bring the product in.

Q. And, sir, I -- do I understand that -- and I'm probably not going to use the phrase you did -- logistics and dealing with the finished products are two separate functions for the production department at Sterling Footwear, Incorporated?

A. Can you say that --

Q. I -- I apologize. You had mentioned that there were two things that the production department did. The second one being dealing with logistics and the first one being with -- dealing with the finished product; are those two separate functions?

A. No, actually it's more into one. Because

Page 53

the -- the goods comes in, which is the finished product, which is production. And then they would work with the custom brokers to clear the product to bring them into the United States.

Q. Okay. Who worked in the production department for Sterling Footwear, Incorporated between July 2007 and August 2009?

A. I believe it's Nancy Ng and Janet Huynh.

Q. Was there anyone else?

A. Not that I'm aware of.

Q. Did you have any role in the production department on a day-to-day matters as president or CEO of Sterling Footwear, Incorporated?

MR. FASEL: Object. It's vague and ambiguous as to day-to-day.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. We've talked now about the design department and the production department. The third department you mentioned was the marketing department. Could you tell me what the marketing department did at Sterling Footwear, Incorporated?

A. Yes, they would promote the product; like advertising, attend shows, working with, I guess, celebrities, people -- popular people or known

Page 54

people to promote the product.

Q. Who worked in the marketing department for Sterling Footwear, Incorporated?

A. Fernanda -- I believe it's Cavio [phonetic].

Q. Did anyone else work in that department?

A. Not that I'm aware of.

Q. Did you have -- did you work with -- is it, I believe, Ms. Fernanda Calvo on any of the various things that you stated the marketing department did, such as promoting the products or attending trade shows or working -- or dealing with the advertising?

A. Well, basically what she does is she just runs by me, like, what she does. Let's say if she wants to do something with -- she would tell me and say, okay, I'm going to try to promote this and this is how I would do it. And that's pretty much it.

Q. Did you ever attend any trade shows regarding these products?

A. Yes.

Q. And what kind of trade shows did you attend?

A. It's the World Shoe Show.

Q. And where is the World Shoe Show held?

Page 55

A. Las Vegas.

Q. Okay. And because I don't know much about it, what goes on at the World Shoe Show?

A. Do you want me to explain?

Q. I -- you know, in very short -- you know, I just sort of want to understand what -- I don't fully understand what -- what occurred. Do you go and try to sell your product there? Or do people come -- I mean, is that actually where you do deals? Or how does -- how does your work at the world trade show actually occur?

MR. FASEL: I'm going to object as to compound.

MR. PHILLIPS: That is fair enough. So let's step back for a second.

THE WITNESS: I can answer you.

BY MR. PHILLIPS:

Q. Okay. Well, I --

A. My --

MR. FASEL: Just let him ask --

BY MR. PHILLIPS:

Q. Let me put the question first, and then -- sir, could you give me a very brief explanation of what Sterling Footwear, Incorporated would do when it attends the World Shoe Show in Las Vegas?

Page 56

A. I would go to the show to get ideas on concept, on trends, on styles, on the next season, whatever that, you know, is.

Q. What types of companies, as best you recall, attend the World Shoe Show?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: All types of shoe company.

BY MR. PHILLIPS:

Q. Are the people -- are any of the people you've met at the world trade show, are they typically retailers of footwear or are they manufacturers of footwear or both?

A. I believe it's both.

Q. Did you, in any of the -- well, let's sit back.

How many of these World Shoe Shows occur in a -- in a particular year?

A. I believe it's one per year.

Q. One per year.

And did you attend this World Shoe Show regularly?

A. When I have a chance.

Q. Do you happen to recall whether or not you attended this World Shoe Show between the years of

Page 57

2007 and 2009?

A. Yes, perhaps I have.

Q. Was that you do recall or you think you may have recalled?

A. I have.

Q. You have.

And when you were there at the World Shoe Show, in any of those three years, 2007, 2008 or 2009, did you ever work or meet with any manufacturers of shoes at this World Shoe Show?

A. No, I just browse around and look for concepts and trends.

Q. Did -- in your position as president and CEO of Sterling Footwear, Incorporated, did you ever try to -- or were you ever soliciting business? And when I mean business, were you ever soliciting clients for whom you would sell shoes when you attended the World Shoe Show in Las Vegas?

A. I talk to people and -- and let them know what I do.

Q. Were any sales ever -- did you ever make any sales at the World Shoe Show?

A. I don't handle that.

Q. Who -- who handles that?

A. Fernanda.

Page 58

Q. Fernanda would have handled the sales? Do you know --

A. She's in the marketing department, yes.

Q. Do you know if she typically made sales of shoes at the World -- World Shoe Show?

A. I don't know.

Q. Okay. All right. Let's step back for a second. I had some other background questions about Sterling.

Did you -- were you the founder of Sterling Footwear, Incorporated?

A. Yes.

Q. Okay. And when was that company created?

A. Estimate, April 2007.

Q. And for what reason did you create the corporation?

A. To do business.

Q. And where did you intend to do business when you created this corporation?

MR. FASEL: Objection. Vague and ambiguous as to where.

THE WITNESS: Here. California.

BY MR. PHILLIPS:

Q. What was Sterling Footwear, Incorporated designed or created to do?

Page 59

A. It's -- it's develop and importing of shoes.

Q. And you had done development and importation of shoes previously, correct, at both One Ambition, LLC and at Fashion Source 2000, LLC?

A. Yes, very little.

Q. How did the work that Sterling Footwear did differ from the importation of shoes that either of those companies did?

MR. FASEL: Object -- objection. Assumes facts not in evidence.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. Your question is: How is it different from Sterling?

Q. How, if at all, was the business that Sterling Footwear, Incorporated was doing importing shoes different -- and it may not have been -- but different from the other two companies where you had imported footwear?

A. Oh, the volume is different.

Q. And how was the volume different?

A. Well, the other company didn't do well, so we end up closing. And Sterling, I guess, did well and -- on terms of volume-wise.

Page 60

Q. And which company were you referring to when you said, "the other company didn't do well?"

A. I --

Q. Was that One Ambition, LLC?

A. Yes.

Q. Okay.

A. Both. And Fashion Source.

Q. Did Sterling Footwear, Incorporated -- Incorporated have any -- any of the same clients as those other two businesses?

A. No.

Q. Did it obtain the shoes it was importing from the same manufacturers?

A. I don't recall.

Q. Is there anything that you could look at that would refresh your recollection about that?

A. No.

Q. Was Sterling Footwear, LLC a wholesaler?

A. Sterling Footwear, Inc. is incorporated, not LLC.

Q. Oh, I apologize. I misspoke. Yes, you are correct. Let me ask the question again.

Was Sterling Footwear, Incorporated a wholesaler?

A. Importer and wholesaler, yes.

Page 61

Q. And what do you understand a wholesaler to do?

A. To my best knowledge, it's to wholesale at large volumes or quantities.

Q. And that's the type of work that Sterling Footwear, Incorporated was doing?

A. Yes.

Q. How many employees did Sterling Footwear, Incorporated have?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Around 12.

BY MR. PHILLIPS:

Q. Did you hire all 12 of those employees?

A. No.

Q. Who did the hiring for those 12 employees?

A. Janet Huynh.

Q. And did you hire Ms. Huynh?

A. Yes.

Q. And did you instruct her to hire other employees?

A. Yes.

Q. In instructing her to hire these other employees, did you give her any guidelines or guidance as to the types of employees she should

16 (Pages 58 to 61)

Page 62

hire or the experience they should have?

A. No.

Q. Did you review any of the potential candidates Ms. Huynh was considering hiring before she hired them at Sterling Footwear, LLC?

MR. FASEL: Objection. Vague and ambiguous as to review.

BY MR. PHILLIPS:

Q. Do you understand -- did you understand what I meant by review any of --

A. The candidates?

Q. -- potential --

Yeah, the candidates.

A. No.

Q. You didn't understand what I meant by review?

A. No, I understand by review.

Q. Okay.

A. Yeah.

Q. Okay. So let's -- let's just clean that one up for the record.

Sir, did you review any of the candidates that Ms. Huynh was considering hiring for -- at Sterling Footwear, Incorporated before she actually hired those employees?

Page 63

A. No.

Q. Are you a -- were you -- well, actually, step back for a second. You said that Sterling Footwear, Incorporated is -- currently exists but it's in inactive status, correct?

A. Yes.

Q. Okay. Are you a shareholder of Sterling Footwear, Incorporated?

A. Yes.

Q. Okay. And what percentage of the company do you own?

A. 95 percent.

Q. Okay. How much money did you invest into the corporation?

A. I don't remember.

Q. Did you invest money into the corporation to receive your percentage of shares that you hold?

A. Yes.

Q. And a ballpark figure, do you have any idea of how much money you would have put in?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Would it have been more than $100,000?

Page 64

A. I'm not sure.

Q. Would it --

A. It's been too long.

Q. Would it have been less than $100,000?

MR. FASEL: I'm going to object. It calls for speculation. Asked and answered.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Do you have any records of the amount of money that you put into the corporation?

A. No.

Q. Do you receive any money from the corporation as a result of your ownership of shares in the corporation?

MR. FASEL: Objection. Vague and ambiguous as to time.

MR. PHILLIPS: At any time.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. And how -- what type of -- strike that.

How much money have you received from the corporation this past year, 2014?

A. Zero.

Q. How much money did you receive from the corporation in 2013?

Page 65

A. Zero.

Q. How much money did you receive from the corporation in 2012?

A. Zero.

Q. How much money did you receive from the corporation in 2011?

A. Zero.

Q. How much money did you receive from the corporation in 2010?

A. I don't remember.

Q. Is there anything that would refresh your memory about how much money you received from the corporation in 2010?

A. Probably from my K-1.

MR. PHILLIPS: Have those been produced in this case?

MR. FASEL: No.

MR. PHILLIPS: We will probably make a request for those.

MR. FASEL: They've been requested. I've objected as to privacy and relevancy as well.

MR. PHILLIPS: Fair enough.

BY MR. PHILLIPS:

Q. How much money did you receive from the corporation in 2009?

Page 66

A. Again, I don't know.

Q. Is there anything that would refresh your recollection about how much money you received from the corporation in 2009?

A. K-1.

Q. How much money did you receive from the corporation in 2008?

A. I don't know.

Q. Is there anything that would fresh -- refresh your recollection about how much money you received from the corporation in 2008?

A. K-1.

Q. How much money did you receive from the corporation in 2007?

A. I don't know.

Q. Is there anything that would refresh your recollection about how much money you received from the corporation in 2007?

A. K-1.

Q. What was the last amount of money you recall receiving from the corporation?

MR. FASEL: Objection. Vague and ambiguous as to time.

THE WITNESS: I don't remember.

BY MR. PHILLIPS:

Page 67

Q. When was the last time you recall receiving money from the corporation?

A. In 2009?

Q. And about how much was that?

A. I don't remember.

Q. How do you receive money from the corporation? Is it paid out as a dividend or in some other form?

A. As a dividend or a distribution.

Q. And who makes the determination about whether or not money will be paid out as a dividend or a distribution?

A. The company.

Q. Who within the company, to your knowledge, makes the determination of whether money will be paid out as a dividend or a distribution?

A. It would be me, Ty and also my CPA.

Q. In your role as president and CEO of Sterling Footwear, Incorporated, how much money did the company pay out as a distribution in 2000 -- or div- -- distribution or dividend in 2007?

MR. FASEL: Objection. Compound.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. How much money did the company pay out as

Page 68

a dividend or distribution in 2008?

MR. FASEL: Same objection.

THE WITNESS: Don't know.

BY MR. PHILLIPS:

Q. How much money did the corporation pay out as a dividend or distribution in 2009?

MR. FASEL: Same objection.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Who is your CPA, sir?

A. Gary Choi.

Q. And do you have an address for Mr. Choi?

A. I just know the street and the city.

Q. And what is that?

A. Fairview in San Gabriel.

Q. And does Mr. Choi work by himself or is he with an accounting firm?

A. He is a certified accountant.

Q. And how long has Mr. Choi worked with you and Sterling Footwear, Incorporated?

A. Ever since the company started.

Q. So that is 2007?

A. Estimate, yes.

Q. And has Mr. Choi been involved in all of the tax filings that Sterling Footwear, Incorporated

Page 69

made since 2007?

A. Yes.

Q. When was the last year that Sterling Footwear, Incorporated filed a tax return?

A. Can you rephrase?

Q. Yes.

What was the last year in which Sterling Footwear, Incorporated filed a tax return?

A. 2014.

Q. And how much income did Sterling Footwear, Incorporated -- Incorporated report on that 2014 tax filing?

A. Zero.

Q. Did Sterling Footwear -- strike that.

A. Excuse me.

Q. Take your time.

Mr. Ng, did you ever receive a salary from Sterling Footwear, Incorporated?

A. I don't remember.

Q. How were you paid, if at all, by Sterling Footwear, Incorporated.

A. By check.

Q. And was that check that you received, was that as part of a salary or other compensation or was that for some other purpose?

18 (Pages 66 to 69)

Page 70

A. To my understanding, was for distribution.

Q. So you don't recall ever receiving a salary from Sterling Footwear, Incorporated?

MR. FASEL: Objection. Misstates testimony.

THE WITNESS: I don't remember.

BY MR. PHILLIPS:

Q. How often were you paid by Sterling Footwear, Incorporated for these distributions or dividends?

A. Maybe once a year.

Q. Did you receive any money from Sterling Footwear, Incorporated during the year at any time for payment for your services?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Maybe.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

What payments did you receive for services you rendered to the company?

A. Again, part of my distribution.

Q. Aside from the distribution from the company, did you receive any other payments from the company in exchange for any work that you may have

Page 71

done for them?

A. I don't recall.

Q. So am I correct, sir, that the -- the only money you recall receiving from Sterling Footwear, Incorporated was a yearly distribution from the company?

A. Yes, to my best knowledge.

Q. And you did not receive and are not currently receiving any salary from Sterling Footwear, Incorporated as president and CEO?

MR. FASEL: Objection. Misstates testimony. Asked and answered.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. Currently, no.

Q. Stepping back, sir, to the -- and just to put you in a frame of reference here, I want to talk about the employees. And we've discussed that there were 12 employees and that you hired Ms. Huynh and then she hired the other 10 employees for the corporation. And these employees, as I understand, were placed into three different departments. What I'd like to discuss is how the overall structure worked and who reported to whom.

So starting with you at the top, who at

Page 72

Sterling Footwear, Incorporated was directly reporting to you?

A. Well, each department, they report to me.

Q. Okay. And who was in charge of each department?

And let's start with the design department. Who was in charge of the design department?

A. Well, we have Chau and -- what's his name? I forgot his name -- Andrew.

Q. And who was in charge of those two men?

A. Actually, they both work at the same level and they would re- -- they would report to me.

Q. So both of those gentlemen reported to you directly about the -- about issues in the design department?

A. Sometime, yes.

Q. And what sort of issues did they report to you?

A. If the style would fit for the season or the color or the concept, things like that.

Q. And I don't -- just so I understand what you mean by that, what do you mean by, they would report to you about whether the style fit for the season or the concept. Can you explain that?

Page 73

A. If the looks -- if the looks is right for that season.

Q. So would they come to you with questions about whether or not Sterling Footwear was going to use a certain -- or manufacture a certain product and import it?

A. No, no. They design what they need to design. And after that, they would run it by me and ask me if this look is okay, if the color is -- is workable and if the print or the design is -- it's okay.

Q. So they would come to you after they have done this work for your approval to make sure that this is something that the company can actually do?

A. Yes. If I'm not -- only if I'm here. Because I spend most of my time oversea. Otherwise they would send that to me and then I would evaluate.

Q. Okay. So -- so whether or not you're here in California, before the design department has sent the specs on to the manufacturers, before they would, I assume, authorize production of that -- of that product, would seek your approval to make sure that that's something that Sterling is going to allow to be manufactured that it's going to import.

Page 74

[Reporter requests clarification --]

BY MR. PHILLIPS:

Q. -- allow it to be manufactured and then import?

And we'll start that over, because I think we got a little -- got a little long.

So these two gentlemen are working in the design department and --

A. Lady and a gentleman.

Q. Lady and the gentleman are working in the design department. And after the design department has sent the specs to the manufacturer, it comes back from the manufacturer for a final approval; is that correct?

A. Yes.

Q. And they review what they have to review. And before they give approval to the manufacturer, they seek approval for you to make that decision, correct?

A. In terms of color, style, I give them my opinion, yes.

Q. Can they -- can they authorize the manufacturer to produce the -- the footwear without getting your approval?

A. If they feel that it's -- it's good. And

Page 75

when I looked at it and I think it's okay, then I will let them make that decision.

Q. And is there any guidelines within the company as to when they can make that decision and when they can't?

A. No, they just have to use their own judgment.

Q. But typically they would -- would they typically bring these questions to you for your approval before they authorize the manufacturer?

MR. FASEL: Objection. Asked and answered.

BY MR. PHILLIPS:

Q. You can answer the question.

A. No.

Q. They wouldn't typically ask for your approval beforehand?

A. No, because they're designer. They should know the directions of the trend.

Q. On to the production department. And you stated that Ms. Ng and Ms. Huynh were in the production department. Who reported directly to you out of those two women?

MR. FASEL: Objection. Calls for facts not in evidence.

Page 76

THE WITNESS: Ms. Huynh.

BY MR. PHILLIPS:

Q. And on what issues would she report to you?

A. If the product needs to be moved or canceled or dropped, add, things like that.

Q. And when she reported these issues to you, what would you do with that information?

A. I would advise the factory either to add, drop or revise the product.

Q. Did Ms. Ng ever report directly to you?

A. Sometimes.

Q. And what issues would she report directly to you?

A. That -- to -- sometime to push the delivery, maybe sooner, things like that, on delivery time.

Q. And could you explain to me a little more what you mean by push the delivery time?

A. Mean sometime if the product gets made too late and she wants it a little sooner, so she would tell me that, oh, that -- if you can try to request the factory to maybe faster the production so they can be here a little sooner to meet the deadline.

MR. FASEL: Are you okay?

Page 77

THE WITNESS: Yeah.

BY MR. PHILLIPS:

Q. Did -- what sort of authority did Ms. Huynh have to make decisions for the company in her position as, I understand, manager of the production department?

A. She has -- you mean how much power she has?

Q. Yes. What sort of power did you -- did you give her any power, specifically as president and CEO -- give her power to do certain tasks? And, if so, what were those tasks?

A. Well --

Q. And we can break that into two.

Did you give her any power to do certain tasks?

A. Yes.

Q. And what tasks did you give her the power to do?

A. To oversee the daily operation and also to hire employees.

Q. Were there any tasks that Ms. Huynh was not given the power to deal with directly?

A. Not that I recall.

Q. So there were no tasks where she couldn't

Alderson Reporting Company
1-800-FOR-DEPO

Page 78

make a decision without checking with you first?

A. That's correct.

Q. And was this delegation of authority ever written down for her or expressed anywhere?

A. Oh, we talked.

Q. Okay. Could you tell me what you talked about with her regarding what her powers would be in her position?

A. Well, because she knows I spend most of my time oversea and she knows that she has the responsibility to oversee the daily operations. And, of course, report to me only in case of any kind of emergency or any type of, you know, problem that might, you know, arise.

Q. What sorts of things did you give her responsibility for that you've characterized as daily operations?

A. If, let's say, something is wrong, for example, like any kind of problem within internally, like within the office. If there's, you know, arguments. If there's any kind of thing like that. You know, if she hire a new employee or she fire an employee, things like that.

Q. Okay. Did she have any responsibility for the other two groups, either the design or the

Page 79

marketing group?

A. Does she have responsibility for them? Yes.

Q. What responsibilities did she have?

A. She -- she oversees them.

Q. And what does that mean?

A. It means make sure they're doing their job.

Q. And how did she ensure that they were doing their job?

MR. FASEL: Objection. Calls for speculation.

BY MR. PHILLIPS:

Q. Answer the question, sir.

A. Making sure things are done on time and making sure that they show up for work.

Q. Did Ms. Huynh have the authority to fire employees?

A. Yes.

Q. And you specifically gave her that authority, as president and CEO?

A. No, I didn't specifically give her. But the people that she hire, she has the right to -- to fire them.

Q. So where did she get that right to fire

Page 80

the employees that she hired?

A. Well, when I hire her, I gave her the approval that she has to manage the company and it that she has the right to hire people and -- and fire people if they don't do their job.

Q. Let's talk about the third department, the marketing department. Who in that department reported directly to you?

A. Fernanda.

Q. And what issues did she report directly to you?

A. About the marketing strategy.

Q. So how did her -- actually, step back. How did that work? What would she -- what issues would she bring to you for approval?

A. She would tell me the way in which she would, I guess, promote or what she would like to do in terms of maybe the directions. How -- how a product -- it's -- I guess, is headed or the directions of a product or the trend of a product. She would advise me on things like that.

Q. And when she advised you on those -- on those issues, you would make the final decisions?

A. No, actually, it's not about decision making. It's just letting me know up-to-date, like,

Page 81

what people like and what people don't like. And at least I'm be aware that whenever I have to develop something I gotta be mindful of -- of what's been made.

Q. So I'd like to explore that a little. When you say when you were developing something you'd like to know how it's being made, step back for a second. Just take me through, sort of, a typical day in your role as president and CEO of Sterling Footwear. What would do you?

MR. FASEL: Objection. Vague and ambiguous as to typical day.

THE WITNESS: What I would do is I would, again, take the tech pack, I go to the -- to the factory. I would present that to them and explain to them how I would expect a product to look and the height, you know, the size, the color, the print, things like that, yeah, and the directions of how -- how the -- the -- the finished product should look like, you know, things like that.

BY MR. PHILLIPS:

Q. Now, when you would go to these manufacturers and discuss these things with them, did you already have orders placed by buyers that you were trying to fill?

21 (Pages 78 to 81)

Page 82

MR. FASEL: Objection. Vague and ambiguous as to these products.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. So you would have the man- -- would you have the manufacturers create the merchandise first and then go out and try and sell it?

A. It's developed first, yes.

[Reporter requests clarification.]

THE WITNESS: Developed.

BY MR. PHILLIPS:

Q. In dealing with the manufacturers -- and I understand that you would -- you've stated that as president and CEO as -- president specifically you would deal with design -- did you ever become familiar working with these people, the manufacturers, with phrases like foxing band or foxing-like band?

MR. FASEL: Objection. Calls for expert opinion.

THE WITNESS: Excuse me?

MR. FASEL: Vague and ambiguous as to these manufacturers.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

Page 83

My question was: You've stated that you worked with the manufacturers. You would take the tech packs over, correct?

A. Yes.

Q. Okay. And in working with these manufacturers, did you ever encounter or become familiar with the phrases foxing band or foxing-like band?

MR. FASEL: Objection. Compound. Calls for expert opinion.

BY MR. PHILLIPS:

Q. Did you ever become familiar, in working with these manufacturers, with the phrase foxing band?

MR. FASEL: Objection. Calls for expert opinion.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. No.

Q. Did you ever become familiar with the phrase foxing-like band while working with these manufacturers?

MR. FASEL: Same objection.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

Page 84

A. No.

Q. When you would discuss manu- -- with these manufacturers the tech packs that you would have presented to them, what did you discuss in particular?

A. Color, prints, the design, means the whole -- the look of --

Q. Did --

A. -- a product.

Q. Did you ever discuss with the manufacturers -- whom I believe were in Vietnam; is that correct?

A. Yes.

Q. Did you ever discuss with these Vietnamese manufacturers anything about how the merchandise, the footwear, was actually going to be produced?

MR. FASEL: Objection. Vague and ambiguous as to manufacturers.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. And by manufacturers, sir, I'm talking about the three entities that you listed in Vietnam. Do you understand that?

MR. FASEL: Objection as to compound.

THE WITNESS: Yes.

Page 85

BY MR. PHILLIPS:

Q. Did you ever discuss cost of the merchandise you were asking the managers to -- to create for -- for Sterling Footwear, Incorporated?

A. Sometimes.

Q. And what did those discussions about cost entail?

A. To get an estimate price what it would be for finished product.

Q. In any of your discussions of cost, was there any discussion about the materials that would go into the footwear that was being produced for Sterling Footwear, Incorporated?

A. No, they just gave me an estimate price of what it would be if it's -- once it's finished.

Q. Did you ever inquire with any of those three manufacturers in Vietnam about any of the materials used in the production of the shoes that Sterling Footwear, Incorporated was importing?

MR. FASEL: Objection. Compound. Vague and ambiguous as to manufacturers.

THE WITNESS: Not to my knowledge.

BY MR. PHILLIPS:

Q. Did you ever discuss with those three manufacturers in Vietnam any of the particulars

Page 86

about how the footwear would be manufactured by those entities?

MR. FASEL:  Objection -- same objections.

THE WITNESS:  No.

BY MR. PHILLIPS:

Q.  Did -- did Sterling Footwear have any departments other than the three we've mentioned; the design, production and marketing department?

A.  That's all I can remember.

Q.  Is there anything that would refresh your recollection on whether Sterling had any other departments?

A.  Not that I recall.

Q.  Do you know if Sterling had an accounting department?

A.  I -- bookkeeping.

Q.  Sterling -- so did Sterling Footwear, Incorporated have a bookkeeping department?

A.  We call it bookkeeping, because that's where we keep all the paperwork.

Q.  And was someone in charge of the -- the bookkeeping for Sterling Footwear?

A.  Yes.

Q.  And who was that?

A.  Kenny.

Page 87

Q.  Do you have a last name for Kenny?

A.  No, I don't remember their last names. It's been too long.

Q.  And what did -- I believe his -- is it possible that it's Kenny Chen?  Does that sound familiar?

A.  Yes.

Q.  And was he the person in charge of the bookkeeping for Sterling Footwear?

A.  Yes.

Q.  And what did Mr. -- Mr. Chen do in his role in bookkeeping at Sterling Footwear?

A.  He does payroll.

Q.  Did he do anything other than payroll?

A.  I guess review bills, invoices to be paid.

Q.  Would Mr. Chen pay those invoices?

MR. FASEL:  Objection.  Calls for speculation.

THE WITNESS:  Yes.

MR. FASEL:  Do you mind if we take a really quick break?  I need to use the restroom.

MR. PHILLIPS:  Sure, that's fine.

MR. FASEL:  Just, like, two or three minutes.

THE VIDEOGRAPHER:  We are going off the

Page 88

record.  The time is 11:35 a.m.

(Recess.)

THE VIDEOGRAPHER:  This is Volume -- or this is media unit No. 2 of the video deposition of Alex Ng.  We're back on the record and the time is 12:56 p.m.

BY MR. PHILLIPS:

Q.  Welcome back, sir.

A.  Thank you.

Q.  A couple more questions about your background before we jump into the substance.

Do you have a driver's license issued by any state in the United States?

A.  Yes.

Q.  And what state issued that driver's license?

A.  California.

Q.  And is that driver's license current?

A.  Yes.

Q.  What address do you use on that driver's license?

A.  I use the 12998 Quail Court in Rancho Cucamonga.

Q.  And what is that address?

A.  That's my sister's house.

Page 89

Q.  And what is your sister's name?

A.  Lynn Wu.

Q.  Does she own or rent that property?

A.  They own the property.

Q.  Do you pay her any rent to stay at that property or use that address as your residence in California?

A.  I just use it on my driver's license.

Q.  And do you happen to know what your driver's license number is?  Or could we get a copy of the license then?

MR. FASEL:  You can get a copy.

MR. PHILLIPS:  Okay.  Great.

BY MR. PHILLIPS:

Q.  Sir, what do you currently do for work?

A.  Unemployed.

Q.  Do you have any source of income?

A.  No.

Q.  How do you pay for any of your living expenses currently?

A.  I don't.  I live with a -- my wife's family in Vietnam.

Q.  And how do you and your wife provide for yourself?  Does your wife have a source of income?

A.  No, it's through her family.

Alderson Reporting Company
1-800-FOR-DEPO

Page 90

Q. And when you say through her family, could you explain what you mean?

A. Her parents.

Q. So her parents -- your wife's parents pay all of your and your wife's living expenses?

A. We -- we live together --

Q. You live --

A. -- in the same house.

Q. With the parents.

And who owns the home that you live in?

A. The parents.

Q. And where is this home?

A. In Vietnam.

Q. Does your wife have a -- a job or any source of income?

A. No.

Q. What was your most recent employment?

A. I don't have one. The last one was with --

MR. FASEL: Listen to his question.

THE WITNESS: Okay.

BY MR. PHILLIPS:

Q. And I may -- and I apologize, I think the question may have been confusing.

I understand, sir, you state that you're

Page 91

currently unemployed. Prior to becoming unemployed, what job did you have? And let's -- you still look confused.

How long have you been unemployed?

A. Ever since the company closed, inactive.

Q. And which company are you referring to?

A. Sterling Footwear and Ng Branding.

Q. And what date did Sterling Footwear go inactive?

MR. FASEL: I'm going to object as vague and ambiguous as to inactive.

THE WITNESS: Estimate, end of 2009, beginning of 2010.

BY MR. PHILLIPS:

Q. So since somewhere in 2009 or 2010 you've had no employment?

A. That's correct.

Q. Have you had any source of income since 2009 or 2010?

A. You mean after those years?

Q. From those years forward, have you had any source of employment -- oh, I mean -- I'm sorry. Strike that question.

Since Sterling Footwear went inactive in 2009 or 2010, have you had any source of income

Page 92

since that time?

A. After, no.

Q. Has your wife had any source of income since that time?

A. No.

Q. At what point did you and your wife begin living in Vietnam with your wife's family?

A. 2000 -- estimate, 2010.

Q. Approximately when in 2010?

A. I would say in the mid-.

Q. Do you or your wife own any homes?

MR. FASEL: Is there more to that question or are you done?

MR. PHILLIPS: No, that was my question.

BY MR. PHILLIPS:

Q. Sir, do you or your wife own any homes or other properties?

A. No.

Q. Do you or your wife own any assets?

MR. FASEL: Objection. Vague and ambiguous as to assets.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Do you and your wife file tax returns in the United States?

Page 93

A. Yes.

Q. And do you file those tax returns singly or jointly?

A. Jointly.

Q. And when was the last tax return that your wife and you filed in the United States?

A. 2014.

Q. And did you list any income from anything on that tax form?

A. Zero.

Q. What is your wife's name, sir?

A. My, M-Y, last name is N-G-U-Y-E-N.

Q. And how long have you been married?

A. Estimate, 2008.

Q. And I'm only asking to understand, sir. Is this a first marriage for both of you or --

A. No.

Q. And who was it not a first marriage for?

A. Who was my first marriage with?

Q. Actually, no. My question -- we'll go into another question.

Were you married previously?

A. Yes.

Q. And from what dates were you married?

A. I believe it was in two -- let me see.

Page 94

1997.

Q. And -- and what was that woman's name?

A. Cindy Chic.

Q. And are you currently divorced?

MR. FASEL: Objection. Vague and ambiguous as to who he's divorced from.

BY MR. PHILLIPS:

Q. From -- from this -- and I can't -- I forgot her name already. I'd mispronounce it.

MR. FASEL: Cindy Chic?

THE WITNESS: Yes, Cindy Chic.

BY MR. PHILLIPS:

Q. And you and Ms. Chic divorced?

A. Yes.

Q. Okay. And do you own any property with Ms. Chic still?

A. We had a timeshare a long time ago, but I believe we might have lost it.

Q. And where was this timeshare?

A. It's in San Diego.

Q. And whose name was this timeshare in?

A. I believe it's in both.

Q. And about when did you obtain this timeshare?

A. Estimate, 1995.

Page 95

Q. Okay. Let's step back, sir. I don't think I have a resume from you. Could -- I would just like to get a little -- a little history on your background. And I believe we started discussing today that you came to the United States in or around 1980, correct?

A. Yes.

Q. Okay. Could you walk me through, very briefly, a work history from your time from 1980 to the present in the United States?

A. My work history?

Q. Yes.

MR. FASEL: Did you say from 1980?

MR. PHILLIPS: I would like to start with 1980.

THE WITNESS: Would --

BY MR. PHILLIPS:

Q. I mean, if you have a resume that you could provide us, that would be great.

A. No.

Q. You know, I --

A. Well, I was just learning English at that time, you know. And I didn't really have a job until after I graduate high school, which is somewhere in 1994, I think.

Page 96

Q. Okay. And fair enough, sir. I -- I know nothing about your background, so I actually didn't know how old you were either.

So as I understand, you then came to the United States in 1980 as a child?

A. At seven or eight.

Q. Okay.

A. Yeah.

Q. And then you went to high school here in the United States and graduated?

A. Yes.

Q. And where did you go to high school? Was it in the state of California or elsewhere?

A. Yes, Los -- Alhambra, California.

Q. Okay. So that was -- so you graduated from high school in 1994?

A. No, I graduate high school in 1989.

Q. '89, okay.

So I'd like to go back to my previous question. Can you provide me with sort of a work history from 1989 to the present?

A. Yeah, my first employment -- this is just an estimate in terms of time, around 1994. It was with a company called American Button. And after that -- it was so long ago. I guess I was doing --

Page 97

I was working as a cashier in a supermarket and a -- at an Exxon gas station. And then later on the fashion store, One Ambition. And up to current would be Sterling Footwear and Ng Branding.

Q. And One Ambition, when did that start? When did you start that business?

A. I do not remember the year exactly.

Q. Was it on or about the year 2004?

A. Estimate.

Q. Do you think that's accurate or would it have been before or after 2004?

A. It's around there.

Q. Okay. And when did One Ambition cease doing business?

A. I believe it's about a year after --

Q. So --

A. -- or two.

Q. -- approximately 2005, One Ambition ceased to do business?

A. Estimate, yes.

Q. Okay. How many companies have you started on your own or been involved with?

MR. FASEL: Objection. Compound.

BY MR. PHILLIPS:

Q. Let's start with the first question.

Page 98

How many companies have you started personally?

A. Under my name or that I set up?

Q. Yes, how many have you set up.

A. I believe it's three.

Q. And which were those three?

A. Sterling Footwear, Ng Branding and One Ambition.

Q. Why did One Ambition stop doing business?

A. There's no business.

Q. And when you say "there's no business", what do you mean?

A. There's no orders. There's no -- no customer.

Q. Was One Ambition ever the subject of any inquiries from Customs and Border Protection?

A. I don't know.

Q. Is there anything you could look at to refresh your recollection of whether or not One Ambition had any issues with CBP?

A. No.

Q. Do you know if there is any documents maintained from One Ambition?

A. No.

Q. And just to clarify, no, you don't know if

Page 99

there are any documents? Or no, there are no documents?

A. No, I don't know.

Q. Do you know who would know if there are any documents maintained by One Ambition?

MR. FASEL: Objection. Calls for speculation.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. No.

Q. Sir, are you familiar with a business entitled Girly Girl?

A. Yes.

Q. And how are -- how are you familiar with that business?

A. It's a -- it's a brand that I established.

Q. And when you mean -- when you say --

A. A name that I established.

Q. Okay. And just to clarify, sir. When you say it's a brand and a name, was Girly Girl a separate business or was it just --

A. It's a separate business.

Q. Okay. Was it also a particular line of clothing or footwear sold by any of your other businesses?

Page 100

A. No.

Q. And what did Girly Girl do?

A. It didn't really do anything. It -- it was kind of open and close business, because there was no business.

Q. And when you say "there was no business", what do you mean? Could you explain that?

A. Means there was no -- there's not -- there's not enough clients to continue the business.

Q. What kind of clients was Girly Girl seeking to obtain?

A. Girls, woman shoes.

Q. Were you an owner or -- actually, first, were you an owner of Girly Girl?

A. Yes.

Q. Were there any other owners of Girly Girl?

A. Not that I'm aware of.

Q. How many employees did Girly Girl have?

A. I don't think we really have any employee. It was just something that I tried to build.

Q. Was there anyone involved with you with Girly Girl?

A. Fernanda.

Q. And how was Fernanda involved in Girly Girl?

Page 101

A. Marketing.

Q. And just to clarify, that was Ms. Calvo, I believe -- Fernanda Calvo?

A. Yes.

Q. Okay. And she was involved in marketing for Girly Girl?

A. Yes.

Q. Was anyone else involved in Girly Girl?

A. Not that I'm aware of.

Q. Did Girly Girl, at any point, engage in importing any merchandise into the United States?

A. I believe they have some samples.

Q. Is that all that Girly Girl imported into the United States?

A. That's what I can remember at this time.

Q. Do you know who would have handled importing of any of those samples into the United States for Girly Girl?

A. If it did, then maybe Fernanda.

Q. Did you -- did you handle any activities for importing merchandise into the United States for Girly Girl?

MR. FASEL: Objection. Vague and ambiguous as to --

THE WITNESS: Yes --

Page 102

MR. FASEL: [Indecipherable.]

THE WITNESS: -- design and develop.

MR. FASEL: Wait for me to finish --

THE WITNESS: I'm sorry.

MR. FASEL: -- my objection.

BY MR. PHILLIPS:

Q. So in -- what did you do, then, in design and development for Girly Girl?

A. Making sure that the styles looks nice and the color, the trend, everything, to see if we can sell the product.

Q. What kind of footwear was Girly Girl looking to import into the United States?

A. Varieties such as sandals, heels.

Q. Anything other than sandals or heels?

A. Yeah, maybe some sports shoes, if there's a business for it.

Q. And what countries was Girly Girl looking to have these -- have this merchandise manufactured in?

A. Vietnam.

Q. Was Vietnam the only country Girly Girl was looking to have this footwear manufactured in?

A. Mostly, yes. I don't know, maybe China.

Q. Who handled the importation of the samples

Page 103

for Girly Girl?

MR. FASEL: Objection. Vague and ambiguous as to importation and handled.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. To my understanding, it was -- it was sent by FedEx.

Q. What was sent by FedEx, sir?

A. The samples.

Q. And how many samples were sent to Girly Girl by FedEx?

A. I don't know.

Q. And where were those samples sent? From what -- what company sent those samples to Girly Girl in the United States?

A. I don't remember.

Q. What position did you have at Girly Girl, sir?

A. President, maybe.

Q. And as far as you recall, only you and Ms. Calvo worked for Girly Girl, correct?

A. At start, yes.

Q. Did anyone else join after it started?

A. I'm not sure. I'm not sure.

Q. Did you personally handle getting any of

Page 104

those samples sent to the United States from the manufacturers in Vietnam for Girly Girl?

A. No.

Q. Do you know who did?

A. Yeah, the factory in Vietnam or China, they sent the sample.

Q. And who would have been their contact for Girly Girl in the United States?

A. It probably would attention to Fernanda, maybe me.

Q. Is there any doc- -- do you have possession of any documents from Girly Girl?

A. What do you mean documents?

Q. Is there -- Girly Girl, I presume, had some documentation from these samples and other things. Do you know where those documents reside?

A. No, I don't.

Q. Did you, at any point, have possession of those documents from Girly Girl?

A. No.

Q. Who would have had possession of documents from Girly Girl?

A. Maybe Fernanda or whoever received the sample at the office.

Q. Would the company have maintained, in any

Page 105

official file, documents from the samples that were imported?

A. I don't know.

Q. As president, did you do anything to create any document retention policy for Girly Girl?

A. Create any what?

Q. Document retention policy.

As president, did you put in any procedures for this company about maintaining documents?

A. No.

Q. Let's switch topics, sir. I'd like to go back to Sterling.

You're aware that Sterling Footwear, Incorporated received a penalty notice from CBP in this case, correct?

MR. FASEL: Objection. Vague and ambiguous as to penalty notice.

THE WITNESS: I didn't know at first.

BY MR. PHILLIPS:

Q. And when did you find out about the penalty notice from CBP?

MR. FASEL: Objection. Vague and ambiguous as to penalty notice.

THE WITNESS: I don't remember. Maybe

Alderson Reporting Company
1-800-FOR-DEPO

Page 106

through the attorney -- my attorney.

BY MR. PHILLIPS:

Q. But you recall seeing or hearing that Sterling Footwear, Incorporated had been issued a penalty notice by CBP, correct?

MR. FASEL: Vague and ambiguous as to penalty notice. Which penalty notice?

BY MR. PHILLIPS:

Q. Sir, are you aware of any penalty notice issued to Sterling Footwear, Incorporated by CBP?

A. Are you talking about now? Or before?

Q. Now.

A. Now I know.

Q. Okay. And when did you first learn about the penalty notices you're referring to?

A. Through Elon Pollack, my previous attorney.

Q. So did you -- your -- is your testimony that you only learned about pen- -- penalty notices to CBP through your attorney?

A. Yes.

Q. Did you ever hear about penalty notices from anyone at Sterling Footwear, Incorporated?

A. No.

Q. Were you ever provided any penalty notice

Page 107

prior to hearing about it from your attorney?

A. I don't understand your question. Can you repeat it?

Q. Fair enough.

When -- actually, let's step back for a second, sir.

Who was your attorney that you learned about the penalty notice from?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Elon Pollack.

BY MR. PHILLIPS:

Q. And do you recall about what -- about when Mr. Pollack told you about the penalty notice?

MR. FASEL: I'm going to object as to attorney-client privilege.

MR. PHILLIPS: This is a fact.

BY MR. PHILLIPS:

Q. You can answer the question, sir. I'm asking merely for the date.

MR. FASEL: Go ahead.

THE WITNESS: Toward the end of 2009.

BY MR. PHILLIPS:

Q. And why did you obtain the services of an attorney?

Page 108

A. I didn't.

Q. Strike that question. Let me go back for a second.

MR. PHILLIPS: Can you actually read back his previous question and answer?

(Record read as follows:

"Q. And do you recall about what -- about when Mr. Pollack told you about the penalty notice?

A. Toward the end of 2009.")

MR. FASEL: Is there a question pending?

MR. PHILLIPS: I'm just --

MR. FASEL: Okay.

MR. PHILLIPS: I'm anticipating --

MR. FASEL: I didn't know if you were waiting on an answer or not.

MR. PHILLIPS: No, I'm anticipate --

BY MR. PHILLIPS:

Q. Sir, prior to hearing about a penalty notice from Mr. Pollack at the end of 2009, were you made aware of any issue with Sterling Footwear, Incorporated's entries into the United States?

MR. FASEL: Objection. Vague and ambiguous as to issue or issues.

BY MR. PHILLIPS:

Page 109

Q. I'm asking a very general question, sir. You stated that you --

A. Was I aware?

Q. Was you aware -- were you aware of any issues with Sterling Footwear, Incorporated's entries of merchandise into the United States prior to hearing it from your attorney, which you've said happened at the end of 2009?

MR. FASEL: Same objections.

THE WITNESS: No.

MR. PHILLIPS: Let's come back to that.

BY MR. PHILLIPS:

Q. Did you hire an attorney for the express purpose of addressing the penalty notice from CBP?

MR. FASEL: I'm going to object as to attorney-client privilege.

BY MR. PHILLIPS:

Q. I'm not asking for any discussions you've had with your -- with your attorney. I'm asking the reason why you, sir, obtained the services of an attorney.

MR. FASEL: Go ahead and answer.

THE WITNESS: I wasn't aware of it at first.

MR. FASEL: Listen to his question.

Alderson Reporting Company
1-800-FOR-DEPO

Page 110

Can you repeat your question?

MR. PHILLIPS: One second.

(Discussion off the record.)

MR. PHILLIPS: Let's come back to that in a few minutes.

BY MR. PHILLIPS:

Q. Sir, I'd like to focus on policies and procedures at Sterling Footwear, Incorporated.

You were president and CEO, I think, as we've discussed earlier, correct?

A. Yes.

Q. And you were in charge of hiring -- one second.

You were in charge of hiring a number of -- a number of employees, and one of those employees was Janet Huynh, correct?

A. Yes.

Q. And Ms. Huynh was in charge of the production department at Sterling Footwear, correct?

A. Yes.

Q. How did Ms. Huynh learn to do her job for Sterling Footwear? Was she trained by you or someone else at Sterling Footwear?

MR. FASEL: Object to compound.

THE WITNESS: Trained by me?

Page 111

BY MR. PHILLIPS:

Q. Yes.

A. No.

Q. Did you provide any training to Ms. Huynh?

A. No.

Q. How did Ms. Huynh learn to do her job for Sterling Footwear, Incorporated?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: I don't know. She probably have experience.

BY MR. PHILLIPS:

Q. Did Sterling -- did you institute, as president and CEO, any sort of training programs for any employee of the company?

A. No.

Q. Did you institute any training programs for any employees dealing with importing goods from Vietnam?

A. No.

Q. Did Sterling Footwear, Incorporated, of which you were president and CEO, employ directly any customs brokers as employees of the company?

A. I don't know.

Q. Do you know if anyone was hired who had

Page 112

experience as a customs broker?

A. Not that I know of.

Q. Was there -- did you put in place any process or procedure for Ms. Huynh and others regarding how to choose customs brokers for Sterling Footwear, Incorporated's importations?

A. No.

Q. Did you personally hire any of the customs brokers Sterling used?

A. No.

Q. Do you know who did hire the customs broker that Sterling used?

A. I assume it would be Janet.

Q. Well, as president and CEO, sir, why did you merely assume that Janet would hire customs brokers for Sterling Footwear, Incorporated?

A. Well, part of production, she has to hire a broker to clear the merchandise before it can enter into the United States.

Q. And as president and CEO of Sterling Footwear, Incorporated, did you have any responsibility for ensuring that the customs brokers that were hired by Ms. Huynh were capable of doing the job?

A. I don't understand the question. Can you

Page 113

break it down, please?

MR. FASEL: I'm going to object as to argumentative.

BY MR. PHILLIPS:

Q. What guidelines was Ms. Huynh given in how to hire custom brokers for Sterling Footwear, Incorporated?

MR. FASEL: Objection. Asked and answered.

BY MR. PHILLIPS:

Q. Answer the question, sir.

A. There was no guideline. She just need to, I guess, contact a broker and work with them. But there's no guideline.

Q. Did Ms. Huynh have any supervision by you over her use or employment of customs brokers?

A. No.

Q. Did Sterling Footwear -- strike that question.

Did you have any involvement in determining which brokers Sterling Footwear, Incorporated would use?

A. No.

Q. Did Ms. Huynh ever report any issues with you or seek your advice and guidance about customs

Alderson Reporting Company
1-800-FOR-DEPO

Page 114

brokers for Sterling Footwear, Incorporated to use?

A. No.

Q. Did you ever have any contact with any of the customs brokers from Sterling Footwear, Incorporated?

A. No.

Q. Do you know who did have contact with the customs brokers from Sterling Footwear, Incorporated?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: Janet Huynh.

BY MR. PHILLIPS:

Q. Was Janet Huynh the person you put in charge of dealing with that?

A. Yes.

Q. Do you recognize the name Scott Kauffman?

A. No.

Q. Do you recognize the company Seattle Logistics?

A. No.

Q. Have you ever dealt with any of the customs brokers that Sterling Footwear, Incorporated used?

MR. FASEL: Objection. Asked and

Page 115

answered.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Do you know the names of any of the customs brokers that Sterling used?

A. No.

Q. Did you ever provide any documentation to any of the customs brokers that Sterling Footwear used?

A. No.

Q. Do you know who did provide any documentation?

A. I assume it would be Janet.

Q. Did you ever, in your role as president and CEO, do any oversight of what Ms. Huynh was doing with the customs brokers Sterling Footwear, Incorporated used?

MR. FASEL: I'm going to object as to vague and ambiguous as to the time.

THE WITNESS: No.

MR. FASEL: Documentation.

BY MR. PHILLIPS:

Q. In your role as president and CEO of Sterling Footwear, Incorporated, did you institute any procedures to ensure that Sterling Footwear paid

Page 116

all applicable duties for the entries of merchandise it imported?

A. Well, my role is to design, develop. I don't handle -- or I don't make any decisions in terms of how the product it's -- how can I say? It's -- basically the value of it. I don't deal with that. I only deal with the aspect of designing the product. That's my main goal.

Q. Sir, as president and CEO, were you the senior-most executive in management for Sterling Footwear, Incorporated?

A. Senior management?

Q. Senior-most?

A. What do you mean by senior-most?

Q. By senior-most, I mean top of the food chain. So my questions, sir, is: Did you report to anyone in your position as president and CEO of Sterling Footwear, Incorporated?

A. No.

Q. So you were the ultimate decision maker at the company should a question arise?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Yeah, if there is.

BY MR. PHILLIPS:

Page 117

Q. And just to be clear, sir, I think you had testified earlier that as president and CEO you did not institute any procedures to ensure that all applicable duties were paid on Sterling Footwear, Incorporated's entries into the United States, correct?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Again, it's -- I don't handle that. And that's -- I hire employees to do that.

BY MR. PHILLIPS:

Q. I understand, sir. But my question is simply: As president and CEO, is it your testimony that you did not institute any procedures or policies that your employees would follow to ensure that any importation of merchandise by Sterling Footwear would be done properly; is that correct?

MR. FASEL: Objection. Vague and ambiguous as to procedures and policies. Compound. Asked and answered.

THE WITNESS: Let me see if I can understand you correctly. You asked me if I set up any procedures for the employee; is that what it is?

BY MR. PHILLIPS:

30 (Pages 114 to 117)

Page 118

Q. Yes, sir.

A. No.

Q. And when -- and just to follow up on that. When we were discussing procedures, is your answer that you didn't set up any procedures for your employees to follow? I'm asking specifically with respect to importing merchandise.

So is it your testimony, sir, that you did not set up any procedures for your employees to follow in importing merchandise into the United States?

MR. FASEL: I'm going to object as unintelligible. I didn't even understand that question.

BY MR. PHILLIPS:

Q. You stated, sir, that you did not set up procedures and policies for your employees correct?

A. Right.

Q. And just to clarify, is it correct that that -- is it correct, then, that your employees were not provided any procedures by you on how to actually import goods and merchandise for Sterling Footwear, Incorporated?

A. That's correct. The instruction was to work with a broker when there's a product that's

Page 119

being imported into the United States.

Q. Was that your only instruction to your employees, to work with a broker?

A. Yes.

Q. Did you provide -- did you provide any instruction to your employees in writing?

A. No.

Q. How were your instructions relayed to your employees?

MR. FASEL: Objection. Vague and ambiguous as to instructions.

BY MR. PHILLIPS:

Q. How did you relay your instructions to your employees?

A. I would talk to them.

Q. And which employees did you talk to specifically about instructions?

A. Well --

MR. FASEL: Vague and ambiguous as to instructions.

THE WITNESS: It depends if it's marketing, design or production.

BY MR. PHILLIPS:

Q. And this is a general question, sir. For all of these instructions, were -- is it correct

Page 120

that none of these instructions were written down?

A. That's correct.

Q. Did you provide any instruction to Ms. Huynh about how to deal with the customs brokers that she employed?

MR. FASEL: Objection. Vague and ambiguous as to deal with customs brokers.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Sir, are you aware of a meeting that Ms. Huynh and Ms. Ng had with CBP on or about July 29th, 2009?

MR. FASEL: Object. It's vague and ambiguous as to CBP.

BY MR. PHILLIPS:

Q. Do you understand what I mean --

A. Can you --

Q. -- by when you say -- when I say CBP? It's a shorthand for Customs and Border Protection. Do you understand that, sir?

A. Yes.

Q. Okay. Good.

A. It -- was I aware?

Q. Was you -- were you aware, in the summer of 2009, that your employees, Ms. Ng and Ms. Huynh,

Page 121

had a meeting with Customs and Border Protection?

A. Yes.

Q. And how did you become aware of that meeting?

A. I was notified by the attorney.

Q. When were you notified by the attorney?

A. Prior to their meetings.

Q. And who was the attorney who notified you?

A. Elon Pollack.

Q. Were you ever notified by either Ms. Huynh or Ms. Ng about a meeting with CBP?

A. Yeah, she -- what's his name? -- Janet, she told me.

Q. And what did Janet tell you about this meeting with CBP?

A. She just said there was a meeting and that they -- she's going to attend with Nancy and Elon Pollack.

Q. So this discussion you're referencing happened before the meeting?

A. Yes.

Q. Did you have any discussions with Ms. Huynh after the meeting about the meeting she had with CBP?

A. Not that I remember.

Page 122

Q. Do you recall having any discussions with Ms. Ng, either before or after this meeting with CBP, about the meeting she was going to attend or had attended with CBP?

A. Not that I recall.

Q. And my colleague is pointing out, sir, I would just like to clarify. There may have been more than one meeting that Sterling Footwear, Incorporated had with CBP and I just want to make that we are both talking about the same one. The meeting you were -- we were discussing a few minutes ago where you had talked about you and Janet discussing, were you in attendance at that meeting or was this a meeting that you weren't in attendance with -- at?

A. I wasn't at the meeting.

Q. Okay. So the meeting we have been discussing was one where you were not at?

A. That's correct.

Q. Was there a later meeting with CBP that you did attend?

A. Yes, there's one.

Q. And do you remember when that meeting was?

A. I don't remember exactly.

Q. Were you accompanied by counsel to that

Page 123

meeting?

A. Yes.

Q. And is that counsel Mr. Pollack?

A. Yes.

Q. Do you -- and I'm just trying to clarify for my sake, sir. Had you dis- -- had you talked to Mr. Pollack or employed his services before the first meeting that Sterling Footwear had with CBP in July of 2009?

A. To my best knowledge, is that when I -- I heard that we were having a problem with the importing -- the importation of the shoes, that's when I -- this is the conversation between myself and Janet, just to clarify. That she told me that we having issue with the product being import. And that -- that's when I told her that -- you know, that we need to try to find a way to resolve it the best way we can. And I believe that's when we hire Mr. Elon Pollack to represent us and trying to resolve this matter.

Q. What did Ms. Huynh tell you the problem was that Sterling was having with the importation of its -- of the footwear?

MR. FASEL: Objection. Assumes facts not in evidence.

Page 124

THE WITNESS: She told me that we have a -- a problem with the duty.

BY MR. PHILLIPS:

Q. Did she explain in any more detail what that problem was?

A. No.

Q. Did you give her any instructions on what to do at this meeting she was going to attend with CBP?

A. No. Actually, if I remember correctly, someone say -- someone told me and -- that we should get an expert to help us to try to resolve this matter. And that's when we hire Elon Pollack.

Q. And what do you mean by an expert?

A. Someone who knows about importation, about, you know, the duties and stuff like that. Because that's not, you know, what we do and that's not our specialties or -- we don't handle that.

Q. Do you know who told you this?

MR. FASEL: And I object, insofar as it violates attorney-client privilege.

MR. PHILLIPS: I'm merely asking for the fact of a name.

THE WITNESS: I don't remember.

BY MR. PHILLIPS:

Page 125

Q. And this -- you would have been told this after Ms. Huynh and Ms. Ng came back from the meeting with CBP?

A. No, I believe we hire Elon before that. When we -- when we realized that the problem happened -- or the situation, you know, with the -- clarify -- the classification issue.

Q. So you learned that there was a problem with Sterling's imports that required the services of an expert prior to your employees meeting with CBP in July of 2009?

MR. FASEL: Objection. Misstates testimony.

THE WITNESS: No, when -- when we found out there was an issue and that's when we hired Elon Pollack.

BY MR. PHILLIPS:

Q. And that's just -- and, sir, I'm just trying to square away the dates. Did you find out that the services of this expert, as you're stating, Mr. Pollack, a lawyer, were necessary after Ms. Huynh and Ms. Ng had gone to the meeting with CBP and came back and told you that they had learned that there were issues that required the use of an expert?

Page 126

MR. FASEL: Object to the -- as to misstates testimony as to necessary and required.

THE WITNESS: That, I do --

[Reporter requests clarification.]

MR. FASEL: Misstates testimony.

THE WITNESS: That, I don't remember.

BY MR. PHILLIPS:

Q. Giving it your best estimate, at what point in this -- and I'm just trying to square away the timeline here, sir. So I understand that you became aware of, as you said, problems that Sterling was having with its imports; is that correct?

A. Yes.

Q. And what were those problems that you were made aware of?

MR. FASEL: Objection. Calls for expert opinion.

THE WITNESS: All I -- I know of is that there's a duty issue.

BY MR. PHILLIPS:

Q. Okay. So you were made aware that there was a problem with the duties Sterling had paid on its imports?

A. Yeah. Duty, yes.

Q. And as a result of that problem, you

Page 127

understood that two of your employees, Ms. Huynh and Ms. Ng, were going to go to a meeting with Customs and Border Protection in July of 2009, correct?

A. I think so.

Q. Okay. And after that meeting you were informed by someone that the issue discussed at that meeting is one for which Sterling should obtain an expert services, correct?

MR. FASEL: Objection. Misstates testimony.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. So you were made aware --

MR. FASEL: Just one second. If you can give me one second -- one second with him.

MR. PHILLIPS: So you want to go off the record --

MR. FASEL: Yes.

MR. PHILLIPS: -- to discuss some attorney-client issue?

MR. FASEL: Yes.

MR. PHILLIPS: Okay. Let's just take a five minute break.

MR. FASEL: I don't even need that, if you don't want to --

Page 128

MR. PHILLIPS: I -- we'll just take a break right now.

THE VIDEOGRAPHER: We're going off the record. The time is 1:41 p.m.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:52 p.m.

MR. PHILLIPS: And Mr. Ng, I understand that you, after consultation with your attorney during the last break, wish to amend or clarify an answer. So I will allow you the opportunity to clarify whatever answer it is you would like to clarify. So please go ahead.

THE WITNESS: Yes. I just want to clarify, because I don't know if I maybe misunderstood what you said or maybe I didn't -- what you call it? -- understand you correctly. That you -- you asked something about -- about Janet and Nancy Ng about attending the meetings. And I wasn't -- wasn't there at the meeting. And I believe Janet and Nancy was at the meeting with Elon Pollack. And Mr. Pollack was hired before the meeting. And I believed that he attended the meeting with Nancy and Janet.

BY MR. PHILLIPS:

Page 129

Q. On what facts are you basing your change to your previous answer?

MR. FASEL: I'm going to object insofar as it violates attorney-client privilege. And instruct the witness not to rely -- or communicate any information that was done between client and counsel.

MR. PHILLIPS: Are you instructing your -- your witness not to provide any information on the facts that he has learned that informed his answer?

MR. FASEL: If they violate communications of attorney-client privilege, I instruct you not to answer. If there's something outside of that that you'd like to provide him, go ahead.

BY MR. PHILLIPS:

Q. Sir, are you going to follow your counsel's instruction and not answer this question about what facts have led you to change your answer based on your attorney's instruction?

A. No, I'm go to clarify something. It's that when I found out there was a duty issue, I have instruct Janet Huynh to hire an expert -- an attorney expert to try to resolve this matter.

Q. When you say "duty issue", what did you understand that duty issue to be caused by?

33 (Pages 126 to 129)

Page 130

MR. FASEL: Objection. Vague and ambiguous.

THE WITNESS: Oh, I don't know. I know there was a problem with the duty.

BY MR. PHILLIPS:

Q. Did you understand that that problem with the duty was a result of classification issues with Sterling's imports?

A. I don't know.

Q. Did you do anything to find out from Ms. Huynh whether the problem with Sterling's imports had to do with classification?

A. Well, I found out later from Elon Pollack about the issue.

Q. And what did you find out about the issue? What was the issue that you were made aware of with Sterling's imports?

A. Well, he mentioned to me that --

MR. PHILLIPS: And I'm just -- actually, sir, I'm just going to stop you, because I understand Mr. Pollack was an attorney. Is he still an attorney? Or has there been a decision about waiver of that --

MR. FASEL: Meredith can talk about.

Is he still an attorney?

Page 131

[Reporter requests clarification.]

MS. JOHNSON: Yes, he's still an attorney. I believe he's still practicing.

MR. FASEL: Yeah.

MR. PHILLIPS: Well, and the -- the reason I raise it, if this is something you're going to assert attorney-client privilege over, then --

MR. FASEL: Do you want to talk to me as far as where you're going with it, off the record? And then maybe we'll waive that attorney-client privilege possibly, if we see where you're going first with it.

MR. PHILLIPS: Let's go off the record and talk for a few minutes.

THE VIDEOGRAPHER: We're going off the record. The time is 1:56 p.m.

(Recess.)

THE VIDEOGRAPHER: The time is 2:01 p.m. We are back on the record.

BY MR. PHILLIPS:

Q. Sir, before we broke we were discussing your knowledge of issues that Sterling Footwear, Incorporated had with certain of its entries into the United States. Do you recall that?

A. Yes.

Page 132

Q. And I had asked you how you became aware of those problems with the entries for Sterling. And do you recall that you stated that Mr. Elon Pollack had informed you of, I believe, the fact of some of those issues? What I would like to know, sir, is: What -- what was the problem that Mr. Pollack informed you about regarding Sterling Footwear, Incorporated's entries of merchandise into the United States?

MR. FASEL: Objection. Assumes facts not in evidence.

THE WITNESS: Oh, he didn't say there was a problem.

BY MR. PHILLIPS:

Q. Did --

Okay. Stepping back for a second, you have used the phrase problem with their -- with your entries to describe issues that where discussed at the meeting with CBP between Ms. Huynh, Ms. Ng and CBP officials. Do you -- do you recall that?

A. I wasn't at the meeting.

Q. Well, I -- and I understand that, sir. I think we have discussed that. What I -- what I'm trying to get at is: You were aware of some -- some problems with Sterling's entries, correct?

Page 133

A. Yes.

Q. And what problems were you made aware of? I was looking for more specifics. Details about the problems. Your knowledge.

A. All I know was there was a duty issue and that was it.

Q. Okay. And when you say a duty issue, what do you mean by "there was duty issue?" There was an issue with how Sterling's imports had been classified?

A. No.

MR. FASEL: Object.

THE WITNESS: I didn't know.

MR. FASEL: Objection. It's vague and ambiguous and misstates testimony.

BY MR. PHILLIPS:

Q. Were you told -- what were you told by Ms. Huynh -- Ms. Huynh or Ms. Ng after their meeting with CBP about what they had discussed with CBP?

MR. FASEL: Objection. Compound.

THE WITNESS: I didn't talk to them.

BY MR. PHILLIPS:

Q. Did they talk to you about anything they had discussed with CBP at that meeting in July 2009?

A. Not that I recall.

34 (Pages 130 to 133)

Page 134

Q. Did they inform you that there were any issues with Sterling's imports after they met with CBP in July 2009?

A. Not that I recall.

Q. Did you institute, as chairman and CEO -- I'm sorry, as president and CEO of Sterling Footwear, any changes to your practices and procedures following Ms. Huynh and Ms. Ng's meeting with CBP in July of 2009?

A. I don't --

MR. FASEL: Objection. Vague and --

THE WITNESS: -- understand --

MR. FASEL: -- ambiguous --

THE WITNESS: -- your question.

MR. FASEL: -- as to policies and procedures.

BY MR. PHILLIPS:

Q. Am I pronounce --

MR. FASEL: H-U-Y-N-H.

BY MR. PHILLIPS:

Q. Yeah, I apologize if I'm mispronouncing it. It's Huynh?

A. Yes.

Q. Okay. And Huynh and Ng?

A. Ng.

Page 135

Q. Okay. I -- I apologize. It's not -- it's not my strong suit.

Did you learn anything from Ms. Huynh after her meeting with CBP in July 2009?

A. No.

MR. FASEL: I'm going to object to that as -- anything is vague and ambiguous.

BY MR. PHILLIPS:

Q. Did Sterling make -- did you instruct anyone at Sterling to change the way they did anything after Ms. Huynh and Ms. Ng met with CBP in July 2009?

MR. FASEL: Vague and ambiguous as to anything.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Did you instruct them to change anything, particularly with respect to how entries were classified for Sterling Footwear, after they had that meeting in July 2009?

MR. FASEL: Vague and ambiguous as to anything.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Sir, did you -- you attended a meeting

Page 136

with CBP in October of 2009, correct?

A. Yes.

Q. And at that meeting you were accompanied by counsel?

A. Yes.

Q. What did CBP discuss with you during that meeting in October 2009?

MR. FASEL: Objection. Lacks foundation. Assumes facts not in evidence.

BY MR. PHILLIPS:

Q. You can answer the question.

A. To my best knowledge?

Q. Yes.

[Reporter requests clarification.]

MR. PHILLIPS: I may have said "yes," but...

THE WITNESS: To my understanding and to my best knowledge, that they were there to assist and help us in trying to resolve whatever problem that we have with our importations.

BY MR. PHILLIPS:

Q. And what did CBP tell you the problem with your importation was?

MR. FASEL: Same objections.

THE WITNESS: It's been so long, I don't

Page 137

remember exactly.

BY MR. PHILLIPS:

Q. Do you recall, generally, what they discussed with you?

A. Not in specific. But I know they -- they were trying -- they saying they were trying to help us and assist us to -- to -- or guide us to the right direction and to import these prop- -- these shoes properly.

Q. Okay. And what did you --

A. And they recommend us a broker that would know or specialize in the shoe industry.

Q. And what do you mean by guide you in the right direction?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: They just want us -- I guess when they said guide, it means, I guess, they want to assist us and help us.

MR. FASEL: Just --

[Reporter requests clarification.]

BY MR. PHILLIPS:

Q. To guide you in the right direction, sir, implies that there was something that was going in the wrong direction. Do you recall any discussion

Page 138

of -- with CBP of what Sterling Footwear was doing incorrectly regarding its imports?

MR. FASEL: Objection. Assumes facts not in evidence. Misstates testimony as to that there was anything incorrect.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. Can you say that again?

Q. Do you recall anything that CBP stated during that meeting that you had with them about what wasn't proper about Sterling's importations?

MR. FASEL: Same objections.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Do you recall CBP discussing with you classifications on Sterling's entries?

A. No. I was only there for a little bit and then I left. And the -- I guess the meeting continues without me.

Q. Who did you leave in charge after you left the meeting?

A. Well, it -- I didn't really leave anybody in charge. It was -- it was a meeting with Janet and Nancy and with their attorneys.

Q. Where Ms. Huyhn and Ms. Ng authorized to

Page 139

speak on behalf of Sterling Footwear, Incorporated?

A. Yeah, they can talk.

Q. So if they had discussed anything with CBP, you had authorized them to make an agreement with CBP on certain issues?

MR. FASEL: Objection. Improper hypothetical.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. You mean am I authorize- -- do I authorize them?

Q. As president and CEO of Sterling Footwear, Incorporated, did you provide Ms. Huynh or Ms. Ng with authorization to deal with CBP in any respect?

A. No, not at that moment.

Q. Did you, at any point, provide them with authorization to work with or deal with CBP?

A. Only just to handle the shipment when it comes in with the broker.

Q. So Ms. Huynh and Ms. Ng were not authorized by you, as president and CEO, to make any decisions on behalf of Sterling Footwear, Incorporated?

MR. FASEL: Objection. Misstates testimony.

Page 140

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Did you take any notes during this meeting?

A. No.

Q. Were you provided any notes by anyone after this meeting?

A. Not that I recall.

Q. Were you provided any update by Ms. Huyhn or Ms. Ng about the discussions they had with CBP after you left the meeting?

A. No.

Q. Did you learn about any of the things that were discussed after you left the meeting?

A. No.

Q. Did CBP provide you or anyone else at Sterling with any documentation or information following the meeting in October 2009?

A. I don't know.

Q. After this meeting, did you ever do anything to verify with CBP that the problems regarding your duties had been rectified?

MR. FASEL: Objection. Vague and ambiguous as to problems.

THE WITNESS: No. I only talked to my

Page 141

attorney, Elon Pollack.

BY MR. PHILLIPS:

Q. And did you make any changes in the way Sterling Footwear, Incorporated dealt with its importation of merchandise after this meeting?

MR. FASEL: Again, vague and ambiguous as to importation of merchandise. Changes.

THE WITNESS: I didn't do anything, because the attorney was handling it for me.

BY MR. PHILLIPS:

Q. As the president and C- -- and CEO of Sterling Footwear, Incorporated, did you request that any of your employees provide you with an update or a recommendation on changes Sterling could make as a result of the issues discussed with CBP during that meeting?

MR. FASEL: What?

THE WITNESS: Can you break it down, please?

BY MR. PHILLIPS:

Q. As president and CEO --

A. Yes.

Q. -- of Sterling Footwear, you're ultimately in charge of the company, correct?

A. Yes.

Page 142

Q.  And you were aware that your employees were having a meeting with CBP to discuss issues or problems that had arisen with Sterling's imports, correct?

A.  Yes.

Q.  And after this meeting, your employees came back, presumably, with information about what these issues were, right?

MR. FASEL:  Objection.  Assumes facts not in evidence.

THE WITNESS:  Well, I don't know.  I wasn't at the meeting at the time they were talking about the issues.

BY MR. PHILLIPS:

Q.  And you didn't do anything to learn about what was discussed at that meeting after you left, right?

MR. FASEL:  Objection.  Misstates testimony.

THE WITNESS:  All I know was that I have attorney there that was to help me and assist and guide us to the right directions.

BY MR. PHILLIPS:

Q.  Sir, it's correct, isn't it, that you never asked Ms. Huynh or Ms. Ng for an update about

Page 143

the result of that meeting after you left it?

A.  That's correct.

Q.  And it's also correct, sir, that as president and CEO, you didn't institute any changes in the way Sterling imported any of its merchandise based on that meeting that your employees had with CBP, correct?

A.  Well, I was told by Elon Pollack, the attorney, that we didn't do anything wrong and that he's going to try to get to the bottom of it by resolving whatever the problem is.  And that's pretty much I know.

Q.  And what did you understand that problem to be?

A.  He -- he told me that there was a problem with -- with the duty being paid, it's incorrect.

Q.  So you were aware that CBP said that the duty Sterling was paying on its imports was incorrect?

A.  No, that's what Elon Pollack told me that CBP claimed.

Q.  And Mr. Pollack was at that meeting with CBP?

A.  Yes.

Q.  Was he there the entire time?

Page 144

MR. FASEL:  Objection.  Calls for speculation.

THE WITNESS:  I think so.

BY MR. PHILLIPS:

Q.  Had you authorized Mr. Pollack to do or make any agreements with CBP regarding Sterling's entries?

MR. FASEL:  Vague and ambiguous as to --

THE WITNESS:  The -- can you --

BY MR. PHILLIPS:

Q.  Did you auth- -- was Mr. Pollack authorized by you, as the president and CEO, to make any decisions on behalf of Sterling Footwear, Incorporated --

A.  For?

Q.  -- with -- in regards to any agreement with CBP?

A.  No, I don't think we ever talked about that.

Q.  And just so I'm clear, sir, because I just want to make sure, so after this meeting in October you never instructed Janet Huynh or Nancy Ng to do anything regarding Sterling's entries --

MR. FASEL:  Objection.

BY MR. PHILLIPS:

Page 145

Q.  -- going forward?

MR. FASEL:  Asked and answered, like, five times.

BY MR. PHILLIPS:

Q.  You can answer the question, sir.

A.  I instruct them -- actually, I -- they were referral by our attorney, Elon Pollack, to hire an expert to assist them on the -- going forward on all the shipments in terms of classification.

Q.  Did you ever hire -- did Sterling or you ever hire that expert?

A.  I think that the company did.

Q.  And who did the company hire?

A.  I think they hired this company.  Craig? Craiger?  I'm -- I don't know exactly the name.

Q.  And what did this company do?

A.  They're a custom broker.

Q.  So are you saying that after the meeting with CBP, Sterling, at your instruction, Janet or Nancy hired a new customs broker?

A.  Yes, to my understanding.  And that was -- that was -- how can I -- that was advised by Mr. Elon Pollack.

MR. FASEL:  I'm sorry, are you asking about -- are you asking about an expert?  Is that

37 (Pages 142 to 145)

Page 146

what you're asking.

MR. PHILLIPS: I'm using the terms he's using. He says he hired an expert. I want to --

MR. FASEL: Because we produced the reports already to you in regards to that hiring. And you have them in your possession --

MR. PHILLIPS: That's fine.

MR. FASEL: -- and the dates of them.

MR. PHILLIPS: As you are well aware, I'm still entitled to ask the questions.

MR. FASEL: I'm not telling you not to. I'm just trying to help you along here.

BY MR. PHILLIPS:

Q. Sir, did you instruct Ms. Huynh or Ms. Ng to do anything regarding the penalty from CBP?

MR. FASEL: Objection. Vague and ambiguous as to CBP.

THE WITNESS: I don't about that.

BY MR. PHILLIPS:

Q. You were -- were you aware that CBP had instituted a penalty against Sterling Footwear based on its importations?

A. I didn't know. I found out that through Elon Pollack.

Q. Did you instruct -- once you found out

Page 147

about this penalty, did you instruct your employees to do anything differently?

A. Yes, I just instruct them to try to talk to Elon and -- if they have any questions. Because I'm not an expert in that.

Q. Did you instruct hem to do anything differently with -- regarding the importation of future merchandise that Sterling was bringing in from, presumably, Vietnam?

A. Again, I told them to talk to Elon before they do anything.

(Discussion off the record.)

BY MR. PHILLIPS:

Q. Sir, I'd like to explore a little training or your interaction with Ms. Huynh. When Ms. Huynh started working at Sterling Footwear, did you provide her any training or instruction about how to do her job?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Did you provide Ms. Huynh any instruction on how to prepare paperwork for customs or paperwork that Sterling would send to customs brokers?

Page 148

MR. FASEL: Asked and answered.

THE WITNESS: No.

MR. FASEL: Are you all right?

THE WITNESS: --

MR. PHILLIPS: Mark this. I believe this is Exhibit 2.

(Whereupon Exhibit 2 was marked for identification.)

BY MR. PHILLIPS:

Q. Sir, what I've handed you is a copy of defendants' first amended responses to plaintiff's first set of interrogatories. And this was something provided by your counsel to the government on or about the 30th of September, 2014.

So what I'd like to start with: Have you seen this document before?

A. Maybe.

Q. Do you not know whether or not you've seen this document before, sir?

A. I might have, but I don't remember exactly. There's so much on here.

MR. FASEL: Give him a chance to read it through --

THE WITNESS: I need the --

MR. FASEL: -- it a little bit more.

Page 149

THE WITNESS: -- time to read it.

MR. PHILLIPS: Take your time, sir.

[Reporter requests attorney and witness speak one at a time.]

[Reporter requests clarification.]

MR. FASEL: To read through it a little bit more.

THE WITNESS: Okay.

BY MR. PHILLIPS:

Q. All right. So my question to you is: Have you seen this document prior to looking at it here today?

A. Yes.

Q. And when did you see this document?

A. I saw it on September 30th when I signed this.

Q. And so are you referring to the certification which is at page 10 of this document?

A. There's no page on mine.

Q. Oh, it looks like it's cuts off, yes.

Following the signature page, there's a certification page, correct?

A. Yes.

Q. And that certification states that: "You, Alex Ryan Ng, chief executive officer of Sterling

Page 150

Footwear, has prepared the following -- the foregoing amended responses and hereby declares under penalty of perjury that you have personal knowledge of the information supplied therein."

Is that what that says?

A. Yes.

MR. FASEL: The document speaks for itself.

BY MR. PHILLIPS:

Q. And you -- that is, in fact, your signature on that -- that page, sir?

A. Yes.

Q. What did you do in reviewing the answers to these interrogatories to enable you to certify these interrogatory responses?

A. Can you elaborate on it?

Q. Sure.

So on this certification you're attesting to the truthfulness of these responses. What did you do to verify that the responses in this -- in these interrogatories were truthful and accurate?

A. Oh, I -- I believe on this one was to the employees information, their address, their phone number.

Q. And which -- you're referring to

Page 151

interrogatory -- response to Interrogatory No. -- No. 9, sir?

A. I think it's 8, 9 there's nothing here (indicating).

Q. If you'll look back one page, sir.

Can I see your copy, sir?

Interrogatory 9 starts here (indicating) and response starts there, sir?

A. Okay. Thank you.

Q. So referencing Interrogatory Response No. 9, which you -- you've pointed us to, what did you do to verify that this information was correct?

A. I contact the CPA.

Q. And who was the CPA that you contacted?

A. Gary Choi.

Q. Gary Choi.

And did Mr. Choi provide you with all the information in this -- in this document?

A. Yes, the name and the address.

Q. Who provided you with the information about each individual's title or job description?

A. Just give me a -- a minute, okay? Let me look at it.

Janet Huynh did.

Q. And you contacted Ms. Huynh directly to

Page 152

find out this information?

A. No, I didn't talk to her.

Q. How did you find out that Ms. Huynh knew this, then?

MR. FASEL: Objection as far as it violates attorney-client privilege.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. So did you not contact Ms. Huynh directly to find out whether she knew this information; is that correct, sir?

A. Yes.

Q. So did you talk to anyone -- any person to find out whether this information was correct?

MR. FASEL: Again, objection as to attorney-client privilege.

MR. PHILLIPS: Are you instructing your witness not to answer how he -- his factual basis is for knowing that this information is true and accurate?

MR. FASEL: As long as it doesn't violate the attorney-client privilege, he can answer.

MR. PHILLIPS: I'm merely asking for facts.

BY MR. PHILLIPS:

Page 153

Q. Who did you obtain the facts that you used to verify this information from, sir?

MR. FASEL: Same objection.

THE WITNESS: Kenny Chen.

BY MR. PHILLIPS:

Q. And you contacted Mr. Chen?

A. Yes.

Q. And what did you and Mr. Chen talk about?

A. I just asked him for the information.

Q. And how did Mr. Chen provide this information to you?

MR. FASEL: Objection. Misstates testimony.

THE WITNESS: He gave it to me on a piece of paper.

BY MR. PHILLIPS:

Q. Did you meet with him in person or talk to him on the phone?

A. I just talked to him.

MR. FASEL: Can I take a one-second break? Go off the record for one second.

MR. PHILLIPS: Let's go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 2:28 p.m.

(Recess.)

Alderson Reporting Company
1-800-FOR-DEPO

Page 154

THE VIDEOGRAPHER: This is the beginning of media unit 3 of the video deposition of Alex Ng, Volume I. The time is 2:32 p.m. We are on the record.

BY MR. PHILLIPS:

Q. Sir, before we took a break, I was asking you questions about your efforts to verify the information that you certified in defendants' first amended responses to the interrogatories. Do you recall that?

A. Yes.

Q. And you took a break so that you and your counsel could discuss an issue related to your certifying these responses.

MR. FASEL: Objection. Assumes facts not in evidence.

BY MR. PHILLIPS:

Q. What I'd like to know, sir, is: In that discussion you had with counsel, were you provided any new facts that you didn't know?

MR. FASEL: Objection. Attorney-client privilege.

I'm going to instruct you not to answer, Alex.

BY MR. PHILLIPS:

Page 155

Q. Sir, your --

MR. FASEL: He doesn't have a right to that.

BY MR. PHILLIPS:

Q. Sir, your counsel has instructed you not answer my question on an account of attorney-client. Are you following counsel's instruction?

A. Yes.

Q. Sir, I'd like to know in detail what you did to educate yourself about the facts as presented in these interrogatory responses such that you were capable of certifying these response under penalty of perjury. And we can start with Interrogatory No. 9 or we can start at generally -- what you did generally.

MR. FASEL: I'm going to object as to harassing and argumentative. And actually putting forth a higher standard that's required to him.

Go ahead.

THE WITNESS: Well, I received this information through my attorney, Thomas, and when I reviewed it, I signed it.

BY MR. PHILLIPS:

Q. You received what information from your attorney, sir?

Page 156

A. This information about each of these employees.

Q. Sir, your previous answer you stated that you talked to Mr. Chen about the information from these employees as well as your CPA, whose name escapes me right now. Are you -- are you stating that your prior testimony is inaccurate? That you --

A. No, no. I'm just saying that I have to verify to make sure that the information is correct before I sign it.

Q. And -- and that's what I'm trying to get at, sir. I want to know what steps you took to verify that the facts presented in this document were correct.

MR. FASEL: He just answered it. He -- he reviewed the document and signed it.

BY MR. PHILLIPS:

Q. How did you know after merely reviewing the document that the information contained herein was accurate?

A. How do I know?

Q. Yes.

A. I looked at it.

Q. And did you know the personal addresses,

Page 157

e-mails and phone numbers of all these individuals without having to refer to documents?

A. No, I just assumed they're correct. Because I haven't been in contact with them, I don't know where they live.

Q. So you -- is it your testimony, sir, that you assumed that this information was correct?

A. Based on the last -- yes.

MR. FASEL: Where are we going with this? I mean, what does this matter?

MR. PHILLIPS: I'm merely --

MR. FASEL: You're just -- you are starting to get harassing here. I don't understand what it matters.

MR. PHILLIPS: Counsel, if you have an objection, please state it succinctly.

MR. FASEL: I'm just trying to figure out what the heck -- why you're so focused on these answers. What does it matter?

MR. PHILLIPS: If you have an objection, please state that objection --

MR. FASEL: Move on.

MR. PHILLIPS: -- succinctly on the record.

MR. FASEL: Move on.

Alderson Reporting Company
1-800-FOR-DEPO

Page 158

MR. PHILLIPS: Counsel, if you have an objection, please state it succinctly. Speaking objections are uncalled for here.

MR. FASEL: Okay. Move on.

BY MR. PHILLIPS:

Q. Sir, I would like to focus on Interrogatory No. 1, specifically subpart B. And for this interrogatory, No. 1, subpart B, the question posed was: "For each person identified in response to paragraph A above, state the specific allegations of the complaint for which that person has knowledge."

And, sir, if you'll turn to page 4 of these responses, there are a number of individuals named there. And various paragraphs in the complaint are ascribed to them as someone who would have knowledge. Do you see that?

A. Yes.

Q. What, if anything, did you do to verify that these five individuals had knowledge of the paragraphs of the complaint for which they're asserted to know things about?

MR. FASEL: You're going to have to show him the complaint before I'll let him answer that question.

Page 159

MR. PHILLIPS: That's fine.

BY MR. PHILLIPS:

Q. But before we get to that, sir, generally, what did you do to verify that those people knew anything?

MR. FASEL: This is getting a little wacky.

MR. PHILLIPS: Again, Counsel --

MR. FASEL: Why does it matter?

MR. PHILLIPS: -- do you have an objection?

MR. FASEL: Let's go off the record, then.

MR. PHILLIPS: No, we're staying on the record. Counsel, do you have an objection?

MR. FASEL: Yeah, I'm wondering why you're bring up irrelevant information. You have a signed --

MR. PHILLIPS: Counsel, do you have an objection?

MR. FASEL: Yes. I object to the fact that you have a signed certification and that's sufficient. He signed it and said he believes it to be true. And you're harassing him.

MR. PHILLIPS: There's no harassment, Counsel.

Page 160

MR. FASEL: You're harassing him.

MR. PHILLIPS: Now we will go off the record.

MR. FASEL: Oh, that's convenient, huh? You're harassing him. He signed a certification.

THE VIDEOGRAPHER: Off the record? Off the record?

MR. FASEL: No.

MR. PHILLIPS: I want to go off the record, yes. Off the record.

MR. FASEL: No.

MR. PHILLIPS: We're in charge of the deposition.

MR. FASEL: Keep it on.

MR. PHILLIPS: The United States --

MR. FASEL: Keep it on.

MR. PHILLIPS: -- is telling you to go off the record.

MR. FASEL: Keep it on.

MR. PHILLIPS: Then start a counter right now. Because any time we continue on the record that counsel for the United States says we're off the record, counts against them. And we will deal with that with the Court. So we're going off the

Page 161

record now.

MR. FASEL: There's a certification here, he signed.

MR. PHILLIPS: We're going off the record, by the way. So please go off the record right now.

THE VIDEOGRAPHER: Okay. Going off the record. The time is 2:39 p.m.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:49 p.m.

BY MR. PHILLIPS:

Q. Sir, before we broke we were discussing defendants' first amended responses to plaintiff's first set of interrogatories. Do you recall that?

A. Yes.

Q. And we were looking at response to Interrogatory 1B. Do you recall that? And that's on page 4 of the document, which is Exhibit 2 in this deposition.

A. Yes.

Q. And in the response to 1B, there are five names listed. Do you see that?

A. Yes.

Q. And those five names have paragraphs of the complaint associated with them, the indication

Page 162

being that those individuals may have knowledge about those paragraphs of the complaint and presumably defendants' response thereto. Do you understand that?

A. I think so.

Q. Okay. What I'd like to know, sir, is: Who of these five people did you contact directly?

MR. FASEL: Objection. Assumes facts not in evidence.

MR. PHILLIPS: Fair enough.

BY MR. PHILLIPS:

Q. Sir, did you contact any of these five individuals directly to talk about this case?

A. No.

Q. How, sir, did you obtain information to inform you that these individuals may have knowledge about the various paragraphs of the complaint that are attributed to them?

A. How -- how did I know?

Q. Yes, sir.

A. It's been a while. I don't remember.

Q. Did you review any documents before verifying these responses?

A. Yeah, I looked through some documents.

Q. And what documents did you look through?

Page 163

A. The documents that my attorney sent to me.

Q. And were those documents ones that -- well, what types of documents were those? Were those e-mails?

MR. FASEL: Objection. Attorney-client privilege here.

I'm going to instruct you not to answer.

MR. PHILLIPS: The documents that the individual -- that the witness looked at are not privileged material. Your selection of --

MR. FASEL: You're asking --

MR. PHILLIPS: -- particular documents --

[Reporter requests attorneys speak one at a time.]

MR. PHILLIPS: Your selection -- while your selection of particular documents to show him in prep may be privileged, if he looked at a document and it informed him as to the facts which he verified these responses on, that's not privileged.

MR. FASEL: He just said -- that's exactly what you said. You're asking him to disclose documents I sent to him.

MR. PHILLIPS: I am asking for the particular documents that he viewed. Are you

Page 164

instructing your witness not to answer a question what documents he looked at to inform him of the information he verified?

MR. FASEL: Don't answer any questions in regards to documents that I sent you. You can answer anything else that you looked at, but not identify the documents I sent to you.

BY MR. PHILLIPS:

Q. Sir, did you look at any e-mails generated by any of these individuals in the course of their work for Sterling Internat- -- Sterling Footwear, Incorporated or Ng Branding, LLC in informing yourself about the truth and veracity of these responses?

A. That's a long question. Can you --

Q. Fair enough, sir.

What documents did you use to educate yourself about the fact that these five individuals would have information about the various paragraphs of the complaint attributed to them?

A. Maybe some of the documents that my attorney sent over that I might have reviewed over that I saw. And that's when I verified this and signed this.

Q. Did you look at any documents that were

Page 165

e-mails of any of these five individuals?

A. No.

Q. Did you look at any documents that had been prepared by any of these five individuals?

A. No.

Q. Did you talk to any of these five individuals?

MR. FASEL: Objection. Asked and answered. He already answered the question.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

MR. FASEL: Do you want to change your question? He answered it.

MR. PHILLIPS: Counsel, again, if you have an objection --

MR. FASEL: You don't have the right --

MR. PHILLIPS: -- please state it succinctly.

MR. FASEL: -- to ask the same questions over and over again.

MR. PHILLIPS: Counsel, if you have an objection, pursuant to the Court's order --

MR. FASEL: I heard you the first time.

MR. PHILLIPS: -- last week in this case, please state it succinctly.

Alderson Reporting Company
1-800-FOR-DEPO

Page 166

[Reporter requests attorneys speak one at a time.]

MR. PHILLIPS: -- of last week, please state that objection succinctly and shortly. Speaking objections are not appropriate.

MR. FASEL: Asked and answered. You don't have to answer the question. You already answered it. Unless you want to change it.

MR. PHILLIPS: Are you instructing your witness not to answer the question?

MR. FASEL: No, he already answered it.

BY MR. PHILLIPS:

Q. Sir, you can answer the question.

MR. FASEL: No, that's not what I said. If you want to change it, you can.

THE WITNESS: I don't plan to change anything.

BY MR. PHILLIPS:

Q. Sir, did you speak to any of these five individuals listed in Interrogatory --

MR. FASEL: Same objection.

BY MR. PHILLIPS:

Q. -- 1B?

Please answer the question, sir.

Page 167

MR. FASEL: Don't. If you want to change it, you can answer.

THE WITNESS: No, I don't want to change it.

BY MR. PHILLIPS:

Q. My question, sir, was: Did you speak to any of the five individuals listed in the response to Interrogatory 1B at page 4 of this document, Exhibit 2?

MR. FASEL: Objection. Vague and ambiguous as to time.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

MR. FASEL: Did he ever speak any of these people; is that the question?

MR. PHILLIPS: Counsel, again, pursuant to the Court's order, speaking objections are inappropriate. This is questionable conduct. I would ask you to abide by the Court's order and the rules of the Court of --

MR. FASEL: I am.

MR. PHILLIPS: -- International Trade. Objections should be stated succinctly without speaking objections.

BY MR. PHILLIPS:

Page 168

Q. Sir, my question to you is very simple. You certified these interrogatory responses in Exhibit 2, correct?

MR. FASEL: Asked and answered.

BY MR. PHILLIPS:

Q. Please answer the question, sir.

MR. FASEL: He's al- -- you keep asking the same question over and over.

MR. PHILLIPS: We'll go off the record.

MR. FASEL: It's harassment.

MR. PHILLIPS: Off the record.

MR. FASEL: Don't turn it off.

MR. PHILLIPS: Off the record.

MR. FASEL: You're trying to turn off my objections?

MR. PHILLIPS: Counsel --

MR. FASEL: You can't turn that off in the middle of my objections.

MR. PHILLIPS: Counsel, are you -- and just so I'm clear for the record, are you stating that the record needs to be continued so that you can continue a speaking objection?

MR. FASEL: You know, I wasn't giving a speaking objection.

In our prior deposition, your former

Page 169

counsel --

MR. PHILLIPS: Please mark this portion of the record --

MR. FASEL: -- again --

MR. PHILLIPS: -- and time it.

MR. FASEL: -- again, stated that she's allowed to ask the same question over and over and over again. Is that your position? You're allowed to do the same thing? May we get two DOJ attorneys saying that? Is that your position; you can ask the same question and harass the witness over and over and over again?

MR. PHILLIPS: Is your speaking objection completed, sir? If it is, I'd like to resume questioning the witness.

MR. FASEL: And don't ever try and cut me off in the middle of an objection. That's completely inappropriate. And not a speaking objection, a valid objection. You tried to turn the camera off in the middle of the objection.

MR. PHILLIPS: I would ask that you merely tell me when you're done with this speaking objection, sir, so that I can continue questioning this witness.

MR. FASEL: You're wasting your time.

Alderson Reporting Company
1-800-FOR-DEPO

Page 170

MR. PHILLIPS: No, our deposition -- no, this time will count against you.

MR. FASEL: No, I don't think so.

MR. PHILLIPS: Are you done, sir?

MR. FASEL: Are you deposing me now?

MR. PHILLIPS: I'm merely asking. You instructed the court reporter to keep the record going. It's been marked. I'm asking you if you're done with whatever it is you feel you have an obligation or right to put --

MR. FASEL: It's --

MR. PHILLIPS: -- it --

MR. FASEL: -- the same question.

MR. PHILLIPS: -- on the record.

MR. FASEL: Ask a question.

MR. PHILLIPS: That's all I -- that's all I asked --

MR. FASEL: That's what --

MR. PHILLIPS: -- sir, if you're done.

MR. FASEL: -- you're supposed to be doing.

BY MR. PHILLIPS:

Q. Mr. Ng, in Response 1B, in document which is Exhibit 2 in this case, did you speak with any of the five individuals listed in that answer?

Page 171

MR. FASEL: Asked and answered, for the tenth time.

BY MR. PHILLIPS:

Q. Please answer the question, sir.

A. No.

Q. In Interrogatory 1C, sir, did you look at any of the documents that are referenced there as DEF00001 through DEF01169?

MR. FASEL: I'm going to instruct the witness not to answer until he's actually able to look at what those documents are. There's no way he can verify that.

BY MR. PHILLIPS:

Q. Sir, do you recall having looked at any documents that were produced in this case before verifying this response?

A. Yeah, I look at some document, but I don't know specific.

Q. About how many documents did you look at?

A. I don't know.

Q. Was it more than 10?

A. Perhaps.

Q. Was it more than 20?

A. I don't remember.

Q. Was it less than 20?

Page 172

A. I don't remember.

Q. About how long did you take reviewing documents before certifying these responses?

A. Depending on what it is.

Q. Could you explain that answer, sir?

A. Depending how -- I guess, how long the document is or --

Q. About how long, generally, did you take reviewing any information so that you were able to verify the answers in these interrogatory responses?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Sometime -- about a day.

[Reporter requests clarification.]

THE WITNESS: About a day.

BY MR. PHILLIPS:

Q. And in Interrogatory Response No. 6, sir, which is on page 5 of this document, the response lists all of the corporate board members of both Sterling Footwear, Incorporated and Ng Branding, LLC. Did you review any documents to educate yourself on who those corporate board members were?

A. No, I just know off my head.

Q. Do you know if there are any documents that memorialize who the corporate board members of

Page 173

those two companies were?

A. Maybe.

Q. As a board member of both Sterling Footwear and Ng Branding, LLC, were you involved in maintaining any files about who the corporate board members of those two entities were?

A. Yes.

Q. And what was your role in doing so?

A. Meetings.

Q. What types of meetings?

A. Corporate meetings.

Q. And when you say corporate meetings, which entity held corporate meetings?

A. Both.

Q. And how frequent were the corporate meetings that those entities held?

A. At least once or twice a year.

Q. Who attended those corporate meetings for either Sterling Footwear, Incorporated or Ng Branding, LLC?

A. Ty Ngo and Alan Wu.

Q. Did anyone else attend those meetings?

A. No.

Q. Did Mr. Ngo and Mr. Wu attend all meetings for both companies?

Alderson Reporting Company
1-800-FOR-DEPO

Page 174

A. No.

Q. Did anyone take any notes during these board meetings?

A. Not that I'm aware of.

Q. What was discussed at these board meetings?

A. Just general information regards to the op- -- the operations.

Q. And what would that information entail?

MR. FASEL: Objection. Vague and ambiguous as to which meeting and time.

BY MR. PHILLIPS:

Q. Let's start with Sterling Footwear. When Sterling Footwear, Incorporated had board meetings and general information, as you stated, was discussed, what did that general information cover, what topics?

A. Time we opened, time we closed, lunch, vacations, things like that.

Q. Was there ever any discussion at these board meetings for Sterling Footwear, Incorporated about the merchandise being imported?

A. No.

Q. Was there ever any discussion at these board meetings about how the company should be run?

Page 175

A. A little. We -- we talked about that.

Q. And what did you talk about?

A. Again, we talked about, you know, about the hours, about the time and about the employees.

Q. Were -- was there ever any discussion at these board meetings about practices or procedures that should be implemented at Sterling Footwear, Incorporated?

A. Can you --

MR. FASEL: Just objection. Compound. Vague and ambiguous as to practices and procedures.

THE WITNESS: Can you break it down and explain a little bit?

BY MR. PHILLIPS:

Q. Yes, sir. At these boards meanings that -- and for Sterling Footwear, am I correct, that the only two people attending were you and Mr. Ngo?

A. Yes.

Q. So when you and Mr. Ngo had these board meetings to discuss various things about Sterling Footwear, Incorporated, did your discussion ever go to whether or not processes or procedures should be created and then implemented in Sterling Footwear, in any manner, shape or form?

Page 176

MR. FASEL: Objection. Compound. Vague and ambiguous.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. Yes, we talk a little.

Q. And what did you talk about?

A. We talk about the company daily operations, what they can and cannot do, and the duties, and their -- I guess, their responsibility.

Q. When you said duties, sir, were you referring to functions of employees of Sterling Footwear or were you referring to duties associated with imports of merchandise?

MR. FASEL: Objection. Compound.

THE WITNESS: No, employee's duty.

BY MR. PHILLIPS:

Q. Employee's duties?

A. Yes.

Q. Was there any discussion at these board meetings for Sterling Footwear of -- of any import duties or classification of Sterling --

MR. FASEL: Asked and answered.

BY MR. PHILLIPS:

Q. -- Footwear's merchandise?

Please answer the question.

Page 177

A. No.

[Reporter requests clarification.]

MR. FASEL: I'm sorry. I thought he had finished.

MR. PHILLIPS: Duties related to imports or classification, I think is what I said.

[Reporter requests clarification.]

MR. FASEL: Asked and answered.

[Reporter requests clarification.]

THE WITNESS: I'm confused.

MR. PHILLIPS: I thought -- I thought his -- correct me if I'm wrong --

MR. FASEL: Can you read it back?

MR. PHILLIPS: I thought the answer was "no." But if we don't have it on the record, let's just ask the question again.

BY MR. PHILLIPS:

Q. Mr. Ng, with respect to the board meetings that Sterling Footwear, Incorporated had, was there ever any discussion between you and Mr. Ngo about import classification or duties due on imports of merchandise Sterling was bringing into the country?

MR. FASEL: Asked and answered.

THE WITNESS: No.

BY MR. PHILLIPS:

Page 178

Q. Sir, moving on to the board meetings that Ng Branding, LLC had. And I believe you said that you and Mr. Wu attended those meetings. What was discussed at those meetings?

A. The same thing.

Q. Was there ever any discussion at those meetings regarding duties on imports of merchandise?

A. No.

Q. Did Ng Branding, LLC ever import any merchandise into the United States?

A. I believe so.

Q. And what did Ng Branding, LLC import into the United States?

A. Shoes.

Q. What types of shoes did Ng Branding import into the United States?

A. Sandals.

Q. Anything else?

A. Sports shoes.

Q. Are those the only two types of shoes that Ng Branding, LLC imported?

A. That I remember, yes.

Q. Where did Ng Branding, LLC import these goods from?

A. Vietnam.

Page 179

Q. Any other country?

A. Not that I'm aware of.

Q. Sir, if you will look at the response to Interrogatory No. 7. And the interrogatory begins on page 5 and the response is completed on page 6 of Exhibit 2. I believe we've covered Sterling Footwear, Incorporated, so I'd like to focus on Ng Branding, LLC.

And you'll notice in this response, which is now on page 6, that it states that Ng Branding, LLC was owned by both you and Mr. Wu. And your ownership percentage was 95 percent and Mr. Wu's was 5 percent. And I don't think we have discussed Ng Branding in depth today.

Did you put any money into Ng Branding, LLC?

EURBGS: Objection. Vague and ambiguous.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. How much money did you invest into Ng Branding, LLC?

A. I don't remember exactly.

Q. Approximately?

A. Over 100,000.

Q. Was it more than $200,000?

Page 180

A. I don't remember.

Q. And how did you invest this money in Ng Branding, LLC?

A. Can you --

Q. And I'm just -- I guess, I'm looking just sort of for a form. Did you have cash that you invested into the corporation? Or did you provide something else of value to the corporation?

A. There was an investment that was -- was -- was used to start Ng Branding.

Q. And where did that investment come from?

A. From my -- well, me.

Q. And that's -- I -- that's what I'm trying to get at, sir. How -- how did you put that investment into Ng Branding, LLC?

A. I believe correctly might be through a check.

Q. And so as -- if I understand you correctly, sir, you believe you may have invested about $100,000 in Ng Branding, LLC and put that money into the company through a check?

A. Yes, that was -- I invest money to the company to buy a license.

Q. Okay. And first question, sir: What -- what type of license were you buying?

Page 181

A. A brand, it's called Robin's Jean.

Q. So you were buying a license for a particular brand of merchandise?

A. Yes.

Q. And you did that personally by providing $100,000 through a check?

A. If I remember correctly, yes.

Q. Was that a personal check?

A. I don't remember. It's been so long.

Q. And what I'm -- what I'm asking, sir: Was that a check on an account that was yours personally? Or was that a check written by another business that you owned?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: It's been a while. I have to look back. I -- I -- I don't remember.

BY MR. PHILLIPS:

Q. What would you need to look at to ascertain how that money was put into Ng Branding, LLC?

A. I've got to check with my CPA.

Q. Do you think that you would have written this check from a personal account?

MR. FASEL: Calls for speculation.

Alderson Reporting Company
1-800-FOR-DEPO

Page 182

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Where would you have obtained the $100,000 that you would have invested in Ng Branding, LLC?

MR. FASEL: Vague and ambiguous.

THE WITNESS: I don't remember.

BY MR. PHILLIPS:

Q. Is there anything that would help you recall where you would have obtained this money?

A. Again, I have to look and check with my CPA.

Q. About when did you put this $100,000 investment into Ng Branding, LLC?

A. After it was open, the company.

Q. And this money that you put into Ng Branding, LLC, were you provided, then, stock from the company afterwards?

A. Yes.

Q. Have you ever received any income from that stock from Ng Branding, LLC?

MR. FASEL: Objection. Vague and ambiguous as to income from stock.

THE WITNESS: I --

BY MR. PHILLIPS:

Q. Dividends or distributions. Do you

Page 183

understand those to be colloquially referred to as income from stock?

A. Yes.

Q. Okay. With that understanding, sir, have you ever received a dividend or a distribution from your stock holdings in Ng Branding, LLC?

A. I don't remember. It's too long.

Q. Does Ng Branding, LLC still exist?

A. Inactive.

Q. And what position do you hold in Ng Branding, LLC currently?

A. President, CEO.

Q. Has Ng Branding, LLC ever, to your knowledge, paid out a dividend or distribution?

A. Maybe.

Q. Is there anything you could refer to to find out whether or not the company paid out a dividend or distribution?

A. I could check with my CPA.

Q. Have you ever received a salary from Ng Branding, LLC?

A. I don't recall.

Q. Have you -- do you recall ever receiving a dividend or distribution at any time since Ng Branding, LLC was created?

Page 184

A. Maybe.

Q. You don't recall ever receiving any money from --

A. I might have, but I just don't remember.

Q. What would you need to look at to find out whether or not you obtained --

A. I've got -- I've got to check with my CPA.

Q. And does your CPA -- do you know that your CPA has documentation on all of the finances of Ng Branding, LLC?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: I don't know. I have to ask.

BY MR. PHILLIPS:

Q. Do you happen to know whether your CPA has documentation on the finances of Sterling Footwear, Incorporated?

MR. FASEL: Same objection.

THE WITNESS: Again, I have to ask.

BY MR. PHILLIPS:

Q. Have you ever inquired with your CPA whether he maintains any records or information about the finances of either Sterling Import -- Sterling Footwear, Incorporated or Ng Branding, LLC?

Page 185

A. Have I asked him or --

Q. Yes.

A. No, I haven't talked to him.

Q. Do you -- do you personally maintain any files about the finances of either of those two companies?

A. No.

Q. Do you maintain the files -- maintain any files of those two companies --

MR. FASEL: Compound.

BY MR. PHILLIPS:

Q. -- personally?

MR. FASEL: Compound.

MR. PHILLIPS: Let's break that down.

BY MR. PHILLIPS:

Q. Do you personally maintain any files of Sterling Footwear, Incorporated?

A. Not at this moment.

Q. Did you ever maintain files of Sterling Footwear, Incorporated?

A. Me personally?

Q. Yes.

A. I don't remember.

Q. Did you ever personally retain any files of Ng Branding, LLC?

Alderson Reporting Company
1-800-FOR-DEPO

Page 186

A. No, not that I remember.

Q. Who owned the license for -- I believe you said Robin's Brand Jeans? Who owned that license? Was it Ng Branding, LLC or was it you?

A. Ng Branding.

Q. And where does that ownership interest currently reside?

A. Oh, it doesn't -- it's expired already.

Q. There's no longer a license for Robin's Brand Jeans?

A. That's correct.

Q. Did Ng Branding, LLC ever use that license that it purchased?

A. Yes.

Q. And how did it use that license?

A. It has the right to use the name to develop shoes.

Q. And was that name used to develop any shoes that Ng Branding, LLC imported?

A. Yes.

Q. And did Ng Branding, LLC ever earn any income off the shoes?

A. No.

Q. Did Ng Branding, LLC ever earn any income that you know of?

Page 187

A. It had a little income, but it was negative.

Q. Sir, let's focus on the response to Interrogatory No. 8. And this is also at page 6 of Exhibit 2. And in -- in this response there's a discussion -- or the answer includes discussion of the various positions that the corporate officer s both Sterling Footwear, Incorporated and Ng Branding, LLC held. Do you see that?

A. Uh-huh.

Q. And focusing on the first one, it states that you served as chief executive officer, which we've discussed today. It also states that your duties included "procuring and organizing manufacturing facilities in Asia, client development, sales and obtaining clients."

What I'd like to focus on is the portion discussing sales and obtaining clients. What did you do in your position as chief executive officer regarding sales and obtaining clients?

A. Well, I would talk to people whenever I travel and let them know what I do and try to earn business.

Q. How did the work you did in the sales position differ, if at all, from what Ms. Calvo was

Page 188

doing in the marketing group for Sterling -- for Sterling Footwear, Incorporated?

A. How is it different?

Q. If at all.

A. The difference is that she goes and try to sell the product. For me, I'm just more into design. And I would just talk with people to let them know what I do. And hopefully I can get connections through people I talk to.

Q. So --

A. Does that make sense?

Q. I think so. And I'm just -- I'm just trying to clarify. I thought we had discussed earlier this morning that you said you weren't involved in sales. So I'm just trying to understand.

A. I don't. I'm just --

MR. FASEL: I'm going to object as to vague and ambiguous as to sales. Can mean a lot of things.

BY MR. PHILLIPS:

Q. Did you understand my question, sir? And I'm referring to using sales as is used in Interrogatory No. 8. And you did, in fact, verify Interrogatory No. 8, among the rest of the

Page 189

interrogatories, correct?

A. Yes.

Q. So when you verified this, what did you understand that portion of your job description, the "sales and obtaining clients", to mean?

MR. FASEL: Asked and answered.

THE WITNESS: Again, I talked to people. I don't sell the product. But I just talking to people what I do and try to get customer or clientele for the company. But to answer your question, I do not present a product and try to sell it, if that's your question.

BY MR. PHILLIPS:

Q. And who did that for Sterling Footwear, Incorporated?

MR. FASEL: Asked and answered.

THE WITNESS: Fernanda.

MR. FASEL: I think we're --

[Reporter requests clarification.]

MR. FASEL: Nothing.

BY MR. PHILLIPS:

Q. Sir, under your job description in that same interrogatory response on page 6. For Ng Branding, LLC, it does not include the -- what we've discussed before, the sales and obtaining clients.

Page 190

It just says "client development and obtaining clients."

How, if at all, did your position at Ng Branding, LLC differ from your position at Sterling Footwear, Incorporated?

A. How is it different? Can you --

Q. My first question is --

A. How is it different from Sterling?

Q. Well, my first question, sir, is: Was your job description at those two companies different?

And I'll note for the record that your counsel has underlined something in the document. Could you just state for the record what portion of the document your counsel has underlined for you?

A. "Client development and obtaining clients."

Q. And that's in the job description for Ng Branding, LLC?

A. Yes.

Q. Okay. So my question, sir, was: These descriptions are slightly different. I'm just trying to find out if there was any difference between your position. And the follow-up question to that -- and I'll let you answer is: If there was

Page 191

a difference, could you explain to me what that difference was?

So the first question is: Was there any difference in your role between these two companies?

A. No.

Q. Okay. Sir, have you ever lived at an address of 4603 Bartlett Avenue, Rosemead, California, 91770?

A. Can you repeat that address, again, sir?

Q. Yes. I -- I want to know if you've ever resided at this address: It's 4603 Bartlett Avenue, Rosemead, California. And the ZIP code is 91770.

A. No.

Q. Do you know what that address is?

A. No.

Q. Sir, I'm going to hand you two things right now. One is the complaint and the other is going to be the defendants' -- which includes all three parties -- answers to the complaint. So let's mark the complaint as Exhibit 3. And the answer will be Exhibit 4.

(Whereupon Exhibit 3 was marked for identification.)

(Whereupon Exhibit 4 was marked for identification.)

Page 192

MR. FASEL: Thank you.

Which one is 3 and 4? I'm sorry.

MR. PHILLIPS: The complaint is going to be No. 3 and the answer will be No. 4.

MR. FASEL: Thank you.

BY MR. PHILLIPS:

Q. And please take your time to look through this. At first I'm just going to ask you some general questions, but you tell me when you're ready to go.

A. I'm ready.

Q. Prior to looking at these two documents now, had you reviewed these?

A. Have I seen these?

Q. Yes.

A. Yeah, I might have seen them before.

Q. In what context have you seen these documents?

A. It was sent by my attorney.

Q. And did you read through the complaint?

A. Yes.

Q. Do you -- did you provide any information -- any factual information to your attorney regarding the complaint or the proposed answer, which is Exhibit 4?

Page 193

A. Can you re-ask the question?

Q. Sure. And it's a very general question, sir.

An answer was filed in this case. Do you understand that?

A. Yes.

Q. And that answer is, presumably, based on facts obtained from individuals with information.

A. Okay.

Q. My question was: Did you provide any factual information to your counsel regarding the answers in this -- in the answer that the defendants filed?

A. Yes.

Q. What information did you provide?

MR. FASEL: Objection. Attorney-client privilege.

I'm going to instruct the witness not to answer.

MR. PHILLIPS: I'm ask -- merely asking for the fact of the information provided by the witness.

MR. FASEL: You're asking him which information is provided, so you're asking for attorney-client communications.

Page 194

MR. PHILLIPS: I asked --

MR. FASEL: I'm going to instruct the witness not to answer.

BY MR. PHILLIPS:

Q. Sir, your counsel has instructed you not to answer. Are you going to follow his instruction?

A. Yes.

Q. Did you provide factual information to your counsel about issues discussed in the complaint?

MR. FASEL: Asked and answered.

BY MR. PHILLIPS:

Q. Please answer the question, sir.

A. Yes.

Q. What information did you provide?

MR. FASEL: Same objection. Attorney-client privilege.

I'm going to instruct the deponent not to answer based on the fact that it violates attorney-client privileged --

MR. PHILLIPS: Are you instruct --

MR. FASEL: -- communications.

MR. PHILLIPS: Are you instructing your witness not to --

MR. FASEL: Yes, I'm instructing --

Page 195

MR. PHILLIPS: -- discuss the underlying facts of the information?

MR. FASEL: I'm instructing the witness not to answer any questions that involve attorney-client communications involving this case, which is protected.

MR. PHILLIPS: And I understand that, Counsel. My question to you is: Are you instructing --

MR. FASEL: I'm not being deposed.

MR. PHILLIPS: I'm not deposing you. I'm asking you for a clarification.

Are you instructing your witness not to state any fact that he may have been aware of or discussed in response to the answer in this case?

MR. FASEL: I'm going to refer you to my prior answer.

BY MR. PHILLIPS:

Q. Mr. Ng, your counsel has instructed you not to answer the question based on attorney-client. Are you going to follow that instruction?

A. Yes.

Q. Sir, if you will turn in this answer to paragraph 10, and that's on page 2. And the last sentence of the response in this answer states that:

Page 196

"Defendants deny that the subheadings used for the entries were incorrect."

And this refers back to paragraph 10 of the complaint, which is discussing: "The 337 entries imported by Sterling Footwear, Incorporated were improperly classified."

Do you, sir, have any information about whether or not those subheadings used on those 337 entries were correct?

MR. FASEL: I'm going to instruct my client not to answer unless you're able to produce the 337 entries so he can review, plus the relevant Harmonized Tariff Schedule section so he can verify that.

MR. PHILLIPS: On what basis are you instructing your -- your client not to answer?

MR. FASEL: You're asking him to refer to subheadings that are not provided in front of us. And you're also asking him to refer -- refer to 337 entries that are not in front of us. And you're asking him to verify whether those match. And there's no way he can do that unless those are presented and he can take a look at it.

MR. PHILLIPS: I have --

MR. FASEL: In addition, I'm going to also

Page 197

object to the fact that it's vague and ambiguous.

MR. PHILLIPS: I have asked your client a very general question and I will ask it again.

BY MR. PHILLIPS:

Q. Sir, do you have any information about whether or not the subheadings used in the 330 -- 337 entries referred to in paragraph 10 of the complaint are incorrect?

MR. FASEL: Same objection.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

MR. FASEL: Give --

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. You don't know whether you have any information about those subheadings?

MR. FASEL: I'm going to object again. The fact --

THE WITNESS: I don't know what this is about.

MR. FASEL: Wait.

-- that the -- the subheadings are not provided to use and neither are the 337 entries. So you're asking him to blindly approve something.

MR. PHILLIPS: Well, then we'll go through

Alderson Reporting Company
1-800-FOR-DEPO

Page 198

it.

BY MR. PHILLIPS:

Q. Sir, if you look at Exhibit 3, which is the complaint. In the complaint -- and this -- and, sir, I'm not trying to trip you up. I'm trying to find out what you know. So in the complaint, which is Exhibit 3 here, it states that -- do I have the right? Yes. "From July 17th 2007 through August 4th, 2009, Sterling --

MR. FASEL: Wait a second. We have no idea --

THE WITNESS: Where are you at?

MR. FASEL: -- where you are.

MR. PHILLIPS: In the complaint, which is Exhibit 3, on page 2, paragraph 10.

THE WITNESS: Okay.

BY MR. PHILLIPS:

Q. Okay. So this is the question, sir: This paragraph states that: "From July 17th, 2007 through August 4th, 2009, Sterling Footwear 337 entries of footwear under the following incorrect Harmonized Tariff Schedule of the United States subheadings." And then it goes on to list a number of subheadings.

If we look at Exhibit 4, the answer of the

Page 199

defendants -- we're looking at the other document, sir. This is Exhibit 4, the answer. The answer provided in this case states a general denial regarding those subheadings. But then ends with this statement: "Deny that the subheadings used for the entries were incorrect."

Do you see these two things, sir?

A. I lost you there. Are you talking about No. 4 on --

Q. I am talking about --

A. -- the answer?

Q. -- paragraph 10 --

A. Okay.

Q. -- of both documents.

A. Okay.

Q. Okay.

MR. FASEL: Here (indicating).

THE WITNESS: Oh, okay.

MR. FASEL: And here (indicating).

THE WITNESS: Okay.

BY MR. PHILLIPS:

Q. And what I'm trying to under- -- give you a second.

What I'm trying to understand, sir, is the sentence at the -- the bottom of the paragraph 10 in

Page 200

the answer says that the defendants -- which in this case are Sterling Footwear, Incorporated, you, Mr. Alex Ryan Ng, and Ng Branding, LLC. It states that those three defendants "deny that the subheadings used for the entries were incorrect." Do you see that?

A. Yes.

Q. My question is: Do you have any personal knowledge about whether or not the subheadings used in the 337 entries referenced in paragraph 10 are or are not incorrect?

MR. FASEL: I going to object again as to the fact that paragraph 10 of Exhibit 3 contains a statement, "see attachment A," which is not attached to this document. Which means it's an incomplete document. Another reference. Also subheadings that are listed in paragraph 10 are not provided to us again, nor the 337 entries.

So, again, you're asking him to blindly verify something that he can't --

MR. PHILLIPS: I'm not.

MR. FASEL: -- look at. And you're also providing with him an incomplete document.

BY MR. PHILLIPS:

Q. Would -- would you like the -- sir, would

Page 201

the schedule attached to this which lists all 337 entries assist you in answering this question?

MR. FASEL: Calls for speculation.

THE WITNESS: Yeah, can I see it?

BY MR. PHILLIPS:

Q. Sure.

MR. PHILLIPS: We'll go off the record.

THE VIDEOGRAPHER: Going off the record. The time is 3:36 p.m.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:47 p.m.

(Whereupon Exhibit 5 was marked for identification.)

BY MR. PHILLIPS:

Q. Sir, you've been handed what has been marked as Exhibit 5. And Exhibit 5 -- to make this as unconfusing as possible, this is Attachment A, which is referenced in paragraph 10 of the complaint. And paragraph -- and the complaint in this case is Exhibit 3. And what Exhibit 5 shows is a list of the 337 entries with corresponding amount of duty that is owed.

And please take your time to look through it. I don't have any specific questions for you

Page 202

about any particular entry.

MR. FASEL: Do you mind if I just make an objection right now?

MR. PHILLIPS: That's fine.

MR. FASEL: I'm going to object to Exhibit No. 5 and the fact that there's no way to link the items contained in Exhibit 5 to the term "337 entries" provided in paragraph 10 of Exhibit 3, the complaint. On that basis, the client cannot reasonably correspond the entries in Exhibit A to any particular entry of goods and know what those goods are.

MR. PHILLIPS: Your objection is noted, Counsel.

BY MR. PHILLIPS:

Q. Mr. Ng, before we were discussing paragraph 10 of the complaint and corresponding answer to paragraph 10 of this complaint. And if you'll recall, paragraph 10 of the complaint, which is Exhibit 3 in this case, makes allegations that 337 entries of footwear imported by Sterling Footwear, Incorporated where incorrectly classified. Do you understand that?

A. Yeah.

Q. In the response in the answer to paragraph

Page 203

10 -- paragraph 10 is Exhibit 4 in this case -- that response denies, generally, most of the material in paragraph 10 of the complaint. And ends with a sentence that states: "Deny that the subheadings used for the entries where incorrect."

Do you see that statement, sir?

A. Yes.

Q. My question, sir, is: Do you have any personal knowledge about whether or not the subheadings used in those 337 entries alleged to be incorrect -- do you have any knowledge whether those subheadings were or were not correct?

MR. FASEL: I'm going object as it calls for an expert opinion.

THE WITNESS: I was advised by Elon Pollack that I didn't misclassify.

BY MR. PHILLIPS:

Q. What I'm asking you, sir, is: Do you have any personal knowledge about whether or not the subheadings that Sterling Footwear, Incorporated used were the correct subheadings to use for its 337 entries of merchandise into the United States, as alleged in paragraph 10 of the complaint?

MR. FASEL: Asked and answered. Vague and ambiguous as to personal knowledge.

Page 204

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Sir, if you look at paragraph 12 of the answer -- and this is document -- I'm sorry, Exhibit 4. It's Exhibit 4 in this case. This is the answer to the complaint. And I want to look at paragraph 12, right there at the top of the page. In the third line down, there is reference to a shoe style number. And the number is 19FLR129W. Do you see that?

A. Yes.

Q. Do you -- do you know what that style number means? Could you break that down for me?

MR. FASEL: Can you give him just one second to review that whole thing before you answer?

BY MR. PHILLIPS:

Q. Take your time, sir.

MR. FASEL: Go ahead and answer.

THE WITNESS: Do I recognize this style number? Is that your question, sir?

BY MR. PHILLIPS:

Q. My question, sir, is: That's a style number that has been used in the complaint. Do you recognize -- first question: Do you recognize that as a style number that Sterling Footwear,

Page 205

Incorporated would have used?

A. It looks like a style number.

Q. Okay. Can you explain for me what that number means? And by explain I mean could you break it down to what those characters in that style number correspond to?

A. I wouldn't know.

Q. Okay. Is there anything that would refresh your memory about what the style numbers -- what the numbers in that -- that large number refer to?

A. No, I wouldn't know. I didn't --

Q. Were you involved in pairing off these style numbers at Sterling Footwear, Incorporated with any classification under the Harmonized Tariff Schedule of the United States?

A. I don't understand your question, sir. Could you --

Q. You understand that the Harmonized Tariff Schedule of the United States assigns certain classifications for merchandise being imported, right?

A. Yeah.

Q. And my question to you was: Did you have any involvement at Sterling Footwear in taking that

Page 206

style number and trying to match it off against a various -- against a corresponding classification number under the Harmonized Tariff Schedule?

A. No. My -- my role is to develop the shoes only.

Q. Did you review anyone or oversee anyone at Sterling Footwear, Incorporated who would have been responsible for taking that style number and finding a corresponding Harmonized Tariff Schedule classification?

A. No.

Q. Do you know who at Sterling Footwear, Incorporated would have been responsible for determining what the classifications -- classification under the HTS was for that particular style number?

MR. FASEL: Object as to vague and ambiguous as to HTS.

THE WITNESS: No.

MR. FASEL: Vince, how are we doing on time?

MR. PHILLIPS: I'm doing my best. If you need to be out of here at 4:00, can we come up with an agreement?

MR. FASEL: I can push a little bit

Page 207

longer.

MR. PHILLIPS: 'Til when?

MR. FASEL: 4:20.

MR. PHILLIPS: We can -- we can certainly end at 4:00, if you will agree --

MR. FASEL: I'm happy to give you, you know, the continuation of your -- whatever time you have until tomorrow, if you want to do it that way.

MR. PHILLIPS: I'm amenable to that.

MR. FASEL: Since we're going to be here anyway.

MR. PHILLIPS: Can -- can you give us a time count as to where we are?

THE VIDEOGRAPHER: I'll need to calculate it real quick.

MR. FASEL: We can go off the record.

MR. PHILLIPS: Yeah, we can go off the record for that.

THE VIDEOGRAPHER: We are going off the record. The time is 3:55 p.m.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:59 p.m.

MR. PHILLIPS: And we have agreed -- counsel for the United States has agreed with

Page 208

counsel for the defendants that we will end the deposition today at 4:00 p.m. at the request of counsel. We will ask the videographer to report the time that has allotted on this deposition so far.

And could you tell us how much time has run on the deposition?

THE VIDEOGRAPHER: Shoot.

THE REPORTER: I had 3, 48 before we went on.

THE VIDEOGRAPHER: 3, 48, okay. Oh, wait. What do you mean?

THE REPORTER: No, three hours and 48 minutes.

THE VIDEOGRAPHER: Okay. Three hours and 48 minutes.

MR. PHILLIPS: So we'll say -- I can agree that four hours of this deposition have been used; there would be three hours remaining. We have agreed that any additional questions we may have of the witness in his personal capacity, we will reserve until tomorrow during the 30(b)(6) deposition. So at the most, we would have the additional three hours to ask questions of Mr. Ng in his personal capacity.

Anything --

Page 209

MR. FASEL: So stipulated.

MR. PHILLIPS: And we're off the record.

THE VIDEOGRAPHER: All right. We're going off the record. The time is 4:00 p.m. This is the end of Volume I of the video deposition of Alex Ng and we are off the record.

(Whereupon, the deposition adjourned at 4:00 p.m.)

-oOo-

Alderson Reporting Company
1-800-FOR-DEPO

Page 210

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____
Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of _____, 2015, and executed the above certificate in my presence.

_____
NOTARY PUBLIC IN AND FOR

_____
County Name

MY COMMISSION EXPIRES:

Page 211

STATE OF CALIFORNIA      )
                         )  ss.
COUNTY OF LOS ANGELES    )

        I, Elizabeth Borrelli, Certified Shorthand Reporter, Certificate No. 7844, for the State of California, hereby certify:
        I am the deposition officer that stenographically recorded the testimony in the foregoing deposition;
        Prior to being examined the deponent was first duly sworn by me;
        The foregoing transcript is a true record of the testimony given;
        Before completion of the deposition, review of the transcript [ ] was [X] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

Dated_____.

_____
ELIZABETH BORRELLI, CSR 7844

Alderson Reporting Company
1-800-FOR-DEPO

# EXHIBIT F

Deposition of Sterling Footwear, Inc.

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

_____

                                    )

UNITED STATES,                      )

                                    )

                    Plaintiff,      )

                                    ) Case No. 12-0193

          vs.                       )

                                    )

STERLING FOOTWEAR, INC., ALEX NG,  )

and NG BRANDING, LLC                )

                                    )

                    Defendants.     )

_____)

                                    Friday, January 16, 2015

                                    Long Beach, California

          Deposition of ALEX NG 30(b)(6) for STERLING FOOTWEAR, INC., taken on behalf of the Plaintiff, at 1 World Trade Center, Suite 1200, Long Beach, California, commencing at 10:08 a.m. and ending at 2:19 p.m.,on Friday, January 16, 2015, before Elizabeth Borrelli, a Certified Shorthand Reporter in the State of California, License No. 7844, CCLL, CLR.

Job No. 55354

Pages 1 to 129

Page 2

APPEARANCES

For the Plaintiff:
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
BY: VINCENT D. PHILLIPS
Attorney at Law
1100 L Street N.W.
Washington, DC 20530
(202) 305-4591
vincent.phillips2@usdoj.gov

For the Defendants:
FASEL LAW
BY: THOMAS A. FASEL
Attorney at Law
610 Newport Center Drive
Suite 810
Newport Beach, California 92660
(949) 706-3188
taf@fasellaw.com

Also Present:
MEREDITH A. JOHNSON
RYAN WONG, Videographer

Page 4

E X H I B I T S (continued)

EXHIBIT NO.                              PAGE
Exhibit 8   Complaint                     83
Exhibit 9   Answer                        83
Exhibit 10  Incomplete copy of Defendants' First   104
       Amended Responses to Plaintiffs'
       First Set of Interrogatories
Exhibit 11  Defendants' First Amended Responses    105
       to Plaintiffs' First Set of
       Interrogatories
Exhibit 12  Defendants' Response to Plaintiff's    114
       Request for Interrogatory Responses
       and Document Production

INSTRUCTION NOT TO ANSWER
       Page    Line
        56      7
        87     14

Page 3

I N D E X

WITNESS                              PAGE
ALEX NG 30(b)(6) for STERLING FOOTWEAR, INC.
   Examination by Mr. Phillips           5


E X H I B I T S

EXHIBIT NO.                          PAGE
Exhibit 1   Revised Notice of Deposition      5
Exhibit 2   E-mail chain, 3/25/2008, Bates Nos.   26
       GOV6073 through GOV6084
Exhibit 3   E-mail between Carolyn Benzel and    35
       Janet Huynh, 6/25/2009,
       Bates No. GOV3708
Exhibit 4   E-mail from Alex Lin, Bates       44
       No. GOV3720
Exhibit 5   Two e-mails from Nancy Ng to      49
       Scott Kauffman, Bates No. GOV3939
Exhibit 6   E-mail from Nancy Ng, 7/17/2009,     52
       Bates No. GOV3801
Exhibit 7   Check from Sterling Footwear,     56
       Incorporated to U.S. Customs
       and Border Protection, Check
       No. 2252, 7/7/2009, Bates
       No. GOV5952

Page 5

ALEX NG 30(b)(6) for STERLING FOOTWEAR, INC.
       having been duly administered
       an oath in accordance with CCP 2094,
       was examined and testified as follows:
       EXAMINATION
BY MR. PHILLIPS:
    Q.  Good morning, sir.  Welcome back.
    A.  Good morning.
    Q.  Yesterday you were here in your capacity as an individual, and I took your deposition in your personal capacity.  Do you understand that?
    A.  Yes.
    Q.  Today we're here in a different capacity.  You have been designated by your counsel as a 30(b)(6) witness on behalf of Sterling Footwear, Incorporated.  Do you understand that?
    A.  What's a 36 --
    Q.  You have -- and let's mark this first.
    THE REPORTER:  Do you want to mark it 1 or 6?
    MR. PHILLIPS:  Let's mark this as 1.  We'll start new with the deposition.
    (Whereupon Exhibit 1 was marked for identification.)
BY MR. PHILLIPS:
    Q.  Sir, I've handed you a document marked as

Alderson Reporting Company
1-800-FOR-DEPO

Page 6

Exhibit 1 in this case. And it is the revised notice of deposition in this matter. And on this notice it states that today you will be appearing as a 30(b)(6) representative of Sterling Footwear, Incorporated. What that means is you are here to answer questions on behalf of the corporation. Do you understand that?

A. Yes.

Q. Okay. And if you will look at page 2 of this document, sir. There are a -- there's a list of 10 separate categories of information upon which I will be asking you questions during this deposition. Do you see those 10?

A. Yes.

Q. Okay. Sir, which of these 10 areas are you -- are you able to offer testimony today on behalf of Sterling Footwear, Incorporated?

MR. FASEL: Do you think we can go through them one at a time?

MR. PHILLIPS: That's fine.

BY MR. PHILLIPS:

Q. And let's just do this preliminarily, sir. Are -- have you seen this document before?

A. No.

Q. You have not seen this document before. Have you had any discussions with your counsel

Page 7

about you appearing as a 30(b)(6) witness? And I would just like a yes or no, sir.

A. No.

Q. Were you informed by your counsel that you would appear today at this deposition to answer questions not from your own personal knowledge, but on behalf of the corporation that you were president and CEO of, Sterling Footwear, Incorporated?

A. Yes.

Q. And what have you done to prepare for this deposition to answer questions on behalf of Sterling Footwear, Incorporated?

A. Not -- I didn't prepare.

Q. Have -- have you looked at any documents in preparation?

A. Yeah, I looked through a lot of documents, but I don't remember specifically the one I looked at. But I know today I have a deposition for myself and the company.

Q. Did you meet with any of the former employees of Sterling Footwear, Incorporated in preparation for this deposition?

A. No.

Q. Did you have any discussions with counsel in preparation for this deposition? And I would just like

Page 8

a yes or no to that.

A. Did I have a meeting?

Q. Any meetings or discussions with your counsel in preparation for your appearance here as a 30(b)(6) witness on behalf of Sterling?

MR. FASEL: Just yes or no.

THE WITNESS: No.

MR. PHILLIPS: Counsel, I'm going to note for the record that it appears that this witness is unprepared for this deposition. We will continue it, but we're reserving our rights to file anything with the Court regarding the lack of preparation for this witness to appear as a 30(b)(6).

MR. FASEL: Okay. I -- your objection is noted.

BY MR. PHILLIPS:

Q. Mr. Ng, I'd like to go through each of these 10 categories. We are going to go through them one at a time. And I would like to know from you whether or not you can answer questions for each of these -- these 10 categories.

So Category 1 in this deposition will seek "information about Sterling and Ng Branding -- Ng Branding's responses to the factual allegations in the complaint."

Page 9

Are you prepared today to provide answers for both Sterling and Ng Branding on this topic?

A. To my -- the best I can, yes.

Q. And Topic No. 2 states that "Sterling's and Ng Branding's responses to plaintiffs interrogatories and request for productions of documents and things."

Are you prepared to provide information regarding this topic today as a 30(b)(6) witness?

A. I'll do my best.

Q. Topic No. 3 of our notice of deposition seeks "information about the corporate structure and business organization of defendants Sterling and Ng Branding, including but not limited to identification of shareholders, directors, partners and officers, corporate and business management (i.e. daily business operations of Sterling and Ng Branding), and the identity, duties and responsibilities of defendants, corporate officers and employees."

Are you prepared to provide testify as a 30(b)(6) witness for both of these corporations here today on this topic?

A. I'll do my best.

Q. Topic No. 4, sir, seeks "information about procuring and organizing manufacturing facilities in Asia, client development, sales and obtaining clients.

Alderson Reporting Company
1-800-FOR-DEPO

Page 10

Are you prepared to provide information on this topic today as a 30(b)(6) representative of defendants Sterling Footwear, Incorporated and Ng Branding, LLC?

A. I'll do my best.

Q. Topic 5, sir, of this notice seeks "information about the customs importation classification and entry by Sterling of the merchandise that is the subject of this civil action."

Are you prepared to provide information and testimony as a 30(b)(6) representative of Sterling Footwear and Ng Branding on this topic, sir?

A. I will do my best.

Q. And am I correct, sir, that for these five topics you have not looked at any documents in preparation or spoken to any witness -- any former employee of either Sterling Footwear or Ng Branding, LLC?

MR. FASEL: Object as it misstates testimony.

THE WITNESS: That's correct.

BY MR. PHILLIPS:

Q. Please answer the question. Thank you.

Sir, Topic No. 6 in this notice seeks "information about the marketing and sales of the merchandise that was entered by Sterling and is the

Page 11

subject of this civil action."

Are you prepared to provide testimony as a 30(b)(6) witness on this topic today?

A. I'll do my best.

Q. Topic 7, sir, seeks "the corporation and business operational status of Sterling and Ng Branding.

Are you prepare -- are you prepared to provide information on this topic today, sir?

A. I'll do my best.

Q. Topic No. 8, sir, seeks "information on the net worth of Sterling, including but not limited to the assets and liabilities of the company at the time that it ceased to do business."

Are you prepared to provide testimony as a 30(b)(6) witness for Sterling Footwear, Incorporated on this topic, sir?

A. I'll do my best.

Q. And what have you done in preparation for your testimony here today as a 30(b)(6) witness that will enable you to provide information about the net worth of Sterling?

A. I'll answer to the -- my best knowledge of what I know.

Q. Have you made any inquiry of your CPA in preparation for your testimony as a 30(b)(6) witness?

Page 12

A. Not yet.

Q. Have you reviewed any tax filings of Sterling Footwear, Incorporated in preparation for your testimony here as a 30(b)(6) witness?

A. Not yet.

Q. Have you reviewed any documents of Sterling Footwear, Incorporated regarding its financial condition in preparation for your testimony here as a 30(b)(6) witness?

A. Not yet.

Q. Sir, Topic No. 9 seeks "information about the disposition of Sterling's assets, including but not limited to all office furniture, computers and equipment at the time that it ceased to business."

Are you prepared -- prepared to provide testimony on behalf of Sterling Footwear, Incorporated on this topic today, sir?

A. I'll do my best.

Q. And what have you done in preparation for your testimony as a 30(b)(6) witness that will enable you to provide information about the disposition of Sterling's assets, sir?

A. I'll give my best honest answer to what I know.

Q. And, sir, is your best honest answer based on

Page 13

your review of any documents of Sterling Footwear, Incorporated?

A. No, not yet. I haven't reviewed any documents.

Q. Will your answers be based on any conversations you've had with your accountant regarding Sterling Footwear, Incorporated's assets?

A. Can be repeat that, sir?

Q. Will your -- the testimony you provide today as a 30(b)(6) witness for Sterling Footwear, Incorporated be based on any conversations or meetings you've had with your -- with your or Sterling Footwear's CPA in preparation for your testimony here today?

MR. FASEL: I'll object as vague and ambiguous as to time. Do you mean at any time or do you mean within the -- a month or --

BY MR. PHILLIPS:

Q. My question is: In preparation for your testimony here today, sir, have you had any conversations or discussions with your CPA -- your or Sterling Footwear, Incorporated's CPA about the disposition of Sterling's assets?

A. No.

Q. Sir, Topic 10 in this deposition notice seeks "information about the disposition of Ng Branding's

Page 14

assets (including but not limited to all office furniture, computers and equipment) at the time that it ceased to do business."

Are you prepared to provide testimony today as a 30(b)(6) witness on behalf of Ng Branding, LLC regarding the disposition of that company's assets?

A. I'll do my best.

Q. What have you done in preparation for your testimony here today to be able to answer questions about the disposition of Ng Branding's assets?

A. Just my knowledge. Whatever I can remember and whatever I know.

Q. Have you spoken to anyone who worked at Ng Branding in preparation for your testimony here today?

A. No.

Q. Have you spoken to any accountant that worked with or for Ng Branding in preparation for your testimony here today?

A. No.

Q. You can put that document aside, sir.

MR. FASEL: Which exhibit is this?

MR. PHILLIPS: This is Exhibit 1 for the 30(b)(6) deposition for Sterling Footwear, Incorporated.

BY MR. PHILLIPS:

Q. Sir, your name is Alex Ryan Ng, correct?

Page 15

A. Yes.

Q. And you were or -- and currently are president and CEO of Sterling Footwear, Incorporated, correct?

A. Yes.

Q. And Janet Huynh was an employee of Sterling Footwear, correct?

A. Yes.

Q. And you hired Ms. Huynh to work at Sterling Footwear, correct?

A. Yes.

Q. And Ms. Huynh was put in charge of the logistics department at Sterling Footwear by you, correct?

A. Production.

Q. Production department.

So Ms. -- Ms. Huynh was put in charge of the production department by you; is that correct?

A. Yes.

Q. And one of Ms. Huynh's responsibilities in the production department was to deal with the importation of merchandise that Sterling Footwear, Incorporated was bringing into the United States, correct?

MR. FASEL: Objection. Vague and ambiguous as to deal with importation.

THE WITNESS: Yes.

Page 16

BY MR. PHILLIPS:

Q. And Ms. Huynh was trained for her position in production at Sterling Footwear, correct?

MR. FASEL: Objection. Misstates testimony.

THE WITNESS: She has experience.

BY MR. PHILLIPS:

Q. Ms. Huynh was provided training once she started at Sterling Footwear, Incorporated regarding how to do her job, correct?

MR. FASEL: Objection. Calls for facts not in evidence.

THE WITNESS: Yes.

MR. FASEL: Lacks foundation.

BY MR. PHILLIPS:

Q. And one of the things Ms. Huynh was trained on was dealing with customs brokers, correct?

A. I -- I don't understand by training to deal with custom.

Q. You testified, sir, that Ms. Huynh was trained when she started at Sterling Footwear, Incorporated, correct?

A. She have experience, yes.

Q. Okay. Was she provided any training when she started on the job at Sterling Footwear, Incorporated?

A. She was provided some knowledge of the

Page 17

production operation within the company.

Q. And what knowledge was she provided, sir?

A. With -- how to handle orders, process the order.

Q. And when you say "how to handle and process the orders," does that include dealing with the importation of the merchandise that Sterling Footwear, Incorporated was bringing into the country from Vietnam?

MR. FASEL: Objection. Vague and ambiguous as to import.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. And was Ms. Huynh provided training on how to work with customs brokers when she started at Sterling Footwear, Incorporated?

A. No.

Q. On what do you base your answer that she wasn't provided any training when starting at Sterling Footwear, Incorporating?

A. That she -- she worked with the custom broker for the shipments that is coming into the United States.

Q. So, sir, I may not understand your last answer. Was she provided instruction or training on how to deal with Sterling Footwear, Incorporated's imports of shoes from Vietnam or not?

Alderson Reporting Company
1-800-FOR-DEPO

Page 18

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. Answer the question, sir.

She was provided with training?

A. With -- yes.

Q. And what was the training that she was provided with?

A. The trainings that every order that -- that's coming to the country, that she needs to be in contact or work with the custom broker to clear the merchandise.

Q. And you provided her with the instructions that for those entries she needed to work with the customs broker, correct?

A. Yes.

MR. FASEL: Objection. Misstates testimony.

BY MR. PHILLIPS:

Q. Sir, my question was: You were the one at Sterling Footwear, Incorporated who provided her with the instruction to deal with the customs brokers to make sure that Sterling Footwear, Incorporated's merchandise was imported into the United States, correct?

MR. FASEL: Same objection.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Page 19

Q. And, in fact, sir, you had -- had shown Ms. Huynh how to prepare paperwork that Sterling Footwear, Incorporated would provide to its customs brokers regarding the imports of merchandise Sterling Footwear was bringing in from Vietnam, correct?

MR. FASEL: Objection. Misstates testimony. Lacks foundation.

THE WITNESS: Can you repeat, I guess?

BY MR. PHILLIPS:

Q. Sure. Sir, I can certainly repeat the question.

You stated Ms. -- Ms. Huynh was given instructions by you on how to deal or how to work with customs brokers in getting Sterling Footwear's merchandise imported into the United States, correct?

MR. FASEL: Objection. Vague and ambiguous as to how to deal with. And misstates testimony.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. And one of the things that Ms. Huynh was instructed to do was provide customs brokers with certain paperwork related to the importation of this merchandise, correct?

A. Yes.

Q. And one of the things Ms. Huynh was instructed

Page 20

to do was to write a classification number to these customs brokers regarding the merchandise being imported, correct?

A. No. I told her to work with the custom broker and see what they need and, I guess, submit to them so that way we can bring our products in or clear custom. I mean, I have no knowledge in terms of classification. All I -- all I told her was that she needs to work with a broker and see what type of documents they need or requires to clear the product.

Q. Ms. Huynh was instructed, when she worked at Sterling Footwear, Incorporated, to provide the customs brokers with classification numbers, correct?

MR. FASEL: Objection. Misstates testimony. Argumentative.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

MR. FASEL: Asked and answered.

THE WITNESS: Can you stay that again, sir?

BY MR. PHILLIPS:

Q. Certainly, sir.

Ms. Huynh, when she started at Sterling Footwear, Incorporated, was provided instruction that included -- strike that question. Let's start this over.

Page 21

In her position in production, Ms. Huynh worked with the customs brokers, correct?

A. Production, yes.

Q. Yeah. And one of the things that Ms. Huynh did in her job was to provide those customs brokers with necessary paperwork regarding the importation of goods?

MR. FASEL: Objection.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. Correct?

MR. FASEL: Calls for speculation.

Just give me one second.

THE WITNESS: Okay.

BY MR. PHILLIPS:

Q. And one of the things that Ms. Huynh would provide when she gave the customs brokers paperwork was a classification number that should be used for Sterling Footwear, Incorporated's entries, correct?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: Not that I know.

BY MR. PHILLIPS:

Q. What did you do to investigate how Ms. Huynh performed her job in preparation for your testimony here as a 30(b)(6) witness?

A. What have I prepared?

Page 22

Q. What have you done in preparation for your testimony here today to be able to answer questions about Ms. Huynh's job duties and responsibilities at Sterling Footwear, Incorporated?

MR. FASEL: Objection. Argumentative. And harassing. Asked and answered.

MR. PHILLIPS: Counsel, I'm going to note again for the record that this witness does not seem prepared for this deposition. The United States reserves all rights that it has to recall this witness in the event that we determine or a Court determines that he isn't properly prepared for a 30(b)(6) deposition.

MR. FASEL: We disagree. The -- the documents that you refer to, the reviews don't exist or are not necessary. And he is prepared.

BY MR. PHILLIPS:

Q. Sir, my --

MR. FASEL: Simply because he gives, you know, responses that are not what you want, does not mean he's not prepared.

BY MR. PHILLIPS:

Q. Sir, did you speak with Ms. Huynh in preparation for your testimony here as a 30(b)(6) witness?

Page 23

MR. FASEL: Asked and answered. Harassing.

BY MR. PHILLIPS:

Q. Please answer the question, sir.

A. No.

Q. Did you review any documents that Ms. Huynh may have provided to customs brokers in her role at Sterling Footwear, Incorporated in preparation for your testimony here today as a 30(b)(6) witness?

MR. FASEL: Objection. Vague and ambiguous as to time. Did you ever? Is it did he ever review them?

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Sir, have you reviewed any e-mails that have been produced in this case related to Sterling Footwear, Incorporated's communications with any of the customs brokers it utilized in importing goods to the country from Vietnam?

MR. FASEL: Objection. Vague and ambiguous as to time.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. What documents did Ms. Huynh provide to the customs brokers in her roles -- in her role at Sterling Footwear, Incorporated?

MR. FASEL: Objection. Asked and answered.

Page 24

Calls for speculation.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Did you do anything to investigate this in preparation for your testimony here today?

A. No.

Q. What information did Ms. Huynh provide to customs brokers in her communications with them for --

MR. FASEL: Same --

BY MR. PHILLIPS:

Q. -- her --

Let me start that question again.

What information did Ms. Huynh provide to customs brokers in the course of her duties at Sterling Footwear, Incorporated in regard to importing goods to the United States from Vietnam?

MR. FASEL: Same objections.

BY MR. PHILLIPS:

Q. Please answer the question.

A. I don't know.

Q. Did you do anything to investigate what information Ms. Huynh provided in preparation for your testimony here today as a 30(b)(6) witness?

A. No.

Q. Why did Sterling Footwear, Incorporated

Page 25

provide classification numbers to its customs brokers?

MR. FASEL: Objection. Calls for expert opinion.

THE WITNESS: Did you say why did it or why didn't?

BY MR. PHILLIPS:

Q. I said -- let me repeat the question, sir.

Sterling Footwear, Incorporated provided classification numbers to its brokers, correct?

MR. FASEL: Objection.

THE WITNESS: I don't know.

MR. FASEL: Calls for speculation.

BY MR. PHILLIPS:

Q. Have you done anything in preparation for your testimony here today to ascertain whether or not Sterling Footwear, Incorporated provided classification numbers to its brokers?

MR. FASEL: Asked and answered. Come on.

THE WITNESS: No.

MR. PHILLIPS: Counsel, again, I'm going to note for the record this witness does not seem prepared for this deposition.

MR. FASEL: Asked -- you've already stated it a million times. Let's move on. He is prepared. It's eight years ago.

Page 26

BY MR. PHILLIPS:

Q. How did Sterling Footwear, Incorporated determine the classification numbers that you provided to its customs brokers?

MR. FASEL: Objection. Calls for speculation. Calls for expert opinion.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Did you do anything in preparation for your testimony as a 30(b)(6) witness to determine how Sterling Footwear, Incorporated chose the classification numbers that are provided to its customs brokers?

A. No.

MR. PHILLIPS: Would you mark this as Exhibit 2?

(Whereupon Exhibit 2 was marked for identification.)

BY MR. PHILLIPS:

Q. Sir, please tell me when you've had -- when you've had a chance to review that document.

MR. FASEL: Do you want him to read the whole thing or a certain portion of it?

BY MR. PHILLIPS:

Q. I would like you to take as much time as you need to familiarize yourself with the document. I'm

Page 27

going to ask you questions about the first page and pages 2 and 3 and 4. Please --

A. Can we do page-by-page? Let me read one page and then we'll do one at a time; is that okay?

MR. FASEL: No, you should read the whole thing --

BY MR. PHILLIPS:

Q. I would rather you --

MR. FASEL: -- because it will probably relate to --

BY MR. PHILLIPS:

Q. I would rather you at least, sir, take a look through the first --

A. Okay.

Q. -- four pages of the document before we begin the questions.

MR. FASEL: It's all going to relate to -- to each other, so you need to read it as a whole, okay?

THE WITNESS: Okay.

MR. FASEL: You should probably read from 4 to 1, because that's the order it probably goes.

THE WITNESS: Okay.

MR. FASEL: So go to page 4.

BY MR. PHILLIPS:

Q. And while you're reading, sir, I would note

Page 28

for the record that Exhibit 2 in this case is an e-mail chain starting -- actually, I'll give you the -- it's an e-mail chain with the Bates stamps in this case of GOV6073 through 6084. And it is a March 25th, 2008 e-mail -- chain of e-mails between individuals at a customs brokerage, Freight Logistics, Sterling Footwear, with others attached and cc'd.

MR. FASEL: While he's reading this, do you have an estimate for today? Did you get a chance to kind of think about it?

MR. PHILLIPS: We can talk about that at a break.

MR. FASEL: Do you have a card, by the way? I never got a card from you -- a card.

MR. PHILLIPS: I'll see if I have one at the break.

BY MR. PHILLIPS:

Q. And, sir, are you ready to discuss this document?

A. Yes.

Q. Sir, the first e-mail on page 1 of this document, it's an e-mail from Scott Kauffman at Freight Logistics. Who was he?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: I don't know.

Page 29

BY MR. PHILLIPS:

Q. Did Sterling Footwear, Incorporated utilize the services of Freight Logistics in importing its merchandise from Vietnam?

A. I don't know.

Q. What did you do in preparation for your testimony here today to determine how Sterling Footwear, Incorporated handled the importation of goods that -- that it brought into the country?

MR. FASEL: Objection. Asked and answered.

BY MR. PHILLIPS:

Q. Did you review any documents in preparation for your testimony here today regarding Sterling Footwear, Incorporated's actions and efforts in importing goods from Vietnam?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Did you speak with any employee of Sterling Footwear, Incorporated who dealt with the importation of goods from Vietnam in preparation for your testimony?

MR. FASEL: Asked and answered.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Sir, if you'll turn to page 2, the bottom

Page 30

e-mail, which goes over to page 3. And I'd like to start on page 2. On the "from", the name there is "Sterling Footwear, Incorporated." And an e-mail address is given as sterlingfootwearinc@yahoo.com. What is that e-mail address?

MR. FASEL: Objection. Vague and ambiguous.

THE WITNESS: Company e-mail address.

BY MR. PHILLIPS:

Q. And who had access to that company e-mail address, sir?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: The employees.

BY MR. PHILLIPS:

Q. Which employees had access to that e-mail address, sir?

A. Looks like Janet Huynh.

Q. Did anyone other than Ms. Huynh have access to that e-mail address?

A. I don't know.

Q. Did you have access to that e-mail address, as president and CEO?

A. I don't remember.

Q. Was that an e-mail address or an e-mail account you created to be used by Sterling Footwear, Incorporated for official company business?

Page 31

A. It's been so long, I don't remember.

Q. Who would have been in charge of creating e-mail accounts for use by Sterling Footwear, Incorporated for official company business?

A. The employees.

Q. Which employees?

A. I -- I don't know specific.

Q. As president and CEO of Sterling Footwear, Incorporated, it was your duty to be in charge of all these employees correct?

A. Yes.

Q. And you would have had knowledge of what all these employees where doing, correct?

MR. FASEL: Objection. Argumentative.

THE WITNESS: To a certain extent, yes. I don't micromanagement. I don't do micromanagement. I don't micromanage them.

BY MR. PHILLIPS:

Q. How did you manage your employees, sir?

MR. FASEL: Objection. Vague and ambiguous. Calls for narrative.

THE WITNESS: I would -- they would talk to me if there's an issue. But I guess everybody know what their duties are and they just do their work.

BY MR. PHILLIPS:

Page 32

Q. How did everyone at Sterling Footwear, Incorporated know what their duties were, sir?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: Well, when they're hired, they should know what they're doing before they can be hired.

BY MR. PHILLIPS:

Q. What process did Sterling Footwear, Incorporated have in place to ensure that the employees that it hired knew what they were doing before they were hired?

A. Perhaps guidelines like their duties, their -- their hours, their responsibility.

Q. Who provided those guidelines to the employees at Sterling Footwear, Incorporated?

A. It would be Ms. Huynh.

Q. And Ms. Huynh reported directly to you, as president and CEO of the corporation, correct?

A. Yes.

Q. And you were Ms. Huynh's direct supervisor, correct?

A. Yes.

Q. And you ultimately had final say so and authority over anything Ms. Huynh did, correct?

A. Yes.

Q. Sir, if we can turn back to this document. If

Page 33

you will look to the top of page 3. And you notice that this was an e-mail that Ms. Janet Huynh sent from Sterling Footwear, Incorporated's official account.

What I'd like to focus on is that first paragraph where it -- the document states: "BTW, I don't remember if I have given you our tariff code. If not, here it is." And then it's provided a number of 6402.91.4050. And after that it states: "(Please remember to use the code given to submit entry for all of our shipments until we notify of any changes.)"

Why did Ms. Huynh provide this tariff classification code to "Per Linden" at freightlogistics.com?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Sir, in preparation for your testimony here today, did you review any of the documents or procedures of Sterling Footwear, Incorporated related to its importation of goods and communications with customs brokers?

MR. FASEL: Asked and answered --

THE WITNESS: No.

MR. FASEL: -- many, many times.

BY MR. PHILLIPS:

Alderson Reporting Company
1-800-FOR-DEPO

Page 34

Q. It was -- it was, in fact, Ms. Huynh's duty to provide to her customs brokers, in her role in production at Sterling Footwear, Incorporated, classification numbers, correct?

MR. FASEL: Objection. Misstates testimony. Assumes facts not in evidence. Lacks foundation.

THE WITNESS: Well, her job is to work with the custom broker for all shipment that comes through the United States. That was my instruction.

BY MR. PHILLIPS:

Q. And according to this e-mail, Ms. Huynh provided that customs broker with the classification code to use for Sterling Footwear, Incorporated's entries into the United States, correct?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: Based on this document, it looks like it.

BY MR. PHILLIPS:

Q. And it was the normal practice of Sterling Footwear, Incorporated to provide classification codes to its customs brokers, correct?

MR. FASEL: Objection. Misstates testimony.

THE WITNESS: That, I don't know.

BY MR. PHILLIPS:

Q. What have you done to investigate what

Page 35

Sterling Footwear, Incorporated's guidelines or practices were regarding its dealings with its customs brokers?

MR. FASEL: Asked and answered. Assumes facts not in evidence.

THE WITNESS: I don't -- I let them work with the broker directly. And if there's a problem, they would let me know.

BY MR. PHILLIPS:

Q. Ms. Huynh was instructed, in her position, to provide classification numbers to the brokers; wasn't she?

MR. FASEL: Objection. Asked and answered. Argumentative. Harassing.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Put that document aside, sir.

MR. PHILLIPS: We'll mark this is a Exhibit 3.

(Whereupon Exhibit 3 was marked for identification.)

MR. FASEL: Is this the complete e-mail chain?

MR. PHILLIPS: As far as I know, Counsel. And I will note for the record that this is an e-mail with the Bates stamp of GOV3708. It's a series of e-mails. The top one is between Ms. Carolyn Benzel

Page 36

at Freight Logistics and Ms. Janet Huynh of Sterling Footwear, Incorporated, with a date of June 25th, 2009.

MR. FASEL: I'm going to object to Exhibit 3, as it appears to me that it's not the complete e-mail chain, that there are missing portions of this communication.

BY MR. PHILLIPS:

Q. Sir, have you had a chance to familiarize yourself with the document?

A. Give me one second, okay? Almost done. Okay.

Q. Sir, I'd like to focus on the second e-mail in this chain of three. And that e-mail is from Nancy Ng. And attached to her name is an address of nancyn@sterlingfw.com. Was that Ms. Ng's official work e-mail address at Sterling Footwear, Incorporated?

A. Yes.

Q. And in this e-mail she is sending to Ms. Carolyn Benzel at Freight Logistics a number of documents, as noted in the e-mail. But also asks her to "please use below HTS." Do you see that?

A. Yes.

Q. And then she has a number of entries and has highlighted a number of different HTS numbers. Do you see that?

Page 37

A. Yes.

Q. And among those HTS numbers, the first one is 6404.19.5060. Do you see that?

A. Yes.

Q. It was Ms. Ng's responsibility in her position at Sterling Footwear, Incorporated to provide customs brokers these HTS numbers; wasn't it?

MR. FASEL: Objection. Lacks foundation. Assumes facts not in evidence. Calls for speculation.

THE WITNESS: Not that I know of.

BY MR. PHILLIPS:

Q. What did you do to investigate what Ms. Ng's responsibilities and duties were as an employee of Sterling Footwear, Incorporated?

MR. FASEL: Asked and answered. Argumentative. Harassing.

THE WITNESS: Ms. Ng is Janet Huynh assistant to production.

BY MR. PHILLIPS:

Q. All right. And Ms. Huynh reported directly to you, as president and CEO of the corporation, correct?

MR. FASEL: Again, asked and answered.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. So Ms. Huynh was ultimately responsible to you

Alderson Reporting Company
1-800-FOR-DEPO

Page 38

in the chain of command at Sterling Footwear, Incorporated -- or the chain of management?

MR. FASEL: Objection. Asked and answered. Argumentative. Harassing.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. And in the course of her official duties, Ms. Ng was providing tariff classification numbers to Sterling Footwear, Incorporated's customs brokers, correct?

MR. FASEL: Objection. Asked and answered. Harassing.

THE WITNESS: I don't know.

MR. FASEL: Calls for speculation.

THE WITNESS: In -- on this e-mail, it looks like.

BY MR. PHILLIPS:

Q. And the classification numbers she's providing in this e-mail are coming from her official Sterling Footwear, Incorporated e-mail account, correct?

A. From her e-mail, yes.

Q. And that was her e-mail account issued by Sterling Footwear, Incorporated, correct?

A. Yes.

THE WITNESS: Can we take five?

Page 39

MR. FASEL: Yeah. Can we take a five-minute break? He needs use the restroom.

MR. PHILLIPS: Sure.

THE WITNESS: Thank you.

MR. PHILLIPS: Go off the record.

(Recess.)

MR. PHILLIPS: We're going to mark another document.

MR. FASEL: My client would like to make a statement, actually, before we get started.

MR. PHILLIPS: While this is rather unorthodox, and I'm not sure it's appropriate, I will allow your client to make whatever statement he believes he needs to make.

MR. FASEL: Go ahead.

THE WITNESS: Earlier, sir, you asked me about if I was prepared -- have I prepared or have I done anything to prepare for this deposition in regards to Ng and -- Ng Branding and Sterling Footwear. And I didn't understood clearly exact -- clearly what you said. But to -- to clarify that, I just want to say that I have review all of the documents the past three -- three months. And I have spoke with my attorney yesterday, today and also a few other times on the phone regarding to this matter.

Page 40

BY MR. PHILLIPS:

Q. Sir, what didn't you understand about my questions?

A. I thought you -- did I looked at everything today. And no, I didn't look at everything today. I was thinking -- I was thinking everything what -- like, did I review everything within -- you know, before I come here. But I misunderstood you for that. But yes, I did reviewed it going back, estimate, three months.

Q. And how many hours during those three months did you review these documents?

A. Oh, lots. Because I looked through so many documents. And as much as over thousands of pages.

Q. How many documents did you look through?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: I looked through all the documents.

BY MR. PHILLIPS:

Q. What constitutes "all the documents" in your previous response?

A. What constitutes? What do you mean?

Q. You said you looked through all the documents, sir. I'm trying to understand what you understand "all of the documents" to be.

A. Right. I look at all the documents regarding

Page 41

to the Ng and the Sterling Footwear, and the complaints and the answers and --

Q. Did any of the documents you looked at in preparation -- did Exhibit 2 and 3 that we've used in this deposition -- were those two of the documents you looked at?

A. I might have reviewed it a while back. I -- I -- like I say, I looked through a lot of documents before. And to be specific, I -- I cannot tell you. But I did look through everything --

Q. What types --

A. -- before.

Q. -- of documents did you review?

A. Again, I looked through the -- the documents for the complaints, for the answers in prep- -- preparation for my deposition.

Q. Did you look at e-mails that were generated by Sterling Footwear, Incorporated in preparation for this deposition as a 30(b)(6) witness?

A. Did I look at Sterling Footwear e-mail?

Q. Yes.

A. No, I only looked at the documents for this -- for Ng and Sterling Footwear.

Q. How many times did you meet with your attorney in preparation for testifying as a 30(b)(6) witness?

Alderson Reporting Company
1-800-FOR-DEPO

Page 42

A. We met a few times, but we mostly talk on the phone.

Q. And give me a number. How many is a few? Did you meet two times?

A. I would say more than 10 times.

Q. More than 10 times.

And what was the average length of each of those meetings?

A. An hour to two.

Q. And during those meetings, did you discuss the facts about this case?

A. We talk about the case, yes.

Q. And were you provided documents by your attorney to review as a result of those meetings?

A. Yes.

Q. How many documents were you provided by your attorney?

A. Oh, I receive a lot of documents.

Q. And what types of documents were those that you received?

A. Again, it would be, like, what the law -- for the Ng Branding and the Sterling Footwear.

Q. Did you receive any entry summaries from Sterling Footwear, Incorporated?

A. I'm -- from who?

Page 43

Q. Sterling Footwear, Incorporated, the company that you were president and CEO of.

A. Right. Did I --

Q. Did you review any documents that were submitted on behalf of that company to Customs to gain entry for these items from Vietnam?

A. I reviewed the documents that was sent by my attorney.

Q. And what were those documents, sir?

A. Again --

MR. FASEL: Objection. Asked and answered. Argumentative.

THE WITNESS: It's the documents, the complaint and all the answers for this lawsuit.

MR. FASEL: Harassing.

BY MR. PHILLIPS:

Q. Sir, when we broke for a break, did you have a discussion with your attorney?

A. Yes.

Q. And as a result of that discussion with your attorney, did you -- now that we're back on the record, is your changed answer a result of that discussion with your attorney?

A. That's my -- yeah, that's my answer. Because I misunderstood what you said earlier.

Page 44

MR. PHILLIPS: Let's mark this as Exhibit 4 please.

(Whereupon Exhibit 4 was marked for identification.)

THE WITNESS: Thank you.

MR. FASEL: Thank you.

THE WITNESS: I'm ready.

BY MR. PHILLIPS:

Q. Okay. And, sir, Exhibit 4 is marked with a Bates stamp of GOV3720. This is an e-mail from Alex Lin at MGL (USA) to a number of recipients; it's the top e-mail. Do you know who Alex Lin is?

A. No.

Q. Do you know what MGL (USA) is?

A. No.

Q. Is MGS -- MGL (USA) a customs broker -- I'm sorry, a freight forwarder that Sterling Footwear, Incorporated used?

A. I don't know.

Q. What did you do in preparation for your testimony today to determine whether or not Sterling Footwear, Incorporated used freight forwarders?

MR. FASEL: Objection. Asked and answered. Harassing. Argumentative.

BY MR. PHILLIPS:

Page 45

Q. Please answer the question, sir.

A. Again, I instruct my employees to contact the broker to work directly with them in regards to our entries.

Q. What instruction did you provide your employees, as president and CEO, regarding freight forwarders?

A. That -- to work with them on whatever they need in order to clear the merchandise.

Q. Who did you provide that instruction to?

A. Ms. Huynh.

Q. Anyone else?

A. No.

Q. What were your instructions that you provided Ms. Huynh?

MR. FASEL: Objection. Asked and answered. Argumentative.

THE WITNESS: Did you say when?

BY MR. PHILLIPS:

Q. No, sir.

My questions was: What were the instructions that you provided Ms. Huynh regarding freight forwarders?

MR. FASEL: Same objections.

THE WITNESS: My instruction is that any

Page 46

shipment that comes through here, to work with a custom broker to clear the merchandise.

BY MR. PHILLIPS:

Q. And I understand that, sir.

My question was: What instruction did you provide Ms. Huynh regarding her interactions on behalf of Sterling Footwear, Incorporated with freight forwarders?

MR. FASEL: Objection. Asked and answered. Argumentative. Harassing.

THE WITNESS: I don't understand your question, sir.

BY MR. PHILLIPS:

Q. Do you understand -- do you know what a freight forwarder is, sir?

A. Not really.

Q. Do you have any understanding of what a freight forwarder is?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: A little --

MR. FASEL: Argu- --

THE WITNESS: -- bit.

MR. FASEL: Let me --

THE WITNESS: Sorry.

MR. FASEL: Argumentative.

Page 47

BY MR. PHILLIPS:

Q. Did Sterling Footwear, Incorporated use the services of freight forwarders?

A. They use the service of a broker.

Q. And my question is somewhat different, sir.

Did Sterling Footwear, Incorporated use the services of a freight forwarder?

MR. FASEL: Objection. Asked and answered. Argumentative.

THE WITNESS: If a forward- -- freight forwarder is a broker to clear the product.

BY MR. PHILLIPS:

Q. And my question, sir, is: Do you know if Sterling Footwear, Incorporated utilized the services of a freight forwarder?

MR. FASEL: Same objection. And harassing.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. And what is that knowledge based on? What documents did you review or people did you talk to to learn that information?

MR. FASEL: Objection. Assumes facts not in evidence. Asked and answered. Argumentative. Harassing. Lacks foundation.

THE WITNESS: I didn't use anything. I'm just

Page 48

instruct my employees to work with a custom broker.

BY MR. PHILLIPS:

Q. Thanks.

(Discussion off the record.)

Q. Sir, in this e-mail --

A. Are we done with --

Q. No, we're still -- we're still working on this document, sir --

A. Okay.

Q. -- which is Exhibit No. 4 in this deposition.

In this e-mail it appears that Mr. Alex Lin is providing classification numbers on behalf of Sterling Footwear, Incorporated. Who at Sterling Footwear, Incorporated provided him with the classification numbers to use?

MR. FASEL: Objection. Assumes facts not in evidence. Lacks foundation. Calls for speculation.

BY MR. PHILLIPS:

Q. Please answer the question, sir.

A. I don't know, sir.

Q. Did you do anything to investigate what information Sterling Footwear, Incorporated provided to Mr. Lin at MGL (USA)?

MR. FASEL: Same objections. Plus argumentative. Harassing. Asked and answered. As well

Page 49

as improper hypothetical.

THE WITNESS: I didn't.

MR. PHILLIPS: All right. Please mark this as Exhibit 5.

(Whereupon Exhibit 5 was marked for identification.)

THE WITNESS: Are we done with this, sir?

MR. PHILLIPS: We are done with that, sir. Yes, you can put it aside.

BY MR. PHILLIPS:

Q. I'm handing you what is being marked as Exhibit No. 5. This is a document with a Bates stamp of GOV3939.

MR. FASEL: I'm going to object to this document as it appears not to be a complete document of the communications between the parties.

THE WITNESS: Okay.

BY MR. PHILLIPS:

Q. Sir, and this is an e-mail -- two e-mails. The first e-mail is from Nancy Ng at Sterling Footwear to scottk@seattlelogistics.com. And the bottom e-mail is also from Ms. Ng to Mr. Kauffman, both at Seattle Logistics.

And if you'll notice, sir, in the top e-mail Ms. Ng states to: "Please use the attached docs and HTS

Page 50

that I have provided below." Do you see that?

A. Yes.

Q. She also writes: "Please disregard the docs sent by MGL." Do you see that?

A. Oh, yes. Yes, sorry. My --

Q. Why was Ms. Ng providing HTS numbers to Seattle Logistics on behalf of Sterling Footwear, Incorporated?

MR. FASEL: Objection.

BY MR. PHILLIPS:

Q. -- in this July 27th, 2009 e-mail.

MR. FASEL: Objection. Calls for speculation. Assumes facts not in evidence.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Did you do anything to investigate Mrs. Ng's duties or responsibilities or what she did in the course of her performance of her job --

MR. FASEL: Ask --

BY MR. PHILLIPS:

Q. -- in preparation for this deposition?

MR. FASEL: Asked and answered. Argumentative. Harassing.

THE WITNESS: No.

BY MR. PHILLIPS:

Page 51

Q. It was Ms. Ng's responsibility at Sterling Footwear, Incorporated to provide the brokers with classification numbers, correct?

MR. FASEL: Objection. Asked and answered. Harassing. Argumentative.

BY MR. PHILLIPS:

Q. Please answer the question, sir.

A. Not that I know of.

Q. Did you do anything to investigate what Ms. Ng's responsibilities and duties were at Sterling Footwear, Incorporated?

A. Yes, her job is to assist Ms. Janet Huynh.

Q. And how did she assist Ms. Janet Huynh?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: On her daily duties.

BY MR. PHILLIPS:

Q. And one of those daily duties was providing classification numbers to customs brokers, correct?

MR. FASEL: Objection. Asked and answered. Argumentative. Harassing.

THE WITNESS: That, I don't know.

BY MR. PHILLIPS:

Q. As president and CEO of Sterling Footwear, Incorporated, were you aware of everything that your corporation was doing?

Page 52

MR. FASEL: Objection. Argumentative. Harassing. Vague and ambiguous as to everything the corporation is doing. And improper hypothetical.

BY MR. PHILLIPS:

Q. Please answer the question, sir.

A. Yeah, they would notify me if anything happens.

MR. PHILLIPS: We'll mark this as Exhibit 6.

(Whereupon Exhibit 6 was marked for identification.)

THE WITNESS: Thank you.

MR. FASEL: Thank you.

MR. PHILLIPS: I'll note for the record that this is an e-mail with a Bates stamp of GOV3801. It's a July 17th, 2009 e-mail from Nancy Ng to Angela Kimbrough and others.

THE WITNESS: I'm ready.

BY MR. PHILLIPS:

Q. Who is Angela Kimbrough, sir?

A. I don't know.

Q. What is A.N. Deringer, Incorporated, sir?

MR. FASEL: I'm sorry. Where are you looking?

BY MR. PHILLIPS:

Q. Sir, if you'll look at the bottom of the e-mail, there under the name Angela Kimbrough it states:

Page 53

"International logistics supervisor, A.N. Deringer, Incorporated." What is that business?

A. I don't know.

Q. Did you do anything to investigate what that business was?

MR. FASEL: Objection. Harassing. Argumentative.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Did you review this document in your preparation for your testimony here today?

A. I might have seen this document, but...

Q. Do you recall seeing this document in your preparation for your testimony, sir?

A. I'm not sure. It's been too long.

Q. When did you prepare for this testimony here today, sir?

A. About two, three weeks ago.

Q. And you're saying -- is it your testimony, sir, that you don't recall whether or not you looked at this document two weeks ago?

A. That's correct.

Q. So you don't know either way whether or not you saw this document in preparation for this testimony here today?

Page 54

MR. FASEL: Objection. Argumentative.

THE WITNESS: I don't remember.

BY MR. PHILLIPS:

Q. If you'll look at the top e-mail, sir, Ms. Ng is sending from her Sterling FW account, an e-mail to Angela saying: "Docs attached. Please clear under..." and there's a number, 6402.91.4061.

Do you see that, sir?

A. Yes.

Q. In this e-mail Ms. Ng is providing the classification code that Ms. Kimbrough is supposed to use to enter Sterling Footwear, Incorporated's imports into the United States, correct?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: Looks like it.

BY MR. PHILLIPS:

Q. And Ms. Ng routinely provided classification codes to brokers regarding Sterling Footwear, Incorporated's entries --

MR. FASEL: Objection.

BY MR. PHILLIPS:

Q. -- into the United States, correct?

MR. FASEL: Objection. Calls for speculation. Asked and answered.

THE WITNESS: I don't know.

Page 55

BY MR. PHILLIPS:

Q. Did you do anything to find out what Ms. Ng had done in the normal course of her -- of her duties at Sterling?

MR. FASEL: Objection. Asked and answered. Argumentative. Harassing.

BY MR. PHILLIPS:

Q. Please answer the question, sir.

A. Yeah, her job is to assist Ms. Janet Huynh.

Q. Sir, did you review any of the deposition testimony taken in this case in preparation for your testimony as a 30(b)(6) witness?

MR. FASEL: Objection. Vague and ambiguous as to test- -- deposition testimony.

BY MR. PHILLIPS:

Q. Sir, did you review the deposition testimony of Ms. Janet Huynh taken in this case in preparation for your testimony here today?

A. Did I review Ms. Janet Huynh deposition?

Q. Yes, sir.

A. No.

Q. Did you review Ms. Ng's deposition in this case in preparation for your testimony?

A. No.

Q. Did you review anyone's deposition in this

Page 56

case in preparation for your testimony?

A. No.

Q. Have you been made aware by anyone of what Ms. Huynh or Ms. Ng testified to in their depositions which were taken in this case?

MR. FASEL: I'm going to object to an attorney-client privilege.

And I instruct the witness not to answer.

BY MR. PHILLIPS:

Q. Are you aware of anything that Ms. Huynh or Ms. Ng testified to in their depositions in this case?

A. No.

MR. PHILLIPS: Let's mark this as Exhibit 7.

(Whereupon Exhibit 7 was marked for identification.)

THE WITNESS: Thank you.

MR. FASEL: Thank you.

MR. PHILLIPS: I'll note for the record that this is a photocopy of a check with the Bates stamp in this case of GOV5952.

BY MR. PHILLIPS:

Q. Are you ready, sir?

A. Yes.

Q. And, sir, what we're looking at is a check with the check number of 2252 dated 7/7/2009 payable to

Page 57

the order of U.S. Customs and Border Protection from Sterling Footwear, Incorporated. Do you see that?

A. Yes.

Q. And there's a signature on this check, sir. Whose signature is that?

A. Mine.

Q. And this check is payable in the amount of $62,370, sir. Do you see that?

A. Yes.

Q. Why did Sterling Footwear write this check?

A. Well, I pay the bills whenever there's an invoice.

Q. Are you -- is it your testimony, sir, that this check is in reference to an invoice for Sterling Footwear, Incorporated?

MR. FASEL: Objection. Calls for speculation. There's no invoice attached to the --

THE WITNESS: It looks -- it says "entry" for something. It must be paid for something.

BY MR. PHILLIPS:

Q. Did Sterling Footwear, Incorporated typically pay U.S. Customs and Border Protection for invoices?

MR. FASEL: Calls for --

THE WITNESS: We pay bills.

BY MR. PHILLIPS:

Alderson Reporting Company
1-800-FOR-DEPO

Page 58

Q. Sir, in preparation for your testimony here today, did you review a copy of this check?

A. I might have seen it before.

Q. Do you recall whether or not you did see this?

A. Long time ago.

Q. When was it that you saw this last?

A. Years ago.

Q. Could you give me a year?

A. May- --

Q. 2009 possibly?

A. Yes.

Q. You saw this in 2009?

A. Yes. And I -- I might have seen it when I was reviewing the documents.

Q. But you don't recall whether or not you reviewed this in preparation for this testimony, correct?

A. I review a lot of documents, so I don't know this one in particular.

Q. Sterling Footwear wrote this check out to U.S. Customs and Border Protection to be applied to rate advances on the four entries that are listed at the bottom, correct?

MR. FASEL: Objection. Calls for speculation. The document speaks for itself.

Page 59

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Do you have any reason to believe this check was written for any other purpose?

A. I don't know.

Q. Do you know if there were any issues that Sterling Footwear, Incorporated was dealing with regarding the four entries listed below for which this check was written to pay?

MR. FASEL: Objection as vague and ambiguous as to issues.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Is there any documents that would refresh your recollection whether Sterling Footwear, Incorporated had any issues with its entries for which it paid CBP $62,000?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: Again, I don't know.

BY MR. PHILLIPS:

Q. Did you do anything to educate yourself about the reasons behind why CBP paid this $62,000?

MR. FASEL: Objection. Harassing. Argumentative.

THE WITNESS: It's a long time ago. I don't

Page 60

remember.

MR. FASEL: Are you okay?

THE WITNESS: --

BY MR. PHILLIPS:

Q. Sir, the bank account that this check was written from, is that bank account still active?

MR. FASEL: Objection. Vague and ambiguous.

THE WITNESS: To my best knowledge, no.

BY MR. PHILLIPS:

Q. When was that bank account closed?

MR. FASEL: Objection. Vague and ambiguous as to bank account.

THE WITNESS: I don't remember.

BY MR. PHILLIPS:

Q. Who had access to this bank account, sir?

A. I do.

Q. Did anyone else?

A. I don't remember.

Q. Is there anything that would refresh your recollection on whether or not someone else had access to that bank account?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: I gotta go back to the bank and ask.

BY MR. PHILLIPS:

Page 61

Q. Did you inquire with the bank regarding this account in preparation for your testimony here today?

MR. FASEL: Objection. Harassing. Argumentative.

THE WITNESS: Did I talk to the bank?

BY MR. PHILLIPS:

Q. Yes.

A. No.

Q. Did you inquire with your or Sterling Footwear, Incorporated's CPA regarding this account in preparation for this -- your testimony here today?

MR. FASEL: Same objections.

THE WITNESS: Not on this particular check.

BY MR. PHILLIPS:

Q. I'm asking about the -- the account from which this check was written, sir.

A. Uh-huh.

MR. FASEL: Same objections.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Is there any money in this account? Or was there any money in this account when it was closed?

A. I believe this account was closed because there's no fund, by the bank.

Q. I don't understand that answer, sir. Could

Page 62

you explain to me what you mean by "there's no fund by the bank?"

A. Well, because -- because the company is inactive and I believe the bank might have closed the account.

Q. Do you know whether or not the bank closed the account?

A. I don't know. I'm not sure.

Q. When did Sterling Footwear, Incorporated go inactive, sir?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: End of 2009, early 2010.

BY MR. PHILLIPS:

Q. In 2010, what business had Sterling Footwear, Incorporated been conducting?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: Could you tell -- I don't understand.

BY MR. PHILLIPS:

Q. We will step back for a second, sir.

Between July of 2007 and August of 2009, Sterling Footwear, Incorporated was importing footwear from Vietnam, correct?

A. Yes.

Q. Did Sterling Footwear -- did Sterling

Page 63

Footwear, Incorporated continue to import merchandise from Vietnam or anywhere else after August 2009?

A. There was still shipment of orders that has already been placed and that's still coming in from Vietnam.

Q. And when was the date of the last of those orders that had been placed that was still coming in?

A. Toward the end of 2009.

Q. Approximately when in 2009?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: I don't know exactly.

BY MR. PHILLIPS:

Q. Did you do anything to investigate that in preparation for your testimony today?

MR. FASEL: Objection. Argumentative. Harassing. Asked and answered.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Did Sterling Footwear, Incorporated conduct any other business after those shipments came in in 2009?

A. Not that I'm aware of.

Q. When was the last date on which Sterling Footwear, Incorporated received any sort of income from any party that it was doing business with?

Page 64

MR. FASEL: Objection. Vague and ambiguous as to income.

THE WITNESS: Probably be end of 2009, beginning of 2010.

BY MR. PHILLIPS:

Q. When Sterling Footwear, Incorporated stopped doing business and went inactive, did it have any assets?

A. Not that I remember.

Q. And what have you reviewed in preparation for your testimony to know whether or not Sterling Footwear, Incorporated had assets --

MR. FASEL: Objection. Asked and answered.

BY MR. PHILLIPS:

Q. -- at that time?

MR. FASEL: Asked and answered. Argumentative. Harassing.

THE WITNESS: Have -- what have I prepare?

BY MR. PHILLIPS:

Q. What have you done? Have you reviewed any documents or talked to anyone in preparation for your testimony here today about what Sterling Footwear, Incorporated's assets were at the time, as you've said, that the business went inactive?

MR. FASEL: Same objections.

Page 65

THE WITNESS: No.

BY MR. PHILLIPS:

Q. What liabilities, if any, did Sterling Footwear, Incorporated have at the time that it went inactive?

A. I don't remember we have any liability.

Q. What did you do in preparation for your testimony here today to ascertain whether or not Sterling Footwear, Incorporated had liabilities at the time --

[Reporter requests clarification.]

BY MR. PHILLIPS:

Q. -- had liabilities at the time it went inactive?

MR. FASEL: Objection. Asked and answered. Harassing. Argumentative.

THE WITNESS: It --

MR. FASEL: And it's irrelevant.

BY MR. PHILLIPS:

Q. Please answer the question, sir.

A. Well, the employee would notify me if there is any.

Q. Which employees would notify you?

A. Any of the employees.

Q. Did any employee notify you at the time that

Page 66

Sterling Footwear, Incorporated went into inactive status that there were outstanding liabilities?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: The -- can you re- -- can you re-ask the question?

BY MR. PHILLIPS:

Q. And at the time that Sterling Footwear, Incorporated went inactive, as you've testified to, were you informed by any of your employees that Sterling Footwear had any outstanding liabilities that remained to be paid?

A. No.

Q. What did you do in preparation for your testimony today to ascertain whether Sterling Footwear had any liabilities?

MR. FASEL: Objection. Asked and answered. Harassing.

THE WITNESS: Again --

MR. FASEL: Argumentative.

THE WITNESS: Again, I don't know. I don't -- if there is any, I would -- they would have told me.

BY MR. PHILLIPS:

Q. Who would have told you?

A. The employees.

Q. When would they have told you?

Page 67

MR. FASEL: Objection. Calls for speculation. Improper hypothetical.

THE WITNESS: Years ago.

BY MR. PHILLIPS:

Q. And I'm asking, in preparation for this testimony, sir, you have just testified that at the time Sterling Footwear went inactive there were no outstanding liabilities. I want to understand the basis for that knowledge that you're testifying to today.

MR. FASEL: Objection. Asked and answered. Harassing. Argumentative.

THE WITNESS: Well, again, like, if there is any, my employee would have informed me.

BY MR. PHILLIPS:

Q. Sir, when was the last year that Sterling Footwear, Incorporated filed a tax return?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: 2014.

BY MR. PHILLIPS:

Q. Did you review those tax returns in preparation for your testimony here today?

A. Yes.

Q. And what income, if any, did Sterling Footwear, Incorporated report on that tax return for 2014?

Page 68

A. Zero.

Q. Why is Sterling Footwear, Incorporated filing tax returns if the business is inactive?

MR. FASEL: Objection. Misstates testimony. Requires expert opinion.

THE WITNESS: Because I'm thinking maybe later on I can go back and doing business again.

BY MR. PHILLIPS:

Q. Do you have any plans, sir, to do any business in the future?

A. Yes.

Q. And are those plans ones that you're currently working on?

A. My plans is to go back and -- and do business again. I didn't -- I didn't expect for this to end. I just really want to go back and continue and do business. And --

Q. What type of business do you want to do, sir?

MR. FASEL: Objection. Irrelevant. Harassing.

THE WITNESS: Well, I have always have an eye for design. So I would like to go back and continue again.

BY MR. PHILLIPS:

Q. Do you intend to continue doing business under

Page 69

the name Sterling Footwear, Incorporated?

MR. FASEL: Objection. Misstates testimony as to continue.

THE WITNESS: I would go back and do business -- yes.

BY MR. PHILLIPS:

Q. Are there any other businesses that you're contemplating doing bus- -- business names that you're contemplating doing business under in the future?

A. Not at this moment.

Q. Do you -- do you have any other businesses, other than Sterling Footwear, Incorporated or Ng Branding, LLC, with which you're affiliated presently?

A. No, not that I'm aware of.

Q. Sir, I would like to go back to Exhibit 7, which is that check there.

Was -- did Sterling Footwear close this account due to Customs and Border Protection issuing a penalty to the business.

A. Not that I know of.

Q. What did you do to ascertain the information used for that answer?

MR. FASEL: Objection. Calls for speculation. Improper hypothetical. Misstates testimony. Argumentative.

Alderson Reporting Company
1-800-FOR-DEPO

Page 70

THE WITNESS: Can you rephrase that?

BY MR. PHILLIPS:

Q. In preparation for testifying today --

A. Yes.

Q. -- did you review any documents or talk to anyone about the reasons that Sterling Footwear, Incorporated closed that account or why that account was closed?

A. No.

Q. Did Sterling Footwear, prior to going inactive, have any equipment at its offices? And by equipment I mean, furniture, computers or anything else.

A. No.

Q. Did it have it prior to -- actually, rephrase.

When Sterling Footwear, Incorporated was working, between July 2009 and August -- July 2007 and August 2009 did, the company have any computers or other equipment in the office?

A. Yes.

Q. What happened to that equipment?

A. We sold them.

Q. And who did you sell that equipment to?

A. We just sold it to -- to walk-in people.

Q. And how much was it?

I'm sorry. I cut you off, sir.

Page 71

[Reporter requests clarification.]

MR. PHILLIPS: I said I was sorry I cut him off.

THE WITNESS: We had everything at the office and people would come in and buy 'em.

BY MR. PHILLIPS:

Q. And how much did Sterling Footwear, Incorporated receive for selling that equipment?

A. I don't know. Not very much.

Q. Did anyone maintain records of how much Sterling Footwear, Incorporated received for the items that it sold?

A. No.

Q. Was that equipment sold by Sterling Footwear, Incorporated or was it sold by Ng Branding, LLC?

A. It was sold by the company.

Q. Which company, sir?

A. Sterling.

Q. Did Ng Branding, LLC have any interaction with Sterling regarding its office equipment?

A. Yeah, it has equipments.

Q. I'm sorry, sir. Did --

A. You asked if Ng Branding has equipments, right?

Q. Yes.

Page 72

A. Yes.

Q. And was the equipment that Ng Branding, LLC had equipment that it received from Sterling Footwear, Incorporated?

A. Oh, that's two different thing. That's two different equipment.

Q. So the equipment used for Sterling Footwear, Incorporated was not transferred to Ng Branding, LLC?

A. From my understanding, it's separate.

Q. And what is your understanding based on, sir?

A. That it's two different company.

MR. FASEL: Objection. This calls for legal expert opinion. And also you keep using the word "active," and the company is active; it's just it's not operating. So I think you're -- it's --

MR. PHILLIPS: I'm using --

MR. FASEL: -- creating confusion.

MR. PHILLIPS: -- the terminology that witness has provided, so...

MR. FASEL: Right. And he's not a lawyer. I'm just telling you it's active. So when you say it's inactive, you're misstating what's actually going on.

BY MR. PHILLIPS:

Q. Sir, when you use the word inactive to describe Sterling Footwear, Incorporated, what do you

Page 73

mean by that?

A. Inactive; is that your word?

Q. Yes.

A. It means it's -- it's not doing business.

MR. PHILLIPS: We're going to go off the record for two minutes.

(Recess.)

BY MR. PHILLIPS:

Q. Welcome back, sir. I'm going to ask a couple more questions -- some questions about Sterling's compliance or internal procedures, just so you know where I'm going.

So Sterling Footwear, Incorporated did not have any compliance procedures in place regarding the information that it provided to its brokers for classifications, correct?

MR. FASEL: Objection. Misstates testimony.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. Okay. And no one was given any sort of -- Janet Huynh and Nancy Ng weren't given any sort of written instructions from you or anyone else at Sterling Footwear about what type of information to provide to any of the customs brokers, correct?

A. Not that I know of.

Page 74

Q. And they weren't given any verbal or written instruction about how to choose the classification that they provided to the brokers, correct?

MR. FASEL: Objection. Compound.

THE WITNESS: Correct.

BY MR. PHILLIPS:

Q. Ms. Ng and Ms. Huynh did not actually choose the classification code that they provided to the customs brokers on behalf of Sterling Footwear, correct?

MR. FASEL: Objection. Misstates testimony. Calls for speculation.

THE WITNESS: Oh, I don't know.

BY MR. PHILLIPS:

Q. Well, do you know who chose the classification code that those two ladies provided to the customs brokers on behalf of Sterling Footwear, Incorporated?

A. No.

Q. Did you do anything to investigate how that classification was -- code was chosen by Sterling Footwear, Incorporated to be provided to customs brokers?

A. No.

Q. You're aware that Sterling Footwear, Incorporated had at least one and maybe two meetings with CBP regarding the entries that are at issue in this

Page 75

case, correct?

A. Perhaps.

Q. And that first meeting in July of 2009, Ms. Huynh and Ms. Ng met with the customs brokers -- I'm sorry, Ms. -- strike that. Let's start over.

In July 2009, Ms. Huynh and Ms. Ng from Sterling Footwear, along with Mr. Kauffman from Seattle Logistics, who was Sterling's customs broker, met with CBP, correct?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: I believe so.

BY MR. PHILLIPS:

Q. Did you do anything to investigate what occurred or who attended that meeting in preparation for your testimony here today as a 30(b)(6) witness?

MR. FASEL: Objection. Asked and answered. Harassing. Argumentative.

THE WITNESS: I believe at that time an attorney, Elon Pollack, was present with Ms. Huynh and Ms. Ng.

BY MR. PHILLIPS:

Q. He was also present at the meeting --

A. I --

MR. FASEL: Objection.

THE WITNESS: -- assume so.

Page 76

MR. FASEL: Asked and answered.

BY MR. PHILLIPS:

Q. And during that meeting, CB- -- Customs and Border Protection brought to Sterling Footwear's attention that the classification used on its imports were incorrect; is that right?

MR. FASEL: Objection. Misstates testimony. Provides an improper hypothetical. Misstates the facts. And calls for speculation.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

My question, if you've forgotten it, is: At that meeting that Sterling -- representatives of Sterling Footwear attended with Customs and Border Protection, Sterling Footwear was made aware of problems with their entries, specifically the use of an incorrect classification code, correct?

MR. FASEL: And assumes facts not in evidence. Lacks foundation. Misstates facts. Misstates testimony. Improper hypothetical. And calls for speculation.

THE WITNESS: That, I didn't know.

BY MR. PHILLIPS:

Q. As president and CEO, did you do anything to learn about the meeting that your employees were

Page 77

attending with Customs and Border Protection?

A. Yes, I -- I just spoke to my former attorney, Elon Pollack. And he believed there was a difference of an opinion on the classification. And that's -- I'm -- that's all I'm aware of.

Q. Did Sterling Footwear receive any pamphlets or other written materials from CBP as a result of that meeting?

MR. FASEL: Objection. Calls for speculation. And vague and ambiguous as to pamphlets.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Did you do anything to investigate what information Sterling Footwear, Incorporated received from CBP in preparation for this testimony?

MR. FASEL: Objection. Asked and answered. Argumentative. And harassing.

THE WITNESS: Can you rephrase that, sir?

BY MR. PHILLIPS:

Q. In preparation for giving your testimony as a 30(b)(6) witness representative of Sterling Footwear, did you review any documents or talk to anyone about any portion of the meeting that representatives of Sterling Footwear had with Customs and Border Protection in July 2009?

Alderson Reporting Company
1-800-FOR-DEPO

Page 78

MR. FASEL: Same objections.

THE WITNESS: I only spoke to Elon Pollack, the attorney.

BY MR. PHILLIPS:

Q. And when did you last --

A. The former --

Q. -- speak to Mr. Pollack about the meeting that Sterling Footwear had with CBP?

A. Years ago.

Q. About how many years ago?

A. At least two years ago.

Q. Have you spoken to anyone, other than Mr. Pollack, about the meeting that representatives of Sterling Footwear had with CBP in July of 2009?

A. You're asking me recently have I spoke to anybody?

Q. Yes, sir. In preparation for your testimony today or your testimony yesterday.

A. Yes, I spoke to my attorney, Thomas Fasel.

Q. Have you spoken to any witness who is not your counsel about that meeting?

A. No.

Q. Did Sterling Footwear, Incorporated change any of its practices or procedures as a result of the meeting that it had with CBP in July 2009?

Page 79

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. What practice or procedure did Sterling Footwear, Incorporated change?

A. They work -- how can I put this? They have hire a qualified custom broker to assist them in changing the way how they work to -- to avoid any mistakes for any going -- ongoing entries.

Q. Was -- so Sterling Footwear, Incorporated was aware of mistakes in its entries in --

MR. FASEL: Objection. Misstates testimony. Argumentative.

THE WITNESS: No, that's not what I said.

BY MR. PHILLIPS:

Q. Why did you say that, sir?

A. Because --

MR. FASEL: Objection.

THE WITNESS: -- there was -- there was a misunderstanding in terms of classification. So it was recommended by Elon Pollack to work with a custom broker to -- I guess, for all ongoing orders to -- I guess, to -- to input the goods.

BY MR. PHILLIPS:

Q. Did Sterling Footwear, Incorporated

Page 80

misunderstand how to classify its goods?

MR. FASEL: Objection. Argumentative.

THE WITNESS: No, not that I'm aware of.

BY MR. PHILLIPS:

Q. As a result of this meeting and -- as a result of this meeting, you stated that Sterling Footwear hired a qualified customs broker, correct?

A. To my understanding, yes.

Q. Who was that -- that customs broker?

A. I don't remember. It was referral by someone.

Q. Did you do anything in preparation for this testimony to investigate who that broker was?

MR. FASEL: Objection. Asked and answered. Harassing. Argumentative.

THE WITNESS: I don't remember.

BY MR. PHILLIPS:

Q. I think I misunderstood, sir. You don't remember if you did anything in preparation? Or you don't remember who the broker was?

A. I just don't remember the name.

Q. Is there any documents that would refresh your recollection on that?

A. I probably have to check back with my former attorney, Elon Pollack.

Q. Well, why do you -- why do you think you'd

Page 81

have to check back with your attorney on who Sterling Footwear, Incorporated hired as a customs broker?

A. Because I -- again, I don't know. I don't remember. He would know.

Q. So you have no recollection of any of the events surrounding what Sterling Footwear, Incorporated did following its meeting with CBP?

MR. FASEL: Objection. Misstates testimony. Argumentative. Asked and answered.

THE WITNESS: Yes, I know.

BY MR. PHILLIPS:

Q. And what do you know about that?

A. All I --

MR. FASEL: Objection. Asked and answered.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. All I know was there was a dispute or a difference of opinion on the classification. And, therefore, Mr. Elon Pollack was involved to try to resolve this matter.

Q. And both you and Sterling Footwear were aware of this, as you claim, a dispute in July 2009?

A. Say that again, sir?

MR. FASEL: Objection. Calls for speculation. Compound.

Alderson Reporting Company
1-800-FOR-DEPO

Page 82

BY MR. PHILLIPS:

Q. Were both you and Sterling Footwear, Incorporated aware of this dispute with CBP in July 2009?

MR. FASEL: Same objections.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. It's not -- it's -- it's more like a difference of an opinion on the classification.

Q. Why -- and why do you -- why do you say that it's a difference of opinion, sir?

A. Because I believe it's correct and CBP claim it's wrong.

Q. On what basis do you believe that the classifications that Sterling Footwear, Incorporated used were correct?

A. Because if there was a problem, I -- they -- someone would have notified me.

Q. Who would have notified you if there was a problem?

A. Employees.

Q. And how would they have notified you of a problem?

A. They would talk to me. They would tell me about it.

Page 83

Q. How would an employee at Sterling Footwear, Incorporated know there was a problem with the classification the company was using?

MR. FASEL: Calls for speculation.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. All right. Sir, we're going to turn to the answer to this case. And in response to what we did yesterday, I'm going to provide you with both the complaint and the answer before I ask you questions.

MR. PHILLIPS: What number exhibit are we up to?

THE REPORTER: Eight.

MR. PHILLIPS: Eight.

Okay. So the complaint will be Exhibit 8 here. The answer will be Exhibit 19.

(Whereupon Exhibit 8 was marked for identification.)

(Whereupon Exhibit 9 was marked for identification.)

BY MR. PHILLIPS:

Q. Sir, you're welcome to look at any portion of these documents that you would like. I'm going to ask you questions about only a few paragraphs; and those paragraphs are 10, 12, 13, 14, 24 and 25. And all of

Page 84

that is on pages 2, 3 and 5 of Exhibit 9, which is the answer.

A. Did you say 2, 3 and 5?

Q. Pages 2, 3 and 5 of the answer, which is the other document, sir. That document. And those paragraphs will correspond to the paragraphs in the complaint.

A. Okay.

Q. Please tell me when you're ready, sir.

A. Okay.

Okay.

Q. Okay, sir. I would like to focus first on paragraph 10 of the answer, and that's Exhibit 9 there. And if you look at the bottom of that paragraph in the answer, paragraph 10, it states that: "Defendants" -- and that includes Sterling Footwear, Incorporated -- "deny that the subheadings used for the entries were incorrect." Do you see that sentence there, sir?

A. What page is that?

Q. That is on page 2 of the answer, sir, at the end of paragraph --

A. Right here, no?

Q. Yeah.

A. Okay.

Q. Look one sentence up, sir.

Page 85

A. Oh, okay.

Q. Do you see that sentence, sir? And that sentence in paragraph 10 of the answer states that: "Plaintiffs, including Sterling Footwear, Incorporated, deny that the subheadings used for the entries were incorrect." Do you see that sentence, sir?

A. Yes.

Q. What information does Sterling Footwear, Incorporated have that the subheadings used for the entries were correct?

MR. FASEL: Objection. Calls for expert opinion.

THE WITNESS: Well, from beginning, I mean, we go by the instruction of -- or the -- the help of a custom broker. And I -- I believe there's that -- that we haven't done anything wrong.

BY MR. PHILLIPS:

Q. And which customs broker provided you that instruction on the classification to use?

A. It's provided to part -- to the employee.

Q. What employee was it provided to?

A. Probably Ms. Huynh or Ms. Ng.

Q. Do you have any information about -- to -- to demonstrate that a particular customs broker provided Ms. Huynh or Ms. Ng with instructions on what

Page 86

classification to use?

A. No.

Q. So does -- so is it correct, then, that Sterling Footwear, Incorporated is --

And, I'm sorry. Your counsel has just provided you with a document. Could you tell me what that document is?

MR. FASEL: This document, Bates number government 3939, an e-mail from Nancy Ng to Scott Kauffman where she writes: "I need classification help on this one."

BY MR. PHILLIPS:

Q. And could you tell me what part of that document your counsel, who has just put that document in front of you, has pointed you to?

A. Which -- are you asking for --

Q. I'm just asking what your -- your counsel has --

A. Oh, it says --

Q. -- placed a --

A. Yeah.

Q. -- document --

A. I need --

Q. -- in front of you --

A. -- classification help on this one.

Page 87

Q. -- and is instructing you to look at a document. I'm asking what document he asking -- he's instructing you to look at and what portion of that document he's instructing you to look at.

A. It's on GOV0003939.

Q. And what portion of that document was he instructing you to look at?

A. It would say: "I need classification help on this one." It's right in the middle of the page.

Q. And the sentence he's referring you to is in reference to one particular style of shoe imported by Sterling Footwear, Incorporated, and that's 19FLR902W; is that correct?

MR. FASEL: Objection. Calls for speculation. The document speaks for itself. Don't --

BY MR. PHILLIPS:

Q. You can answer my question, sir.

MR. FASEL: The document speaks for itself.

BY MR. PHILLIPS:

Q. You can answer my question, sir.

MR. FASEL: No, I am instructing him not to.

MR. PHILLIPS: On what basis are you instructing your witness not to answer --

MR. FASEL: The document speaks --

MR. PHILLIPS: -- a fact question?

Page 88

MR. FASEL: -- for itself.

MR. PHILLIPS: On what basis --

MR. FASEL: He cannot speculate as to what the document means.

MR. PHILLIPS: Are you --

MR. FASEL: Think about it.

MR. PHILLIPS: -- instructing your --

MR. FASEL: Yes.

MR. PHILLIPS: -- witness not --

MR. FASEL: I already --

MR. PHILLIPS: -- to answer a question?

MR. FASEL: I did.

BY MR. PHILLIPS:

Q. Sir, are you following your -- your counsel's instruction to not answer a question not based on a privilege?

A. Yes.

Q. That's fine. We'll take care of that later.

MR. FASEL: You're asking him to interpret someone else's writing.

MR. PHILLIPS: Counsel, do you have an objection to make? Otherwise, I would ask that you refrain from speaking objections on the record.

MR. FASEL: Like you are.

MR. PHILLIPS: Counsel, again, I would ask --

Page 89

MR. FASEL: Ask your question.

MR. PHILLIPS: -- that you follow --

MR. FASEL: Ask your question.

MR. PHILLIPS: -- in accordance with the Court's order in this case that any objection you have be stated succinctly on the record. No speaking objections, please.

MR. FASEL: And I ask that you do the same.

BY MR. PHILLIPS:

Q. Sir, I'd like to focus on paragraph 12 of the answer. And that's on the next page. And I want to look at the last sentence in that response where it starts: "Defendants further deny that HTSUS subheading 6402.91.4050 covers footwear with uppers over 90 percent rubber or plastic, but specifically excludes footwear with foxing or foxing-like bands."

Do you see that sentence, sir?

A. Yes.

Q. My question: What factual information does Sterling Footwear, Incorporated have in reference to this statement that the subheading does not cover those certain things?

A. I don't know.

Q. Did you do anything to investigate this response?

Alderson Reporting Company
1-800-FOR-DEPO

Page 90

A. No.

MR. FASEL: I need talk to you for one second.

MR. PHILLIPS: Are we going off the record?

MR. FASEL: Yes, just for a minute.

MR. PHILLIPS: Counsel has requested a conference with his witness.

MR. FASEL: One second.

THE WITNESS: All right.

THE REPORTER: Off the record?

MR. PHILLIPS: We're going off the record.

(Recess.)

MR. PHILLIPS: We're back on the record. And I just note for the record that following or during the witness' response to my question regarding paragraph 12, defendant and his counsel left the room and had a discussion.

MR. FASEL: I object to that. I didn't -- didn't leave in the middle of any answer. There was a break and a pause after an answer. And after your question, an answer was given.

BY MR. PHILLIPS:

Q. Sir, I'd like to go back to paragraph 12. And that statement at the end of the paragraph: "The defendants further deny that HTSUS subheading 6402.91.405 covers footwear with uppers over 90 percent

Page 91

rubber or elastic but specifically excludes footwear with foxing or foxing-like bands."

What information, if any, does Sterling Footwear, Incorporated have that that HTSUS subheading does not cover the -- the items described in that answer?

A. And I didn't understand the question. Is that all the -- that's the question?

Q. That -- that was the question, sir. Let -- You see that statement there?

A. Yes.

Q. "The defendants deny that this subheading covers various items," correct? And that was filed -- that was an answer statement filed on behalf of the defendants, of whom Sterling Footwear, Incorporated is one, correct?

A. Yes.

Q. My question to you is: What information, if any, does Sterling Footwear, Incorporated have that the designated subheading in that answer response does not cover the items described in that response?

MR. FASEL: Calls for a legal conclusion. Calls for an expert opinion.

THE WITNESS: I still don't understand your -- your question.

Page 92

BY MR. PHILLIPS:

Q. Let me -- and understood, sir. Let me try to make this as easy as possible.

What I'm looking to find out is if Sterling Footwear, Incorporated has any factual information about that response. So what I'd like to know is: There's a statement in the answer that says that this subheading does not apply to certain items. Does Sterling Footwear, Incorporated know anything about what that subheading actually applies to?

A. Well, this -- it was -- that --

MR. FASEL: Objection. That's a compound question. Same objections as before to --

THE WITNESS: How do I answer this?

[Reporter requests clarification.]

MR. FASEL: Same objections as before.

BY MR. PHILLIPS:

Q. Sir, let me make it simpler for you. All I'm looking for, are there any facts that Sterling Footwear, Incorporated has that forms it or helps it understand whether or not that subheading applies to the items described in that answer?

MR. FASEL: Objection. Vague and ambiguous.

THE WITNESS: Yeah, the broker.

BY MR. PHILLIPS:

Page 93

Q. So Sterling Footwear, Incorporated has no evidence --

A. We --

Q. -- or information --

A. We relied --

Q. -- as to --

[Reporter requests attorney and witness speak one at a time.]

BY MR. PHILLIPS:

Q. My question, sir, was: So Sterling Footwear, Incorporated has no information in its possession as a corporation about whether or not that subheading applies to the items described in that answer?

A. We rely on a broker and Elon Pollack that what we -- what we did was right.

Q. Did Sterling Footwear, Incorporated rely on a broker and Mr. Pollack before it had its meeting with CBP in July 2007 -- I'm sorry, 2009?

A. I -- I'm not sure.

MR. FASEL: I'm going to object as compound question.

BY MR. PHILLIPS:

Q. Sir, let's move on to paragraph 13. And I'd like to focus on the last sentence there.

In this response it states that: "Defendants

Page 94

deny that HTSUS subheading 6402.91.405 was incorrect. Further states that plainti-" -- I'm sorry -- "defendants deny both generally and specifically that the footwear had textile uppers and a foxing-like band."

And my question, sir: Does Sterling Footwear, Incorporated have any knowledge of whether the footwear that it imported had textile uppers and a foxing-like band?

MR. FASEL: Objection. Calls for expert opinion. Calls for a legal conclusion.

THE WITNESS: Does Sterling Footwear have knowledge? Is that what your question, sir?

BY MR. PHILLIPS:

Q. Yes, sir.

MR. FASEL: Calls for speculation.

BY MR. PHILLIPS:

Q. You can answer the question, sir; yes, no or I don't know?

A. I don't know.

Q. Did you do anything to investigate whether Sterling Footwear, Incorporated had any knowledge of whether the footwear that it imported consisted of textile uppers and foxing-like bands?

MR. FASEL: Objection. Asked and answered. Harassing. Argumentative.

Page 95

THE WITNESS: I don't remember.

BY MR. PHILLIPS:

Q. You don't remember doing any investigation or you didn't do any investigation, sir?

MR. FASEL: Same objections.

THE WITNESS: I don't remember if I did or -- or didn't.

BY MR. PHILLIPS:

Q. Let's go on to paragraph 14, sir.

A. On the answer?

Q. On the answer, sir.

A. Okay.

Q. The next paragraph down. And I want to look -- it's the fourth line of that answer, the sentence that begins: "Deny, both generally and specifically, that HTSUS subheading 6404.19.5060 covers footwear with outer soles of rubber, plastic, leather or composition leather, uppers of textile materials and a foxing-like band."

Do you see that sentence, sir?

A. Yes.

Q. My question is: Does Sterling Footwear, Incorporated have any information regarding whether or not the listed subheading does or does not cover the footwear described in that response?

Page 96

A. I don't know.

Q. Did you do anything to investigate whether Sterling Footwear, Incorporated had any such knowledge?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: I don't remember.

BY MR. PHILLIPS:

Q. Did Sterling Footwear, Incorporated have any knowledge institutionally of foxing-like bands?

MR. FASEL: Objection. Asked and answered. Harassing. Argumentative.

BY MR. PHILLIPS:

Q. Please answer the question, sir.

A. Say that again? I --

Q. Did Sterling Footwear, Incorporated, for which you are a 30(b)(6) representative, did that corporation have any institutional knowledge of what foxing-like bands were or meant?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Did you do anything to investigate whether anyone at the corporation had such knowledge?

MR. FASEL: Objection. Argumentative. Harassing. Asked and answered.

THE WITNESS: With the broker?

Page 97

BY MR. PHILLIPS:

Q. My question, sir, was: Did you do any investigation to determine whether anyone who worked for Sterling Footwear, Incorporated had any knowledge of this classification code or what a foxing-like band was?

MR. FASEL: Same objections.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. You don't know whether you did any investigation or you don't know whether anyone had any knowledge?

MR. FASEL: Same objections.

THE WITNESS: That anyone had any knowledge. I --

BY MR. PHILLIPS:

Q. Did you do any investigation to find out if anyone had any knowledge?

MR. FASEL: Same objections.

THE WITNESS: I don't remember.

BY MR. PHILLIPS:

Q. You don't remember whether or not you did an investigation or you didn't do an investigation?

MR. FASEL: Same objections.

THE WITNESS: I don't know if I did or I -- I did or not. It's been so long.

25 (Pages 94 to 97)

Page 98

BY MR. PHILLIPS:

Q. Please turn to page, sir --

MR. FASEL: And I'd also note that the -- the attorney has rolled his eyes at the deponent and it's constituting harassing the deponent.

MR. PHILLIPS: I'd like to note for the record that counsel continues to make speaking objections. He's making speaking objections that are not in response to any question posed, but he's merely making speeches on the record.

MR. FASEL: That was a speaking objection you just made.

MR. PHILLIPS: And you can mark that point in the transcript, again, as another example of the speeches that counsel is making on the record.

BY MR. PHILLIPS:

Q. Sir, could you turn to page 5 of the answer? And I want to look at paragraph 24.

And the first sentence states that: "Admit that there was a meeting with import specialists by individuals at Sterling Footwear."

And that's correct, individuals from Sterling Footwear met with CBP in July 2007?

A. Yes.

Q. I misspoke. I believe it was July 2009, not

Page 99

July 2007.

Now, sir, if you will focus on paragraph 25 of the answer. And in this the defendants, which includes Sterling Footwear, Incorporated, "admit that import specialists provided handouts Sterling Footwear." Do you see that?

A. Yes.

Q. Can you tell me what happened to those handouts that were provided to Sterling Footwear, Incorporated?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: I don't know. I wasn't there.

BY MR. PHILLIPS:

Q. Did you do anything to investigate, in preparation for your testimony here today, what was done with those handouts that were provided to Sterling Footwear?

MR. FASEL: Objection. Asked and answered. Harassing. Argumentative.

THE WITNESS: I don't remember.

BY MR. PHILLIPS:

Q. You don't remember whether or not you did any investigation, sir?

MR. FASEL: Same objections.

THE WITNESS: I don't remember if I -- I saw

Page 100

this handout.

BY MR. PHILLIPS:

Q. You don't remember whether you ever saw this handout, sir? Or you don't --

A. That's correct.

Q. So it's your testimony, sir, that you don't think you ever saw these handouts?

A. Perhaps I haven't seen it.

Q. Sir, if you would turn to page 10 of the answer. And I'd like to look at the fourth -- what is under the caption "Fourth Affirmative Defense."

And paragraph 4 under this fourth affirmative defense states that: "All the goods and/or footwear alleged to be misclassified by defendants in plaintiffs' complaint were, in fact, properly and legally classified pursuant to the Harmonized Tariff Schedule of the United States by defendants."

Do you see that, sir?

A. Yes.

Q. Does Sterling Footwear, Incorporated have any knowledge regarding whether or not the 337 entries in this complaint were properly or improperly classified?

MR. FASEL: Calls for a legal conclusion. Calls for expert opinion.

BY MR. PHILLIPS:

Page 101

Q. And I'm merely asking, sir, if Sterling Footwear, Incorporated has any factual evidence or information regarding whether or not the 337 entries referenced in the complaint were or were not properly classified?

MR. FASEL: Same objections.

A. It's properly classified based on the broker.

Q. And who was that broker?

MR. FASEL: Objection. Compound as to 337 entries.

THE WITNESS: I don't re- -- I don't know.

BY MR. PHILLIPS:

Q. And what information did that broker provide?

MR. FASEL: Objection. Vague and ambiguous as to which broker you're referring to. It's 337 different entries.

THE WITNESS: The broker that worked with Ms. Huynh.

BY MR. PHILLIPS:

Q. Is there any document that shows any communications between this broker, who you cannot name, and Ms. Huynh?

MR. FASEL: Objection. Calls for speculation. Argumentative.

THE WITNESS: No.

Alderson Reporting Company
1-800-FOR-DEPO

Page 102

BY MR. PHILLIPS:

Q. Sir, could you note for the record the document that your counsel just put in front of you, please?

A. Yeah, GOV0003939.

Q. Thank you, sir. We can put that aside.

Sir, I'd like to step back to the events that occurred after your employees from Sterling Footwear, Incorporated met with CBP in July 2009.

After that meeting, did you give your employees, Ms. Huynh and Ms. Ng, instructions to keep doing things the way they had been doing?

MR. FASEL: Objection. Vague and ambiguous as to things and doing. And it's incomprehensible.

THE WITNESS: No, I instruct them to talk to Mr. Elon Pollack on on- -- all ongoing orders.

BY MR. PHILLIPS:

Q. Did you give them any instructions on how to fill out any paperwork they provided to customs brokers?

A. No.

Q. Sir, you can put those documents aside. I am going to pass out another document.

Sir, could you tell me what you -- what you just circled and on which document you did so?

A. Oh, just the GOV -- GOV3 -- is it 0003939.

Page 103

Q. And what did you circle on that document?

A. I just circled where it says, "I need classification help on this one."

Q. And why did you circle that?

A. Because it seems like my employee doesn't know and is asking for help from a custom broker --

Q. And in that same --

A. -- to clarify the goods.

Q. And in that same document, isn't your employee also providing that custom broker with a number of other classification codes for which that employee did not ask for any help?

MR. FASEL: Objection. Calls for speculation. The document speaks for itself.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. All I see is styles number and classification numbers.

Q. And my question to you, sir, is: On that same document where you pointed out one sentence, there are also a number of classification codes provided by your employee to the customs broker in which there is no request for any assistance; that's correct, right?

MR. FASEL: Objection. Lacks foundation. Assuming that she never asked for those before.

Page 104

Misstates facts. Asked and answered. Argumentative.

BY MR. PHILLIPS:

Q. Please answer the question --

MR. FASEL: Harassing.

BY MR. PHILLIPS:

Q. -- sir.

Don't cut off my objections.

THE WITNESS: Maybe.

BY MR. PHILLIPS:

Q. Please put that document aside, sir.

MR. PHILLIPS: Mark this as Exhibit 10.

(Whereupon Exhibit 10 was marked for identification.)

BY MR. PHILLIPS:

Q. Sir, you've been handed what has been marked as Exhibit 10. And Exhibit 10 is a copy of defendants' first amended responses to plaintiffs' first set of interrogatories. And, sir, I have only a few questions on this. I would like to refer you to page 10 of this document, which is the certification.

MR. FASEL: Object. There is no page 10.

BY MR. PHILLIPS:

Q. Sir, do you see after page 9 of defendants' response there is a page noted "certification?"

MR. FASEL: Certification of service by mail?

Page 105

THE WITNESS: Where is that?

MR. FASEL: We don't have any other certification.

MR. PHILLIPS: Did we -- let's go off the record.

(Recess.)

BY MR. PHILLIPS:

Q. I'm going to hand out another document. This is going to be a corrected version of the one I previously handed out, so we are not going to use that first one; we'll use another one. And we will label this Exhibit 11.

(Whereupon Exhibit 11 was marked for identification.)

BY MR. PHILLIPS:

Q. And, sir, as we were discussing before, after page 9 of this document there is a certification that you signed.

A. Yes.

Q. And in this certification you're attesting to the truth and veracity of these interrogatory responses, correct?

A. Yes.

MR. FASEL: Objection. Calls for a legal opinion.

Page 106

BY MR. PHILLIPS:

Q. And, sir, the fourth line of this -- so, actually, started on the third line you state that: "I have personal knowledge of the information supplied in this response and/or I have consulted with other Sterling Footwear, Incorporated and Ng Branding, LLC employees who have personal knowledge of this information."

Do you see that?

A. Yes.

Q. Could you tell me who you consulted with at Sterling Footwear or Ng Branding before certifying this?

MR. FASEL: I'm going to object as to the fact that Counsel did not finish the sentence.

MR. PHILLIPS: Fair enough.

BY MR. PHILLIPS:

Q. Sir, would you like me to read the sentence --

A. Yes, please.

Q. -- the conclusion of it?

So, sir, in this declaration in this certification you state that: "I, Alex Ryan Ng, chief executive officer of Sterling Footwear, Incorporated and Ng Branding, LLC, having prepared the foregoing amended responses to the United States Interrogatories 1 through 17, hereby declare under the penalties of perjury that I

Page 107

have personal knowledge of the information supplied in the responses and/or I have consulted with other Sterling Footwear, Incorporated and Ng Branding, LLC employees who have personal knowledge of the information supplied in the responses and/or I have reviewed documents containing information supplied in the interrogatories and these responses, based on information and belief, are true and correct."

Did I read that correctly, sir?

A. Yes.

Q. And my question for you, sir, is: In this you state that you consulted with other Sterling Footwear and Ng Branding, LLC employees. What I would like to know is, who at those two companies you consulted with.

MR. FASEL: Objection. Misstates the substance of the --

[Reporter requests clarification.]

MR. FASEL: -- the substance of the certification as it says "and/or consulted with employees." It doesn't say that he, in fact, did consult.

BY MR. PHILLIPS:

Q. With that, sir -- and I don't believe you provided me with an answer to my previous question.

Let me ask you this: Did you consult with any

Page 108

other Sterling Footwear or Ng Branding employees before signing this certification?

A. Did I talk to anyone?

Q. Yes, sir.

A. No.

Q. And, sir, let me just break that down. Did you consult with anyone from Sterling Footwear, Incorporated before signing this certification?

MR. FASEL: Ever?

BY MR. PHILLIPS:

Q. Do you understand my question, sir?

A. Not really.

Q. You signed this certification on September 30th, 2014, correct?

A. Yes.

Q. And in this certification, you're attesting that the information contained in these response is true and correct to the best of your knowledge; isn't that right?

A. Yes.

Q. And in this certification, you stated that you have consulted with other Sterling Footwear, Incorporated employees, correct?

MR. FASEL: Objection. Misstates the substance of the certification.

Page 109

THE WITNESS: That's what it said on here, yes.

BY MR. PHILLIPS:

Q. And when you signed this, had you consulted with any Sterling Footwear, Incorporated employees?

A. No.

Q. When you signed this, had you consulted with any Ng Branding, LLC employees?

A. No.

Q. Sterling Footwear used a number of different customs brokers between the period of July 2007 and August 2009, correct?

MR. FASEL: Objection. Lacks foundation. Assumes facts not in evidence.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Did you do anything to investigate how many customs brokers Sterling Footwear, Incorporated utilized during that period of time, in preparation for your testimony here today?

A. No, but I trust my employees for them to try to work with the right person to bring these good in.

Q. Do you know if your employees -- do you know how many customs broker your employees chose to work with during that time period of July 2007 through

Page 110

August 2009?

MR. FASEL: Calls for speculation.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Do you know how Sterling Footwear, Incorporated chose the various import brokers that it used during July -- during the period of July 2007 through August 2009?

A. You asked me do I know how they -- how they choose --

Q. Yes.

A. -- a broker?

Yes.

Q. And how did Sterling Footwear choose its brokers?

A. Based on price. Based on -- service. And based on how quickly can they performs their -- their duties.

Q. And how do you know these are the factors Sterling Footwear, Incorporated used in choosing customs brokers?

A. Because I told my employee that this is what we need to do. We need to look for -- for brokers that give us good rates and good service.

Q. Why did Sterling Footwear utilize brokers

Page 111

around the country?

MR. FASEL: Objection. Calls for -- calls for speculation. Assumes facts not in evidence. Lacks foundation.

THE WITNESS: I don't know.

BY MR. PHILLIPS:

Q. Did you do anything to investigate the reasons why Sterling hired the brokers that it did during the period of July 2007 through August 2009?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Are there any documents that Sterling Footwear has that explained the rationale or the reasons behind why it hired the customs brokers that it did?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: No.

BY MR. PHILLIPS:

Q. Did you do any investigation, in preparation for your testimony, to ascertain what sort of documents Sterling Footwear may have had?

MR. FASEL: Objection. Asked and answered. Harassing. Argumentative.

THE WITNESS: No.

BY MR. PHILLIPS:

Page 112

Q. Did Sterling Footwear, Incorporated -- well, strike that.

What did Sterling Footwear, Incorporated do with the prepenalty and penalty notices that it received in 2012 from Customs and Border Protection?

MR. FASEL: Objection. Calls for speculation. Vague and ambiguous.

THE WITNESS: What did they do with the notice?

BY MR. PHILLIPS:

Q. Yes.

A. Is that what your question is?

Q. What did the company do with the notices that they received for prepenalty and penalty from Customs and Border Protection?

MR. FASEL: Same objections. Vague and ambiguous as to do with.

THE WITNESS: Do you want my opinion?

BY MR. PHILLIPS:

Q. I want to know based on any investigation you did as a 30(b)(6) witness to ascertain what the company did with the documents that it received from CBP.

MR. FASEL: Same objections.

BY MR. PHILLIPS:

Q. So with that understanding, as a 30(b)(6)

Page 113

witness for Sterling Footwear, Incorporated, what did the company do with the documents that it received, the prepenalty and penalty notices from Customs and Border Protection in 2012?

A. I believe it was given to our former attorney, Elon Pollack.

Q. So Sterling Footwear, after receiving the documents, provided them to its counsel?

MR. FASEL: Objection. Asked and answered.

THE WITNESS: Maybe.

MR. FASEL: Argumentative.

BY MR. FASEL:

Q. Did you do anything to investigate what Sterling Footwear did with the documents it received?

MR. FASEL: Objection. Which documents?

BY MR. PHILLIPS:

Q. Did you understand my question, sir?

A. Not really.

Q. You testified that Sterling Footwear, Incorporated received the prepenalty and penalty notices from Customs and Border Protection in 2012, right?

A. I know we received something.

Q. Did you do any -- anything to investigate what Sterling Footwear did with those documents, in preparation for this testimony?

Alderson Reporting Company
1-800-FOR-DEPO

Page 114

MR. FASEL: Objection. Asked and answered. Harassing.

THE WITNESS: I believe it was given to the attorney.

MR. PHILLIPS: We're going to mark this as --

THE REPORTER: 12...

MR. PHILLIPS: -- 12.

(Whereupon Exhibit 12 was marked for identification.)

BY MR. PHILLIPS:

Q. Sir, what you've been handed and is being marked as Exhibit 12 is defendants' -- which includes Sterling Footwear, Incorporated -- response to request of the United States for interrogatory responses and for document production.

And please take whatever time you need to familiarize yourself with the document. I'm not going to be asking you any pointed question about it. I'm going to be asking you questions generally about what Sterling Footwear did in collecting documents to produce in this case.

Please tell me when you've had a chance to familiarize yourself with this generally.

And to orient you to the document, sir --

MR. FASEL: I'm sorry, are you ready?

Page 115

THE WITNESS: No, no. Hold on.

BY MR. PHILLIPS:

Q. I'm just trying to orient you to the document, sir. The request for document production and your responses begin on page 13 of this document.

A. Okay.

Q. So that's the earliest portion of the document we'll be talking about.

A. There's a lot in here, sir.

Q. Understood, sir. And I'm not asking you for all the particular -- your questions -- answers from that document. And, sir, generally, if there's something that you need to refer to, we can go back, if that's acceptable.

A. Yeah, that's fine.

Q. So let's do that.

So, sir, you understand that plaintiff in this case, the United States, sent request for documents to the defendants in this case?

MR. FASEL: Objection. Calls for a legal opinion.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. Okay. And how was Sterling Footwear, Incorporated informed of this request for documents?

Page 116

Did the company receive this request?

MR. FASEL: Objection. In as far as it violates attorney-client communications -- attorney-client privilege.

BY MR. PHILLIPS:

Q. Strike that question.

Then we'll ask it this way, sir: Did anyone from Sterling Footwear, Incorporated ever review the document request from the United States in this case?

A. The attorney.

Q. And aside from the attorney, sir, I'm asking if any employee, you or any of the other employees from Sterling Footwear, ever reviewed the request for documents in this case?

A. Myself and the attorney.

Q. So you reviewed the request for documents personally, sir?

A. I looked at it, yes.

Q. How did Sterling Footwear go about collecting documents to produce in response to these requests from the United States?

MR. FASEL: Objection. Calls for speculation.

THE WITNESS: How do we collect them, you said?

BY MR. PHILLIPS:

Page 117

Q. How did the company collect documents that were produced in response to the request from the government?

MR. FASEL: Calls for speculation.

THE WITNESS: From --

BY MR. PHILLIPS:

Q. If the answer is "I don't know", sir, that's fine.

A. Yeah, I -- I don't -- I don't know.

Q. Did you do any investigation, prior to your testimony today, to ascertain what steps Sterling Footwear, Incorporated took to collect documents that it would produce in response to the request from the government?

MR. FASEL: Objection. Asked and answered. Harassing. And argumentative.

THE WITNESS: Did you ask me if I did anything to collect information? Is that -- is that your question, sir?

MR. PHILLIPS: Can we have the question read back, because I don't remember my exact formulation?

(Record read as follows:

"Q. Did you do any investigation, prior to your testimony today, to ascertain what steps Sterling Footwear,

Alderson Reporting Company
1-800-FOR-DEPO

Page 118

Incorporated took to collect documents that it would produce in response to the request from the government?")

THE WITNESS: I don't remember.

BY MR. PHILLIPS:

Q. You don't remember reviewing this or you don't remember learning about the steps that Sterling took? And if the answer is "I don't know", sir, that's fine.

A. Yeah, that's --

Q. Did you --

A. I don't know.

Q. Did you personally conduct any search of any documents you may have had in your possession that may have been responsive to requests from the government for documents?

A. Maybe.

Q. Do you know whether or not you conducted any review of documents you have in your possession?

A. I might, but I don't remember --

Q. Do you have documents --

A. -- exactly.

Q. I apologize, sir. Were you finished?

A. No -- yes, I am.

Q. Okay. Do you have any documents in your

Page 119

possession that are responsive to the requests in the government's document request?

A. Not right now, no.

Q. Did you have them at any time?

MR. FASEL: Objection. Vague and ambiguous as to time. Overly broad as to time.

THE WITNESS: Can you tell me when?

BY MR. PHILLIPS:

Q. At any time, sir. You stated that you no longer have documents in your possession, correct?

A. That's correct.

Q. When did you last have possession of those documents?

A. When it was turned over to the attorney.

Q. And when was that, sir?

A. It's been a while, maybe years ago.

Q. How many years, sir?

A. Estimate, maybe 2012.

Q. Did you turn over all of the documents in your possession to your attorney, sir?

MR. FASEL: Objection. Vague and ambiguous as to documents -- all the documents.

THE WITNESS: Whatever I have.

BY MR. PHILLIPS:

Page 120

Q. So everything that you had related to Sterling Footwear, Incorporated in this case, you turned over to your -- your attorney?

A. Yes.

Q. Did Sterling Footwear, Incorporated make any request of any of the other 11 employees of the company that they provide any document they have to Sterling Footwear?

MR. FASEL: Objection. Calls for speculation. Calls for a legal opinion. Violates attorney-client privilege.

BY MR. PHILLIPS:

Q. I'm merely asking you, sir, for the fact of whether or not Sterling Footwear, Incorporated made a request to any of its employees that those employees return or provide to Sterling any documents those employees may have in their possession, custody or control.

MR. FASEL: Same objections.

BY MR. PHILLIPS:

Q. You can answer the question, sir.

A. I believe so.

Q. And why do you say you believe so?

A. Because -- because the attorney instruct us to hand over all the documents.

Page 121

Q. Did any of Sterling's former employees provide documents to the company or their attorney in this case?

MR. FASEL: Objection. Calls for speculation. How is he supposed to know that?

[Reporter requests clarification.]

MR. FASEL: How is he supposed to know that?

MR. PHILLIPS: I will note for the record that this witness has been designated as a 30(b)(6) representative for Sterling Footwear, Incorporated. And among the various topics for which this witness was asked to be prepared, concerns Category 2, Sterling and Ng Branding's responses to plaintiff's interrogatories and request for production. And I'll note for the record that it does not appear that the witness is prepared to provide responses on this topic in this 30(b)(6) deposition.

MR. FASEL: I'd also like to add -- I forgot to put this in before in the record -- that I received the notice of -- of deposition on Wednesday of this week. It was not served with proper notice. But we appeared at this deposition, nevertheless, and the witness is properly prepared. Do you want to serve -- give me more time? Serve it timely.

BY MR. PHILLIPS:

Q. Sir, my question to you --

Alderson Reporting Company
1-800-FOR-DEPO

Page 122

MR. PHILLIPS: And, actually, can -- can the reporter read back the question before the colloquy -- before the attorneys, please?

(Record read as follows:

"Q. Did any of Sterling's former employees provide documents to the company or their attorney in this case?")

BY MR. PHILLIPS:

Q. And, sir, I don't believe we got a answer to that question. So could you please answer the question whether or not any of Sterling's former employees provided documents to either the company or anyone else in response to document requests in this case?

MR. FASEL: Objection. Compounds. Calls for speculation.

THE WITNESS: Probably to the attorney.

BY MR. PHILLIPS:

Q. Do you have any -- any knowledge of whether or not those individuals did, in fact, provide any documents?

A. I am pretty sure they did. If not, the attorney would have contacted me.

[Reporter requests clarification.]

THE WITNESS: If not -- yes.

Page 123

BY MR. PHILLIPS:

Q. Do you know if Sterling Footwear, Incorporated's former employees were requested to provide documents --

MR. FASEL: Objection.

BY MR. PHILLIPS:

Q. -- to either the company or anyone else in this case?

[Reporter requests clarification.]

BY MR. PHILLIPS:

Q. -- requested to provide documents either to the company or to anyone else?

MR. FASEL: Objection. Calls for speculation. And compound.

THE WITNESS: Yes, to the attorney.

BY MR. PHILLIPS:

Q. And how were Sterling's employees notified of this request to provide documents?

A. From the attorney.

Q. Did anyone from Sterling contact these employees and ask them to provide documents?

MR. FASEL: Objection. Calls for speculation. Violates attorney-client privilege.

BY MR. PHILLIPS:

Q. Sir, I'm not asking --

Page 124

A. I don't remember.

Q. -- anything about what your attorney may have done. I'm asking if you or anyone else from Sterling Footwear contacted the former employees of the company to request that they provide documents that they may have in their possession, custody or control related to the actions in this case.

MR. FASEL: Calls for speculation.

THE WITNESS: Perhaps the attorney did.

BY MR. PHILLIPS:

Q. Sir, do you -- so just to clarify: Sir, you do not know whether or not the former employees of Sterling were contacted and requested to provide documents, correct?

A. I'm not sure.

Q. Sir, between the period of July 2007 and August 2009, what was Sterling Footwear, Incorporated's document retention policy?

MR. FASEL: Objection. Vague and ambiguous as to document retention policy.

THE WITNESS: Can you explain?

BY MR. PHILLIPS:

Q. Between that time --

A. I don't understand.

Q. -- period, did Sterling have any rules or

Page 125

guidelines about how documents were maintained for the business?

A. Yes.

Q. What were those rules and guidelines?

A. That they keep in -- on -- in a file.

Q. And where was that file maintained?

A. You're talking about when?

Q. Where.

A. Where? At the office.

Q. And who maintained that file?

A. The individuals. The employees.

Q. The employees of Sterling --

A. Employees.

Q. -- each maintained individual files?

MR. FASEL: Objection. Misstates testimony.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. When Sterling Footwear went inactive, what happened to those files that each individual employee maintained?

MR. FASEL: Objection. Vague and ambiguous as to inactive.

BY MR. PHILLIPS:

Q. Do you understand what I mean by inactive, sir?

Alderson Reporting Company
1-800-FOR-DEPO

Page 126

A.  Yes.

Q.  My question, then, is:  When Sterling Footwear went inactive, what happened to the files that each of those employees of the company maintained?

MR. FASEL:  Same objection.

THE WITNESS:  I believe it's given to the attorney.

BY MR. PHILLIPS:

Q.  Were there any written procedures provided to any employee of Sterling Footwear regarding how they were supposed to maintain files or what files they should maintain?

MR. FASEL:  Objection.  Compound.

THE WITNESS:  No.

BY MR. PHILLIPS:

Q.  And --

MR. FASEL:  Are you guys waving your Ng Branding deposition?  Because we've gone past the point now and we're into the point at which Ng Branding was supposed to begin.

MR. PHILLIPS:  Oh, and that's what I was just going to talk about.  I believe that I am finished with the questions we have for Sterling Footwear.  We will reserve our right.  The government still asserts that the witness was not properly prepared.  We reserve all

Page 127

rights that we have.  I'm going to not close this deposition presently and we can discuss afterwards whether or not these answers are sufficient.  But we will end the deposition at this point today for Sterling Footwear.  And then begin very shortly, and should be briefly, the deposition for Ng Branding, LLC.

MR. FASEL:  And do you have follow-up questions in regards to him individually?

MR. PHILLIPS:  I may have a few, but I can't imagine it's more than 10 or 15 minutes.

MR. FASEL:  Okay.

MR. PHILLIPS:  So we can either do that at the conclusion of the Ng Branding, LLC deposition or --

MR. FASEL:  It's your call.

MR. PHILLIPS:  -- create something separate.  We'll -- then we'll do it at the conclusion.

So, with that, we are going to end the deposition for today, pursuant to the caveats that I -- I previously mentioned.

MR. FASEL:  I'm going to object to counsel's opinion that the witness was not properly prepared and that the deposition will continue on a further date.

(Whereupon, the deposition adjourned at 2:19 p.m.)

-oOo-

Page 128

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.  Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____
Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of _____, 2015, and executed the above certificate in my presence.

_____
NOTARY PUBLIC IN AND FOR

_____
County Name

MY COMMISSION EXPIRES:

Page 129

STATE OF CALIFORNIA     )
                        )  ss.
COUNTY OF LOS ANGELES   )

I, Elizabeth Borrelli, Certified Shorthand Reporter, Certificate No. 7844, for the State of California, hereby certify:

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition;

Prior to being examined the deponent was first duly sworn by me;

The foregoing transcript is a true record of the testimony given;

Before completion of the deposition, review of the transcript [ ] was [X] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

Dated_____.

_____
ELIZABETH BORRELLI, CSR 7844

# EXHIBIT G

Deposition of Ng Branding, LLC

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

_____

                                        )

UNITED STATES,                          )

                                        )

                    Plaintiff,          )

                                        ) Case No. 12-0193

            vs.                         )

                                        )

STERLING FOOTWEAR, INC., ALEX NG, )

and NG BRANDING, LLC                    )

                                        )

                    Defendants.         )

_____)

                                        Friday, January 16, 2015

                                        Long Beach, California

        Deposition of ALEX NG 30(b)(6) for NG BRANDING, LLC, taken on behalf of the Plaintiff, at 1 World Trade Center, Suite 1200, Long Beach, California, commencing at 2:27 p.m. and ending at 2:58 p.m., on Friday, January 16, 2015, before Elizabeth Borrelli, a Certified Shorthand Reporter in the State of California, License No. 7844, CCLL, CLR.

Job No. 55355

Pages 1 to 30

Page 2

APPEARANCES

For the Plaintiff:
    UNITED STATES DEPARTMENT OF JUSTICE
    CIVIL DIVISION
    BY: VINCENT D. PHILLIPS
    Attorney at Law
    1100 L Street N.W.
    Washington, DC 20530
    (202) 305-4591
    vincent.phillips2@usdoj.gov

For the Defendants:
    FASEL LAW
    BY: THOMAS A. FASEL
    Attorney at Law
    610 Newport Center Drive
    Suite 810
    Newport Beach, California 92660
    (949) 706-3188
    taf@fasellaw.com

Also Present:
    MEREDITH A. JOHNSON
    RYAN WONG, Videographer

Page 3

INDEX
WITNESS                          PAGE
ALEX NG 30(b)(6) for NG BRANDING, LLC
  Examination by Mr. Phillips        4, 27
  Examination by Mr. Fasel              26


        EXHIBITS
EXHIBIT NO.                      PAGE
Exhibit 1   Notice of Deposition        4
Exhibit 2   Driver's License of Alex Ryan Ng   21


        INSTRUCTION NOT TO ANSWER
            Page  Line
              15   12
              27   17

Page 4

ALEX NG 30(b)(6) for NG BRANDING, LLC
having been duly administered
an oath in accordance with CCP 2094,
was examined and testified as follows:
EXAMINATION
BY MR. PHILLIPS:

Q. Sir, and do you understand that you're appearing at this deposition as a 30(b)(6) corporate designated for Ng Branding, LLC?

A. Yes.

Q. And in that capacity, I will be asking you questions about corporation and not about you personally. Do you understand that?

A. Yes.

MR. PHILLIPS: We'll mark this again as Exhibit 1.

(Whereupon Exhibit 1 was marked for identification.)

BY MR. PHILLIPS:

Q. Sir, this is a notice of deposition, as we discussed earlier.

MR. FASEL: I'm going to object to this Exhibit 1 on the basis that I -- counsel did not receive the notice of deposition until Wednesday, which is two days prior to today. It lacks proper or reasonable

Page 5

notice.

MR. PHILLIPS: And we will note for the record that after receiving the notice of deposition with the time and the date, counsel for the defendants agreed to provide a witness on these dates and made no mention prior to his mention right now that time was insufficient for him to prepare the witness for the topics noticed in the deposition.

MR. FASEL: That's actually incorrect. I object to that. Counsel agreed to the depositions prior to receiving the notice of depositions and only received them late on Wednesday.

MR. PHILLIPS: Your objection is noted, sir.

BY MR. PHILLIPS:

Q. Mr. Ng, before you is the notice of deposition. And we had looked at this earlier. If you will turn to the second page of this notice of deposition, there are a number of topics, 10 to be precise.

MR. FASEL: You don't have to go through them individually if you don't want to.

MR. PHILLIPS: I just want --

MR. FASEL: Now, you do.

BY MR. PHILLIPS:

Q. Eight of these -- and I just want to note for

Page 6

the record, sir, if you'll -- if you'll look, Topics 1, 2, 3, 4, 5, 6, 7 and Topic 10 are related to Ng Branding, LLC. Do you see that?

A. On 1 and 2 is Sterling and Ng Branding, right?

Q. Yes.

A. Okay.

MR. FASEL: Everything but, I think, Counsel said 8 and 9.

MR. PHILLIPS: Except 7 and 8.

MR. FASEL: 7 and 8. Everything but 7 and 8.

THE WITNESS: Okay.

MR. PHILLIPS: Oh, I misspoke. You were all correct. Everything except 8 and 9. I'm looking at the wrong ones.

MR. FASEL: I was right about something, right?

MR. PHILLIPS: I appreciate that.

MR. FASEL: Get that on the record.

MR. PHILLIPS: I appreciate that.

BY MR. PHILLIPS:

Q. So, sir, you have been designated to speaking for Ng Branding, LLC on these eight topics, correct?

A. Yes.

Q. And I am correct that -- well, could you tell me what your preparations were today -- strike that.

Page 7

What did you do to prepare to provide responses for Ng Branding, LLC at this deposition today?

MR. FASEL: Objection. Overly broad as to time.

THE WITNESS: I talked with my attorney.

BY MR. PHILLIPS:

Q. Did you speak with anyone else, sir?

A. No.

Q. When did you speak with your attorney?

A. Yesterday, today and prior to the deposition.

Q. For how long did you speak with your attorney?

A. We -- we talked a few times. Sometimes for hours.

Q. During any of those meetings with your attorney, did you review documents?

A. We just talk in general, but I have reviewed the documents about three months ago.

Q. Sir, could you tell me when Ng Branding was created?

A. Estimate, February 2009.

Q. And for what purpose was Ng Branding, LLC created?

A. Ng Branding was created to take on licensed brand.

Q. And what was that license brand?

Page 8

A. Robin's Jean.

Q. How many employees did Ng Branding have?

A. About -- well, they share the work. About 12.

Q. Okay. And when you said "they share the work", what -- what do you mean by that?

A. Well, because we have employees that work on Sterling and also on Ng Branding.

Q. So was -- there was -- so is your testimony there was overlap between the attorneys who worked for both Sterling Footwear, Incorporated --

MR. FASEL: Objection.

BY MR. PHILLIPS:

Q. -- and Ng Branding, LLC?

MR. FASEL: I think you misspoke. You said for the attorneys that worked for...

MR. PHILLIPS: I apologize. Thank you.

BY MR. PHILLIPS:

Q. Sir, is it your testimony that the employees that worked for Ng Branding, LLC also worked for Sterling Footwear, Incorporated?

A. Yes.

Q. Did those employees perform -- those employees of Sterling Footwear who working for Ng Branding, LLC, did they work out of the offices of Sterling Footwear, LLC -- Sterling Footwear, Incorporated? I apologize.

Page 9

A. Yes.

Q. Of the 12 employees that Ng Branding had, how many of them were the same employees that Sterling Footwear, Incorporated had?

A. The same.

Q. Did Ng Branding, LLC ever import any merchandise into the United States?

A. Yes.

Q. How much merchandise did Ng Branding, LLC import?

A. I don't remember off my head.

Q. Did you review any documents or talk to any employees of Ng Branding, LLC to determine how much merchandise the company imported?

A. No.

Q. What type of merchandise did Ng Branding, LLC import?

A. Shoes.

Q. What types of shoes, sir.

A. A variety of type -- variety of shoes.

Q. Could you provide me some specifics on the types in that variety?

A. Heels. Sandals.

Q. Did Ng Branding import any -- I believe you referred to them as sports shoes?

## Page 10

A. Maybe.

Q. Who, at Ng Branding, LLC, was responsible for importing this merchandise into the United States?

A. I don't understand the question, sir.

Q. Fair enough.

Did Ng Branding, LLC have various departments within it?

A. Various department?

Q. Yes, was there -- for example, was there a production department at Ng Branding, LLC?

A. Yes.

Q. And who worked in that production department at Ng Branding?

A. Janet Huynh and Nancy Ng.

Q. And those are the same Ms. Huynh and Ms. Ng that worked for Sterling Footwear, Incorporated?

A. Yes.

Q. And were Ms. Ng and Ms. Huynh responsible for working with customs brokers for all of Ng Branding, LLC's importations?

MR. FASEL: Objection. Compound.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q. Does Ng Branding, LLC still exist?

MR. FASEL: I'm going to object as to vague

## Page 11

and ambiguous as to exist.

[Reporter requests clarification.]

MR. FASEL: Vague and ambiguous as to exist.

THE WITNESS: What do you mean by "exist", sir?

BY MR. PHILLIPS:

Q. Is Ng Branding, LLC still an active corporation?

A. It's active, but it's not operating.

Q. And you were an owner of Ng Branding, LLC, correct?

A. Yes.

Q. And the other owner of Ng Branding is Mr. Alan Wu; is that correct?

A. Yes.

Q. When was the last year for which Ng Branding, LLC filed a tax return?

A. 2010.

Q. And on that 2010 --

A. Oh, I'm sorry, it was 2014.

Q. So 2014 was the last year for which Ng Branding filed a tax return?

A. That's correct.

Q. How much income did Ng Branding, LLC report in that tax return?

## Page 12

A. What year, sir?

Q. For 2014.

A. Zero.

Q. Does Ng Branding, LLC have -- maintain any office space anywhere?

A. What do you mean "office space"?

Q. Does it maintain any facility where it receives mail or has employees or maintains files or anything like that?

A. No.

Q. Does Ng Branding have any assets?

A. No.

Q. Did Ng Branding ever have any income?

MR. FASEL: Objection. Overly broad as to time.

THE WITNESS: Do you have a time?

BY MR. PHILLIPS:

Q. Any time after its creation through 2010 when you -- I'm sorry -- yes, 2010 when you said it went inactive.

A. Perhaps, yes.

Q. Did you do any -- did you do anything to investigate what, if any, income Ng Branding, LLC had?

A. Did I do anything?

Q. Did you do any investigation, prior to your

## Page 13

testimony here today, to investigate what, if any, income Ng Branding, LLC ever earned?

A. All I know is that we stopped doing business in 2000 -- late 2009, early 2010.

Q. And why did Ng Branding, LLC stop doing business in late 2009, early 2010?

A. Because there was no more business and that -- because of this lawsuit, this allegation.

Q. Ng Branding, LLC stopped doing business because of this lawsuit?

A. It just stopped because there's no more business.

Q. And was the business that Ng Branding, LLC was doing, was that related to the importations that are at issue in this case?

MR. FASEL: Objection. Calls for a legal --

THE WITNESS: What -- what do you mean, sir?

BY MR. PHILLIPS:

Q. Sir, you stated that Ng Branding, LLC stopped doing business based on this lawsuit, correct?

A. And it's -- there's -- and there's no business.

Q. And is the reason there was no business because Ng Branding, LLC's business was related to the importation that Sterling Footwear, Incorporated was

4 (Pages 10 to 13)

Page 14

also dealing with?

MR. FASEL: Objection. Incomprehensible. I don't understand what you're asking either.

THE WITNESS: What --

BY MR. PHILLIPS:

Q. Do you understand my question, sir?

A. No.

Q. Why did Ng Branding, LLC stop doing business?

A. Oh, because there's no more business.

Q. And why was there no more business for Ng Branding, LLC?

A. Because we don't have the license.

Q. And why did Ng Branding, LLC not have the license?

A. Because it ended.

Q. And when did that end?

A. Toward 2009.

Q. And what was that license for?

A. License was for shoes.

Q. What did it -- what did that license allow Ng Branding, LLC to do?

A. To design and develop and sell shoes.

Q. Did Ng Branding, LLC design and develop shoes in connection with Sterling Footwear, Incorporated?

A. What do you mean by in connections?

Page 15

Q. Did they work with Sterling Footwear, Incorporated in any manner, shape or form?

MR. FASEL: Objection. Vague and ambiguous.

THE WITNESS: Oh, they worked separately.

BY MR. PHILLIPS:

Q. But the businesses were staffed by all the same employees?

A. Yes.

Q. Sir, and I will just note for the record that you and your counsel just exchanged some sort of communications. Were those communications related to your testimony here today?

A. Uh-uh. Excuse me?

Q. What were those communications related to?

MR. FASEL: Objection.

I'm going to instruct the witness not to answer as it violates attorney-client privileged communications.

BY MR. PHILLIPS:

Q. Sir, are you going to abide by your attorney's instruction to not answer this question?

A. Yes.

Q. Fine.

Sir, when Ng Branding, LLC was created, was any money invested in the corporation?

Page 16

A. I believe so.

Q. Who invested money in that corporation?

A. I did.

Q. Did anyone else invest money in Ng Branding, LLC?

A. No.

Q. How did you invest money into Ng Branding, LLC?

A. You mean in form of a check or -- is that what your question is?

Q. Yes, sir. My question is, one -- my question is actually twofold. First is: How did you actually physically invest the money into Ng Branding, LLC? And then my follow-up question is: How much money did you invest?

MR. FASEL: I'm going to object as to compound.

MR. PHILLIPS: And that's fine.

BY MR. PHILLIPS:

Q. If you can take the first one, sir.

A. I --

Q. Let's start with the first one: How much money did you invest in Ng Branding, LLC?

A. It will be an estimate. About -- over 100.

Q. And how did you invest that money in Ng

Page 17

Branding, LLC?

A. In the bank account.

Q. And when Ng Branding, LLC stopped doing business around 2010, did you receive any money back from the corporation?

A. I don't remember. It's been so long.

Q. Are there any documents that refresh your recollection of whether or not you received money from the corporation?

A. Yes, tax return.

Q. And where are those tax returns maintained?

A. My CPA would have them.

Q. And did you provide your CPA with the documents you have in your possession regarding any income you would have received from Ng Branding, LLC?

A. Yes.

Q. Sir, in response to -- sir, in response to document requests in this case -- and I'm looking for general answers -- did Ng Branding, LLC conduct any search of any files to determine whether it was in possession of responsive documents?

A. Did -- did I do any research to locate the document; is that your question, sir?

Q. I was looking for the company specifically. But I'd also like to hear, after that, whether you did

Page 18

anything specifically.

My question is: Did the company, Ng Branding, LLC, take any steps to gather or collect documents that it may have had in its possession that were responsive to requests made in this case?

A. Yes.

Q. What did it -- what steps did that company take?

A. What -- looking for -- are you talking about looking for documents?

Q. Yes.

A. Well, the documents was -- we looked for the document a while back and we submit everything to the attorney, if that's -- if that makes sense.

Q. I understand that, sir. I'm -- I'm looking for some specifics about what steps either you or any other employee of Ng Branding, LLC took to collect documents that they had in their possession.

MR. FASEL: Objection. Compounds. Calls for speculation.

THE WITNESS: I don't remember.

BY MR. PHILLIPS:

Q. Did you do any investigation, prior to your testimony today, to ascertain what steps Ng Branding, LLC took to collect documents that it may have had in

Page 19

its possession?

A. No.

Q. Has any employee of -- was any employee of Ng Branding, LLC contacted by the company in response to this case?

A. Not that I know of.

Q. Going back to when Ng Branding, LLC went inactive, which I believe you testified was 2010 --

MR. FASEL: Objection. Can we -- I'm sorry, but can we just not use active and inactive? It stopped doing business or began doing business. Because it really is confusing as regards to the status of the corporation.

BY MR. PHILLIPS:

Q. Sir, what -- what terminology do you use when discussing whether the corporations for which you are president and CEO are actively doing busy? I just want to use the terminology you use. So how do you refer to Ng Branding, LLC as of today?

A. That it stopped doing business.

Q. Okay. That it stopped doing business.

And so when you used the term active, you mean doing business and inactive do you mean it's not doing business?

A. Yes.

Page 20

Q. Okay. So back to my question, sir: Going to the time when Ng Branding, LLC stopped doing business -- which I understand is approximately 2010?

A. --

Q. Did the company have any assets that -- did it have any assets at that time?

A. To my knowledge, I don't think so.

Q. Did it have any accounts receivable at that time?

A. Not that I know of.

Q. Did Ng Branding, LLC have any office equipment that wasn't office equipment used by Sterling Footwear, Incorporated at that time?

A. They shared the equipment, like the printers.

Q. So all of the equipment used for Sterling Footwear, Incorporated was the same equipment used for Ng Branding, LLC?

A. Some of it.

Q. What was different?

A. Maybe the computer.

Q. Which computers?

A. The computer in the office.

Q. Were there different -- how many computers were there for each of these companies?

A. I don't know.

Page 21

Q. Did you do anything to investigate how many computers there were for each of these companies?

A. No.

Q. All right. Sir, I'm going to show you one more document. I just want to ask you to identify this document.

MR. PHILLIPS: We will mark this as Exhibit 2.

(Whereupon Exhibit 2 was marked for identification.)

BY MR. PHILLIPS:

Q. And, sir, what I've handed you is a photocopy of a driver's license. Do you recognize this driver's license as your current driver's license?

A. Yes.

Q. And the information in this driver's license, with respect to the address, is that your current residence in California?

A. No.

Q. What is your current residence in California?

A. I don't have -- I'm just staying at my brother's house when I'm here.

Q. The address that's listed on this license, what is this address?

A. It's my sister's home.

Q. And how often during the year do you stay at

6 (Pages 18 to 21)

Page 22

your sister's home?

A. I don't.

Q. You don't what?

A. I don't stay there.

Q. Did you ever stay at this address listed on this license?

A. Not that I recall.

Q. Do you receive mail at this address?

A. Not that I remember.

Q. At what address do you receive mail in the United States?

MR. FASEL: Objection. Assumes facts not in evidence.

THE WITNESS: I don't really have any mail.

BY MR. PHILLIPS:

Q. Do you have any P.O. Box that you use in the United States?

A. Yes.

Q. What is that address?

A. 333 West Garvey Avenue, Monterey Park, California --

[Reporter requests clarification.]

THE WITNESS: -- Monterey Park, California, 91754.

BY MR. PHILLIPS:

Page 23

Q. Sir, do you own a car?

A. A van.

Q. And where is that van registered?

A. My name.

Q. I understand it's in your name.
Where -- in what state is that van registered?

A. California.

Q. And what is the address of the registration of that van?

A. Oh, I don't know.

Q. Is it the same address that you used on your California driver's license?

A. I don't know. I have to look.

Q. And when did you purchase this van?

A. Many years ago. I don't know when.

Q. What do you use this van for?

A. When I commute.

Q. Commute to where?

A. When I need to go places.

Q. What places are you going?

MR. FASEL: Just object. It is way overly broad.

THE WITNESS: Groceries.

MR. FASEL: Argumentative.

THE WITNESS: Restaurants. Places.

Page 24

BY MR. PHILLIPS:

Q. And how often do you use this van?

MR. FASEL: Objection. Vague and ambiguous. And overly broad.

THE WITNESS: Once in a while, when I'm here.

BY MR. PHILLIPS:

Q. And could you explain a little more what "once in a while" means? Give me some sort of context. Do you use this van weekly? Monthly?

A. No, whenever I'm here.

Q. And how often is that?

A. It depends. Could be a few months I'm here.

Q. Was this van ever used by either Sterling Footwear, Incorporated or Ng Branding, LLC for official work business?

A. I don't -- I don't remember.

Q. Is there anything you could refer to that would refresh your recollection?

A. I have to think about it, because I don't remember it being used for the company.

Q. Does anyone, other than you, use this van?

A. I use it and I just park it at my brother's house.

Q. And where is your brother's house? What's the address of that?

Page 25

A. I don't know his address.

Q. What is your brother's name?

A. Ty Ngo.

Q. And what city does Mr. Ngo live in?

A. Arcadia, California.

Q. Does he own a home at this address that you park your van?

A. Oh, I don't know.

Q. What type of residence is -- is Mr. Ngo living in where you park your van?

A. It's a house.

Q. And does he have a mortgage on the house or pay rent?

MR. FASEL: Objection. Calls for speculation. Asked and answered.

THE WITNESS: I don't know. You have to ask him.

BY MR. PHILLIPS:

Q. Do you provide your brother, Mr. Ngo, any money to park your van at his address?

A. No.

MR. PHILLIPS: I think I'm done. But if you'll give me two minutes, I just want to walk out and confer with --

MR. FASEL: I have, like, three or four

7 (Pages 22 to 25)

Page 26

questions for him.

MR. PHILLIPS: Okay. Can you give me two minutes? I just --

MR. FASEL: Yeah.

MR. PHILLIPS: -- want to --

MR. FASEL: Absolutely.

MR. PHILLIPS: -- confer with Meredith. And then you can throw those questions on as soon as we pass.

MR. FASEL: Sure.

MR. PHILLIPS: We're going to go off the record for a few minutes.

(Recess.)

MR. PHILLIPS: No further questions from the United States.

MR. FASEL: I just have a couple questions. Should only take a minute or so.

EXAMINATION

BY MR. FASEL:

Q. Alex, what was the name that Ng Branding did business under?

A. Under my last name.

Q. Did it do business under the name Ng Branding?

A. Yes, that's correct.

Q. And who decided what the name of the business

Page 27

would be?

A. I am, because I want people to know.

Q. And does -- Ng is your last name, correct?

A. Yes.

Q. So you weren't trying to conceal the fact that you own the business?

MR. PHILLIPS: Objection. Leading.

THE WITNESS: No, because if -- if I was to hide something, I wouldn't use my last name to start up a business.

MR. FASEL: Thank you.

MR. PHILLIPS: One further question, sir.

FURTHER EXAMINATION

BY MR. PHILLIPS:

Q. If you were trying to hide something, what would you call the business?

MR. FASEL: Objection. Improper hypothetical. I'm going to ask you not to answer that question.

BY MR. PHILLIPS:

Q. Please answer the question, sir.

MR. FASEL: Don't -- you're not answering that question.

MR. PHILLIPS: Are you instructing --

MR. FASEL: You're not going to -- he's not

Page 28

going to --

MR. PHILLIPS: -- the witness --

MR. FASEL: -- answer a question on how to commit a crime.

MR. PHILLIPS: I'm asking --

MR. FASEL: That's exactly what you're asking him to do.

MR. PHILLIPS: Are you --

MR. FASEL: Don't answer.

MR. PHILLIPS: -- instructing --

MR. FASEL: Yes, I'm instructing --

MR. PHILLIPS: -- your witness not to answer?

BY MR. PHILLIPS:

Q. Sir, are you following your counsel's instruction?

A. Yes.

Q. Fair enough.

MR. PHILLIPS: And with that, we're done.

(Whereupon, the deposition adjourned at 2:58 p.m.)

-oOo-

Page 29

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____
Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of _____, 2015, and executed the above certificate in my presence.

_____
NOTARY PUBLIC IN AND FOR

_____
County Name

MY COMMISSION EXPIRES:

Alderson Reporting Company
1-800-FOR-DEPO

Page 30

STATE OF CALIFORNIA      )
                         )  ss.
COUNTY OF LOS ANGELES    )

        I, Elizabeth Borrelli, Certified Shorthand
Reporter, Certificate No. 7844, for the State of
California, hereby certify:
        I am the deposition officer that
stenographically recorded the testimony in the
foregoing deposition;
        Prior to being examined the deponent was
first duly sworn by me;
        The foregoing transcript is a true record
of the testimony given;
        Before completion of the deposition,
review of the transcript [ ] was [X] was not
requested.  If requested, any changes made by the
deponent (and provided to the reporter) during the
period allowed are appended hereto.

Dated_____.


                        _____
                        ELIZABETH BORRELLI, CSR 7844

# EXHIBIT H

Alex Ng's Discovery to Government

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:

|  |  |  |  |
|---|---|---|---|
| | ) | | |
| UNITED STATES, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | Court No. | 12-00193 |
| | ) | | |
| STERLING FOOTWEAR, INC., | ) | Hon. Leo M. Gordon | |
| ALEX RYAN NG, and NG BRANDING, | ) | | |
| LLC, | ) | | |
| | ) | | |
| Defendants. | ) | | |
| | ) | | |

## DEFENDANT ALEX NG'S FIRST SET OF INTERROGATORIES, REQUEST FOR PRODUCTION OF DOCUMENTS AND REQUESTS FOR ADMISSION TO PLAINTIFF UNITED STATES OF AMERICA

Defendant, Alex Ng, hereby requests that plaintiff, the United States, answer the following interrogatories under oath, produce to plaintiff the documents and things requested below and respond to the requests for admission in accordance with Rules 33, 34 and 36 of the Rules of the United States Court of International Trade (USCIT), respectively.

Pursuant to USCIT Rule 26(e), these interrogatories, production requests and requests for admission shall be deemed continuing, so as to require supplemental response(s) if plaintiff obtains additional information and/or discovers additional documents after service of their original responses. Supplemental responses shall be served from time to time, but not later than 10 days after the additional information has been obtained by plaintiff.

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

**DEFINITIONS AND INSTRUCTIONS**

(a)      "Plaintiff" refers to the United States, the named plaintiff in the above-captioned civil action, and any of its related or affiliated organizations, agencies, entities and/or persons.

(b)      "Defendant" and/or "defendants" refer individually and/or collectively to Sterling Footwear, Inc., Alex Ng, and Ng Branding, LLC, any parent, other related or affiliated corporation, and/or entity, every person connected with defendants in connection with the matter at issue in this action and/or acting at their direction or on their individual or collective behalf, including, but not limited to, each of their respective agents, representatives, attorneys, or assigns.

(c)      "Complaint" refers to the pleading filed by plaintiff, which commenced the above-captioned civil action.

(d)      "Answer" refers to the pleading filed by the named defendants in response to the complaint in the above-captioned civil action.

(e)      As used herein, the term "document" shall have the broadest possible construction under Rule 34(a) of the Federal Rules of Civil Procedure and the USCIT Rules, and includes, without limiting the generality of the foregoing, the original or any copies, regardless of origin or location, of every writing or record of every type and description that is or has been in the possession, control, or custody of plaintiff or of which plaintiff has knowledge, including: correspondence, publications, books, pamphlets, periodicals, letters, calendar or diary entries, memorandums, telegrams, cables, reports, records, resumes, recommendations, studies, stenographic or handwritten notes, summaries of records of personal conversations or interviews, working papers or drafts, invoices, vouchers, checks, statements, degrees, diplomas, certificates,

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

transcripts, awards, evaluations, charts, graphs, maps, diagrams, blueprints, charges, petitions, affidavits, tables, records, logs, indexes, pictures, voice recordings, tapes, electronically stored data, microfilm, data sheets or data processing cards or disks, electronic mail (e-mail), facsimile transmissions, computer disks, computer hard drives or any other written, typed, printed, recorded, transcribed, punched, taped, filmed, photographed or graphic matter, and any other method used to communicate thoughts, ideas or information, however produced or reproduced, to which plaintiff has or has had access, and copies or reproductions of any of the above that differ in any respect from the original, such as copies containing marginal notations or other variations, and all other records or writings, however produced or reproduced, to which plaintiff has or has had access. Designated documents are to be taken as including all attachments, exhibits, enclosures, appendices and other documents that relate to or refer to such designated documents.

(f)　　"Person" means and includes natural persons, firms, partnerships, corporations, proprietorships, associations, governmental bodies, and any other organizations or entities.

(g)　　"Date" means the exact day, month, and year, if ascertainable, or, if not, the best available approximation (including relationship to other events).

(h)　　As used herein, "thing" shall have the broadest possible meaning and includes, without limiting the generality of the foregoing: any tangible object, as distinguished from a document, concept, quality, etc.; any inanimate object; any item; personal belonging; article or device, etc., used for some purpose, for example, a CD (also referred to as a compact disc), a DVD (also known as a digital versatile disc or digital video disc), any other optical storage media format; any article, part, piece, or item which is not at issue in this civil action or a sample

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

thereof; and, any article not encompassed by or within the meaning of "document" as defined above.

(i)     "Identify" shall have the following meanings: (1) When used in reference to an individual, the term means and requires that the response state the full name, present or last known address (designating which), present or last known telephone number and electronic mail address (designating which), present or last known business address (designating which), last known place of employment, and any past or present affiliation with the defendants (including their professional titles and duties and responsibilities at their place of employment during the period on and between January 1, 2007 and December 31, 2009). (2) When used in reference to a firm, partnership, corporation, proprietorship, association, or other organization or entity, the term means and requires that the response state the full name, the present or last known address of the organization or entity, present or last known telephone number and electronic mail address (designating which), the identity of any employees at the organization with whom plaintiff may have had regular contact, and any past or present affiliation with the plaintiff (including any duties and responsibilities they may have had with the respect to the plaintiff during the period on and between January 1, 2007 and December 31, 2009). (3) When used in reference to a document, the term means and requires that the response state the following: the type of document (*e.g.*, a letter, memorandum, note) or some other means of identifying it (*i.e.*, the title of the document, if any); the date, author, sender, recipient, and the identity of the person signing it; synopsis of its content; and its present location and/or custodian. In lieu of providing identification of a document, the plaintiff may attach a copy of the document to its responses to the interrogatory, identifying the interrogatory to which it is responsive. In the event that a

document was, but is no longer, in the possession, custody or control of plaintiff, plaintiff must state what disposition was made of it and where, when, why, and by whom the disposition was made. (4) When used in reference to a source of information, the term means and requires that the response shall identify each individual who provided information. The response shall also state whether the information has been reduced to writing or other tangible form and, if so, this writing or other record shall be identified in the manner described in subparagraph (3) above.

(j)     "Describe" or "state," as used in the interrogatories, means and/or requires the following:

(1)  A detailed and full account of an act or event by reference to underlying facts rather than ultimate facts or conclusions of law or facts.

(2)  The disclosure of:

(a) the identity of each person involved in each such act or event, including, but not limited to persons employed by plaintiff and those persons purporting to act for plaintiff;

(b)  the specific acts of each person participating in each such event;

(c)  the date and time of each such act or event;

(d)  the address and location of each such act or event; and

(e)  the identity of each person present during each such act or event.

(k)     The word "explain" means to state with specificity each and every fact, ultimate fact, particular circumstances, incident, act, omission, detail, and event that relates to the reference, contention or response.

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(m) "Concerning" and "relating to" mean directly or indirectly containing, constituting, discussing, describing, identifying, supporting, explaining, regarding, contradicting, embodying, comprising, reflecting, analyzing, referring to, dealing with, commenting on, responding to, or is in any way relevant to a given subject matter (including, without limitation, documents regarding or referring to the presentation of other documents). These terms have similar meanings in connection with document production requests in that a document "concerning" or "relating to" a given subject matter, as used herein, means a document that directly or indirectly constitutes, embodies, comprises, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, contains information regarding, or is in any way relevant to that subject matter, including, without limitation, documents regarding or referring to the presentation of other documents.

(n) "You" and "your" as used herein, refers to Plaintiff in this action, United States of America.

(o) "Mr. Ng" as used herein, refers to defendant in this action, Alex Ng.

(p) "Sterling" as used herein, refers to defendant in this action, Sterling Footwear, Inc.

(q) "Ng Branding" as used herein, refers to defendant in this action, Ng Branding, LLC.

(r) "HTSUS" as used herein, refers to the Harmonized Tariff Schedule of the United States of America.

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(s)     In responding to the documents requests, plaintiff is to furnish all available information, including information in the possession of its attorneys, investigators, or any other person acting on their behalf.

(t)     In responding to these discovery requests, all requested documents in plaintiff's "possession, custody or control" are to be produced. This includes documents in the possession, custody or control of its attorneys, investigators, or any third party or parties to whom plaintiff has surrendered possession, custody or control, or who are acting on plaintiff's behalf, or who have otherwise obtained possession, custody or control, or who, upon plaintiff's request, would surrender possession, custody or control to plaintiff.

(u)     If plaintiff cannot produce a document, sample or thing after exercising due diligence to secure it, plaintiff shall so state in writing and shall produce whatever portion of said document that is possible to produce. In such case, plaintiff shall specify, in writing, its inability to respond to the remainder of the document request and shall state whatever information or knowledge defendants have concerning the document that plaintiff is unable to produce, including, but not limited to, the content of such document.

(p)     In the event that any document called for by this request has been destroyed, that document is to be identified in writing as follows: addressor, addressee, indicated or blind copies, date, subject matter and content, number of pages, attachments, exhibits and appendices, all persons to whom the document was distributed, shown, summarized or explained, date of destruction, manner of destruction, reason for destruction, person(s) who authorized destruction, and person(s) who destroyed the document(s).

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(q)     If any document falling within any description contained in any of the following requests is withheld under claim of privilege, plaintiff shall serve upon the undersigned attorneys for defendants a written list of the withheld documents, including the following information as to each of such items: (1) date; (2) the name(s) of the person(s) or other entity or entities who or which drafted, authored, or prepared it; (3) its title; (4) type of document (*e.g.*, letter, memorandum, telegram, etc.); (5) the name(s) of the person(s) or other entity or entities to whom or which it was addressed; (6) the name(s) of each person or entity to whom or which the item or any copy or reproduction thereof was ever directed, addressed, sent, delivered, mailed, given, or in any other manner disclosed; and (7) a statement of the ground or grounds upon which each such document is considered to be privileged from production.

(r)     Each request for document production contemplates the production of every document in its entirety, without abbreviation, redaction, or expurgation. If any portion of any document falling within any description contained in any of the following requests is abbreviated, redacted, or expurgated for any reason, defendants shall serve upon the undersigned attorneys for plaintiff the following information as to each abbreviation, redaction, or expurgation: (1) the date of the document; (2) the name(s) of the person(s) or other entity or entities who or which drafted, authored, or prepared the document; (3) the title of the document; (4) type of document (for example, letter, memorandum, telegram, etc.); (5) the name(s) of the person(s) or other entity or entities to whom or which it was addressed; (6) the name(s) of each person or entity to whom or which the document or any copy or reproduction thereof was ever directed, addressed, sent, delivered, mailed, given or in any other manner disclosed (including, summaries or explanations of content or subject matter); (7) a statement as to whether the

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

document was produced to the persons identified in (6) above in its entirety; (8) a description of the redacted material; (9) the identity of the person(s) who directed or authorized the redaction; (10) the identity of the person(s) who redacted the document; (11) the date and time the document was redacted; (12) identification of all persons who witnessed the redaction; and (13) a detailed explanation of the ground or grounds upon which redaction was made.

(s)     Plaintiff is requested, pursuant to Fed. R. Civ. P. 34 and/or USCIT Rule 34(b), to produce the documents as they are kept in the usual course of business and shall organize and label the documents produced to correspond with the categories of documents set forth in this request.

## INTERROGATORIES

INTERROGATORY NO. 1:

(a)     State all facts which you contend support "COUNT I" as alleged against Mr. Ng in your complaint.

(b)     Identify all documents which you contend supports "COUNT I" as alleged against Mr. Ng in your complaint.

(c)     Identify all persons which you contend have knowledge of any fact which you contend supports "COUNT I" as alleged against Mr. Ng in your complaint.

INTERROGATORY NO. 2:

(a)     State all facts which you contend support "COUNT II" as alleged against Mr. Ng in your complaint.

(b)     Identify all documents which you contend supports "COUNT II" as alleged against Mr. Ng in your complaint.

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(c)    Identify all persons which you contend have knowledge of any fact which you contend supports "COUNT II" as alleged against Mr. Ng in your complaint.

INTERROGATORY NO. 3:

(a)    State all facts which you contend support "COUNT III" as alleged against Mr. Ng in your complaint.

(b)    Identify all documents which you contend supports "COUNT III" as alleged against Mr. Ng in your complaint.

(c)    Identify all persons which you contend have knowledge of any fact which you contend supports "COUNT III" as alleged against Mr. Ng in your complaint.

INTERROGATORY NO. 4:

(a)    Identify each entry misclassification you allege Mr. Ng is liable for of the "337" alleged misclassifications identified in paragraph 45 of your complaint.

(b)    For each misclassification identified in paragraph (a) above, identify all facts upon which you contend the entry was misclassified.

(c)    For each misclassification identified in paragraph (a) above, identify all documents that you contend support your allegation that the entries were misclassified.

(d)    For each misclassification identified in paragraph (a) above, identify all person(s) you contend have knowledge of any fact that supports your allegation that the entries were misclassified.

INTERROGATORY NO. 5:

(a)    State all facts which you contend support your allegation that "Mr. Ng engaged in a pattern of illegal conduct" as alleged in paragraph 42 of your complaint.

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(b)     Identify all persons which you contend have knowledge of any fact that supports your contention that "Mr. Ng engaged in a pattern of illegal conduct" as alleged in paragraph 42 of your complaint.

(c)     Identify all documents which you contend support your contention that "Mr. Ng engaged in a pattern of illegal conduct" as alleged in paragraph 42 of your complaint.

(d)     Identify all affirmative acts performed personally by Mr. Ng that are "illegal conduct" as alleged in paragraph 42 of the complaint.

INTERROGATORY NO. 6:

(a)     State all facts which you contend support your allegation that Mr. Ng "knowingly participated in a scheme to avoid millions of dollars in duties" as alleged in paragraph 42 of your complaint.

(b)     Identify all persons which you contend have knowledge of any fact that supports your contention that Mr. Ng "knowingly participated in a scheme to avoid millions of dollars in duties" as alleged in paragraph 42 of your complaint.

(c)     Identify all documents which you contend support your contention that Mr. Ng "knowingly participated in a scheme to avoid millions of dollars in duties" as alleged in paragraph 42 of your complaint.

(d)     Identify all affirmative acts performed personally by Mr. Ng in furtherance of the "scheme" Mr. Ng "knowingly participated in" as alleged in paragraph 42 of the complaint.

INTERROGATORY NO. 7:

(a)     State all facts which you contend support your allegation that Mr. Ng entered "Sterling Footwear's merchandise" as alleged in paragraph 42 of your complaint.

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(b)     Identify all persons which you contend have knowledge of any fact that supports your contention that Mr. Ng entered "Sterling Footwear's merchandise" as alleged in paragraph 42 of your complaint.

(c)     Identify all documents which you contend support your contention that Mr. Ng entered "Sterling Footwear's merchandise" as alleged in paragraph 42 of your complaint.

(d)     Identify all affirmative acts performed personally by Mr. Ng in entering "Sterling Footwear's merchandise" as alleged in paragraph 42 of the complaint.

INTERROGATORY NO. 8:

 (a)     State all facts which you contend support your allegation that "Mr. Ng engaged in a pattern of illegal conduct whereby he knowingly participated in a scheme to avoid millions of dollars in duties" as alleged in paragraph 43 of your complaint.

(b)     Identify all persons which you contend have knowledge of any fact that supports your contention that "Mr. Ng engaged in a pattern of illegal conduct whereby he knowingly participated in a scheme to avoid millions of dollars in duties" as alleged in paragraph 43 of your complaint.

(c)     Identify all documents which you contend support your contention that "Mr. Ng engaged in a pattern of illegal conduct whereby he knowingly participated in a scheme to avoid millions of dollars in duties" as alleged in paragraph 43 of your complaint.

(d)     Identify all affirmative acts performed personally by Mr. Ng in furtherance of the "scheme" Mr. Ng "knowingly participated in" as alleged in paragraph 43 of the complaint.

(e)     Identify all affirmative acts performed personally by Mr. Ng that were "illegal conduct" as alleged in paragraph 42 of the complaint.

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

<u>INTERROGATORY NO. 9</u>:

(a)     State all facts which you contend support your allegation that "Once CBP made inquiries regarding a company's questionable importation practices and potential violations, Mr. Ng, the sole corporate officer, ceased operations and recommenced importation under the name of another corporate entity" as alleged in paragraph 43 of your complaint.

(b)     Identify all persons which you contend have knowledge of any fact that supports your contention that "Once CBP made inquiries regarding a company's questionable importation practices and potential violations, Mr. Ng, the sole corporate officer, ceased operations and recommenced importation under the name of another corporate entity" as alleged in paragraph 43 of your complaint.

(c)     Identify all documents which you contend support your contention that "Once CBP made inquiries regarding a company's questionable importation practices and potential violations, Mr. Ng, the sole corporate officer, ceased operations and recommenced importation under the name of another corporate entity"  as alleged in paragraph 43 of your complaint.

<u>INTERROGATORY NO. 10</u>:

(a)     Do you contend that Mr. Ng personally made classification determinations pursuant to HTSUS on behalf of Sterling or Ng Branding?

(b)     If your response to subparagraph (a) above is in the affirmative, identify each and every of the alleged "337 . . . misclassifications" Mr. Ng personally made the entry classification pursuant to HTSUS.

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(c)     For each of the classifications identified in response to subparagraph (b) above, state all facts which support your contention that Mr. Ng personally made the entry classification pursuant to HTSUS.

(d)     For each of the classifications identified in response to subparagraph (b) above, identify all documents which support your contention that Mr. Ng personally made the entry classification pursuant to HTSUS.

(e)     For each of the classifications identified in response to subparagraph (b) above, identify all persons that have knowledge of facts which support your contention that Mr. Ng personally made the entry classification pursuant to HTSUS.

(f)     For each of the classifications identified in response to subparagraph (b) above, identify all date(s) Mr. Ng personally made the entry classification pursuant to HTSUS.

(g)     State all affirmative acts performed personally by Mr. Ng in misclassifying any of the alleged "337 . . . misclassifications".

INTERROGATORY NO. 11:

(a)     Do you contend that Mr. Ng directed any person to misclassify any of the "337 . . . misclassifications" pursuant to HTSUS on behalf of Sterling or Ng Branding?

(b)     If your response to subparagraph (a) above is in the affirmative, identify each and every of the alleged "337 . . . misclassifications" Mr. Ng directed any person to misclassify pursuant to HTSUS.

(c)     For each of the classifications identified in response to subparagraph (b) above, state all facts which support your contention that Mr. Ng directed any person to misclassify the entry pursuant to HTSUS.

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(d)     For each of the classifications identified in response to subparagraph (b) above, identify all documents which support your contention that Mr. Ng directed any person to misclassify the entry pursuant to HTSUS.

(e)     For each of the classifications identified in response to subparagraph (b) above, identify all persons that have knowledge of facts which support your contention that Mr. Ng directed any person to misclassify the entry pursuant to HTSUS.

(f)     For each of the classifications identified in response to subparagraph (b) above, identify all persons Mr. Ng directed to misclassify any entry pursuant to HTSUS.

(g)     For any person identified in response to subparagraph (f) above, identify each and every date Mr. Ng directed the identified person to misclassify any entry pursuant to HTSUS.

(h)     For any person identified in response to subparagraph (f) above, identify the method by which Mr. Ng communicated to the identified person to misclassify any entry pursuant to HTSUS.

(i)     Describe in detail how Mr. Ng directed any person to misclassify any of the "337 . . . misclassifications".

(j)     State all affirmative acts performed personally by Mr. Ng in directing any person to misclassify any of the "337 . . . misclassifications".

INTERROGATORY NO. 12:

(a)     Do you contend that Mr. Ng authorized any person to misclassify any of the "337 . . . misclassifications" pursuant to HTSUS on behalf of Sterling or Ng Branding?

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(b)     If your response to subparagraph (a) above is in the affirmative, identify each and every of the alleged "337 . . . misclassifications" Mr. Ng authorized any person to misclassify pursuant to HTSUS.

(c)     For each of the classifications identified in response to subparagraph (b) above, state all facts which support your contention that Mr. Ng authorized any person to misclassify the entry pursuant to HTSUS.

(d)     For each of the classifications identified in response to subparagraph (b) above, identify all documents which support your contention that Mr. Ng authorized any person to misclassify the entry pursuant to HTSUS.

(e)     For each of the classifications identified in response to subparagraph (b) above, identify all persons that have knowledge of facts which support your contention that Mr. Ng authorized any person to misclassify the entry pursuant to HTSUS.

(f)     For each of the classifications identified in response to subparagraph (b) above, identify all persons Mr. Ng authorized to misclassify any entry pursuant to HTSUS.

(g)     For any person identified in response to subparagraph (f) above, identify each and every date Mr. Ng authorized the identified person to misclassify any entry pursuant to HTSUS.

(h)     For any person identified in response to subparagraph (f) above, identify the method by which Mr. Ng communicated to the identified person that they were authorized to misclassify any entry pursuant to HTSUS.

(i)     Describe in detail how Mr. Ng authorized any person to misclassify any of the "337 . . . misclassifications".

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(j)     State all affirmative acts performed personally by Mr. Ng in authorizing any person to misclassify any of the "337 . . . misclassifications".

INTERROGATORY NO. 13:

(a)     Do you contend that Mr. Ng assisted any person in misclassifying any of the "337 . . . misclassifications" pursuant to HTSUS on behalf of Sterling or Ng Branding?

(b)     If your response to subparagraph (a) above is in the affirmative, identify each and every of the alleged "337 . . . misclassifications" Mr. Ng assisted any person in misclassifying pursuant to HTSUS.

(c)     For each of the classifications identified in response to subparagraph (b) above, state all facts which support your contention that Mr. Ng assisted any person in the misclassification of any entry pursuant to HTSUS.

(d)     For each of the classifications identified in response to subparagraph (b) above, identify all documents which support your contention that Mr. Ng assisted any person in the misclassification of any entry pursuant to HTSUS.

(e)     For each of the classifications identified in response to subparagraph (b) above, identify all persons that have knowledge of facts which support your contention that Mr. Ng assisted any person in the misclassification of any entry pursuant to HTSUS.

(f)     For each of the classifications identified in response to subparagraph (b) above, identify all persons Mr. Ng assisted in misclassifying any entry entry pursuant to HTSUS.

(g)     For any person identified in response to subparagraph (f) above, identify each and every date Mr. Ng assisted the identified person in misclassifying any entry pursuant to HTSUS.

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(h)     Describe in detail how Mr. Ng assisted any person to misclassify any of the "337 . . . misclassifications".

(i)     State all affirmative acts performed personally by Mr. Ng in assisting any person to misclassify any of the "337 . . . misclassifications".

INTERROGATORY NO. 14:

(a)     Do you contend Mr. Ng ever personally communicated with Sterling or Ng Branding's customs brokers regarding classification of Sterling or Ng Branding's entries?

(b)     If your response to subparagraph (a) above is in the affirmative, identify each and every custom broker Mr. Ng personally communicated with regarding classification of Sterling or Ng Branding's entries.

(c)     If your response to subparagraph (a) above is in the affirmative, identify each and every document that supports your contention that Mr. Ng personally communicated with Sterling or NG Branding's customs broker(s) regarding classification of Sterling or Ng Branding's entries.

(d)     If your response to subparagraph (a) above is in the affirmative, identify each and every person that has knowledge of any fact that supports your contention that Mr. Ng personally communicated with Sterling or NG Branding's customs broker(s) regarding classification of Sterling or Ng Branding's entries.

(e)     If your response to subparagraph (a) above is in the affirmative, identify the date of each and every communication Mr. Ng personally had with any of Sterling or NG Branding's customs broker(s) regarding classification of Sterling or Ng Branding's entries.

INTERROGATORY NO. 15:

(a)     Do you contend that Mr. Ng personally participated in any classification of the alleged "337 . . . misclassifications" pursuant to HTSUS on behalf of Sterling or Ng Branding?

(b)     If your response to subparagraph (a) above is in the affirmative, identify each and every of the alleged "337 . . . misclassifications" Mr. Ng personally participated in the classification.

(c)     For each of the classifications identified in response to subparagraph (b) above, state all facts which support your contention that Mr. Ng personally participated in the classification.

(d)     For each of the classifications identified in response to subparagraph (b) above, identify all documents which support your contention that Mr. Ng personally participated in the classification.

(e)     For each of the classifications identified in response to subparagraph (b) above, identify all persons that have knowledge of facts which support your contention that Mr. Ng personally participated in the classification.

(i)     State all affirmative acts performed personally by Mr. Ng in participating in any of the "337 . . . misclassifications".

INTERROGATORY NO. 16:

(a)     Do you contend that Mr. Ng had actual personal knowledge that the "337 . . . entries" were "misclassified" pursuant to HTSUS on behalf of Sterling or Ng Branding?

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(b)     If your response to subparagraph (a) above is in the affirmative, identify each and every of the alleged "337 . . . misclassifications" Mr. Ng had actual personal knowledge were "misclassified".

(c)     For each of the misclassifications identified in response to subparagraph (b) above, state all facts which support your contention that Mr. Ng had actual personal knowledge of the identified "misclassification".

(d)     For each of the misclassifications identified in response to subparagraph (b) above, identify all documents which support your contention that Mr. Ng had actual personal knowledge of the identified "misclassification".

(e)     For each of the misclassifications identified in response to subparagraph (b) above, identify all persons that have knowledge of facts which support your contention that Mr. Ng had actual personal knowledge of the identified "misclassification".

INTERROGATORY NO. 17:

(a)     Do you contend that Mr. Ng was personally negligently responsible for any of the alleged "337 . . . misclassifications" as alleged in the complaint?

(b)     If your response to subparagraph (a) above is in the affirmative, identify each and every of the alleged "337 . . . misclassifications" Mr. Ng was personally negligently responsible for the "misclassification".

(c)     For each of the misclassifications identified in response to subparagraph (b) above, state all facts which support your contention that Mr. Ng was personally negligently responsible for the identified "misclassification".

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(d)     For each of the misclassifications identified in response to subparagraph (b) above, identify all documents which support your contention that Mr. Ng was personally negligently responsible for the identified "misclassification".

(e)     For each of the misclassifications identified in response to subparagraph (b) above, identify all persons that have knowledge of facts which support your contention that Mr. Ng was personally negligently responsible for the identified "misclassification".

(f)     State all affirmative negligent acts performed personally by Mr. Ng in participating in any of the "337 . . . misclassifications".

INTERROGATORY NO. 18:

(a)     Do you contend that Mr. Ng was personally grossly negligently responsible for any of the alleged "337 . . . misclassifications" as alleged in the complaint?

(b)     If your response to subparagraph (a) above is in the affirmative, identify each and every of the alleged "337 . . . misclassifications" Mr. Ng was personally grossly negligently responsible for the "misclassification".

(c)     For each of the misclassifications identified in response to subparagraph (b) above, state all facts which support your contention that Mr. Ng was personally grossly negligently responsible for the identified "misclassification".

(d)     For each of the misclassifications identified in response to subparagraph (b) above, identify all documents which support your contention that Mr. Ng was personally grossly negligently responsible for the identified "misclassification".

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(e)     For each of the misclassifications identified in response to subparagraph (b) above, identify all persons that have knowledge of facts which support your contention that Mr. Ng was personally grossly negligently responsible for the identified "misclassification".

(f)     State all affirmative grossly negligent acts performed personally by Mr. Ng in participating in any of the "337 . . . misclassifications".

INTERROGATORY NO. 19:

(a)     Do you contend that Mr. Ng personally misrepresented "the footwear's components" as alleged in paragraph 49 of the complaint?

(b)     If your response to subparagraph (a) above is in the affirmative, state all facts which support your contention that Mr. Ng personally misrepresented "the footwear's components".

(c)     If your response to subparagraph (a) above is in the affirmative, identify all persons that have knowledge of any fact which supports your contention that Mr. Ng personally misrepresented "the footwear's components".

(d)     If your response to subparagraph (a) above is in the affirmative, identify all documents that support your contention that Mr. Ng personally misrepresented "the footwear's components".

(e)     State all misrepresentations made personally by Mr. Ng relating to "the footwear's components".

(f)     State the date of all misrepresentations stated in response to subparagraph (e) above.

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

(g)     State the method by which Mr. Ng personally communicated the misrepresentations stated in response to subparagraph (e) above.

(h)     State to whom Mr. Ng personally communicated the misrepresentations stated in response to subparagraph (e) above.

## REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to USCIT 34, defendant Sterling Footwear, Inc. requests that plaintiff produce and make available for inspection and copying, within 30 days of the service of this request, at Fasel Law, 610 Newport Center Drive, Suite 810, Newport Beach, California 92660, the categories of documents, samples or things described below.

REQUEST NO. 1:

Produce all documents identified or described in and/or which contain the information upon which plaintiff's responses to Alex Ng's First Set of Interrogatories, above, are based.

## REQUEST FOR ADMISSIONS

Pursuant to USCIT 36, defendant Alex Ng requests that plaintiff respond to the following requests for admission.

REQUEST NO. 1:

Admit Mr. Ng was never the importer of record for any entries described in the complaint.

REQUEST NO. 2:

Admit that Mr. Ng has never been a United States customs broker.

<u>REQUEST NO. 3:</u>

Admit that you have no facts supporting your allegation that "Mr. Ng [personally] engaged in a pattern of illegal conduct" as provided in paragraph 42 of your complaint.

<u>REQUEST NO. 4:</u>

Admit that you have no facts supporting your allegation that Mr. Ng personally "knowingly participated in a scheme to avoid millions of dollars in duties" as provided in paragraph 42 of your complaint.

<u>REQUEST NO. 5:</u>

Admit that because Mr. Ng was never the importer of record regarding the entries described in the complaint, he was not personally required to pay any of the duties pursuant to HTSUS.

<u>REQUEST NO. 6:</u>

Admit that Mr. Ng never entered "Sterling Footwear's merchandise" as alleged in paragraph 42 of your complaint.

<u>REQUEST NO. 7:</u>

Admit that Mr. Ng was not personally negligent in making the "337 subject entries of footwear" as alleged in paragraph 45 of your complaint.

<u>REQUEST NO. 8:</u>

Admit that Mr. Ng was not personally grossly negligent in making the "337 subject entries of footwear" as alleged in paragraph 45 of your complaint.

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

REQUEST NO. 9:

Admit that there are no facts that support your contention that Mr. Ng personally "directed various brokers to enter its merchandise under certain classifications" as alleged in paragraph 42 of your complaint.

REQUEST NO. 10:

Admit that there are no facts that support your contention that Mr. Ng "did not exercise reasonable care when they misclassified the footwear" as alleged in paragraph 55 of your complaint.

REQUEST NO. 11:

Admit there are no facts supporting your contention that "Mr. Ng engaged in a pattern of illegal conduct whereby he knowingly participated in a scheme to avoid millions of dollars in duties" as alleged in paragraph 43 of your complaint.

REQUEST NO. 12:

Admit there are no facts supporting your contention that "Once CBP made inquiries regarding a company's questionable importation practices and potential violations, Mr. Ng, the sole corporate officer, ceased operations and recommenced importation under the name of another corporate entity" as alleged in paragraph 43 of your complaint.

REQUEST NO. 13:

Admit that Ng Branding was formed and operating prior to "CBP" making any "inquiries regarding a company's questionable importation practices and potential violations" as alleged in paragraph 43 of your complaint.

<u>REQUEST NO. 14:</u>

Admit that Mr. Ng never personally made any classification determinations pursuant to HTSUS on behalf of Sterling and Ng Branding.

<u>REQUEST NO. 15:</u>

Admit that there are no facts establishing that Mr. Ng personally made any classification determinations pursuant to HTSUS on behalf of Sterling and Ng Branding.

<u>REQUEST NO. 16:</u>

Admit that Mr. Ng never personally directed any person to misclassify any of the alleged "337 ... misclassifications" pursuant to HTSUS on behalf of Sterling or Ng Branding.

<u>REQUEST NO. 17:</u>

Admit that there are no facts establishing that Mr. Ng personally directed any person to misclassify any of the alleged "337 ... misclassifications" pursuant to HTSUS on behalf of Sterling or Ng Branding.

<u>REQUEST NO. 18:</u>

Admit that Mr. Ng never personally authorized any person to misclassify any of the alleged "337 ... misclassifications" pursuant to HTSUS on behalf of Sterling or Ng Branding.

<u>REQUEST NO. 19:</u>

Admit that there are no facts establishing that Mr. Ng personally authorized any person to misclassify any of the alleged "337 ... misclassifications" pursuant to HTSUS on behalf of Sterling or Ng Branding.

REQUEST NO. 20:

Admit that Mr. Ng never personally assisted any person to misclassify any of the alleged "337 ... misclassifications" pursuant to HTSUS on behalf of Sterling or Ng Branding.

REQUEST NO. 21:

Admit that there are no facts establishing that Mr. Ng personally assisted any person to misclassify any of the alleged "337 ... misclassifications" pursuant to HTSUS on behalf of Sterling or Ng Branding.

REQUEST NO. 22:

Admit that Mr. Ng never personally communicated with Sterling or Ng Branding's custom's brokers regarding any classification of entries.

REQUEST NO. 23:

Admit that there are no facts establishing that Mr. Ng personally communicated with Sterling or Ng Branding's customs brokers regarding any classification of entries.

REQUEST NO. 24:

Admit that Mr. Ng never personally participated in any classification of the alleged "337 . . . misclassifications" pursuant to HTSUS on behalf of Sterling or Ng Branding.

REQUEST NO. 25:

Admit that there are no facts establishing that Mr. Ng personally participated in any classification of the alleged "337 . . . misclassifications" pursuant to HTSUS on behalf of Sterling or Ng Branding.

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

REQUEST NO. 26:

Admit that there are no facts establishing that Mr. Ng personally had any knowledge of that the "337 . . . entries" were "misclassified" pursuant to HTSUS on behalf of Sterling or Ng Branding.

REQUEST NO. 27:

Admit that Mr. Ng was not personally negligently responsible for any of the alleged "337 . . . misclassifications" as alleged in the complaint.

REQUEST NO. 28:

Admit that there are no facts establishing that Mr. Ng was personally negligently responsible for any of the alleged "337 . . . misclassifications" as alleged in the complaint.

REQUEST NO. 29:

Admit that Mr. Ng was not personally grossly negligently responsible for any of the alleged "337 . . . misclassifications" as alleged in the complaint.

REQUEST NO. 30:

Admit that there are no facts establishing that Mr. Ng was personally grossly negligently responsible for any of the alleged "337 . . . misclassifications" as alleged in the complaint.

REQUEST NO. 31:

Admit that Mr. Ng never personally misrepresented "the footwear's components" as alleged in paragraph 49 of the complaint.

REQUEST NO. 32:

Admit that there are no facts establishing that Mr. Ng personally misrepresented "the footwear's components" as alleged in paragraph 49 of the complaint.

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188

Dated: May 27, 2014

FASEL LAW
Attorneys for Defendants
610 Newport Center Drive, Suite 810
Newport Beach, CA 92660
Telephone:     (949) 706-3188
Facsimile:     (949) 606-7002
taf@fasellaw.com

By: /s/ Thomas A. Fasel
Thomas A. Fasel
California Bar No. 239964

<u>**CERTIFICATE OF SERVICE BY OVERNIGHT DELIVERY AND EMAIL**</u>

I, THOMAS A. FASEL, certify that I am an attorney admitted to practice before all the courts of the State of California and the United States Court of International Trade, with offices located at 610 Newport Center Drive, Suite 810, Newport Beach, CA 92660, and that on May 17, 2014, on behalf of the United States, plaintiff herein, I caused the DEFENDANT ALEX NG'S FIRST SET OF INTERROGATORIES, REQUEST FOR PRODUCTION OF DOCUMENTS AND REQUESTS FOR ADMISSION TO PLAINTIFF UNITED STATES OF AMERICA to be served upon:

(1)     MEREDITH A. JOHNSON, Attorney U.S. Customs and Border Protection Office of Associate Chief Counsel Long Beach, CA 90802;

(2)     MIKKI COTTET, Senior Trial Counsel Commercial Litigation Branch Civil Division, U.S. Department of Justice PO Box 480 Ben Franklin Station Washington, DC 20044; Mikki.Cottet@usdoj.gov,

the attorney(s) for plaintiff the United States of America by causing the deposit of a true copy thereof in a U.S. Postal Service mail receptacle, properly enclosed in a securely closed envelope, duly franked or postage prepaid, addressed to said attorney(s) as above indicated; and by electronic means (electronic mail (email)) to Mikki.Cottet@usdoj.gov.

/s/ Thomas A. Fasel
Thomas A. Fasel

Fasel Law
610 Newport Center Drive, Suite 810, Newport Beach, CA 92660
Telephone: 949-706-3188